# EXHIBIT A-1

**BIMCO**

TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS
CODE NAME: SUPPLYTIME 2005                                    PART I

First issued 1975. Revised 1989 and 2005.
Printed by BIMCO's idea
Adopted by International Support Vessel Owners' Association (ISOA), London
Copyright published by BIMCO Copenhagen

| | |
|---|---|
| 1. Place and date of contract<br>Houston, TX January 31, 2014 | |
| 2. Owners/Place of business (full style, address, e-mail and fax no.)<br>Ranger Offshore Mexico, S. de.R.L. de C.VC<br>Ave. Edna 49A Parque Ind. Mundo Maya<br>Cuidad del Carmen, Campeche C.P. 24153, Mexico<br>Tel. 52 930 131 4707<br>t.cunningham@rangeroffshoreinc.com<br>RFC ROM1206196H8 | 3. Charterers/Place of business (full style, address, e-mail and fax no.)<br>Tradeco Infraestructura, S.A. de C.V.<br>Insurgentes Sur 1647 Local D<br>Col. San Jose Insurgentes<br>Delegacion Benito Juarez<br>Mexico, Distrito Federal, C.P. 03900<br>Tel. (55)22822300<br>Email: jose.velazquez@orcanav.com<br>RFC TIN920218SU9 |
| 4. Vessel's name and IMO number (ANNEX A)<br>MV Lewek Toucan<br>IMO number 9374264 | 5. Date of delivery (Cl. 2(a) and (c))<br>January 31, 2014     6. Cancelling date (Cl. 2(a) and (c))<br>February 20, 2014 |
| 7. Port or Place of delivery (Cl. 2(a))<br>Safe Berth, Ingleside, Texas | 8. Port or place redelivery/notice of redelivery (Cl. 2(d))<br>(i) Port or place of redelivery<br>Port of Galveston, Texas, at safe berth Owner's option or other mutually agreed US GOM Port<br><br>(ii) Number of days' notice of redelivery<br>Thirty (30) days |
| 9. Period of hire (Cl. 1(a))<br>One hundred twenty (120) days | 10. Extension of period of hire (optional) (Cl. 1(b))<br>(i) Period of extension<br>1 x 30 day option at Charterer's option<br>2 x 30 day options to be mutually agreed<br><br>(ii) Advance notice for declaration of option (days)<br>45 days |
| 11. Automatic extension period to complete voyage or well (Cl. 1(c))<br>(i) Voyage or well (state which)<br>Voyage<br><br>(ii) Maximum extension period (state number of days)<br>Five (5) days | 12. Mobilisation charge (Cl. 2(b)(i))<br>(i) Lump sum<br>None<br><br>(ii) When due<br>N/A |
| 13. Early termination of charter (state amount of hire payable) (Cl. 31(a))<br>(i) State yes, if applicable<br>N/A<br><br>(ii) If yes, state amount of hire payable<br>N/A | 14 Number of days' notice of early termination (Cl. 31(a))<br>N/A     15. Demobilisation charge (lump sum) (Cl. 2(e) and Cl. 31 (a))<br>N/A |
| 16. Area of operation (Cl. 6(a))<br>Gulf Of Mexico | 17. Employment of vessel restricted to (state nature of services(s)) (Cl. 6(a))<br>Offshore construction and Subsea operations including diving and any other associated duties as directed by Charters but in any event always within Vessel's design criteria for safe operating conditions and class approved certificates. |
| 18. Specialist operations (Cl. 6(a))<br>(i) State if vessel may be used for ROV operations<br>Yes<br><br>(ii) State if vessel may be employed as a diving platform<br>Yes | 19. Bunkers (Cl. 10)<br>(i) Quantity of bunkers on delivery and redelivery<br>To be determined by on hire/off hire survey, however, Owners agree to deliver the Vessel with enough fuel for the transit to Carmen, Mexico.<br><br>(ii) Price of bunkers on delivery<br>N/A<br><br>(iii) Price for bunkers on redelivery<br>Any shortage in fuel on redelivery shall be reimbursed to Owner by Charterer at the then prevailing market rate. Any overages in fuel will be refunded by Owner to Charterer at the then prevailing market rate.<br><br>(iv) Fuel specifications and grades for fuel supplied by Charterers<br>To be provided by Owner prior to delivery |
| 20. Charter hire (state rate and currency) (Cl. 12(a), (d) and (e))<br>USD 90,000 per day, pro rata. Rate excludes survey. Rate excludes VAT. VAT and 6% of all invoices of Owners to be paid in Mexican Pesos converted from US Dollars on the date payment is made. | 21. Extension hire (if agreed, state rate) (Cl 12(b))<br>USD 88,000 per day, pro rata. If Vessel is performing sat. diving related services during extension period, rate is USD 85,000 per day, pro rata. |

continued

(continued)     Supplytime 2005 Time Charter Party for Offshore Service Vessels     PART I

| | |
|---|---|
| 22. Invoicing for hire and other payments (Cl 12(d))<br>(i) State whether to be issued in advance or arrears<br>**Advance, but see additional clause 48.**<br><br>(ii) State by whom to be issued if other than the party stated in Box 2<br>**Box 2**<br><br>(iii) State to whom to be issued if addressee other than stated in Box 3<br>**Box 3** | 23. Payments (state mode and place of payment; also state beneficiary and bank account) (Cl. 12(e))<br>**As per Owners Invoice Instructions** |

| | | |
|---|---|---|
| 24. Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl. 12(e))<br>**See additional clause 48.** | 25. Interest rate payable (Cl. 12(e))<br>**8% APR** | 26. Maximum audit period (Cl. 12(g))<br>**One (1) year** |

| | | |
|---|---|---|
| 27. Meals (state rate agreed) (Cl. 6(c)(i))<br>**Provided by Charterers, see Clause 50.** | 28. Accommodation (state rate agreed) (Cl. 6(c)(i))<br>**See Clause 50.** | 29. Sublet (state amount of daily increment of charter hire) (Cl. 20)<br>**None $0.00** |

30. War Cancellation (indicate countries agreed) (Cl. 23)
**Sub-clause (a) of clause 23 applies**

31. General Average (Place of settlement – only to be filled in if other than London) (Cl. 26)
**Houston, Texas**

32. Taxes (Payable by Owners) (Cl. 30)
**Each party will pay taxes due on its own profits, property, and personnel**

33. Breakdown (State period) (Cl. 31(b)(v))
**Twelve (12) days**

34. Dispute resolution (state (a), (b) or (c) of Cl. 34, as agreed; if (c) agreed also state Place of Arbitration) (Cl. 34)
**Arbitration in Houston under US general maritime law–see additional clause 39**

35. Numbers of additional clauses covering special provisions, if agreed.
**39 - 51**

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting of PART I, including additional clauses, if any agreed and stated in Box 35, and PART II as well as ANNEX "A" and ANNEX "B" as annexed to this Charter. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| *[signature]* | *[signature]* |

## PART II
## SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

**Definitions** 1
"**Owners**" shall mean the party stated in Box 2 2
"**Charterers**" shall mean the party stated in Box 3 3
"**Vessel**" shall mean the vessel named in Box 4 and 4
with particulars stated in ANNEX "A" 5
"**Well**" shall mean the time required to drill, test, 6
complete and/or abandon a single borehole including 7
any side-track thereof. 8
"**Offshore Unit**" shall mean any vessel, offshore 9
installation, structure and/or mobile unit used in offshore 10
exploration, construction, pipe-laying or repair, 11
exploitation or production. 12
"**Employees**" shall mean employees, directors, 13
officers, servants, agents or invitees. 14

1. **Charter Period** 15
   (a) The Owners let and the Charterers hire the Vessel 16
   for the period as stated in Box 9 from the time the Vessel 17
   is delivered to the Charterers. 18
   (b) Subject to Clause 12(b), the Charterers have the 19
   option to extend the Charter Period in direct continuation 20
   for the period stated in Box 10(i), but such an option 21
   must be declared in accordance with Box 10(ii). 22
   (c) The Charter Period shall automatically be 23
   extended for the time required to complete the voyage 24
   or well (whichever is stated in Box 11(i)) in progress, 25
   such time not to exceed the period stated in Box 11(ii). 26

2. **Delivery and Redelivery** 27
   (a) Delivery. - Subject to Clause 2(b) the Vessel shall 28
   be delivered by the Owners free of cargo and with clean 29
   tanks at any time between the date stated in Box 5 and 30
   the date stated in Box 6 at the port or place stated in 31
   Box 7 where the Vessel can safely lie always afloat. 32
   (b) Mobilisation. — 33
   (i) The Charterers shall pay a lump sum mobilisation 34
   charge as stated in Box 12 without discount. 35
   (ii) Should the Owners agree to the Vessel loading 36
   and transporting cargo and/or undertaking any 37
   other service for the Charterers en route to the 38
   port of delivery or from the port of redelivery, then 39
   all terms and conditions of this Charter Party shall 40
   apply to such loading and transporting and/or 41
   other service exactly as if performed during the 42
   Charter Period excepting only that any lump sum 43
   freight agreed in respect thereof shall be payable 44
   and earned on shipment or commencement of 45
   the service as the case may be, the Vessel and/ 46
   or goods lost or not lost. 47
   (c) Cancelling. - If the Vessel is not delivered by 48
   midnight local time on the cancelling date stated in Box 49
   6, the Charterers shall be entitled to cancel this Charter 50
   Party. However, if the Owners will be unable to deliver 51
   the Vessel by the cancelling date, they may give notice 52
   in writing to the Charterers at any time prior to the delivery 53
   date as stated in Box 5 and shall state in such notice the 54
   date by which they will be able to deliver the Vessel. The 55
   Charterers may within 24 hours of receipt of such notice 56
   give notice in writing to the Owners cancelling this Charter 57
   Party. If the Charterers do not give such notice, then the 58
   later date specified in the Owners' notice shall be 59
   substituted for the cancelling date for all the purposes of 60
   this Charter Party. In the event the Charterers cancel 61
   the Charter Party, it shall terminate on terms that neither 62
   party shall be liable to the other for any losses incurred 63
   by reason of the non-delivery of the Vessel or the 64
   cancellation of the Charter Party. 65
   (d) Redelivery. - The Vessel shall be redelivered on 66
   the expiration or earlier termination of this Charter Party 67
   free of cargo and with clean tanks at the port or place 68
   as stated in Box 8(i) or such other port or place as may 69
   be mutually agreed. The Charterers shall give not less 70
   than the number of days notice in writing of their intention 71
   to redeliver the Vessel, as stated in Box 8(ii). 72
   (e) Demobilisation. - The Charterers shall pay a lump 73
   sum demobilisation charge without discount in the amount 74
   as stated in Box 15 which amount shall be paid on the 75
   expiration or on earlier termination of this Charter Party. 76

3. **Condition of Vessel** 77
   (a) The Owners undertake that at the date of delivery 78
   under this Charter Party the Vessel shall be of the 79
   description and Class as specified in ANNEX "A", 80
   attached hereto, and in a thoroughly efficient state of 81
   hull and machinery. 82
   (b) The Owners shall exercise due diligence to 83
   maintain the Vessel in such Class and in every way fit 84
   for the service stated in Clause 6 throughout the period 85
   of this Charter Party. 86

4. **Structural Alterations and Additional Equipment** 87
   The Charterers shall, at their expense, have the option 88
   of making structural alterations to the Vessel or installing 89
   additional equipment with the written consent of the 90
   Owners, which shall not be unreasonably withheld. 91
   Unless otherwise agreed, the Vessel is to be redelivered 92
   reinstated, at the Charterers' expense, to her original 93
   condition. The Vessel is to remain on hire during any 94
   period of these alterations or reinstatement. The 95
   Charterers shall at all times be responsible for repair 96
   and maintenance of any such alteration or additional 97
   equipment. However, the Owners may, upon giving 98
   notice, undertake any such repair and maintenance at 99
   the Charterers' expense, when necessary for the safe 100
   and efficient performance of the Vessel. 101

5. **Survey** 102
   The Owners and the Charterers shall jointly appoint an 103
   independent surveyor for the purpose of determining 104
   and agreeing in writing, the condition of the Vessel, any 105
   anchor handling and towing equipment specified in 106
   ANNEX "A", and the quality and quantity of fuel, 107
   lubricants and water at the time of delivery and redelivery 108
   hereunder. The Owners and the Charterers shall jointly 109
   share the time and expense of such surveys. 110

6. **Employment and Area of Operation** 111
   (a) The Vessel shall be employed in offshore activities 112
   which are lawful in accordance with the law of the place 113
   of the Vessel's flag and/or registration and of the place 114
   of operation. Such activities shall be restricted to the 115
   service(s) as stated in Box 17, and to voyages between 116
   any good and safe port or place and any place or 117
   offshore unit where the Vessel can safely lie always 118
   afloat within the Area of Operation as stated in Box 16 119
   which shall always be within International Navigation 120
   Limits and which shall in no circumstances be exceeded 121
   without prior agreement and adjustment of the Hire and 122
   in accordance with such other terms as appropriate to 123
   be agreed; provided always that the Charterers do not 124
   warrant the safety of any such port or place or offshore 125
   unit but shall exercise due diligence in issuing their 126
   orders to the Vessel as if the Vessel were their own 127
   property and having regard to her capabilities and the 128
   nature of her employment. 129
   Unless otherwise stated in Box 18(i), the Charterers 130
   shall not have the right to use the Vessel for ROV 131
   operations. Unless otherwise stated in Box 18(ii), the 132
   Vessel shall not be employed as a diving platform. 133

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
**SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels**

(b) Relevant permission and licences from responsible authorities for the Vessel to enter, work in and leave the Area of Operation shall be obtained by the Charterers and the Owners shall assist, if necessary, in every way possible to secure such permission and licences. 134-139

(c) The Vessel's Space. - The whole reach and burden and decks of the Vessel shall throughout the Charter Period be at the Charterers' disposal reserving proper and sufficient space for the Vessel's Master, Officers, Crew, tackle, apparel, furniture, provisions and stores. The Charterers shall be entitled to carry, so far as space is available and for their purposes in connection with their operations: 140-147

(i) Persons other than crew members, other than fare paying, and for such purposes to make use of the Vessel's available accommodation not being used on the voyage by the Vessel's Crew. The Owners shall provide suitable provisions and requisites for such persons for which the Charterers shall pay at the rate as stated in Box 27 per meal and at the rate as stated in Box 28 per day for the provision of bedding and services for persons using berth accommodation. 148-157

(ii) Lawful cargo whether carried on or under deck. 158

(iii) Explosives and dangerous cargo whether in bulk or packaged, provided proper notification has been given and such cargo is marked and packed in accordance with the national regulations of the Vessel and/or the International Maritime Dangerous Goods Code and/or other pertinent regulations. Failing such proper notification, marking or packing the Charterers shall indemnify the Owners in respect of any loss, damage or liability whatsoever and howsoever arising therefrom. The Charterers accept responsibility for any additional expenses (including reinstatement expenses) incurred by the Owners in relation to the carriage of explosives and dangerous cargo. 159-172

(iv) Hazardous or noxious substances, subject to Clause 14(f), proper notification and any pertinent regulations. 173-175

~~(d) Laying-up of Vessel. The Charterers shall have the option of laying up the Vessel at an agreed safe port or place for all or any portion of the Charter Period in which case the Hire hereunder shall continue to be paid but, if the period of such lay-up exceeds 30 consecutive days, there shall be credited against such Hire the amount which the Owners shall reasonably have saved by way of reduction in expenses and overheads as a result of the lay-up of the Vessel.~~ 176-184

7. **Master and Crew** 185

(a) (i) The Master shall carry out his duties promptly and the Vessel shall render all reasonable services within her capabilities by day and by night and at such times and on such schedules as the Charterers may reasonably require without any obligations of the Charterers to pay to the Owners or the Master, Officers or the Crew of the Vessel any excess or overtime payments. The Charterers shall furnish the Master with all instructions and sailing directions and the Master and Engineer shall keep full and correct logs accessible to the Charterers or their agents. 186-197

(ii)(1) No Bills of Lading shall be issued for shipments under this Charter Party. 198-199

(2) The Master shall sign cargo documents as directed by the Charterers in the form of receipts that are non-negotiable documents and which are clearly marked as such. 200-203

(3) The Charterers shall indemnify the Owners against all liabilities that may arise from the signing of such cargo documents in accordance with the directions of the Charterers to the extent that the terms of such cargo documents impose more onerous liabilities than those assumed by the Owners under the terms of this Charter Party. 204-210

(b) The Vessel's Crew if required by Charterers will connect and disconnect electric cables, fuel, water and pneumatic hoses when placed on board the Vessel in port as well as alongside the offshore units; will operate the machinery on board the Vessel for loading and unloading cargoes; and will hook and unhook cargo on board the Vessel when loading or discharging alongside offshore units. If the port regulations or the seamen and/ or labour unions do not permit the Crew of the Vessel to carry out any of this work, then the Charterers shall make, at their own expense, whatever other arrangements may be necessary, always under the direction of the Master. 211-222

(c) If the Charterers have reason to be dissatisfied with the conduct of the Master or any Officer or member of the Crew, the Owners on receiving particulars of the complaint shall promptly investigate the matter and if the complaint proves to be well founded, the Owners shall as soon as reasonably possible make appropriate changes in the appointment. 223-229

(d) The entire operation, navigation, and management of the Vessel shall be in the exclusive control and command of the Owners, their Master, Officers and Crew. The Vessel will be operated and the services hereunder will be rendered as requested by the Charterers, subject always to the exclusive right of the Owners or the Master of the Vessel to determine whether operation of the Vessel may be safely undertaken. In the performance of the Charter Party, the Owners are deemed to be an independent contractor, the Charterers being concerned only with the results of the services performed. 230-241

8. **Owners to Provide** 242

(a) The Owners shall provide and pay for all provisions, wages and all other expenses of the Master, Officers and Crew; all maintenance and repair of the Vessel's hull, machinery and equipment as specified in ANNEX "A"; also, except as otherwise provided in this Charter Party, for all insurance on the Vessel, all dues and charges directly related to the Vessel's flag and/or registration, all deck, cabin and engineroom stores, cordage required for ordinary ship's purposes mooring alongside in harbour, and all fumigation expenses and de-ratisation certificates. The Owners' obligations under this Clause extend to cover all liabilities for consular charges appertaining to the Master, Officers and Crew, customs or import duties arising at any time during the performance of this Charter Party in relation to the personal effects of the Master, Officers and Crew, and in relation to the stores, provisions and other matters as aforesaid which the Owners are to provide and/or pay for and the Owners shall refund to the Charterers any sums they or their agents may have paid or been compelled to pay in respect of such liability. 243-263

~~(b) On delivery the Vessel shall be equipped, if appropriate, at the Owners' expense with any towing and anchor handling equipment specified in ANNEX "A".~~ 264-266

9. **Charterers to Provide** 267

(a) While the Vessel is on hire the Charterers shall 268

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

provide and pay for all fuel, lubricants, water, dispersants, firefighting foam and transport thereof, port charges, pilotage and boatmen and canal steersmen (whether compulsory or not), launch hire (unless incurred in connection with the Owners' business), light dues, tug assistance, canal, dock, harbour, tonnage and other dues and charges, agencies and commissions incurred on the Charterers' business, costs for security or other watchmen, and of quarantine (if occasioned by the nature of the cargo carried or the ports visited whilst employed under this Charter Party but not otherwise).

(b) At all times the Charterers shall provide and pay for the loading and unloading of cargoes so far as not done by the Vessel's crew, cleaning of cargo tanks, all necessary dunnage, uprights and shoring equipment for securing deck cargo, all cordage except as to be provided by the Owners, all ropes, slings and special runners (including bulk cargo discharge hoses) actually used for loading and discharging, inert gas required for the protection of cargo, and electrodes used for offshore works, and shall reimburse the Owners for the actual cost of replacement of special mooring lines to offshore units, wires, nylon spring lines etc. used for offshore works, all hose connections and adaptors, and further, shall refill oxygen/acetylene bottles used for offshore works.

(c) Upon entering into this Charter Party or in any event no later than the time of delivery of the Vessel the Charterers shall provide the Owners with copies of any operational plans or documents which are necessary for the safe and efficient operation of the Vessel. All documents received by the Owners shall be returned to the Charterers on redelivery.

(d) The Charterers shall pay for customs duties, all permits, import duties (including costs involved in establishing temporary or permanent importation bonds), and clearance expenses, both for the Vessel and/or equipment, and spares required for, or arising out of, or during this Charter Party. See also clauses 41, 42, and 46.

(e) The Charterers shall pay for any replacement of any anchor handling/towing/lifting wires and accessories which have been placed on board by the Owners or the Charterers, should such equipment be lost, damaged or become unserviceable, other than as a result of the Owners' negligence.

(f) The Charterers shall pay for any fines, taxes or imposts levied in the event that contraband and/or unmanifested drugs and/or cargoes are found to have been shipped as part of the cargo and/or in containers on board. The Vessel shall remain on hire during any time lost as a result thereof. However, if it is established that the Master, Officers and/or Crew are involved in smuggling then any financial security required shall be provided by the Owners.

10. **Bunkers**
(a) *Quantity at Delivery/Redelivery.* – The Vessel shall be delivered with at least the quantity of fuel as stated in Box 19 (i) and the Vessel shall be redelivered with about the same quantity as on delivery, provided always that the quantity of fuels at redelivery is at least sufficient to allow the Vessel to safely reach the nearest port at which fuels of the required type or better are available.

(b) *Purchase Price.* – The Charterers shall purchase the fuels on board at delivery at the price prevailing at the time and port of delivery unless otherwise stated in Box 19 (ii) and the Owners shall purchase the fuels on board at redelivery at the price prevailing at the time and port of redelivery unless otherwise stated in Box 19 (iii). The Charterers shall purchase the lubricants on board at delivery at the list price and the Owners shall purchase the lubricants on board at redelivery at the list price.

(c) *Bunkering.* – The Charterers shall supply fuel of the specifications and grades stated in Box 19 (iv). The fuels shall be of a stable and homogeneous nature and unless otherwise agreed in writing, shall comply with ISO standard 8217:1996 or any subsequent amendments thereof as well as with the relevant provisions of MARPOL. The Chief Engineer shall co-operate with the Charterers' bunkering agents and fuel suppliers and comply with their requirements during bunkering, including but not limited to checking, verifying and acknowledging sampling, reading or soundings, meters etc. before, during and/or after delivery of fuels. During delivery four representative samples of all fuels shall be taken at a point as close as possible to the Vessel's bunker manifold. The samples shall be labelled and sealed and signed by suppliers, Chief Engineer and the Charterers or their agents. Two samples shall be retained by the suppliers and one each by the Vessel and the Charterers. If any claim should arise in respect of the quality or specification or grades of the fuels supplied, the samples of the fuels retained as aforesaid shall be analysed by a qualified and independent laboratory.

(d) *Liability.* – The Charterers shall be liable for any loss or damage to the Owners caused by the supply of unsuitable fuels or fuels which do not comply with the specifications and grades set out in Box 19 (iv) and the Owners shall not be held liable for any reduction in the Vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences arising as a result of such supply.

11. **BIMCO ISPS/MTSA Clause for Time Charter Parties**
(a) (i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(iii) Except as otherwise provided in this Charter Party, loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account.

(b) (i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
## SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

| | |
|---|---|
| provision: | 404 |
| "The Charterers shall provide the Owners with | 405 |
| their full style contact details and, where sub- | 406 |
| letting is permitted under the terms of the charter | 407 |
| party, shall ensure that the contact details of all | 408 |
| sub-charterers are likewise provided to the | 409 |
| Owners". | 410 |
| (ii) Except as otherwise provided in this Charter Party, | 411 |
| loss, damages, expense or delay (excluding | 412 |
| consequential loss, damages, expense or delay) | 413 |
| caused by failure on the part of the Charterers to | 414 |
| comply with this Clause shall be for the Charterers' | 415 |
| account. | 416 |
| (c) Notwithstanding anything else contained in this | 417 |
| Charter Party all delay, costs or expenses whatsoever | 418 |
| arising out of or related to security regulations or | 419 |
| measures required by the port facility or any relevant | 420 |
| authority in accordance with the ISPS Code/MTSA | 421 |
| including, but not limited to, security guards, launch | 422 |
| services, tug escorts, port security fees or taxes and | 423 |
| inspections, shall be for the Charterers' account, unless | 424 |
| such costs or expenses result solely from the Owners' | 425 |
| negligence. All measures required by the Owners to | 426 |
| comply with the Ship Security Plan shall be for the | 427 |
| Owners' account. | 428 |
| (d) If either party makes any payment which is for the | 429 |
| other party's account according to this Clause, the other | 430 |
| party shall indemnify the paying party. | 431 |

12. **Hire and Payments** 432
    (a) <u>Hire.</u> - The Charterers shall pay Hire for the Vessel 433
    at the rate stated in Box 20 per day or pro rata for part 434
    thereof from the time that the Vessel is delivered to the 435
    Charterers until the expiration or earlier termination of 436
    this Charter Party. 437
    (b) <u>Extension Hire.</u> - If the option to extend the Charter 438
    Period under Clause 1(b) is exercised, Hire for such 439
    extension shall, unless stated in Box 21, be agreed 440
    between the Owners and the Charterers. Should the 441
    parties fail to reach an agreement, then the Charterers' 442
    shall not have the option to extend the Charter Period. 443
    (c) <u>Adjustment of Hire.</u> - The rate of hire shall be 444
    adjusted to reflect documented changes, after the date 445
    of entering into the Charter Party or the date of 446
    commencement of employment, whichever is earlier, 447
    in the Owners' costs arising from changes in the 448
    Charterers' requirements, or regulations governing the 449
    Vessel and/or its Crew or this Charter Party or the 450
    application thereof. 451
    (d) <u>Invoicing.</u> - All invoices shall be issued in the 452
    contract currency stated in Box 20. In respect of 453
    reimbursable expenses incurred in currencies other than 454
    the contract currency, the rate of exchange into the 455
    contract currency shall be that quoted by the Central 456
    Bank of the country of such other currency as at the 457
    date of the Owners' invoice. Invoices covering Hire and 458
    any other payments due shall be issued monthly as 459
    stated in Box 22(i) or at the expiration or earlier 460
    termination of this Charter Party. Notwithstanding the 461
    foregoing, bunkers and lubricants on board at delivery 462
    shall be invoiced at the time of delivery. 463
    (e) <u>Payment s.</u> - Payments of Hire, bunker invoices 464
    and disbursements for the Charterers' account shall be 465
    received within the number of days stated in Box 24 466
    from the date of receipt of the invoice. Payment shall 467
    be made in the currency stated in Box 20 in full without 468
    discount to the account stated in Box 23. 469
    However, any advances for disbursements made on 470
    behalf of and approved by the Owners may be deducted 471

from Hire due. 472
if payment is not received by the Owners within 5 473
banking days following the due date the Owners are 474
entitled to charge interest at the rate stated in Box 25 475
on the amount outstanding from and including the due 476
date until payment is received. 477
Where an invoice is disputed, the Charterers shall notify 478
the Owners before the due date and in any event pay 479
the undisputed portion of the invoice but shall be entitled 480
to withhold payment of the disputed portion provided 481
that such portion is reasonably disputed and the 482
Charterers specify such reason. Interest will be 483
chargeable at the rate stated in Box 25 on such disputed 484
amounts where resolved in favour of the Owners. 485
Should the Owners prove the validity of the disputed 486
portion of the invoice, balance payment shall be received 487
by the Owners within 5 banking days after the dispute 488
is resolved. Should the Charterers' claim be valid, a 489
corrected invoice shall be issued by the Owners. 490

(f) (i) Where there is a failure to pay Hire by the due 491
date, the Owners shall notify the Charterers in 492
writing of such failure and further may also suspend 493
the performance of any or all of their obligations 494
under this Charter Party until such time as all the 495
Hire due to the Owners under the Charter Party 496
has been received by the Owners. Throughout any 497
period of suspended performance under this 498
Clause, the Vessel is to be and shall remain on 499
Hire. The Owners' right to suspend performance 500
under this Clause shall be without prejudice to any 501
other rights they may have under this Charter Party. 502
(ii) If after 5 days of the written notification referred 503
to in Clause 12(f)(i) the Hire has still not been 504
received the Owners may at any time while Hire 505
remains outstanding withdraw the Vessel from the 506
Charter Party. The right to withdraw is to be 507
exercised promptly and in writing and is not 508
dependent upon the Owners first exercising the 509
right to suspend performance of their obligations 510
under the Charter Party pursuant to Clause 12(f)(i) 511
above. The receipt by the Owners of a payment 512
from the Charterers after the five day period 513
referred to above has expired but prior to the 514
notice of withdrawal shall not be deemed a waiver 515
of the Owners' right to cancel the Charter Party. 516
(iii) Where the Owners choose not to exercise any of 517
the rights afforded to them by this Clause in 518
respect of any particular late payment of Hire, or 519
a series of late payments of Hire, under the 520
Charter Party, this shall not be construed as a 521
waiver of their right either to suspend performance 522
under Clause 12(f)(i) or to withdraw the Vessel 523
from the Charter Party under Clause 12(f)(ii) in 524
respect of any subsequent late payment under 525
this Charter Party. 526
(iv) The Charterers shall indemnify the Owners in 527
respect of any liabilities incurred by the Owners 528
under the Bill of Lading or any other contract of 529
carriage as a consequence of the Owners' proper 530
suspension of and/or withdrawal from any or all 531
of their obligations under this Charter Party. 532

(g) <u>Audit.</u> - The Charterers shall have the right to 533
appoint an independent chartered accountant to audit 534
the Owners' books directly related to work performed 535
under this Charter Party at any time after the conclusion 536
of the Charter Party, up to the expiry of the period stated 537
in Box 26, to determine the validity of the Owners' 538
charges hereunder. The Owners undertake to make 539

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
## SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

their records available for such purposes at their 540
principal place of business during normal working hours. 541
Any discrepancies discovered in payments made shall 542
be promptly resolved by invoice or credit as appropriate. 543

13. **Suspension of Hire** 544
(a) If as a result of any deficiency of Crew or of the 545
Owners' stores, strike of Master, Officers and Crew, 546
breakdown of machinery, damage to hull or other 547
accidents to the Vessel, the Vessel is prevented from 548
working, no Hire shall be payable in respect of any time 549
lost and any Hire paid in advance shall be adjusted 550
accordingly provided always however that Hire shall 551
not cease in the event of the Vessel being prevented 552
from working as aforesaid as a result of: 553
(i) the carriage of cargo as noted in Clause 6(c)(iii) 554
and (iv); 555
(ii) quarantine or risk of quarantine unless caused by 556
the Master, Officers or Crew having communication 557
with the shore at any infected area not in 558
connection with the employment of the Vessel 559
without the consent or the instructions of the 560
Charterers; 561
(iii) deviation from her Charter Party duties or 562
exposure to abnormal risks at the request of the 563
Charterers; 564
(iv) detention in consequence of being driven into port 565
or to anchorage through stress of weather or 566
trading to shallow harbours or to river or ports 567
with bars or suffering an accident to her cargo, 568
when the expenses resulting from such detention 569
shall be for the Charterers' account howsoever 570
incurred; 571
(v) detention or damage by ice; 572
(vi) any act or omission of the Charterers, their 573
servants or agents. 574
(b) Liability for Vessel not Working. – The Owners' 575
liability for any loss, damage or delay sustained by the 576
Charterers as a result of the Vessel being prevented 577
from working by any cause whatsoever shall be limited 578
to suspension of hire, except as provided in Clause 579
11(a)(iii). 580
(c) Maintenance and Drydocking. – Notwithstanding 581
Clause 13(a), the Charterers shall grant the Owners a 582
maximum of ~~72~~ 24 hours on hire, of which 24 hours shall be 583
cumulative, per month or pro rata for part of a month 584
from the commencement of the Charter Period for 585
maintenance and repairs including drydocking 586
(hereinafter referred to as "maintenance allowance"). 587
The Vessel shall be drydocked at regular intervals. The 588
Charterers shall place the Vessel at the Owners' 589
disposal clean of cargo, at a port (to be nominated by 590
the Owners at a later date) having facilities suitable to 591
the Owners for the purpose of such drydocking. 592
During reasonable voyage time taken in transits 593
between such port and Area of Operation the Vessel 594
shall be on hire and such time shall not be counted 595
against the accumulated maintenance allowance. 596
Hire shall be suspended during any time taken in 597
maintenance repairs and drydocking in excess of the 598
accumulated maintenance allowance. 599
In the event of ~~less time being taken by the Owners for~~ 600
~~repairs and drydocking or, alternatively,~~ the Charterers 601
not making the Vessel available for all or part of this 602
time, the Charterers shall, upon expiration or earlier 603
termination of the Charter Party, pay the equivalent of 604
the daily rate of Hire then prevailing in addition to Hire 605
otherwise due under this Charter Party in respect of all 606
such time ~~not so taken or~~ made available. 607

Upon commencement of the Charter Period, the Owners 608
agree to furnish the Charterers with the Owners' 609
proposed drydocking schedule and the Charterers 610
agree to make every reasonable effort to assist the 611
Owners in adhering to such predetermined drydocking 612
schedule for the Vessel. 613

14. **Liabilities and Indemnities** 614
(a) Definitions 615
For the purpose of this Clause "Owners' Group" shall 616
mean: the Owners, and their contractors and sub- 617
contractors, and Employees of any of the foregoing. 618
For the purpose of this Clause "Charterers' Group" shall 619
mean: the Charterers, and their contractors, sub- 620
contractors, co-venturers and customers (having a 621
contractual relationship with the Charterers, always with 622
respect to the job or project on which the Vessel is 623
employed), and Employees of any of the foregoing. 624
(b) Knock for Knock 625
(i) Owners. - Notwithstanding anything else contained 626
in this Charter Party excepting Clauses 6(c)(iii), 627
9(b), 9(e), 9(f), 10(d), 11, 12(f)(iv), 14 (d), 15 (b), 628
18(c), 26 and 27, the Charterers shall not be 629
responsible for loss of or damage to the property 630
of any member of the Owners' Group, including 631
the Vessel, or for personal injury or death of any 632
member of the Owners' Group arising out of or in 633
any way connected with the performance of this 634
Charter Party, even if such loss, damage, injury or 635
death is caused wholly or partially by the act, 636
neglect, or default of the Charterers' Group, and 637
even if such loss, damage, injury or death is caused 638
wholly or partially by unseaworthiness of any 639
vessel; and the Owners shall indemnify, protect, 640
defend and hold harmless the Charterers from any 641
and against all claims, costs, expenses, actions, 642
proceedings, suits, demands and liabilities 643
whatsoever arising out of or in connection with such 644
loss, damage, personal injury or death. 645
(ii) Charterers. - Notwithstanding anything else 646
contained in this Charter Party excepting Clause 647
11, 15(a), 16 and 26, the Owners shall not be 648
responsible for loss of, damage to, or any liability 649
arising out of anything towed by the Vessel, any 650
cargo laden upon or carried by the Vessel or her 651
tow, the property of any member of the Charterers' 652
Group, whether owned or chartered, including 653
their Offshore Units, or for personal injury or death 654
of any member of the Charterers' Group or of 655
anyone on board anything towed by the Vessel, 656
arising out of or in any way connected with the 657
performance of this Charter Party, even if such 658
loss, damage, liability, injury or death is caused 659
wholly or partially by the act, neglect or default of 660
the Owners' Group, and even if such loss, 661
damage, liability, injury or death is caused wholly 662
or partially by the unseaworthiness of any vessel; 663
and the Charterers shall indemnify, protect, 664
defend and hold harmless the Owners from any 665
and against all claims, costs, expenses, actions, 666
proceedings, suits, demands, and liabilities 667
whatsoever arising out of or in connection with 668
such loss, damage, liability, personal injury or 669
death. 670
(c) Consequential Damages.- 671
Neither party shall be liable to the other for any 672
consequential damages whatsoever arising out of or in 673
connection with the performance or non-performance 674
of this Charter Party, and each party shall protect, defend 675

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels**

and indemnify the other from and against all such claims 676
from any member of its Group as defined in Clause 677
14(a). 678
"Consequential damages" shall include, but not be 679
limited to, loss of use, loss of profits, shut-in or loss of 680
production and cost of insurance, whether or not 681
foreseeable at the date of this Charter Party. 682

(d) Limit-ations.- 683
Nothing contained in this Charter Party shall be 684
construed or held to deprive the Owners or the 685
Charterers, as against any person or party, including 686
as against each other, of any right to claim limitation of 687
liability provided by any applicable law, statute or 688
convention, save that nothing in this Charter Party shall 689
create any right to limit liability. Where the Owners or 690
the Charterers may seek an indemnity under the 691
provisions of this Charter Party or against each other in 692
respect of a claim brought by a third party, the Owners 693
or the Charterers shall seek to limit their liability against 694
such third party. 695

(e) Himalaya Clause.- 696
(i) All exceptions, exemptions, defences, immunities, 697
limitations of liability, indemnities, privileges and 698
conditions granted or provided by this Charter Party 699
or by any applicable statute, rule or regulation for 700
the benefit of the Charterers shall also apply to 701
and be for the benefit of the Charterers' parent, 702
affiliated, related and subsidiary companies; the 703
Charterers' contractors, sub-contractors, co- 704
venturers and customers (having a contractual 705
relationship with the Charterers, always with 706
respect to the job or project on which the Vessel is 707
employed) ; their respective Employees and their 708
respective underwriters. 709
(ii) All exceptions, exemptions, defences, immunities, 710
limitations of liability, indemnities, privileges and 711
conditions granted or provided by this Charter Party 712
or by any applicable statute, rule or regulation for 713
the benefit of the Owners shall also apply to and 714
be for the benefit of the Owners' parent, affiliated, 715
related and subsidiary companies, the Owners' 716
contractors, sub-contractors, the Vessel, its Master, 717
Officers and Crew, its registered owner, its operator, 718
its demise charterer(s), their respective Employees 719
and their respective underwriters. 720
(iii) The Owners or the Charterers shall be deemed 721
to be acting as agent or trustee of and for the 722
benefit of all such persons and parties set forth 723
above, but only for the limited purpose of 724
contracting for the extension of such benefits to 725
such persons and parties. 726

(f) Hazardous or Noxious Subst ances. 727
Notwithstanding any other provision of this Charter Party 728
to the contrary, the Charterers shall always be 729
responsible for any losses, damages or liabilities 730
suffered by the Owners' Group, by the Charterers, or 731
by third parties, with respect to the Vessel or other 732
property, personal injury or death, pollution or otherwise, 733
which losses, damages or liabilities are caused, directly 734
or indirectly, as a result of the Vessel's carriage of any 735
hazardous or noxious substances in whatever form as 736
ordered by the Charterers, and the Charterers shall 737
defend, indemnify the Owners and hold the Owners 738
harmless for any expense, loss or liability whatsoever 739
or howsoever arising with respect to the carriage of 740
hazardous or noxious substances. 741

15. **Pollution** 742
(a) Except as otherwise provided for in Clause 18(c)(iii), 743
the Owners shall be liable for, and agree to indemnify, 744
defend and hold harmless the Charterers against all 745
claims, costs, expenses, actions, proceedings, suits, 746
demands and liabilities whatsoever arising out of actual 747
or threatened pollution damage and the cost of cleanup 748
or control thereof arising from acts or omissions of the 749
Owners or their personnel which cause or allow 750
discharge, spills or leaks from the Vessel, except as may 751
emanate from cargo thereon or therein. 752
(b) The Charterers shall be liable for and agree to 753
indemnify, defend and hold harmless the Owners from 754
all claims, costs, expenses, actions, proceedings, suits, 755
demands, liabilities, loss or damage whatsoever arising 756
out of or resulting from any other actual or threatened 757
pollution damage, even where caused wholly or partially 758
by the act, neglect or default of the Owners, their 759
Employees, contractors or sub-contractors or by the 760
unseaworthiness of the Vessel. 761
(c) The Charterers shall, upon giving notice to the 762
Owners or the Master, have the right (but shall not be 763
obliged) to place on board the Vessel and/or have in 764
attendance at the site of any pollution or threatened 765
incident one or more Charterers' representative to 766
observe the measures being taken by Owners and/or 767
national or local authorities or their respective servants, 768
agents or contractors to prevent or minimise pollution 769
damage and to provide advice, equipment or manpower 770
or undertake such other measures, at Charterers' risk 771
and expense, as are permitted under applicable law 772
and as Charterers believe are reasonably necessary to 773
prevent or minimise such pollution damage or to remove 774
the threat of pollution damage. 775

16. **Wreck Removal** 776
If the Vessel becomes a wreck and is an obstruction to 777
navigation and has to be removed by order of any lawful 778
authority having jurisdiction over the area where the 779
Vessel is placed or as a result of compulsory law, the 780
Owners shall be liable for any and all expenses in 781
connection with the raising, removal, destruction, 782
lighting or marking of the Vessel. 783

17. **Insurance** 784
(a) (i) The Owners shall procure and maintain in 785
effect for the duration of this Charter Party, with 786
reputable insurers, the insurances set forth in 787
ANNEX "B". 788
Policy limits shall not be less than those indicated. 789
Reasonable deductibles are acceptable and shall 790
be for the account of the Owners. 791
(ii) The Charterers shall upon request be named as 792
co-insured. The Owners shall upon request cause 793
insurers to waive subrogation rights against the 794
Charterers (as encompassed in Clause 14(e)(i)). 795
Co-insurance and/or waivers of subrogation shall 796
be given only insofar as these relate to liabilities 797
which are properly the responsibility of the Owners 798
under the terms of this Charter Party. 799
(b) The Owners shall upon request furnish the 800
Charterers with copies of certificates of insurance which 801
provide sufficient information to verify that the Owners 802
have complied with the insurance requirements of this 803
Charter Party. 804
(c) If the Owners fail to comply with the aforesaid 805
insurance requirements, the Charterers may, without 806
prejudice to any other rights or remedies under this 807
Charter Party, purchase similar coverage and deduct 808
the cost thereof from any payment due to the Owners 809

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
## SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

under this Charter Party.

### 18. Saving of Life and Salvage
(a) The Vessel shall be permitted to deviate for the purpose of saving life at sea without prior approval of or notice to the Charterers and without loss of Hire provided however that notice of such deviation is given as soon as possible.

(b) Subject to the Charterers' consent, which shall not be unreasonably withheld, the Vessel shall be at liberty to undertake attempts at salvage, it being understood that the Vessel shall be off-hire from the time she leaves port or commences to deviate and she shall remain off-hire until she is again in every way ready to resume the Charterers' service at a position which is not less favourable to the Charterers than the position at the time of leaving port or deviating for the salvage services. All salvage monies earned by the Vessel shall be divided equally between the Owners and the Charterers, after deducting the Master's, Officers' and Crew's share, legal expenses, value of fuel and lubricants consumed, Hire of the Vessel lost by the Owners during the salvage, repairs to damage sustained, if any, and any other extraordinary loss or expense sustained as a result of the salvage.

The Charterers shall be bound by all measures taken by the Owners in order to secure payment of salvage and to fix its amount.

(c) The Owners shall waive their right to claim any award for salvage performed on property owned by or contracted to the Charterers, always provided such property was the object of the operation the Vessel was chartered for, and the Vessel shall remain on hire when rendering salvage services to such property. This waiver is without prejudice to any right the Vessel's Master, Officers and Crew may have under any title.

If the Owners render assistance to such property in distress on the basis of "no claim for salvage", then, notwithstanding any other provisions contained in this Charter Party and even in the event of neglect or default of the Owners, Master, Officers or Crew:

(i) The Charterers shall be responsible for and shall indemnify the Owners against payments made, under any legal rights, to the Master, Officers and Crew in relation to such assistance.

(ii) The Charterers shall be responsible for and shall reimburse the Owners for any loss or damage sustained by the Vessel or her equipment by reason of giving such assistance and shall also pay the Owners' additional expenses thereby incurred.

(iii) The Charterers shall be responsible for any actual or potential spill, seepage and/or emission of any pollutant howsoever caused occurring within the offshore site and any pollution resulting therefrom wheresoever it may occur and including but not limited to the cost of such measures as are reasonably necessary to prevent or mitigate pollution damage, and the Charterers shall indemnify the Owners against any liability, cost or expense arising by reason of such actual or potential spill, seepage and/or emission.

(iv) The Vessel shall not be off-hire as a consequence of giving such assistance, or effecting repairs under Clause 18(c)(ii), and time taken for such repairs shall not count against time granted under Clause 13(c).

(v) The Charterers shall indemnify the Owners against any liability, cost and/or expense whatsoever in respect of any loss of life, injury, damage or other loss to person or property howsoever arising from such assistance.

### 19. Lien
The Owners shall have a lien upon all cargoes and equipment for all claims against the Charterers under this Charter Party and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned. The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel. Except as provided in Clause 14, the Charterers shall indemnify and hold the Owners harmless against any lien of whatsoever nature arising upon the Vessel during the Charter Period while she is under the control of the Charterers, and against any claims against the Owners arising out of the operation of the Vessel by the Charterers or out of any neglect of the Charterers in relation to the Vessel or the operation thereof. Should the Vessel be arrested by reason of claims or liens arising out of her operation hereunder, unless brought about by the act or neglect of the Owners, the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their own expense put up bail to secure release of the Vessel.

### 20. Sublet and Assignment
(a) Charterers. - The Charterers shall have the option of subletting, assigning or loaning the Vessel to any person or company not competing with the Owners, subject to the Owners' prior approval which shall not be unreasonably withheld, upon giving notice in writing to the Owners, but the original Charterers shall always remain responsible to the Owners for due performance of the Charter Party. The person or company taking such subletting, assigning or loan and their contractors and sub-contractors shall be deemed contractors of the Charterers for all the purposes of this Charter Party. The Owners make it a condition of such consent that additional Hire shall be paid as agreed between the Charterers and the Owners in Box 29, having regard to the nature and period of any intended service of the Vessel.

(b) Owners. - The Owners may not assign or transfer any part of this Charter Party without the written approval of the Charterers, which approval shall not be unreasonably withheld. Approval by the Charterers of such subletting or assignment shall not relieve the Owners of their responsibility for due performance of the part of the services which is sublet or assigned.

### 21. Substitute Vessel
The Owners shall be entitled at any time, whether before delivery or at any other time during the Charter Period, to provide a substitute vessel, subject to the Charterers' prior approval which shall not be unreasonably withheld.

### 22. BIMCO War Risks Clause "CONWARTIME 2004"
(a) For the purpose of this Clause, the words:
(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and
(ii) "War Risks" shall include any actual, threatened or reported: war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(d) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty:-
(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or direc-

tions;
(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;
(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;
(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;
(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

23. **War Cancellation Clause 2004**
Either party may cancel this Charter Party on the outbreak of war (whether there be a declaration of war or not)
(a) between any two or more of the following countries: the United States of America; Russia; the United Kingdom; France; and the People's Republic of China, or,
(b) between the countries stated in Box 30.

24. **BIMCO Ice Clause for Time Charter Parties**
(a) The Vessel shall not be obliged to force ice but, subject to the Owners' prior approval having due regard to its size, construction and class, may follow ice-breakers.
(b) The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights, lightships, markers or buoys have been or are about to be withdrawn by reason of ice, nor where on account of ice there is, in the Master's sole discretion, a risk that, in the ordinary course of events, the Vessel will not be able safely to enter and remain at the port or area or to depart after completion of loading or discharging. If, on account of ice, the Master in his sole discretion considers it unsafe to proceed to, enter or remain at the place of loading or discharging for fear of the Vessel being frozen in and/or damaged, he shall be at liberty to sail to the nearest ice-free and safe place and there await the Charterers' instructions.
(c) Any delay or deviation caused by or resulting from ice shall be for the Charterers' account and the Vessel shall remain on-hire.

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels**

(d) Any additional premiums and/or calls required by the Vessel's underwriters due to the Vessel entering or remaining in any icebound port or area, shall be for the Charterers' account.

25. **Epidemic/Fever**
The Vessel shall not be ordered to nor bound to enter without the Owners' written permission any place where fever or epidemics are prevalent or to which the Master, Officers and Crew by law are not bound to follow the Vessel.
Notwithstanding the terms of Clause 13, Hire shall be paid for all time lost including any lost owing to loss of or sickness to the Master, Officers, Crew or passengers or to the action of the Crew in refusing to proceed to such place or to be exposed to such risks.

26. **General Average and New Jason Clause**
General Average shall be adjusted and settled in London unless otherwise stated in Box 31, according to York-Antwerp Rules, 1994.
Hire shall not contribute to General Average. Should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply:
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, loss or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo.
If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the Owners before delivery".

27. **Both-to-Blame Collision Clause**
If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owners in the navigation or the management of the Vessel, the Charterers will indemnify the Owners against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represent loss of or damage to, or any claim whatsoever of the owners of any goods carried under this Charter Party paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than or in addition to the colliding ships or objects are at fault in respect of a collision or contact.

28. **Health and Safety**
The Owners shall comply with and adhere to all applicable international, national and local regulations pertaining to health and safety, and such Charterers' instructions as may be appended hereto.

29. **Drugs and Alcohol Policy**
The Owners undertake that they have, and shall maintain for the duration of this Charter Party, a policy on Drugs and Alcohol Abuse applicable to the Vessel (the "D & A Policy") that meets or exceeds the standards in the OCIMF Guidelines for the Control of Drugs and Alcohol Onboard Ship 1995 as amended from time to time.
The Owners shall exercise due diligence to ensure that the D & A Policy is understood and complied with on and about the Vessel. An actual impairment, shall not in and itself mean that the Owners have failed to exercise due diligence.

30. **Taxes**
Within the day rate the Owners shall be responsible for the taxes stated in Box 32 and the Charterers shall be responsible for all other taxes.
In the event of change in the Area of Operation or change in local regulation and/or interpretation thereof, resulting in an unavoidable and documented change of the Owners' tax liability after the date of entering into the Charter Party or the date of commencement of employment, whichever is the earlier, Hire shall be adjusted accordingly.

31. **Early Termination**
(a) At Charterers' Convenience. - The Charterers may terminate this Charter Party at any time by giving the Owners written notice of termination as stated in Box 14, upon expiry of which, this Charter Party will terminate. Upon such termination, Charterers shall pay the compensation for early termination stated in Box 13 and the demobilisation charge stated in Box 15, as well as Hire or other payments due under the Charter Party up to the time of termination. Should Box 13 be left blank, Clause 31(a) shall not apply.
(b) For Cause. - If either party becomes informed of the occurrence of any event described in this Clause that party shall so notify the other party promptly in writing and in any case within 3 days after such information is received. If the occurrence has not ceased within 3 days after such notification has been given, this Charter Party may be terminated by either party, without prejudice to any other rights which either party may have, under any of the following circumstances:
(i) Requisition. - If the government of the state of registry and/or the flag of the Vessel, or any agency thereof, requisitions for hire or title or otherwise takes possession of the Vessel during the Charter Period.
(ii) Confiscation. - If any government, individual or group, whether or not purporting to act as a government or on behalf of any government, confiscates, requisitions, expropriates, seizes or otherwise takes possession of the Vessel during the Charter Period (other than by way of arrest for the purpose of obtaining security).
(iii) Bankruptcy. - In the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of either party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed or if it suspends payment or ceases to carry on business.
(iv) Loss of Vessel. – If the Vessel is lost or becomes a constructive total loss, or is missing unless the Owners promptly state their intention to provide, and do in fact provide, within 14 days of the Vessel

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
### SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

being lost or missing, at the port or place from which the Vessel last sailed (or some other mutually acceptable port or place) a substitute vessel pursuant to Clause 21. In the case of termination, Hire shall cease from the date the Vessel was lost or, in the event of a constructive total loss, from the date of the event giving rise to such loss. If the date of loss cannot be ascertained or the Vessel is missing, payment of Hire shall cease from the date the Vessel was last reported.

(v) Breakdown. - If, at any time during the term of this Charter Party a breakdown of the Owners' equipment or Vessel result in the Owners being unable to perform their obligations hereunder for a period exceeding that stated in Box 33 and have not initiated reasonable steps within 48 hours to remedy the non-performance or provided a substitute vessel pursuant to Clause 21.

(vi) Force Majeure. - If a force majeure condition as defined in Clause 32 prevents or hinders the performance of the Charter Party for a period exceeding 15 consecutive days from the time at which the impediment causes the failure to perform if notice is given without delay or, if notice is not given without delay, from the time at which notice thereof reaches the other party.

(vii) Default. - If either party is in repudiatory breach of its obligations hereunder.

Termination as a result of any of the above mentioned causes shall not relieve the Charterers of any obligation for Hire and any other payments.

**32. Force Majeure**
Neither party shall be liable for any loss, damage or delay due to any of the following force majeure events and/or conditions to the extent the party invoking force majeure is prevented or hindered from performing any or all of their obligations under this Charter Party, provided they have made all reasonable efforts to avoid, minimize or prevent the effect of such events and/or conditions:
(a) acts of God;
(b) any Government requisition, control, intervention, requirement or interference;
(c) any circumstances arising out of war, threatened act of war or warlike operations, acts of terrorism, sabotage or piracy, or the consequences thereof;
(d) riots, civil commotion, blockades or embargoes;
(e) epidemics;
(f) earthquakes, landslides, floods or other extraordinary weather conditions;
(g) strikes, lockouts or other industrial action, unless limited to the Employees of the party seeking to invoke force majeure;
(h) fire, accident, explosion except where caused by negligence of the party seeking to invoke force majeure;
(i) any other similar cause beyond the reasonable control of either party.

The party seeking to invoke force majeure shall notify the other party in writing within 2 working days of the occurrence of any such event/condition.

**33. Confidentiality**
All information or data provided or obtained in connection with the performance of this Charter Party is and shall remain confidential and not be disclosed without the prior written consent of the other party. The parties shall use their best efforts to ensure that such information shall not be disclosed to any third party by any of their sub-contractors, Employees and agents. This Clause shall not apply to any information or data that has already been published or is in the public domain.

All information and data provided by a party is and shall remain the property of that party.

**34. BIMCO Dispute Resolution Clause**
*(a) ~~This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause. The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.~~
~~The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.~~
~~Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.~~
~~In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.~~

*(b) ~~This Charter Party shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and any dispute arising out of or in connection with this Charter Party shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purposes of enforcing any award, judgement may be entered on an award by any court of competent jurisdiction. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.~~
~~In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc. current at the time when the arbitration proceedings are commenced.~~

* (c) This Charter Party shall be governed by and construed in accordance with the laws of the place mutually agreed by the parties and any dispute arising out of or in connection with this Charter Party shall be

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

tradeco 000113

PART II
SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

referred to arbitration at a mutually agreed place, subject to the procedures applicable there.

(d) Notwithstanding (a), (b) or (c) above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Charter Party.

In the case of a dispute in respect of which arbitration has been commenced under (a), (b) or (c) above, the following shall apply:

(i) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(ii) The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.

(iii) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.

(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(v) Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(vi) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

(Note: The parties should be aware that the mediation process may not necessarily interrupt time limits.)

If Box 34 in PART I is not appropriately filled in, sub-clause 34(a) of this Clause shall apply. Sub-clause (d) shall apply in all cases.

\* Sub-clauses 34(a), 34(b) and 34(c) are alternatives; indicate alternative agreed in Box 34.

35. **Notices**

(a) All notices given by either party or their agents to the other party or their agents in accordance with the provisions of this Charter Party shall be in writing.

(b) For the purposes of this Charter Party, "in writing" shall mean any method of legible communication. A notice may be given by any effective means including, but not limited to, cable, telex, fax, e-mail, registered or recorded mail, or by personal service.

36. **Headings**

The headings of this Charter Party are for identification only and shall not be deemed to be part hereof or be taken into consideration in the interpretation or construction of this Charter Party.

37. **Severance**

If by reason of any enactment or judgement any provision of this Charter Party shall be deemed or held to be illegal, void or unenforceable in whole or in part, all other provisions of this Charter Party shall be unaffected thereby and shall remain in full force and effect.

38. **Entire Agreement**

This Charter Party, including all Annexes referenced herein and attached hereto, is the entire agreement of the parties, which supersedes all previous written or oral understandings and which may not be modified except by a written amendment signed by both parties.



This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

### 39. Arbitration

In addition to Box 34 and Clause 34, for the sake of clarification, any and all differences and disputes of whatsoever nature arising out of this contract shall be put to arbitration in the City of Houston, Texas, pursuant to the Maritime Laws of the United States, The Federal Arbitration Act, and the Rules of the Houston Maritime Arbitrators Association, before a panel of three persons, consisting of one Arbitrator to be appointed by each of the parties hereto and a third by the two so chosen. Their decision or that of any two of the three on any point or points shall be final. Until such time as the Arbitrators formally close the hearings, either party shall have the right by written notice served on the Arbitrators and on the other party to specify further disputes or differences under this contract for hearing and determination. The Arbitrators may grant any relief which they, or a majority of them, deem just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance. Awards made in pursuance to this Clause may include costs, including a reasonable allowance for attorney's fees, and judgment may be entered upon any Award made hereunder in any Court having jurisdiction in the premises.

### 40. Crew

Throughout the term of this Charter, the Owners are responsible for the transit of its masters and members of the crew to the agreed upon nearest airport in the port of embarkation in the Area of Operation. Charterers shall be responsible for the transit from the airport to the Vessel. At crew change, should weather or other reasons beyond the control of Owners prevent the crew change from occurring as scheduled, Charterers shall provide for all meals and lodging for the Owners' crew so affected. If the Owners' crew arrives earlier than scheduled for the crew change or misses relevant flights, Charterer is not responsible for the meals & lodging of the affected crew during such time out of the scheduled crew change.

### 41. Vessel Importation/Exportation and Customs Clearance in and out of Mexico

Owners shall import and export the Vessel into and out of Mexico, including clearing it through Mexican customs. Owners are allowed 4 business days to clear in the Vessel and 4 business days to clear out the Vessel while on-hire. Should Owners be the sole cause of a delay in clearing in or out exceeding the allowed days, the Vessel may be taken off-hire for the period of such delay. Charterers shall reimburse all Owners' costs, fees, expenses to import and export the Vessel (including its spares and equipment) and clear customs.

### 42. Navigation Permits

Charterers shall be fully responsible for obtaining all Mexican navigation permits and any associated authorization or approval for the Vessel to operate in the intended area of operation.

### 43.

This clause intentionally left blank.

### 44. Marine Crew Visa and Training

Owners shall obtain visas for the marine crew. Charterers shall reimburse Owners USD $1,000.00 per visa obatained for the first 60 members of the marine crew. Charterers shall reimburse Owners for the cost of any Charterers' or Charterers' client required training of the first 60 members of the marine crew, including meals, lodging and payroll during such training, necessary to work in the area of operation.

### 45. PEMEX Required Personnel

Charterers are responsible for supplying the Mexican Master and Mexican onboard Doctor, if required.

### 46. Importation of Spares

Without altering the obligations set out in Clause 9(d), Owners may arrange for transportation and importation of spares for the Vessel and Sat. System with all associated costs reimbursed to Owners by Charterers so long as Charterers have provided approval to Owners. The reimbursement of costs by Charerers under this clause shall be limited to the actual costs of Owners.

### 47. ROV Demobilization Fee

Prior to the Vessel's departure from Ingleside, Tx., a ROV demobilization fee of USD 15,000 shall be be paid to Owners by Charterers.

### 48. Invoicing and Payment

Invoices for charterhire shall be issued in advance. Each invoice shall be for 30 days of hire. Each invoice shall be due and paid on or before the 1st day of the 30 day term covered by the invoice.

All other Owners' invoices shall be due and paid no later than 15 days from receipt of the invoice by Charterers.

### 49. Sat System Downtime

Notwithstanding Clause 13, in the event the Sat System has a breakdown and has become inoperable and there is no available Maintenance Allowance but the Vessel is still capable of progressing Charterers' work, including working on, but not limited to, surface diving, topside, ROV, etc., then Charterers' sole remedy is to be credited USD 15,773 per day, pro rata, until the Sat System is back in service.

### 50. Catering and Hotel Services

Notwithstanding Clause 6(c)(i), whilst the Vessel is under this Charter, Charterers shall provide and pay for the Catering Crew and suitable provisions (3 meals per day, including 1 hot night meal, bottled water, and sodas) including full hotel services for all onboard, including the marine crew, at no cost to Owner. The standard/content of meals for the marine crew to be agreed with the Owners' senior representative onboard the Vessel.

### 51. Medical/Hospital Supplies

Prior to the Vessel's departure from Ingleside, Tx. an inventory will be taken of the onboard Medical/Hospital supplies, the results of which to be agreed by Owners and Charterers. During the term of this Charter, Charterers are responsible for maintaining and re-supplying the Medical/Hospital supplies at no cost to Owners and shall redeliver the Vessel with the same quantity and quality of Medical/Hospital supplies as were inventoried prior to the Vessel's departure from Ingleside, Tx.

tradeco 000116

Annex "A"



# Lewek Toucan

**Multipurpose offshore support vessel with dive support capabilities**



*Lewek Toucan* is an advanced multipurpose offshore support vessel with excellent dive support capabilities as well as a DP 2 dynamic positioning system, accommodations for a crew of 100, a 920 M2 / 1,000 ton cargo deck and helideck. The 120 ton capacity crane has a 12 metres reach and is capable of operating in water depths reaching 2,000 m.

## SPECIFICATIONS

**LENGTH**
88.4 m

**BREADTH MOULDED**
20.6 m

**DEPTH MOULDED**
7.8 m

**DRAFT DESIGNED**
6.6 m

**DEADWEIGHT**
4019.62 T

**GROSS TONNAGE**
4654 T

**DECK AREA**
920 m$^2$

**DECK STRENGTH**
5.5t/m$^2$

tradeco 000117

# Lewek Toucan General Specification



## CLASSIFICATION

ABS + 1A1, Fire Fighting Class 1,
Offshore Support Vessel, DP 2

Year Built.................................................................2006
Flag......................................................................Panama

## MAIN PARTICULARS

Length Overall.....................................................86.4 m
Length W.L.........................................................84.58 m
Breadth Moulded.................................................20.6 m
Depth, main deck..................................................7.8 m
Draft Design.........................................................6.6 m

Deadweight.....................................................4019.62 T
Gross tonnage.......................................................4654 T

## DYNAMIC POSITIONING

Kongsberg DP2 System
1 x Acoustic HIPAP 500
1 x Taut wire Bandak MK15B
1 x Fan beam MK4.2
2 x FUGRO DGPS

www.emas.com
marketing@emas.com

## MANUEVERUNG AND PROPULSION SYSTEM

Type ........................... 2 x Straight Shaft Diesel Mechanical
Main Engine ................................... 2 x BERGEN B32:40V12P
Propulsion ........................................ 2 x Kamewa - Ulstein CPP
Power ........................................................................ 2 x 6000KW

Power ........................................................................ 2 x 6000KW

Type ........................................ 1 x Forward azimuth thrusters
Make............................................. Ulstein Aquamaster, UL 1201
Power ......................................................... 14 Ton, 1 x 820 kW

Type ......................... 2 x Forward transverse tunnel thrusters
Make................. Kamewa Ulstein, TT 1650 DPN CP & TT1650
Power ....................................................... 1 x 850 kW & 1 x 750 kW

Type ............................... 2 x Aft transverse tunnel thrusters
Make................................... Kamewa Ulstein, TT 1650 DPN CP
Power ......................................................................... 2 x 750 kW

## FRESH WATER PRODUCER

Type ................................... Reverse Osmosis 30m3 / day

## SEWAGE SYSTEM

Type .................................... Hamworthy ST 8, Super Trident

\* This vessel specification is given in good faith and assumed to be accurate at the time of print.
\*\* Owners will not be liable for errors, omissions, or misprints published. Owners reserve the rights to amend this specification without notification.

Annex "A"



## POWER GENERATION

| | |
|---|---|
| Type | Shaft Generator |
| Make | AVK Generator |
| Power | 2 x 2118ekw, 440V/60Hz |
| Type | Main Generator set |
| Make | CAT 3412 generators |
| Power | 590ekw, 440V/60Hz |
| Make | Cummins KTA50D generators |
| Power | 1200ekw, 440V/60Hz |
| Total Installed Power | 7816ekw |

Emergency Generator......... AT 3056T, 1 x 99ekw, 440V/60Hz

## ACCOMMODATIONS

The ship is arranged with an accommodation for total 100 persons plus hospital.
Berth / Cabin .................................8 x Single Cabins
Berth / Cabin .................................14 x 2 Men Cabins
Berth / Cabin .................................16 x 4 Men Cabins

## CRANES

Maker ............................................Huisman
Type...................................120T AHC Knuckle Boom Crane

### Main Hoist

| | |
|---|---|
| Safe working load at 7.4 - 12 m radius, in air | 120 MT |
| Safe working load at 30 m radius, in air | 30 MT |
| Hook travel | approx. 2000 m |
| No. of falls | 1 |
| No. of layers on drum for 2000m wire | 2 |

### Active Heave Compensation

| | |
|---|---|
| Maximum load | 120 MT |
| Peak speed, at full load, outer layer | approx. 90 m/min |
| Resulting crane tip motion | 5.0 m with period 12 sec |

### Aux Hoist

| | |
|---|---|
| Safe working load at 7.5 - 32 m radius, in air | 24 MT |
| Hook travel | approx. 300 m |
| No. of falls | 1 |
| No. of layers on drum for 300m wire | 2 |

### Active Heave Compensation

| | |
|---|---|
| Maximum load | 24 MT |
| Peak speed, at full load, outer layer | approx. 100 m/min |
| Resulting crane tip motion | 6.4 m with period 12 sec |

## NAVIGATION AND COMMUNICATION EQUIPMENT

Maritime VSAT Antenna 1.5 meter C-Band
PA system, Integrated Telephone, Sound Powered Telephone
Radio Plant with Satellite Communication System,
Life Boat Radios, Radar Transponder,
Radar Plant, Global Positioning System,
Gyro compass, Magnetic Compass, Autopilot,
Echo Sounder, Doppler Speed Log, AIS & VDR,
TV-FM-SAT System, CCTV,

## FIREFIGHTING EQUIPMENT

*Fire extinguishers*: Powder, foam and $CO_2$ extinguishers according to regulations in force.
*Fire hoses with equipment:* Adjacent to each of the fire hydrants, a 2" fire hose with length of at least 15 meters. The hoses are equipped with combined jet nozzles and fog nozzles, with coupling connections to the hydrant.
One (1) off international coupling
Fire axes fitted according to requirements from the National Authorities.

## SAFETY EQUIPMENT

Safety equipments shall be based upon the regulation of the vessel, for a total number of persons on board of 100 persons.

FRC Boat.......................One (1) SOLAS FRC boat Mako 655
                              Diesel driven water jet complete with davit
Rescue Boat (MOD) with Davits

Life Raft............................................................... 12 x 25 persons
Inflatable rubber life rafts of approved type. Life rafts capacity according to national authority's requirements. Raft launching crane of approved type, allowing effective launching of rafts, and not requiring manual reloading after use.

Lifebuoys, jackets
Lifebuoys of plastics of approved type. Numbers and equipments are according to the National Authorities requirements. Parachutes signals and equipments are according to rules

## HELIDECK

Type ............................ 22.2 M Octagonal Aluminium Helideck

tradeco 000119

## ANNEX "B" to Time Charter Party for Offshore Service Vessels
## Code Name: SUPPLYTIME 2005

### INSURANCE

Insurance policies (as applicable) to be procured and maintained by the Owners under Clause 17:

(1) <u>Marine Hull Insurance.</u> – Hull and Machinery Insurance shall be provided with limits equal to those normally carried by the Owners for the Vessel.

(2) Protection and Indemnity (Marine Liability Insurance. –
Protection and Indemnity (P&I) or Marine Liability Insurance with coverage equivalent to the cover provided by members of the International Group Protection and Indemnity Associations with a limit of cover no less than USD 10,000,000
for any one event. The cover shall include liability for collision and damage to fixed and floating objects to the extent not covered by the insurance in (1) above.

(3) <u>General Third Party Liability Insurance.</u> – To the extent not covered by the insurance in (2) ABOVE, Coverage shall be for:
Bodily Injury **USD 10,000,000** per person
Property Damage **USD 10,000,000** per occurrence.

(4) <u>Workmen's Compensation and Employer's liability Insurance for Employees.</u> –
To the extent not covered in the insurance in (2) above, covering Owners' employees and other persons for whom Owners are liable as employer pursuant to applicable law for statutory benefits as set out and required by local law in area of operation or area in which the Owners may become legally obliged to pay benefits.

(5) ~~(Comprehensive General Automobile Liability Insurance.~~
~~Covering all owned, hired and non-owned vehicles, coverage shall be for:~~
~~Bodily injury – According to the local law.~~
~~Property Damage – In an amount equivalent to~~
~~single-limit per occurrence.~~

~~(6)~~(5) Such other insurances as may be agreed.

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document

tradeco 000120