# EXHIBIT A-4

# Houston Maritime Arbitrators Association

## In the Matter of

## <u>Ranger Offshore Mexico, S. DE R.L. DE C.V.</u>

## vs.

## <u>Tradeco Infraestructura, S.A. DE C.V. and Grupo Tradeco, S.A. DE C.V.</u>

# PARTIAL FINAL AWARD

**AFFIRMATION BY THE ARBITRATORS**

WE, the undersigned Arbitrators, having been appointed in accordance with the arbitration provisions of the agreements executed by the Parties and the applicable Rules of the Houston Maritime Arbitrators Association, and having been duly sworn, do hereby AFFIRM that we have reviewed and studied the written submissions and exhibits of the Parties, represented through their counsel, and having duly heard the allegations and proof offered by the Parties in the course of hearings conducted to receive testimony in respect thereof, **DO HEREBY ORDER, ADJUDGE AND AWARD** as follows:[1]

## INTRODUCTION

**TRIBUNAL REPORT**

The commencement date of this arbitration (date of service of the notice) was March 12, 2015. The rules applied to the proceeding were those promulgated by the Houston Maritime Arbitrators Association as amended by specific consent of the parties, including certain supplemental procedural rules adopted by agreed order on July 24, 2015.

The parties were allowed to conduct such discovery by way of document production, deposition and the use of expert assistance as, in their considered judgment, would be necessary to make a full presentation of their claims and defenses. The Tribunal stressed it had no interest in participating or directing this activity unless and until it became necessary to resolve disputes. To their credit, counsel were able to conduct pre-arbitration discovery with only the occasional need for intervention by the Tribunal.

The Tribunal made every effort to accommodate personal and professional conflicts encountered by counsel during approximately ten months of discovery undertaken in preparation for hearings. This resulted in three extensions of time for concluding depositions, the collection of documentation and preparation of expert reports. During that period, the panel considered motions and requests for schedule changes which resulted in producing seventeen orders, memoranda and rulings.

In keeping with generally accepted arbitration principles and consistent with the Houston Maritime Arbitrators Association Rules, the Tribunal accepted for consideration every form of evidence commonly recognized in proceedings of this kind, whether in writing or by oral testimony. Statements, deposition transcripts, remote testimony using "Skype" as a medium, attachments to relevant documents (such as one giving the vessel's characteristics) and email exchanges among the parties, all were permitted.

The limiting control to admissibility was that the proffered evidence be relevant and material to the outcome of the issue it was intended to illuminate. After that threshold was met, it was given "...appropriate weight considering any objections made by any party, the circumstances in which the affidavit is submitted, and other relevant circumstances." (HMAA Rule 5.4.5).

Hearings were held over a nine day period, commencing May 23rd and ending June 1st, 2016 (excluding Memorial Day weekend) at which the testimony of thirteen individuals was received under oath, three of whom offered expert advice. A one thousand page transcript of these proceedings was generated, evidencing attendance by the Tribunal, representatives of the parties, translators and audio visual technicians. Exhibits were introduced, and argument permitted together with opening statements and final summations. Members of the Tribunal were allowed to interrogate witnesses, ask questions of counsel and make suggestions in aid of clarification.

## THE ARBITRATORS

Aníbal Sabater
Chaffetz Lindsey LLP
505 Fifth Avenue, 4th Floor
New York, NY, 10017
+1 212 257 6945 Direct
+1 212 257 6950 Fax
www.chaffetzlindsey.com

Mr. Sabater is a Partner of the firm. He was appointed by Ranger Offshore Mexico on March 12, 2015.

3

James Patrick Cooney
Royston Rayzor, Vickery & Williams LLP
1600 Smith Street, Suite 5000
Houston, Texas 77002
713.890.3231 direct
patrick.cooney@roystonlaw.com

Mr. Cooney is a Senior Counsel of the firm.  He was appointed by Tradeco
Infraestructura, S.A. de C.V. on May 27, 2015.

Eugene J. Silva
8 Smithdale Estates Dr.
Houston, TX 77024
713-465-3320
ejsilva@swbell.net

Mr. Silva is a retired Partner of the firm Vinson & Elkins.  He was selected
by the party designated arbitrators and appointed by the parties to chair the
Tribunal on July 8, 2015.

**THE PARTIES AND THEIR COUNSEL**

**For the Claimant**

**Ranger Offshore Mexico, S. de R.L. de C.V.**
(hereinafter "Ranger," Claimant" or "Disponent Owner")

Represented by

JOHN SULLIVAN, ESQ.
JULIUS HINES, ESQ.
DEVIN WAGNER, ESQ.
K&L GATES
1000 Main, Suite 2550
Houston, Texas 77002
Telephone: 713-815-7346
E-mail: john.sullivan@klgates.com

4

## For the Respondents

**Tradeco Infraestructura, S.A. de C.V.**
(hereinafter "Tradeco," "Respondent" or "Charterer")

**Grupo Tradeco, S.A. de C.V.**[2]
(hereinafter "Grupo," "Respondent" or "Guarantor")

Represented by

BRENT L. VANNOY, ESQ.
HUGHES WATTERS ASKANASE
1201 Louisiana, 28th Floor
Houston, Texas 77002
Telephone: 713-759-0818
E-mail: bvannoy@hwa.com

JAY T. HUFFMAN, ESQ.
MICHAEL BELL, ESQ.
BLANK ROME LLP
717 Texas Avenue, Suite 1400
Houston, Texas 77002
Telephone: 713-632-8655
E-mail: jhuffman@blankrome.com

## JURISDICTION

On January 31, 2014, Ranger and Tradeco entered into a modified BIMCO Time Charter Party for Offshore Service Vessels (Code Name: Supplytime 2005). Clause 34 of the Time Charter Party contains in Exhibit A-1 an arbitration clause (the "Clause") providing for arbitration in Houston under the Rules of the Houston Maritime Arbitrators Association. The Clause provides, inter alia:

> "...any and all differences and disputes of whatsoever nature arising out of this contract shall be put to arbitration in the city of Houston, Texas pursuant to the Maritime Laws of the United States, the Federal Arbitration Act and the Rules of the Houston Maritime Arbitrators Association, before a panel of three

persons, consisting of one arbitrator appointed by each of the parties hereto and the third by the two so chosen. ..."

On March 12, 2015, Ranger instituted the present proceedings against Tradeco on the basis of the Clause.  In submissions including, without limitation, an amended statement of defense and counterclaim served on September 11, 2015, Grupo agreed to participate in these proceedings as a Co-Respondent / Co-Counterclaimant.

Grupo has not challenged the validity or effect of any activity undertaken in this arbitration prior to its agreement to participate in it.

No party participating in these proceedings has contested the validity of the Clause or challenged the ability of the Tribunal to proceed pursuant to it.

## BRIEF FACTUAL HISTORY

The subject of the charter party was *M/V Lewek Toucan* (*"Toucan")*, an advanced multipurpose offshore vessel of 4654 GRT with dive support and dynamic positioning capabilities.  The registered owner throughout the relevant period was EMAS OFFSHORE SERVICES PTE LTD ("EMAS"). EMAS time chartered the vessel to RANGER OFFSHORE, INC. ("ROI"), an American corporation and parent of Ranger Offshore Mexico (previously defined as "Ranger"), under a BIMCO offshore service vessel form on June 26, 2013.  Neither EMAS nor Ranger Offshore, Inc. are parties to this arbitration.

Ranger Offshore, Inc. subsequently sub-chartered *Toucan* to its affiliated company Ranger Offshore Mexico which, as a "disponent owner," time chartered the vessel to Tradeco on January 31, 2014, initially for a period of 120 days.  Tradeco intended to use the vessel in connection with one or more projects it planned to undertake for PETROLEOS MEXICANOS ("Pemex") or an affiliated Pemex company thereof.  Pemex is a partially owned Mexican state enterprise that conducts extensive oil exploration and production operations in parts of the Gulf of Mexico.  Pemex is not a party to this arbitration.

The period of hire provided for in the Charter Party was for 120 days.  The area of operation was defined broadly as "Gulf of Mexico," and the employment of the vessel was restricted to "Offshore construction and

6

Subsea operations including diving and other associated duties as directed by Charters, but in any event always within Vessel's design criteria for safe operating conditions and class approved certificates." There were no other restrictions placed on the employment of the Vessel by the charter party. Charter hire was fixed at UDS 98,000 per day, pro rata, commencing at the time the Vessel was delivered to Charterers. Invoices for charter hire were to be issued in advance for 30 days of hire and were due and payable on or before the first day of the 30 day period covered by the invoice. The charter hire did not include VAT and other charges and were to be paid in Mexican Pesos converted from U.S. Dollars on the date of payment. Late charter hire payments were to bear interest at 8% per annum.

The vessel was delivered and accepted by Tradeco without exception on February 3, 2014 in Ingleside, Texas. By agreement, the charter hire was reduced to USD 88,000 until the vessel arrived off Carmen, Mexico.

From certain agreements and testimony introduced at the hearing, it has become clear that the underlying reason for Tradeco to charter *Toucan* was to carry out pipeline installation work for Pemex. Tradeco was to provide project management and Ranger was to provide diving services, with the vessel serving as a construction and dive support platform. This work was delayed and apparently the vessel was never employed on the pipeline installation project prior to the suspension of the Charter Party in April 2014. Neither the underlying project for which the vessel was chartered nor its prior acceptance by Pemex was referred to in the charter party. Nor was there anything therein that would make performance conditioned on the employment of the vessel on any specific project.

On June 13, 2014, Ranger and Tradeco entered into an agreement to amend the charter party, which, among other things, suspended the payment of charter hire effective on midnight April 14, 2014 for a period of not more than 85 days and released the vessel back to Ranger for other employment. See (Amendment No. 1 to that BIMCO Time Charter Party for Offshore Service Vessels between Ranger Offshore Mexico and Tradeco Infraestructura). As of April 14, 2014, when the charter party was suspended, Tradeco was in default under that agreement in the amount of USD 5,948,558.15, which Tradeco acknowledged both in the Amendment and at the hearing.

7

Under the Amendment, Tradeco agreed to satisfy these Past Due amounts by issuing six unconditional and unqualified "Pagarés," which the Tribunal understands to be legal instruments under Mexican law analogous to a promissory note in U. S. Law. Both Tradeco and its parent Grupo Tradeco acted as co-maker and co-obligor on each Pagaré, payable on a monthly basis as follows:

> USD 600,000 payable no later than June 30, 2014
> USD 1,189,711.63 payable no later than July 31, 2014
> USD 1,189,711.63 payable no later than August 29, 2014
> USD 989,711.63 payable no later than September 30, 2014
> USD 989,711.63 payable no later than October 31, 2014
> USD 989,711.63 payable no later than November 28, 2014

Subsequently, Tradeco made three payments to Ranger totaling USD 1.33 million, which Ranger would credit against the amount owing as of the date of the suspension, thereby reducing the total amount due and owing up to the time of the suspension to USD 4,618,558.15.

On May 27, 2014, prior to the execution of the Amendment on June 13th, Grupo Tradeco, the parent of Tradeco, entered into a BIMCO Charter Party Guarantee agreeing to unconditionally and irrevocably guarantee any sums due from Tradeco to Ranger under or in connection with the Charter Party and to pay such amount within ten banking days following the receipt of a written demand from Ranger together with interest at the rate of 12 per cent per annum.

The Charter Party Guarantee was to be governed by Texas law and subject to exclusive jurisdiction in Houston, Texas. Grupo Tradeco and Ranger have agreed to submit all issues arising under the Charter Party Guarantee in this consolidated arbitration proceeding so that Grupo's liability under the Guarantee is before this Tribunal.

The need to amend the charter as noted underscores the problems that arose from the very start of the commercial relationship between the parties. The nature, extent and cause of these difficulties form the bedrock of the disputes that arose. In short, the vessel was not put to work as envisioned notwithstanding the fact it was incurring charter hire at the rate of $98,000 per day. The schedule of payments in the charter was not followed despite repeated demands by Ranger and assurances in

response from Tradeco seeking delay and promising compliance in the future.

As a direct consequence of *Toucan's* inactivity, the parties agreed to suspend the provisions of the charter and excuse their mutual obligations of performance for a given interval, whereupon the original contractual relationship would resume as before.  As noted, at the time of this amendment, and for the purpose of securing performance of its affiliate, Grupo Tradeco executed both a BIMCO form charter party guarantee and an instrument delineated "Amendment No. 1" thereto which was made a part of the original charter.

Amendment No. 1 to the BIMCO form read, in part, as follows:

> Upon the conclusion of the suspension period and upon re-delivery, the vessel will return to "on hire" status under the charter for the original remaining full term period of 48 days plus an additional 85 days firm.

Amendment No. 1 defined by mutual agreement all past due unpaid charter hire, related ancillary charges, the responsibilities assumed by Grupo Tradeco as guarantor of those amounts and specified in the pagarés used to discharge its obligations.  The suspended period had an effective commencement date of April 15, 2014 and would extend for a period of not more than 85 days, but giving the disponent owner the option of an additional time, not to exceed 65 days, to complete the project on which *Toucan* would be employed.

During the suspension period, *Toucan* was time chartered by Ranger to SUBSEA 7, and was employed in offshore construction projects for Pemex. It was during this time period that complaints were first raised by Pemex relating to the vessel engine's exhaust system.  The nature, extent and gravity of this alleged problem are disputed.  When the vessel was re-delivered to Tradeco at the end the suspension period Tradeco challenged her seaworthiness and fitness for the work she was to engage.

Given this history, it is understandable that throughout these proceedings the parties have drawn a distinction between the charter period before the suspension and the charter period occurring after *Toucan* was tendered by Ranger back to Tradeco for the remaining months of the charter term.  The

charter party, having been amended in several material and obvious ways, was not abandoned or replaced. It was preserved and retained in its modified form as a legally binding instrument defining the rights and responsibilities of the parties.

Breaches of contract and wrongful misconduct subsequently have been alleged by each of the parties in their legal capacity as either disponent owner, charterer or guarantor with the guarantor/charterer on one side of the argument and the disponent owner on the other. Yet, many of the foundational facts concerning the course of conduct and business relationship among them are not truly in dispute. With the exception of one document which was at best peripheral to the issues and a second which a party sought to introduce during hearings, there was general agreement as to the legitimacy of operational records submitted to the Tribunal for consideration in terms of their authenticity if not relevance or probative value.

## The Parties' Claims and Defenses

### Claimant

Ranger asserts a simple breach of contract claim for Tradeco's failure to pay the charter hire owed over two periods of time; the first beginning from the inception of the charter on January 31, 2014 until April 14, 2014 (as per Amendment No. 1 of the agreement) and the second period commencing after the vessel was placed back at the disposal of Tradeco, up until the charter was legally concluded.

### The Pre-suspension period

Taking account of some payments that were indeed made by the charterer and therefore credited against the total "pre-suspension" period debt when many others were not made, Claimant demands **$4,618,558.15** of lost charter hire. To this is added simple interest of **$1,344,453.53** for a total of **$5,966,011.68** through September 30 2016. Based also on this calculation, the Tribunal is advised interest will continue to accrue at the rate of **$1,518.43** per day from and after September 30, 2016.

## The Post-suspension period

Taking into account simple interest calculated at 8% per annum through June 1, 2016, claimant seeks to recover **$17,367,941.40** in charter hire, interest and other charges that became due during the post-suspension period.   That figure is predicated upon past due charter hire of **$15,340,310.89**.  This accounting relies on several key assumptions that are disputed; therefore, it is accompanied by alternative figures in the event one or more of those assumptions are not recognized or are changed by the Tribunal.

## Grupo's Guarantee

Ranger also seeks recovery from Grupo under its Guarantee obligation to secure payment of Tradeco's past due charterhire, interest and other charges under the Charter Party in the total amount of **$22,537,669**.  This is arrived at by adding principal balances of **$4,618,558.15** accrued in the pre-suspension period and **$15,340,310.89** in the post suspension period, for a total of **$19,958,869.04** plus interest at the rate of 12% per annum from May 27, 2015, as provided in the Charter Party Guarantee.

## Respondents

Tradeco and Grupo assert both affirmative defenses and counterclaims. Principal among these is the claim that *Toucan* was unseaworthy at the time it was tendered for redelivery at the end of the suspension period and that Tradeco was entitled to reject the vessel on this basis, relieving it of any obligation to pay charter hire under the Charter.  Tradeco and Grupo advance these arguments in the alternative and base them upon their interpretation of commonly acknowledged events, such as Ranger's "attempted" redelivery of the vessel, the vessel's "long history of excessive smoke", and the rejection of the vessel by Pemex.  Briefly, these are the points that have been raised:

## Unseaworthiness

Tradeco asserts that *Toucan's* "excessive" exhaust problems pre-dated her charter to Tradeco and had been the subject of prior complaints.  In response to these complaints, the vessel's fuel injectors, which were deemed the source of the difficulty, were checked, removed and replaced.

11

However, according to Tradeco, these efforts to improve performance were never verified.   Tradeco and Grupo argue that this rendered the vessel unseaworthy and not fit for her intended use under the Charter Party on the attempted re-delivery date.

## Breach of contract for Failure to Re-deliver

In a related argument, Tradeco asserts that its refusal to acknowledge *Toucan's* re-delivery was justified because of Ranger's failure to exercise due diligence to ensure the injector upgrade actually solved pre-existing exhaust problems.   Additionally, Tradeco and Grupo argue that Ranger "...failed to disclose that the *LEWEK TOUCAN's* exhaust [was a problem] and the vessel itself needed to be proven to PEMEX post upgrade", also breaching its obligation to exercise due diligence to maintain the vessel in every way fit for the service for which it was chartered as required by Clause 3(b) of the Charter Party.   Finally, Tradeco and Grupo argue that the charter party terminated when re-delivery did not occur.

## Force Majeure

Tradeco contends that Pemex' refusal to authorize use of the *Toucan* excused Tradeco from further performance of its obligations under the Charter Party, including the obligation to pay charter hire.   This argument is advanced under the *force majeure* provisions in Clause 32 of the Charter, Tradeco having been prevented or hindered from performing its contractual obligations by this act on the part of "the Mexican government."

## Frustration of commercial purpose

Tradeco and Grupo contend that the vessel's unseaworthiness and Ranger's continued failure to maintain her condition throughout the term of the charter frustrated its commercial purpose, thereby excusing Tradeco's performance under that agreement.   On the same grounds are added defenses of "Prevention of performance," "Impossibility," "Failure to mitigate damages" and contractual "Offset."

## Limitation of Claimant's damages

Respondents challenge Ranger's right to charter hire and other charges after *Toucan* was redelivered to its registered owner, EMAS, on or before

12

October 31, 2014 following Tradeco's rejection of the Charter Party. This challenge goes to both Ranger's right to charter hire and, alternatively, the amount of charter hire Ranger was entitled to recover for the remaining approximately two month period after the vessel returned to her owners.

Counterclaims

Tradeco and Grupo characterize their pleadings as containing counterclaims, although the relevant allegations could also be read as constituting a cross claim for Ranger's failure to mitigate or a direct contractual set off depending on which version of the proven facts are adopted. Nevertheless, in their presentation of evidence and argument, two broadly stated claims for relief are asserted.

1. During the post suspension period, Tradeco sought to employ *Toucan* for a "sandbagging project," again for Pemex. According to Tradeco, Ranger's failure to re-deliver and/or to supply a seaworthy vessel and/or one acceptable to Pemex and/or one fit for the purposes intended by the charter caused Tradeco to lose this tendered work and thereby incur losses in the amount of **$1,985,815.80**.

2. Tradeco and Grupo allege that Ranger's filing of attachment actions in federal court in an effort to attach Respondents' assets in the United States as security for past due amounts, prior to arbitration, without seeking to have the judicial record of these proceedings sealed, violated confidentiality provisions in the Charter Party. As a result, third parties cancelled non-related contracts with Respondents, causing Tradeco and related corporations to suffer financial losses exceeding **$1,106,849.00, to** which Respondents are entitled to recover in this arbitration.

## DISCUSSION AND ANALYSIS

**Pre-suspension Period**

Tradeco has offered no legal justification for its failure to pay charter hire during the pre-suspension period and has admitted the claimed amount was due and owing. As the Tribunal held in its Order of April 27, 2016, "Ranger had a valid and enforceable claim . . . against Tradeco under the charter party when the Amendment was signed on June 13, 2014 and as of

13

the effective date of April 14, 2014. Thus, as of the time of the charter party suspension, Tradeco was in default under the charter party."

Instead of pursuing its rights to recover the then past due sums , Ranger entered into the Amendment and accepted Tradeco's promise to pay the then outstanding charter hire in accordance with the payment schedule set out therein, using the six Pagarés as vehicles to facilitate the contemplated payments.

Section 7 provides that if Tradeco defaults on any of the obligations set out in the Amendment, including any payment default on any Pagaré, Ranger would be free to pursue all of its rights and remedies, including arbitration under the charter party, the enforcement of the Guarantee executed by Grupo and the enforcement of the Pagarés.

Under the Amendment, the parties agreed to substitute the unconditional obligation to pay in accordance with the terms of the Pagarés for the obligation to pay the outstanding charter hire due as of April 15, 2014. From the testimony elicited at the hearing, it appears that the Pagarés payable on June 30 in the amount of USD 600,000 and on July 31, 2014 in the amount of USD 1,189,711 were executed and delivered to Ranger, but that the other four Pagarés were never delivered to Ranger and thus never became effective. Each of the Pagarés, according the translations made available to the Tribunal without objection, provided:

> "For anything regarding the interpretation, execution and fulfillment of this PROMISSORY NOTE, the parties submit to the applicable laws and competent courts of Mexico City and expressly waive any other present or future jurisdiction that may correspond by reason of their domiciles, of the location of their assets or for any other reason."

As noted in the Order of April 27, 2016, to the extent the Pagarés were validly executed and delivered by Tradeco to Ranger, Ranger's right of recovery under the Pagarés is governed by Mexican law and is subject to exclusive Mexican jurisdiction, leaving this Tribunal without jurisdiction as to the two Pagarés that were executed and delivered. However, there is no evidence that the remaining four Pagarés were ever executed or delivered by Tradeco to Ranger. Therefore, Ranger retains the right to recover the stipulated amounts represented by those remaining Pagarés from Tradeco and Grupo under Section 7 of the Charter Party Amendment.

14

Tradeco was in default under the Amendment on June 30, 2014 when it failed to make a payment of USD 600,000 through the Pagaré due on that date.  The failure to make this payment had the effect under Section 7 to accelerate the obligations under the Amendment.  Since the four Pagarés due August 29, 2014, September 30, 2014, October 31, 2014 and November 28, 2014, were never executed or delivered, Ranger was entitled to recover USD 4,158,846.52 under the Charter Party, with interest at the rate of 8%.

Because Tradeco and Grupo failed to pay under the Pagaré that had been executed and delivered on June 30, 2014, it would appear Ranger is entitled to recover under that Pagaré, together with the Pagaré issued on July 31, 2014, in the total amount of USD 1,789,711.63 less subsequent payments made by Tradeco in the amount of USD 1,330,000, which the parties have agreed should be applied to reduce the amount due and owing on these Pagarés.  However, as noted in our Order of April 27, the two Pagarés that were actually delivered to Ranger can only be enforced under Mexican law in a Mexican tribunal and cannot be included as part of this Award.

Accordingly, it is the holding of this Tribunal that Ranger is entitled to recover charter hire in this proceeding for the pre-suspension period in the amount of USD 4,158,846.52, plus interest at 8% per annum (from the date each Pagaré should have been issued) until satisfied.

Tradeco's default on its obligations under the Amendment also had the effect of triggering Grupo's obligations under the Guarantee.  Clause 2 of the Guarantee obliges Grupo to pay any Guaranteed Amount, which includes all sums due from the Charterers to the Owners under or in connection with the Charter Party, including any recoverable costs and expenses, within ten banking days following a Demand, with interest at the rate of 12% from the due date for payment by the Charterers.  Under Clause 6, the Demand for payment is to be in writing and shall include a statement of the Guaranteed Amount or other amount claimed and to what it relates.

While the Guarantee does not distinguish between sums due and owing under U.S. or Mexican law and includes all sums due from the Charterers to the Owners under or in connection with the Charter Party, Grupo jointly executed the two Pagarés that were delivered to Ranger and remains exposed to liability in respect thereof under Mexican law.  Accordingly, the

15

Tribunal is of the view that Grupo's guarantee obligation for the pre-suspension debt owed by Tradeco should be the same as Tradeco's primary liability, save for the difference in the interest rates set out in the Charter Party and the Guarantee.

Ranger did not make demand on Grupo until January 26, 2015. Accordingly, the guarantee amount did not become due until February 5, 2015. Grupo has made no payment to satisfy its obligations under the Guarantee and is in default under that agreement. As a consequence, Group is liable to Ranger in the principal amounts of USD 4,158,846.52 plus interest at 12 percent per annum, with the interest relating back to the date when Tradeco's charter hire obligations went into default.

**Post Suspension Period**

**The Contract**

The starting point for any analysis of this dispute must necessarily be the BIMCO Time Charter Party for Offshore Service Vessels (Code Name: Supplytime 2005) signed on January 31, 2014. Together with the BIMCO Charter Party Guarantee, subsequently executed by Tradeco and Grupo on May 27, 2014, these printed forms, as modified and supplemented, provide the contours of the rights granted and duties assumed by the parties.

**Unseaworthiness and Fitness**

As a general, shorthand, proposition of American maritime law, a vessel is seaworthy if it is (a) "reasonably fit" for (b) its intended purpose. It naturally follows that a vessel is deemed unseaworthy based not only upon an established faulty condition or defective state [fitness], but also in relation to her use or trade [purpose]. Unseaworthiness can take many forms. That said, American and European case law is relatively consistent in defining the sorts of conditions that normally render ships legally unseaworthy. Most decisions concern seamen's actions for personal injury, navigational errors, collisions, groundings, cargo damage or loss, charter party, general average and marine insurance disputes.

Although the conditions that may render a vessel unseaworthy are vast in number, to be actionable at law they generally must relate directly to a harm or injury sustained and the legal remedies afforded an aggrieved

16

party under such circumstances tend to be objectively reasonable, particularly in commercial matters unrelated to personal injury or death. This arbitration does not concern human trauma or death. Nor does it implicate significant structural damage to a vessel, fixed platform, surrounding watercraft of any description, or their related appurtenances. This claim of unseaworthiness deals entirely with exhaust expelled from a marine diesel engine and whether that alleged defect is sufficient to void a time charter party.

The unseaworthiness doctrine in American Admiralty law was refined by the United States Supreme Court in 1960 when it took up the concept of "transitory unseaworthiness." *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539 (1960) was an action brought by a crew member aboard a fishing trawler to recover damages for personal injuries sustained as a result of unseaworthiness due to the "temporary presence" on the ship's rail of slime and fish gurry remaining there from recent unloading operations. The court held the shipowner liable for a "temporary" unseaworthy condition, not one that was structural or permanent. 362 U. S. at 549-550. Had the owner simply wiped away the offending slime before the accident occurred, the vessel would have once again been seaworthy. But for this transitory state of unseaworthiness, the *Trawler Racer* was otherwise buoyant, mechanically sound, fit and manned by a competent crew.

Claimant seeks the payment of charter hire due under a standard BIMCO form agreement during the "post suspension period" (August 15 through December 25, 2014) and Respondents answer they are relieved from that obligation because the chartered vessel was unseaworthy. Respondents further allege the re-delivery of the *Toucan* on August 15th was merely an "attempted re-delivery" and rejected. It is relevant to note Respondents acknowledge *Toucan* was seaworthy *ab initio*; that is on January 31, 2014 when the charter term began. The argument is that *Toucan's* unseaworthy condition arose at a subsequent date from the charter's inception, between the agreed suspension beginning April 14th and the alleged (by Claimant) "re-delivery." During the suspension period, *Toucan* worked for SUBSEA 7 and it was then that the supposed unseaworthy condition manifested in the form of "excessive" exhaust emanating from the vessel's diesel engines.

Respondents' unseaworthiness claim has an added dimension. They argue *Toucan* had a "bad reputation" dating from a year before when she was employed in West Africa and suffered from the same "excessive"

17

smoke issue.  Asked why Tradeco would have chartered a vessel with a checkered past of that sort, the answer was that it was unaware of this past history and that the obligation to alert them of it was Claimant's.

Tradeco also alleges Claimant had a continuing responsibility under the Charter Party to maintain the vessel in a seaworthy condition.  Finally, perhaps under the banner of unseaworthiness, but if not then as a separate justification for non-payment, Respondents counter that Ranger failed to provide documentation of origin, sufficient probity and strength to prove the repairs made to *Toucan's* engines were satisfactory and therefore "solved the problem" of "excessive" smoke.  Having failed to "prove" to the satisfaction of Pemex, which had "banned" the vessel from work in the Gulf, that the problems no longer existed, Tradeco could reject use of the *Toucan* without legal consequence under the Charter Party.[3]

## Role of Pemex

In attempting to avoid any obligation to pay charter hire after the suspension period, Tradeco relies almost exclusively on the fact that Pemex, for whom Tradeco was attempting to provide construction services, took the position that *Toucan* failed to meet its requirements and therefore it was "banned" from the project waters.

Petroleos Mexicanos (or "Pemex") was founded in 1938 as a state owned Mexican company with exclusive rights over exploration, extraction, refining, and commercialization of oil in Mexico.  Because of its state ownership and the regulatory role it has carried out with regard to all aspects of the Mexican petroleum industry, Pemex is sometimes considered to be synonymous with the Mexican Government itself. However, Pemex engages almost exclusively in commercial enterprises.

In the Tribunal's view, at least under the facts of this case, Pemex is not the Mexican government nor does it conduct its business as would the government of a sovereign nation despite the considerable economic power inherent in the status of a state owned monopoly.  It does not self-identify as the government of Mexico.  At best, depending on the activity it conducts, it has been regarded in certain instances as an instrumentality of the Mexican government for purposes of the Foreign Sovereign Immunities Act or other similar American laws which, in any event, do not apply to activities that take place outside the jurisdictional limits of the United

States. As an aside, even under American law, Pemex would likely lose any governmental shield or privilege it enjoys by engaging in commercial activities outside the borders of Mexican sovereignty.[4]    [cf. *OBB Personenverkehr AG v. Sachs*, 577 U.S. ___ (2016)].[5]

This is not to suggest Pemex cannot regulate offshore activities in Mexican waters. Some responsibility and significant authority over those activities are inherent in being a company whose shares are held by the central government, but that is a considerable distance away from the claim Pemex is invested with traditional governmental sovereignty as envisaged by the charter party language.

## Force Majeure, Commercial Frustration and Impossibility

A fair reading of the standard language contained in the relevant BIMCO charter provision suggests Force Majeure is applicable only in the event of "...Governmental requisition, control, intervention, requirement or authority." It is at least questionable if not obvious this language was never intended to cover – and on its face does not cover -- such things as complaints about the level of exhaust from a marine diesel engine, save and except in cases that might present a serious danger to personnel or imminent hazard to marine operations such that a governmental entity may feel compelled to intervene out of public safety concerns and in the discharge of sovereign functions. One could assume that under those extraordinary circumstances the government of Mexico would invest authority to act in a national agency similar to the American Coast Guard to regulate and address issues of that urgency in Mexican waters. Clearly, that was not the case here.

Respondents offered no authority upon which the Tribunal could rely to establish that Pemex' relationship to the government of Mexico is of such closeness and identity that whatever decision it makes regarding work vessels alongside offshore platforms rises to the level of a Mexican governmental requisition, control, intervention, requirement and authority. Rather, the initial correspondence received from Pemex concerning *Toucan* states in relevant part (by translation):

> ...[I]n accordance with the report issued by the PEP [Pemex Exploracion y Produccion] Coordination of Comprehensive Protection Services, it has been deemed the vessel

UNAUTHORIZED to enter the platform and serve PEP. (Emphasis in the original)

The letter goes on to cite "safety" in passing but is otherwise vague as to the nature of the problem which allegedly rendered the vessel "unauthorized." It does not say the vessel is unseaworthy nor does it say *Toucan* was "banned." It was not sent directly to Ranger, the disponent owner, no governmental laws or regulations were cited, the vessel had just been the subject of two inspections by marine surveyors who had found no cause to cite defects with the exhaust system aboard and in the recent past she had been working at a Pemex facility offshore for SUBSEA 7.

It is also important to note once again that the Charter Party is not conditioned in any way on whether *Toucan* was acceptable to Pemex and that the employment of *Toucan* was not in any way restricted to working only on a specific Pemex project or on Pemex projects generally.

### Findings

Considering the evidence produced and taking account of the law chosen by the contracting parties as well as arguments made by their retained counsel, the Tribunal concludes:

1. *Toucan's* condition prior to the commencement of its charter with Tradeco is of little or no relevance to the issues in this arbitration and Ranger had no obligation to reveal or discuss with Tradeco what may have occurred in 2013 when she was employed off the West African coast for a different charterer. Every commercial vessel has a "history" and most have a checkered past involving maintenance, repair and casualty. This arbitration did not raise issues of oral representations made by one of the contracting parties that were relied by another to its detriment. Even if there had been such representations made in the course of negotiations, joint inspections conducted at the time of delivery and redelivery were more than sufficient to satisfy the question of suitability and seaworthiness.

2. Ranger had a non-delegable, continuing obligation to exercise due diligence to keep the *Toucan* in a seaworthy condition, which undertaking was assumed at the inception of the charter on January 31, 2014 and remained in place throughout the charter's term initially and as amended. There is a specific clause in the Charter Party confirming this:

*"Condition of Vessel*

*(a) The Owners undertake that at the date of delivery under this Charter Party the vessel shall be of the description and Class as specified in ANNEX "A" attached hereto, and in a thoroughly efficient state of hull and machinery.*

*(b) The Owners shall exercise due diligence to maintain the vessel in such class and in every way fit for the service stated in Clause 6 throughout the period of this Charter Party."*

ANNEX "A" appears to be an accurate description of the vessel and nothing produced in this arbitration suggests this description is incorrect. Clause 6 extends the vessel's area of operation to the entire Gulf of Mexico and is not limited to that area of the gulf subject to Mexican sovereignty.

Ranger's due diligence in maintaining a seaworthy vessel was of obvious importance to both parties to the charter. If an issue of safety, fitness or stability arose one might expect Tradeco would have given notice of concern, followed by a review of materials such as log books and daily reports of activities aboard, to determine what may have occurred and how the issue could be resolved. If deemed appropriate, most charterers and owners in that position might also consider conducting a joint survey to inspect and investigate the incident or damage. Meetings would be arranged at which both sides to the charter could share information and evaluate the nature and importance of whatever issues remained unresolved. If an accord could not be reached, the next step would be to weigh the legal and commercial consequences of fixing the problem, including suspending charter hire if necessary, or terminating the charter.

From the early stages of this dispute, however, attention was given exclusively to the engine exhaust because of complaints registered first by Pemex, a non-party to the Charter Party, arising out of *Toucan's* work for SUBSEA 7, also a non-party. The parties were suddenly made aware Pemex would not accept credible reports of repairs made and offered by Ranger confirming that the exhaust issue, such as it was, had been resolved. Mechanical certifications and surveyors' reports seemed to have no impact.

Based upon the character of exchanges between charterer and disponent owner, it appears Tradeco was primarily concerned about what Pemex was thinking and not whether the vessel was actually fit or seaworthy.  For example, Tradeco did not claim the vessel was unseaworthy when it took initial delivery or when the vessel was tendered after the suspension period.  How would it know, since *Toucan* had successfully passed an online survey and had yet to be put in service after redelivery.

When *Toucan* was re-delivered Tradeco sought neither to fully accept nor conclusively terminate the charter.  Instead, it repeatedly urged Ranger to resolve issues raised by Pemex and took an active hand to assist the process with the hope the business relationship among these parties would continue.   This left Ranger unsure of its status and unable to seek alternative commercial opportunities to offset the damages suffered by the continuing loss of charter hire.   By this time Tradeco's charter hire payments were so far in arrears Ranger had little choice but to stay the course.

Ranger complied with its obligation as set forth in Amendment 1 of the charter to re-deliver the vessel upon the conclusion of the suspension period.   The general rule in American maritime law is that a vessel is regarded as having been delivered when it is made available to be utilized by the charterer.  Tradeco did not reject the delivery orally or in writing on the stated grounds of fitness or unseaworthiness.  The legal burden of proof when claiming breach of a warranty of seaworthiness where the subject vessel has been approved for service at the inception of the charter is upon the charterer (Tradeco), not a client of the charterer (Pemex).

      3.    As noted above, Tradeco admits *Toucan* was accepted as seaworthy and fit in every respect at the inception of the charter.  A central issue in this matter, therefore, is whether Ranger complied with its continuing obligation of due diligence to maintain the vessel in that state, including in particular, when she was re-delivered.

This above referenced obligation extended only to Tradeco.  Ranger did not contractually undertake in the charter party to satisfy demands or meet operational requirements set by Pemex at any time or for any reason.  It did not owe Pemex a warranty of seaworthiness or fitness.   No such representation of any sort was provided by Ranger and none was required by the Charter Party.  Neither box 16 (Area of operation: Gulf of Mexico)

nor box 17 (Employment: "...diving and any other associated duties as directed by Charterers...") of the Charter Party refer to Pemex.  Pemex did not sign the charter party, nor review, modify or approve the terms thereof prior to its effective date.

While Ranger was certainly aware *Toucan* likely would be employed by Tradeco to assist operations at a Pemex controlled site, such employment was not a binding requirement under the terms of the charter.  The charter party was broadly structured to permit vessel activities anywhere in the Gulf of Mexico.  With regard to activities under Mexican jurisdiction, any approval needed for offshore access was the responsibility of Tradeco through its independent contractual agreement with Pemex.[6]

Given these agreed terms, Ranger would have been justified in questioning additional operational demands by Pemex after *Toucan* had already been inspected and accepted for work by Tradeco.  Alternatively, Tradeco could have used this chartered vessel outside of Mexican waters.  It should be noted that *Toucan* had just completed its work for SUBSEA 7 at a site in the Gulf under Pemex control and had passed both a Joint On Hire Survey and a Pemex Checklist Inspection Report shortly after re-delivery (see exhibits P-12 and P-14).

In fact, Pemex did not make a direct demand upon Ranger to do anything.  Instead, it first appeared to signal acceptance but ultimately informed Tradeco the vessel was not authorized to work in the proposed area.  This message was transmitted by Tradeco to Ranger, followed by Ranger's attempt to assist Tradeco in resolving the significant financial problems that decision presented to both parties.

To summarize, at the inception of the charter there was no work for *Toucan* and this led to a mutually agreed suspension of the agreement, despite the fact Tradeco was already in arrears in its charter hire.  Following the suspension, Tradeco urged Ranger to "satisfy" certain requirements demanded by Pemex that appeared to call the vessel's suitability into question.  This was being demanded in order to grant *Toucan* access to the worksite.  Ranger noted it had no obligation to secure approval as a condition of employment because that requirement had been specifically negotiated out of the charter before it was signed.  However, Ranger and Tradeco agreed to work together in an effort to satisfy Pemex.

23

4.    *Toucan* had just completed work on a different Pemex worksite for SUBSEA 7.  While there, on or about July 23, 2014, it was faulted for expelling exhaust from its engines onto a platform being constructed or repaired offshore.  The immediate remedy was to re-position the vessel to accommodate a more favorable wind direction whereupon the exhaust fume problem went away.  Nevertheless, work on the exhaust system to address the complaint subsequently was undertaken, followed by inspection and tests to the satisfaction of the concerned parties, including Pemex.  The vessel then completed its previously assigned tasks for SUBSEA 7 without incident.  No lives were endangered; no physical contact with the platform was recorded.  *Toucan* remained "in class" throughout this adjustment.

While employed by SUBSEA 7, of the nearly 1500 hours devoted to the Pemex project, on which is was engaged only 7 of them were lost repositioning *Toucan* to cure the operational dynamic caused by wind carrying exhaust fumes across the adjoining platform.  When complaints were made they were followed by a repair and upgrade of the vessel's fuel injectors, testing by a Rolls-Royce engineer and an inspection by Pemex representatives in addition to confirmation the matter had been successfully resolved by independent consultants who enjoy a strong reputation in the maritime industry for competence and professionalism.  Some downtime was suffered to complete these tasks but that was covered by the BIMCO charter in place with SUBSEA 7 which allowed 72 hours per month for on hire maintenance and repair.

With the return of *Toucan* for use by Tradeco, and for reasons unknown, Pemex apparently sought additional, unspecified, assurances and "proof" that the repairs to the exhaust system had been successful before it would allow the vessel to enter the proposed worksite.  However, the exchange of messages between Ranger and Tradeco during the critical period immediately following the vessel's re-delivery dealt with *Toucan's* suitability in vague terms.  It was presumed to relate to repairs that had been made when the vessel was working for SUBSEA 7.  It did not evoke alarm or a sense of grave concern for workers and the crew aboard, a reaction that might be expected if the matter at hand was considered dangerous or life threatening.  Unseaworthiness as a specific and more serious issue was never mentioned in the ensuing exchange of correspondence between Ranger and Tradeco.  That did not arise until discussions broke down, much later in time.

Pemex advised Tradeco of these episodic events about 19 days after the fact, on August 12th, just seventy-two hours before the previously announced re-delivery. When the time arrived, Tradeco avoided the two options available in response to the vessel's tender for the remaining term of the charter; either (a) accept or (b) reject the re-delivery. In the latter case, this would have amounted to a termination of the agreement. Instead, perhaps believing the issue would be solved if only Ranger and Pemex came together to settle the matter, Tradeco continued to pass along demands for assurance or proof of repair made by Pemex. What exactly would satisfy Pemex, why it was not willing to accept the repairs already completed to address the problem when the *Toucan* was working for SUBSEA, who was responsible for the decision to seek additional "proof" or "evidence of repair," remains uncertain.

5.    The question is whether Tradeco can rely upon a decision and demand made by Pemex to excuse Tradeco's performance of an obligation under an agreement to which Pemex is not a party. In concrete terms, can Tradeco terminate its charter with Ranger by adopting and construing Pemex' "not acceptable" judgment in relation to *Touca*n as meaning she was an unseaworthy, unsafe or unfit vessel and, by so doing, terminate the charter without legal consequence?

As noted, Pemex was not a party to the BIMCO charter or to this arbitration. The only evidence received directly from this source was provided under less than optimal conditions; namely, by declaration in perfect English translation (translator identity not disclosed) from a Mr. Ricardo Carrillo Zapata who was "employed by Pemex as Supervisor Kumaza Project." Mr. Carrillo Zapata's deposition had been initially noticed with the understanding he would require a translator to communicate and who forwarded his declaration after failing to appear at the appointed time to be examined by counsel for both sides. The most relevant point in the statement was simply that Pemex did not approve the *Toucan* for work at the offshore site. This was nothing more than stating the obvious. The declaration reads:

> *"During the period August 15, 2014 through October 20, 2014, the MN Lewek Toucan was neither accepted by Pemex nor acceptable to Pemex for work in Pemex controlled waters."*

.....followed by:

25

> *"....I, not Captain Julio Alberto Velasco López, had the authority and the corresponding responsibility to notify Tradeco that the MV Lewek Toucan was not authorized to enter the Pemex platform area or carry out Pemex work."*

No explanation is given for the decision taken. No reference is made to the legal or administrative sources that invest in the supervisor of the Kumaza Project the power to refuse the vessel admittance to the work site. No mention is made that *Toucan* had just completed operations in a different area under Pemex jurisdiction or that she had changed out the fuel nozzles to both main engines in response to complaints, that this work had been tested and approved, or that *Toucan* had just passed on hire surveys and a Pemex checklist that revealed no mechanical issues. The reference to Captain Velasco López appears to be related to the fact he had expressed his own opinion the *Toucan* was qualified because she had passed the usual operational tests required to gain admission to areas under Pemex jurisdiction. Although the declaration makes clear the vessel was not acceptable, it does not say it is unseaworthy or not fit for her intended use.

While Pemex presumably has every right to accept or reject vessels working on its offshore projects, its opinion of *Toucan's* fitness and seaworthiness is not dispositive of that issue in this arbitration. For one thing, the laws of the United States apply and there has been credible documentary evidence and live testimony produced to support the conclusion she was fit, safe and seaworthy despite the allegedly offending exhaust. Of course, to the knowledge of the Tribunal, Pemex has never said *Toucan* was unseaworthy although it apparently did fault the vessel's exhaust when she was working for SUBSEA 7. Pemex claims dissatisfaction with the level of proof offered to establish this problem had been solved. That concern is a far different matter from concluding *Toucan* was not fit or unseaworthy or both.[7]

      6.    The Tribunal concludes Respondents did not establish *Toucan* was unseaworthy at any point in time following its acceptance by Tradeco at the inception of the charter. From the content of the record generated, it's clear the episodic events that occurred during the suspension period when the vessel was working for SUBSEA 7 did not lead to serious harm or place anyone at risk, or challenge the vessel's integrity, or result in physical damage or trigger a maritime "breakdown clause" material to a breach of contract. They were the result of the vessel's position in relation to an

offshore platform and variable wind directions. The complaints generated became the subject of routine logbook entries and caused relatively minor delays that were covered by the BIMCO form under which the vessel was then chartered; specifically clauses 13 (a) and (b).

Assuming, arguendo, that one or more of these interruptions rendered *Toucan* unseaworthy, that condition was transitory in nature and timely addressed. It appears no harm befell any person or thing. They did not constitute a fundamental breach of the existing charter with SUBSEA 7, nor were they of sufficient gravity to support Tradeco's subsequent charge that *Toucan* was unseaworthy.

It should be pointed out that the Tribunal recognizes diesel exhaust is not harmless. It contains several constituents that may be detrimental to human health and to the environment, including carbon monoxide, nitrogen oxides, sulfur dioxide and diesel particulate matter. If *Toucan's* crew had been exposed to exhaust in a closed environment over a lengthy period of time and a causal connection were established between that sustained exposure and some harm because of the owners' failure to prevent it, there might well have been a valid claim raised based upon the vessel's unseaworthy condition. Those are not the facts, however.

The Tribunal was asked to adjudge whether the *Toucan* was unseaworthy because of complaints raised during a time when she was not actively engaged in operations for Tradeco, where no one was injured, no damage occurred and a contributing cause in fact was the wind direction at the time, not a structural defect. The evidence supporting this thinking consisted mostly of email, phone conferences and Pemex' refusal to allow the vessel entry to the worksite.

Respondents initially expressed uncertainty whether the vessel was seaworthy at the time of re-delivery, relying instead upon the demand for assurances made by an entity not a party to the charter; namely, Pemex. In other words, whether or not it was unseaworthy appeared to be of less concern to Tradeco than Ranger's perceived failure to "prove" *Toucan's* seaworthiness to the satisfaction of Pemex which remained distant and vague in its response to the issue.[8]

There exist no precedents for finding a vessel unseaworthy under these circumstances. Respondents were asked to produce whatever authority in the form of written legal opinions or maritime arbitral decisions they might find to support their assertions based on facts similar to those in this matter. Nothing of relevance was submitted. A vessel's seaworthiness is established by reliance upon objective criteria usually obtained through observation, testing, inquiry and the examination of relevant documentation. This process is typically conducted for all interested parties by trained and experienced marine surveyors. The Tribunal has carefully considered the testimony of those individuals responsible for maintenance of *Toucan* but has found nothing that would support a finding of unseaworthiness.[9]

The Tribunal also received oral testimony and detailed reports from three highly qualified marine surveyors. Two of the three expert witnesses giving their testimony under oath at the arbitration found *Toucan* seaworthy and fit for her intended use at all relevant periods. The third, retained by the Respondents but equally competent, experienced and credible, reserved judgment because certain documentation dealing with MARPOL emission standards for greenhouse gas was not available, hence "...not adequately addressed [presumably by EMAS] to the satisfaction of the parties..."(Exhibit P-30 referring to P-28). However, he did not say the vessel was unseaworthy.[10]

While emission standards for greenhouse gasses may be relevant, they are a step away from the ultimate issue answered by his surveyor colleagues who provided their professional opinion affirming *Toucan*'s seaworthiness. Their truncated views are summarized here; their lengthy written reports submitted during the course of the arbitration are detailed and exhaustive.

Along with this testimony confirming the vessel's condition, the topic was covered by persons with knowledge of her activities, some who were eye witnesses to the vessel's operations at varying points of her work offshore. They offered a credible accounting of what they experienced.

7.    At the time of re-delivery, *Toucan* was seaworthy and there is no evidence to suggest she was anything but staunch, properly managed and fit for her intended use as an offshore multipurpose vessel. This conclusion is central to any examination of the affirmative defenses raised by Respondents in their pleadings. Chief among these are the contractual

28

doctrine of Force Majeure and the more vaguely fact driven defenses of impossibility, frustration and prevention of performance.  All of these arguments to avoid contractual legal obligations assumed under the Charter Party are predicated upon some presumed fault, failure or intent on the part of Ranger as disponent owner of *Toucan* or the impediments to performance imposed upon Tradeco by a third party.  The facts and credible opinions offered in this arbitration do not support any of these defenses.

The Tribunal was unable to find any legal authority under maritime law factually similar to this matter that led to the successful application of force majeure as a defense in a charter dispute.  The burden of demonstrating force majeure is on the party seeking to have its performance excused, 3A A. Corbin, supra, Sec. 642 at 73 & n. 41.  As already noted it is highly doubtful that the unattributed decision of a project supervisor working for a national oil company could be viewed as the exercise of "...Governmental requisition, control, intervention, requirement or authority."  Even if there were no doubt concerning the exercise of a sovereign's inherent power to manage affairs within its jurisdiction, American law is disinclined to grant relief to any contractual party so aggrieved.  As noted in *Phillips Puerto Rico Core, Inc. v. Tradax Petroleum Ltd*. 782 F.2d 314 (2d Cir. 1985).

> *...[W]e cannot agree that Phillips' performance was excused by its invocation of force majeure.  Even if the detention of the ship by the Coast Guard constituted force majeure and we are inclined to agree with Judge Carter that it did not, that detention did not frustrate the purpose of the contract or prevent Phillips from carrying out its obligation under the terms of the parties' contract to make payment.*

The *Phillips* decision did not concern offshore construction activities conducted by a vessel under charter, but it did invoke "...standard terms, including a force majeure clause and an arbitration clause' in a "convoluted maritime controversy" where one party sought to be excused from performance on the grounds of force majeure and frustration of purpose.  The record in this arbitration does not encompass the level of intervention and governmental action found in the *Phillips* decision.  Respondents have failed to satisfy the heavy burden of proof required to successfully assert a force majeure defense.  Likewise, the remaining entirely fact driven defenses do not survive the conclusion *Toucan* was seaworthy and fit for

its intended purpose at the inception of the charter, which is admitted, as well as at re-delivery.

8.     The first cross or counterclaim mounted by Respondents dealt with an effort by Tradeco to put *Toucan* to work, again for Pemex. What came to be known as the lost "sandbag project" is an argument wholly dependent upon finding *Toucan* was unacceptable to Pemex which therefore, it is argued, chose to award the proffered work to another contractor rather than Tradeco. To the extent Pemex' views can be understood from what it wrote or as they have been interpreted by Tradeco, this reverts to a revival of the unseaworthiness and fitness opinion initially raised by Pemex with which the Tribunal disagrees.

If Pemex refused to award Tradeco the sandbag project because it continued to believe *Toucan* was "not acceptable" for whatever reason, this did not prevent Tradeco from employing another vessel to do the work. Virtually up until the last moment before the charter was unambiguously terminated by Tradeco, both Ranger and Tradeco maintained a hopeful but strained relationship in the belief some productive benefit might be derived from the economic partnership they established months earlier when the charter was signed. Tradeco repeatedly said it "wanted" the *Toucan*, even when Ranger considered putting her to work for another customer. That point of view suggests support for and an understanding of Ranger's belief regarding *Toucan's* fitness.

The fact Pemex would not cooperate in some way to assist Tradeco by awarding the company work is not the fault of Ranger, but rather a decision taken by Pemex. The process of nominating *Toucan* again only to have it rejected was a repetition of what occurred at re-delivery. It bears repeating that Ranger owed no legal responsibility to satisfy Pemex in any manner. Its charter arrangement was with Tradeco, which had yet to claim *Toucan* was unseaworthy, and was nevertheless free to deal with any other vessel owner respecting the sandbag project. No doubt Tradeco wanted to employ *Toucan* but that desire was frustrated by Pemex, not Ranger.

Tradeco formally repudiated and cancelled the charter on October 6, 2014. This was also the date Tradeco first claimed the vessel was unseaworthy by written notice to Ranger. However, Tradeco sought to make that claim retroactive to when re-delivery was effected on August 15, over seven weeks earlier. The specific reference to this attempt reads as follows (syntax in the original):

30

> *"On the Pemex letter, they deny us again the entering of the Lewek Toucan at the work zone, due it is not in conditions; as we stated on previous letters, it wasn't enough the information received to accept the vessel; if Pemex does not accept, we cannot accept the delivery of the Toucan from August 15th......*
>
> *Ranger can dispose of the vessel as how to best serve to their interests."*

Respondents' second counterclaim is predicated upon paragraph 33 of the Charter Party, dealing with confidentiality, to wit:

> *"...All information or data provided or obtained in connection with the performance of this charter party is and shall remain confidential and not be disclosed without the prior written consent of the other party.   The parties shall use their best efforts to ensure that such information shall not be disclosed to any third party by any of their sub-contractors, Employees and agents.   This Clause shall not apply to any information or data that has already been published or is in the public domain."*

Having received formal notice from Tradeco on October 6, 2014 seeking to terminate the Charter Party, Ranger decided to protect its claim for past due charter hire (at that time an amount probably greater than $10,000,000) by filing actions to secure liens upon Tradeco assets found in three different federal judicial districts (the Southern District of Texas, the Southern District of New York, and the Southern District of Florida). Because the filings were not made under seal, Respondents allege they suffered harm to their reputations which led to default proceedings taken against Tradeco's sureties by the state of Texas in connection with unrelated construction work, described as "the Nacogdoches project." (Transcript page 549).

It is at least questionable whether a party that owes millions of dollars in arrears under a valid contract can seek to terminate that agreement and then try to enforce selective provisions thereof to block an effort on the part of another party seeking security for that very debt in a court of competent jurisdiction.  In this case, Tradeco's affiliates had been hired by the Texas Department of Transportation to construct a road and it commenced that effort in this state after being required to post sureties of performance.  The

31

presence of Tradeco's affiliates in Texas alone likely satisfied the exception to the confidentiality clause dealing with "information or data that has already been published or is in the public domain." The Tribunal cannot be certain because so little argument, discussion and recorded testimony of the company's activities was made available to review.

In any event, the Tribunal does not consider it established that the information divulged through federal court filings constitutes confidential information within the meaning of the confidentiality clauses relied on by Respondents.

Likewise, there was no evidence presented to establish a proximate cause between the federal actions brought by Ranger seeking security and the unrelated proceedings against Tradeco's Texas sureties for, allegedly, a breach of contract in that matter. Moreover, if filling lawsuits of a maritime character to secure unpaid charter hire owed by a foreign based entity should be prosecuted under seal, the proper venue to assert that privilege was in the federal court where the actions were pending. Apparently, that step in mitigation of the damages now being alleged was never taken.

Finally, the Tribunal notes the provision found in Paragraph 2 (c) of the Charter Party which is effective in the event of Charterer's cancellation in under these circumstances:

> "...In the event the Charterers cancel the charter party, it shall terminate on terms that neither party shall be liable to the other for any losses incurred by reason of the non-delivery of the vessel or the cancellation of the charter party."

The Tribunal concludes that Tradeco failed to establish both the factual predicate to an award of damages on the grounds of a breach in the charter's confidentiality provision as well as a legally enforceable right to pursue that claim in this arbitration.

## Damages

## I.   Pre-Suspension Amounts

As a result of Tradeco's failure to deliver the Pagarés payable August 29, 2014, September 30, 2014, October 31, 2014, and November 28, 2014,

Ranger was entitled to a principal award of USD 4,158,846.52. (Amendment No. 1, ¶ 3(a)).

For Tradeco, interest at an 8% simple rate accrued on the amount that should have been paid on each Pagaré from the date on which each Pagaré became due. Total interest on the amounts that should have been paid through the four non-delivered Pagarés amounted to USD 544,853.28 on June 1, 2016. (*See* Attachment 3 to the Joseph Peltier Witness Statement ("Peltier Stmt.")). As of September 30, 2016, interest at 8% on those same amounts totaled USD 655,148.17.

Similarly, for Grupo, interest at a 12% rate accrued on the amount that should have been paid on each Pagaré from the date on which each t Pagaré became due. On June 1, 2016, total interest on the amounts that should have been paid through the four non-delivered Pagarés amounted was USD 817,279.92. (*See* Attachment 4 to the Peltier Stmt.). On September 30, 2016, interest at a 12% rate on those amounts was USD 982,722.25.

These and the amounts in the following Sections II and III will be totaled in DISPOSITIVE CONCLUSIONS below.

## II.    Post-Suspension Amounts through October 31, 2014

### A.    Invoices 14MX-1050, 1059, and 1058

Ranger's invoices 14MX-1050, 14MX-1059, and 14MX-1058 to Tradeco covering the *Toucan*'s charter rate from August 15, 2014 through October 13, 2014, as well as personnel service charges for a portion of this period, amounted to USD 7,041,670.89. (Exhibit E to Ranger's First Amended Statement of Claim, pp. 14-16).

On June 1, 2016, interest at 8% on these invoices totaled USD 902,623.72. (*See* Attachment 5 to the Peltier Stmt.). On September 30, 2016, said interest had increased to USD 1,089,372.69.

With respect to interest at 12% on these invoices, it was USD 1,353,935.58 on June 1, 2016 (*id.*), and USD 1,634,059.04 as of September 30, 2016.

### B.    Invoice 14MX-1060B through October 31, 2014

Ranger's invoice 14MX-1060B to Tradeco covered the *Toucan*'s charter rate between October 14, 2014 and December 25, 2014.  (Exhibit E to Ranger's First Amended Statement of Claim, p. 17.).  Its full amount was USD 8,298,640.00.  The invoice's pro-rated amount for the period between October 14, 2014 and October 31, 2014 (18 days) is USD 2,046,240.00.

On June 1, 2016, 14MX-1060B was 576 days due (Peltier Stmt., attachment 5); it was 697 days due by September 30, 2016.  Interest at 8% on 14MX-1060B's pro-rated amount totaled USD 312,598.20 by September 30, 2016.  On a 12% rate, it was USD 468,897.30 by this date.

### C.    Post-suspension through October 31, 2014 subtotals

Under invoices 14MX-1050, 14MX-1059, 14MX-1058 and the pre-November portion of 14MX-1060B, Respondents owe Ranger a principal amount of USD 9,087,910.89.  Interest on this amount as of September 30, 2014 is USD 1,401,970.89 at 8% and USD 2,102,956.33 at 12%.

## III.    Post-Suspension Period beginning November 1, 2014

On or about October 20, 2014, Ranger returned the Vessel to EMAS.  After a demobilization period which ended on October 31, 2014, Ranger Offshore, Inc. was no longer required to pay EMAS the Vessel's hire rate of $59,000 per day.[11]

<u>The Parties' Positions</u>

### 1.    Claimant's Position

Ranger has made two alternative requests with respect to post-October 31, 2014 damages.  As its starting position, Ranger argues that Respondents are liable for the full amount of the Time Charter ($98,000 per day) between November 1, 2014 and December 25, 2014, without any credit for the Vessel's return to EMAS.[12]

In support of this first argument, Ranger states that (a) it has not received any savings from ROI, its parent corporation, but a separate legal entity, for the Vessel's return;[13] and (b) it would be inequitable to award Tradeco a

34

credit because Claimant entered into the time charter with the expectation of gaining future business, which it did not obtain due to Respondents' breach.[14]

In the alternative, should the Tribunal find that ROI's saving are somehow attributable to—or otherwise also benefitted—Ranger, Ranger submits that Tradeco would be entitled to a credit of only $59,000 per day (the amount EMAS charged ROI), as opposed to $74,408.34 per day (the amount that ROI purportedly charged Ranger).[15]

In support of this second argument, Ranger states that ROI had no substitute earnings available at the time it returned the Vessel, and therefore $59,000 per day were the maximum savings ROI could achieve on the Ranger charter.  Ranger submits it would be mistaken to credit Tradeco with the amount ROI charged Ranger – $74,408.34 per day – because this amount "assumes—for no reason—that ROI simply released Ranger from any further obligation after the Vessel was re-delivered back to EMAS.  But that was not the case."[16]

### 2.    Respondents' Position

Tradeco and Grupo similarly present two arguments with respect to the post-October 31, 2014 damages.  Respondents' first argument is that they are not liable for any of the post-October 31, 2014 charter hire costs because after this date, "neither [Ranger] nor ROI had possession of or the right to charter" the Vessel.[17]

In the alternative, Respondents assert that if they are liable for damages between November 1, 2014 and December 25, 2014, they should be credited $74,408.34 (plus a 10% markup) because this was the amount for which ROI billed Ranger.  Respondents note that they are only in privity with Ranger.  Hence in Respondents' view, the proper measure of mitigation is Ranger's savings and not ROI's.[18]

### Caselaw on damages for charterer repudiation and relevant Time Charter Party provisions

Under admiralty law, a charterer's material breach of the charter party releases the shipowner from its obligation to perform.[19]  The shipowner is then generally entitled to expectation damages subject to its duty to

35

mitigate.[20]  That is, the shipowner is entitled to the difference between the charter amount and what it earned or saved through mitigation.[21]

Although under certain circumstances, consequential damages may be recovered,[22] the Time Charter Party forecloses them in this case.[23]  Failure to properly mitigate results in a correspondent reduction in the shipowner's damages.[24]

Applying the general rule of expectation damages under maritime law, the Tribunal concludes Ranger is entitled to compensation for the period after October 31, 2014.  Specifically, in application of that rule, the Tribunal finds that Ranger is entitled to an assessment of damages between November 1, 2014 and December 25, 2014.  Tradeco's material breach of the Charter Party entitled Ranger to stop performance but did not affect its entitlement to a reasonable expectation of profit from under the terms in that agreement.  However, Ranger is not entitled to the full amount of the daily charter rate between November 1, 2014 and December 25, 2014.  The return of the Vessel to EMAS led to significant savings within the Ranger group of companies, of which Ranger is a member.  In other words, Ranger ultimately benefitted from the return of the vessel, and—directly or indirectly—its damages were thus mitigated.  Obviously, damages avoided through mitigation have not materialized and cannot be awarded by this Tribunal.[25]

The question that remains is , by what amount should the daily charter rate be credited for damage calculation purposes between November 1 and December 25, 2014—by $59,000, as Ranger asserts, or by $74,408.34 (plus a 10% markup), as Tradeco asserts?  Applying strict legal logic as well as the equity maritime law allows in damage calculation,[26] the Tribunal finds the latter amount appropriate.  Among others, Mr. Lam's testimony at the hearing leaves no doubt in the mind of the Tribunal that the ROI-Ranger contract was lawful and legitimate.  Yet, there was no commercial reason for that contract to have been kept "alive" after Tradeco repudiated the Charter Party Agreement and after ROI returned the Vessel to EMAS.  The correct amount of Ranger's mitigated damages between November 1 and December 25, 2014, should thus have been $81,849.17 (or $74,408.34, plus a 10% markup) per day.

Consequently, the amount of principal that Ranger is entitled to for the period between November 1 and December 25, 2014 under invoice 14MX-1060B is USD 1,030,422.70 [$98,000 per day (charter hire) − $81,849.17

(amount that should have been mitigated) = $16,150.83 as the daily amount of damages; $16,150.83 x 55 days = $888,295.43; $888,295.43 + $142,127.27 (16% VAT) = $1,030,422.70].

As regards interest, by September 30, 2016, interest at 8% amounted to USD 157,414.71 [697 days late x $225.85 daily rate (not rounded)]. By the same date at 12%, interest was USD 236,122.07 [697 days x $338.77 daily rate].

## DISPOSITIVE CONCLUSIONS

The table below summarizes Ranger's damages as determined by the Tribunal:

| | Principal | Interest at 8% (as of 30-Sept-16) | Interest at 12% (as of 30-Sept-16) |
|---|---|---|---|
| Pre-suspension damages | $4,158,846.52 | $655,148.17 | $982,722.25 |
| Post-suspension through Oct. 31, 2014 | $9,087,910.89 | $1,401,970.89 | $2,102,956.33 |
| Post-suspension through Dec. 25, 2014 | $1,030,422.70 | $157,414.71 | $236,122.07 |
| **Total:** | **$14,277,180.11** | **$2,214,533.77** | **$3,321,800.65** |

Interest on the USD 14,277,180.11 after September 30, 2014, accrues at the daily rate of $3,129.24 for the 8% rate and $4,693.87 for the 12% rate.

Accordingly, the Tribunal holds that the Respondents are jointly and severally liable to the Claimant as of September 30, 2016 in the amount of **$16,491713.88**, inclusive of interest as of that date; that Grupo is separately liable to the Claimant for an additional **$1,107,266.88** as of the date of this Award, representing the higher interest rate of 12% provided for in the Guarantee, and that this Award will accrue interest at the applicable rates from the date of this Award until satisfied.

## <u>Bifurcation and Reservation of Jurisdiction</u>

As indicated in the Tribunal's August 16, 2016 email to the Parties, "the parties also agreed during the course of hearings that issues relating to fees, costs and VAT would be treated separately from substantive claims, cross or counterclaims, demands and defenses."

The Tribunal thus, does not address in this Partial Final Award the following issues:

    (i)    whether Mexican VAT laws require a reduction of the amounts hereby awarded, and if so to what extent;

    (ii)    whether fees and costs are shifted to any party and, if so, in what amount.

Those issues shall be addressed in a separate phase of this same arbitration.  Particulars of the procedure with respect to that phase shall be provided in a separate order within 14 days of service of this Partial Final Award.

[For reasons of convenience in complying with the signing procedure, the signatures of the Tribunal are placed hereafter on a separate page of this award.]

## SIGNATURES ON FOLLOWING PAGE

Made in Houston, Texas on September 30, 2016.

_____

EUGENE J. SILVA, Chairman

_____

JAMES PATRICK COONEY

_____

ANIBAL SABATER

[1]     The Tribunal was presented with a number of requests for interlocutory rulings and issued several orders in response to these requests. All prior rulings are incorporated herein and superseded by this Partial Final Award.

[2]     Grupo became a guarantor of Tradeco's obligations under the Charter Party and became a party to this arbitration by agreement, with Grupo accepting the Tribunal's jurisdiction.

[3]     The Tribunal recognizes and accepts the *Toucan's* emissions during its employment by SUBSEA 7 could very well have constituted an annoyance or even discomfort to personnel on board and those on the platform. Marine diesel engines by design and intent are required to expel smoke and exhaust in order to function. That's not the central issue in this arbitration. What must be considered and resolved is whether the level and frequency of exhaust was such that the vessel was either unseaworthy or unfit or both under maritime law such that Tradeco, not Pemex, was justified in unilaterally repudiating the charter party.

[4]     Tradeco has argued the *Toucan's* area of operation was limited to Mexican waters. In advancing this point it relies not on the charter terms between Tradeco and Ranger, but rather the previous charter between ROI and Ranger. That is irrelevant as a matter of law and misleading in practice. The vessel could have been operated under the Ranger/Tradeco charter anywhere in the Gulf because the referenced clause related only to insurance that required conformity "...with the terms of the insurance coverages referred to in Article 12 of this [ROI/Ranger] agreement." This does not in any way restrict the vessel's freedom of movement or location, only the need to secure appropriate coverage. It is common knowledge in the offshore industry that endorsements to expand insurance coverage are routinely issued by underwriters unless the vessels are entering a war zone or an otherwise hazardous region of the world (sometimes referred to as an "area of increased risk"). Some examples of increased risk would be the coast of Somalia or the straits of Hormuz, but not the Gulf of Mexico. An endorsement expanding areas of operation in most cases can be accomplished within 48 hours of giving underwriters notice of the vessel's intended movement.

[5]     Moreover, the nature and extent of Pemex' regulatory authority in its business affairs now and in the recent past (since 2013) has been the subject of serious question in Mexico and informed commentary generally within the legal community (See, Alejandro Lopez-Velarde and Philip D. Vasquez, <u>Historic Break with the Past: The New Foreign Investment Possibilities in the Mexican Oil and Gas Industry</u>, 153-179 Natural Resources Journal Vol. 55 [2014]); to wit:

Mexico is redefining Pemex's participation in the oil and gas industry as a commercial public entity rather than an administrative public entity subject to commercial regulations. Contracts awarded to the private sector will be governed by mercantile and civil law instead of the administrative law, which previously established terms and conditions in favor of public entities such as Pemex.

6   Clause 6(b) of the Charter Party provides:

Relevant permission and licenses from responsible authorities for the Vessel to enter, work in and leave the Area of Operation shall be obtained by the Charterer and the Owners shall assist , if necessary, in every way possible to secure such permission and licenses.

7   It was suggested by Ranger that Pemex was dissatisfied with Tradeco's performance regarding the contemplated project and used the *Toucan* authorization as a vehicle to remove Tradeco from the project, but there is no evidence supporting this possibility. Suffice it to say, that while the reasons for Pemex' actions are unclear, they do not provide a basis to find that the *Toucan* was unseaworthy.

8   There is a significant legal and practical difference between the obligation of an owner to exercise due diligence in maintaining a seaworthy vessel on the one hand, and having to "prove" that fact to a third party with whom the owner is not in privity of contract on the other. In most cases the question of seaworthiness arises only after an accident or injury occurs, and the charterer, insurer, shipper or seafarer, as the case may be, raises the issue to support a claim for damages or denial of coverage. In this case, *Toucan* did not damage or injure any person or thing while working for Tradeco and the entity that found her not "suitable" (although never claiming unseaworthiness) was Pemex, not Tradeco. The only damage Tradeco suffered was Pemex' failure to allow *Toucan* access to the worksite. Tradeco itself failed to raise unseaworthiness as an issue for seven and a half weeks (52 days) after re-delivery during which period it continued to express its desire to employ the vessel and tried to change Pemex' mind. It was only when Pemex refused that Tradeco ultimately claimed unseaworthiness at the same time and in the same correspondence that reputed the charter party.

9   Tom Cunningham, the Executive Vice President of Ranger Offshore testified that he had been in the  offshore construction and diving industry for over 40 years in a variety of positions and that he had been involved in overseeing the installation of new emission injectors on the *Toucan's* engines. He testified that a certificate of completion of the repairs had been provided and that the installation of new emission injectors resolved the smoke problem with the engines. (Page 81).

41

John Michener ,an experienced Project Director who had been employed by EMAS and by Subsea 7, provided his testimony from Nigeria by way of a Skype transmission. He stated that there had been no complaints that exhaust coming from the *Toucan* constituted a safety hazard and that any problem of exhaust exposure to personnel could be mitigated by orientating the vessel to the wind. (Page 416).

Dave Burt spent 36 years in the offshore construction industry in a variety of positions, including about half that time as a diver aboard vessels similar to the *Toucan*. He is an employee of EMOS. He testified that exhaust smoke was not an issue for him. His concern was keeping the divers safe and the vessel in position and providing power for life support systems. (Page 422).

[10]  Kevin Highfield is a marine surveyor and Master Mariner with 40 years of seagoing experience, 24 years as a surveyor. He inspected the *Toucan* for the purpose of forming an opinion as to seaworthiness and suitability of the vessel.

He described *Toucan* as "a modern generation dynamically-positioned construction vessel fitted out for dive support. It was certificated appropriate to its size, type, and service, and it was well-operated and maintained and –as we considered it -- that the vessel was seaworthy and suitable for the intended operation". (Page 712). He concluded with, "This was a good boat with a good track record, good equipment, and proven reliability." (Page 722).

Sean Hogue is a Master Mariner with 20 years of seagoing experience and as a surveyor. He testified that he believed "the vessel was suitable. It seemed like during the course of reviewing the documentation I had seen reference to commendations towards the vessel for the high power that it had which would allow it to work in more adverse conditions than some other vessels in the field. I know it was going to be engaged in the eastern phase of this platform that they were working against, which would be the predominantly blow-on side and because of the diving operations it would have to work in close quarters. So, you would want a vessel with a large reserve of power." (Page 744, 751).

Pierce Power is a Marine Engineer with 30 years of experience as a mariner and surveyor. Mr. Power was called as an expert by Tradeco. He could not testify that the *Toucan* was unseaworthy, but he did feel that there were several unanswered questions regarding the Roll-Royce repair report  regarding what was actually done to repair the engines. He was particularly concerned with a missing NOX file that provide records concerning the engine emissions and emission repair. (Page 757).

[11]  Cl. Pre-Hearing Br., p. 19; Resp. F. Hearing Br., p. 17.

[12]  Cl. Post-Hearing Br., p. 13.

13   "Ranger Mexico has been charged with all of the hire due under the intra-company charter ...." Cl. Pre-Hearing Br., p. 19.

14   "ROM entered the Charter with an aim toward realizing revenues generated from future diving services ... No such services were ever performed." Cl. Post-Hearing Br., p. 13.

15   Cl. Post-Hearing Br., p. 13.

16   Cl. Post-Hearing Br., p. 14, fn. 19.

17   "When the LEWEK TOUCAN was returned to EMAS, ROM (and ROI) mitigated any damages. ... Thus, ROM is not entitled to recover damages that have been mitigated and therefore Tradeco is not liable to ROM for any portion of the $98,000 per day in charter hire ...." Resp. F. Hearing Br., p. 18.

18   "[T]o the extent ROM is entitled to any claim for the period subsequent to October 31, 2014, the proper amount to be utilized as an offset would be the charter hire rate set forth in ROM's charter agreement with ROI, which was $74,408.34 (plus a 10% markup) per day (i.e., the amount of damages that were mitigated by ROM)." Resp. F. Hearing Br., p. 20.

19   Schoenbaum, 2 ADMIRALTY & MAR. LAW § 11-17 (5th ed. 2015) ("A condition, on the other hand, is said to go to the root of the agreement, entitling the innocent party to refuse further performance and to repudiate the contract."). See Restatement (Second) of Contracts § 253(2) ("Where performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance.").

20   Schoenbaum, 2 ADMIRALTY & MAR. LAW § 11-17 (5th ed. 2015) ("In the case of wrongful cancellation of the charter, the shipowner may recover the difference between what he did earn and what he would have earned under the charter. This presumes that the shipowner made reasonable efforts to mitigate damages by finding a substitute charter.").

21   United Transp. Co. v. Berwind-White Coal Mining Co., 13 F.2d 282, 284 (2d Cir. 1926) ("it is the business of the court to grant as solatium to the injured shipowner the difference between what he did earn and what he would have earned during the time that would have been required to fulfill the charter of which he was wrongfully deprived."); Liberty Nav. & T. Co. v. Kinoshita & Co., Ltd., Tokyo, 285 F.2d 343, 346 (2d Cir. 1960) ("The damages which the law accords to the plaintiff are the value of the defendant's performance less the plaintiff's savings from being relieved of the necessity of performing on his own part.") (internal citations omitted).

---

22    *Cf.*, for damages caused by the shipowner, Schoenbaum, 2 ADMIRALTY & MAR. LAW § 11-17 (5th ed. 2015) ("Actual consequential damages for lost business opportunities are assessed if reasonably foreseeable, subject to the rule of *Hadley v. Baxendale* that the shipowner was put on notice concerning the anticipated profit.").

23    Time Charter, Section 14:

> (c) <u>Consequential Damages</u>. –
>
> Neither party shall be liable to the other for a consequential damages whatsoever arising out of or in connection with the performance or non-performance of this Charter Party, and each party shall protect, defend and indemnify the other from and against such claims from any member of its Group as defined in <u>Clause 14(a)</u>.
>
> "Consequential damages" shall include, but not be limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance, whether or not foreseeable at the date of this Charter Party.

24    *Domar Ocean Transp., Ltd., Div. of Lee-Vac, Ltd. v. Indep. Refining Co.*, 783 F.2d 1185, 1191 (5th Cir. 1986) ("[A] vessel owner is required to mitigate damages and may not recover damages for losses resulting from the owner's failure to use reasonable measures to halt the progress of damage.") (internal citation omitted).

25    *See, e.g., Margaret H. Wayne Trust v. Lipsky*, 846 P.2d 904, 911 (Idaho 1993) ("We hold that [a broker's] claim for a commission on this transaction has been extinguished, and that under the circumstances, it was error for the trial court to award a sum for [a broker's] commission to [the non-breaching party].").

26    *Montauk Oil Transp. Corp. v. Sonat Marine, Inc.*, 871 F.2d 1169, 1172 (2d Cir. 1989) (finding that "by now the law is well established that an admiralty court may use equitable principles where appropriate to avoid injustice. ... Such principles may be resorted to for the purpose of making an equitable and just award of damages.").