# EXHIBIT
# A-10

## HOUSTON MARITIME ARBITRATORS ASSOCIATION

| | |
|---|---|
| RANGER OFFSHORE MEXICO, S. DE R.L. DE C.V., | § § § |
| *Claimant,* | § § |
| vs. | § § |
| TRADECO INFRAESTRUCTURA, S.A. DE C.V. | § § § |
| *Respondent.* | § |

## RESPONDENTS TRADECO INFRAESTRUCTURA, S.A. DE C.V. AND GRUPO TRADECO, S.A. DE C.V.'S SECOND AMENDED COUNTERCLAIM AND STATEMENT OF DEFENSE

TO THE HONORABLE PANEL:

Tradeco Infraestructura, S.A. de C.V., and Grupo Tradeco, S.A. de C.V., Respondents in the above styled and numbered cause, file their Second Amended Counterclaim and Statement of Defense in response to Claimant Ranger Offshore Mexico, S. de R.L. de C.V.'s Notice of Arbitration, and in support thereof respectfully state:

### I.    INTRODUCTION

1.    Tradeco Infraestructura, S.A. de C.V. ("Infraestructura") is a Mexican construction and infrastructure development company founded in 1992. On or about March 23, 2013, Ranger Offshore Mexico, S. de R.L. de C.V. and Ranger Offshore, Inc., developed a ten page proposal[1] for the provision of diving services for a Pemex public tender. Ranger's proposal scoped work on three pipelines in the Ku Maloob Zaap (Kumaza) oilfields in the Gulf of Mexico. Ranger's proposal required two critical resources. First, it needed a Pemex-approved vendor. Second, Ranger's proposal needed a dive support vessel. The Pemex-approved vender was to be Infraestructura. For the vessel, Ranger identified a company known as EMAS, which

---

[1] **Exhibit R-27.**

had the ability to provide a vessel with capabilities such as those offered by the *M/V Lewek Toucan.* Ranger urged that a vessel be secured without delay, citing competing demand in Africa.

2.     On approximately June 17, 2013, Infraestructura contracted with Pemex to perform the work contemplated by Ranger's proposal.

3.     The work involved connecting pipelines to a platform that Pemex planned to build. Obviously, the work could not be performed until the platform was built and ready to connect to. Pemex repeatedly failed to have the platform built by the time it had promised, making it impossible for Infraestructura to connect the pipelines and thus, frustrating Infraestructura's intended use for the *Lewek Toucan.* Ranger agreed to work with Infraestructura in order to suspend Infraestructura's charter of the *Lewek Toucan* for a time and to finance the payment of charter hire that had accrued. In exchange, Infraestructura's parent company, Grupo Tradeco S.A. de C.V., became a guarantor of those amounts.

4.     Unfortunately, while Infraestructura's charter was suspended and the *Lewek Toucan* was being used by a different contractor in the same field, the *Lewek Toucan* experienced a major malfunction with regard to its exhaust system. This was not the first such problem experienced by the *Lewek Toucan* during relevant periods. The malfunction caused significant problems with regard to Pemex's platforms. Thereafter Ranger and Infraestructura were unable to satisfy Pemex of the seaworthiness of the *Lewek Toucan.* The *Lewek Toucan* remained barred from Pemex fields, and Infraestructura lost its contract with Pemex. Both the failure of Pemex to build the platform which was a prerequisite to the pipeline connection work for which Ranger had developed its proposal of March 23, 2013, and the rejection of the *Lewek Toucan* by Pemex constituted *force majeure* events under the express terms of the Charter Party

2

Agreement.  Additionally, the facts underlying the latter also constituted a failure by Ranger to provide a seaworthy vessel which in turn caused Infraestructura to incur losses (associated with a sandbagging job) in the amount of $1,985,815.80, which Respondents assert by way of claim and, alternately, offset.

5.     In 2015 Ranger instituted proceeding in federal court in the Southern District of New York, the Southern District of Florida, and the Southern District of Texas, seeking, *inter alia*, garnishments under Supplemental Rule B, against Grupo, based on the false contention that the Texas Department of Transportation, *inter alia*, was in privity of contract with Grupo. Moreover, although Ranger could have very easily filed the federal court actions under seal, it chose not to, in order to bring illegitimate pressure on Respondents. In so doing, Ranger breached its express duties of confidentiality under the Charter Party Agreement as well as under two other agreements, to wit: that certain Cooperation Agreement between Ranger, Infraestructura, and Operaciones y Rentas Costa Afuera S.A. de C.V. dated as of July 6, 2013 (the "Cooperation Agreement")[2] and that certain Master Service Agreement between the same parties with an effective date of February 14, 2014, (the "MSA"[3] and, together with the Cooperation Agreement, the "Mexican Agreements.")  As a result, two contracts Infraestructura had with the Texas Department of Transportation were taken over by a bonding group and, as a consequence, Infraestructura suffered financial losses which are yet to be fully realized but which are known to exceed $1,106,849 and which Respondents asserts by way of claim and, alternatively, offset.

---

[2] **Exhibit R-28.**
[3] **Exhibit R-29.**

## II.     INDEX OF EXHIBITS[4]

Exhibits are attached as follows:

**Exhibit R-1 –** October 9, 2013 letter from Ing. Alfredo Gómez Rangel of Pemex to Ing. Gustavo Trujillo Hernandez of Infraestructura.

**Exhibit R-2** – BIMCO Time Charter Party for Offshore Service Vessels, executed by Ranger Offshore Mexico, S. de R.L. de C.V. and Tradeco Infraestructura, S.A. de C.V. on January 31, 2014.

**Exhibit R-3 –** Amendment No. 1 To that BIMCO Time Charter Party for Offshore Service Vessels Between Ranger Offshore Mexico and Tradeco Infraestructura, executed June 13, 2014.

**Exhibit R-4 –** August 13, 2014 letter from Eduardo Andrés Benton Zavala of Infraestructura to Thomas F. Cunningham of Ranger Offshore Inc.

**Exhibit R-5** – May 27, 2014 BIMCO Charter Party Guarantee executed between Ranger Offshore Mexico, S. de R.L. de C.V. and Grupo Tradeco, S.A. de C.V.

**Exhibit R-6 –** July 28, 2014 letter from Ing. Rodrigo Hernández Gómez of Pemex to Ing. José César Velázquez Muñoz and Caleb Raywood o Sr. Arie Peter Smits (relevant excerpts).

**Exhibit R-7 –** August 12, 2014 letter from Ing. Ricardo Carrillo Zapata of Pemex to Ing. Gustavo Trujillo Hernández of Infraestructura.

**Exhibit R-8 –** August 15, 2014 letter from Ing. Eduardo Andrés Benton Zavala of Infraestructura to Thomas F. Cunningham of Ranger.

**Exhibit R-9** – August 16, 2014 letter from Thomas F. Cunningham of Ranger to David Espinosa of Infraestructura.

**Exhibit R-10 –** August 18, 2014 letter from Ing. Eduardo Andrés Benton Zavala of Infraestructura to Thomas F. Cunningham of Ranger.

**Exhibit R-10.1** – August 18, 2014 letter from Ing. Gustavo Trujillo Hernández of Infraestructura to Ing. Ricardo Carrillo Zapata of Pemex.

**Exhibit R-11 –** August 20, 2014 letter from Gerson Arreola of Ranger to David Espinosa of Infraestructura.

---

[4] Contemporaneously herewith, Respondents have filed a motion for Partial Summary Disposition to Dismiss or in the Alternative, Abate, based on mandatory arbitration provisions of the Mexican Agreements.  This pleading is filed subject thereto.

**Exhibit R-12** – August 22, 2014 letter from Eduardo Andrés Benton Zavala of Infraestructura to Gerson Arreola of Ranger.

**Exhibit R-13** – August 23, 2014 letter from of Gerson Arreola of Ranger to David Espinosa of Infraestructura.

**Exhibit R-14** – September 30, 2014 letter from Ing. Ricardo Carrillo Zapata of Pemex to Ing. Gustavo Trujillo Hernández of Infraestructura.

**Exhibit R-15** – October 2, 2014 letter from Ing. Gustavo Trujillo Hernández of Infraestructura to Ing. Ricardo Carrillo Zapata of Pemex.

**Exhibit R-16** – October 3, 2014 letter from Ing. Ricardo Carrillo Zapata of Pemex to Ing. Gustavo Trujillo Hernández of Infraestructura.

**Exhibit R-17** – October 6, 2014 letter from Ing. Eduardo Andrés Benton Zavala to Bill Cunningham of Ranger.

**Exhibit R-18** – December 3, 2014 letter from Ing. Alejandro de la Cruz Colorado of Pemex to Ing. Gustavo Trujillo Hernández of Infraestructura.

**Exhibit R-19 -** January 21, 2015 letter from Ing. David Espinosa Guzmán of Infraestructura to Bill Cunningham of Ranger.

**Exhibit R-20** – Diagram of Kumaza fields and platforms

**Exhibit R-21** – *Allegiance Hillview, L.P. v. Range Texas Prod., LLC*, 347 S.W.3d 855 (Tex. App.—Fort Worth 2011, no pet.)

**Exhibit R-22** – *Ham Marine, Inc. v. Dressler Indus., Inc.,* 72 F.3d 454 (5th Cir. 1995).

**Exhibit R-23** – *Louis Dreyfus Corp. v. 27,946 Long Tons of Corn*, 830 F.2d 131 (5th Cir. 1987).

**Exhibit R-24** – BLACK'S LAW DICTIONARY 814 (6th ed. 1990).

**Exhibit R-25** – *S. Seas Navigation Ltd. of Monrovia v. Petroleos Mexicanos of Mexico City*, 606 F. Supp. 692 (S.D.N.Y. 1985).

**Exhibit R-26** – *Puerto Rico Maritime Shipping Authority v. Star Lines, Ltd.*, 454 F.Supp. 368 (S.D.N.Y. 1978).

**Exhibit R-27** – March 23, 2013 Proposal from Ranger to Infraestructura for pipeline connection work in Pemex's Kumaza Oilfield

**Exhibit R-28 –** Cooperation Agreement dated July 6, 2013 as between Ranger Offshore Mexico, S. de R.L. de C.V., Tradeco Infraestructura, S.A. de C.V. and Operaciones y Rentas Costa Afuera, S.A. de C.V.

**Exhibit R-29 –** Master Services Agreement, effective date of February 14, 2014, as between Ranger Offshore Mexico, S. de R.L. de C.V., Tradeco Infraestructura, S.A. de C.V. and Operaciones y Rentas Costa Afuera, S.A. de C.V.

## III.    DEFINITIONS

6.    Defined terms used herein are:

"**Amendment No. 1**" is defined as the Amendment No. 1 To that BIMCO Time Charter Party for Offshore Service Vessels Between Ranger Offshore Mexico and Tradeco Infraestructura, executed on June 13, 2014.

"**Charter Party Agreement**" is defined as the BIMCO Charter Party Agreement entered into between Ranger Offshore Mexico, S. de R.L. de C.V.  and Tradeco Infraestructura, S.A. de C.V. on January 31, 2014.

"**Charter Party Guarantee**" is defined as the BIMCO Charter Party Guarantee entered into between Ranger Offshore Mexico, S. de R.L. de C.V. and Grupo Tradeco, S.A. de C.V. on May 27, 2014 in Houston, Texas.

"**Grupo**" is defined as Grupo Tradeco, S.A. de C.V.

"**Infraestructura**" is defined as Tradeco Infraestructura, S.A. de C.V.

"**Kumaza Contract**" is defined as the contract entered into between Infraestructura and Pemex on June 17, 2013, called Contrato No. 420833822: Procura, Construcción, Instalación, Interconexión y Puesta en Operación de 3 Ductos Marinos: un oleoducto de 24"Ø x 1.6 km de longitud, de la plataforma PP-KU-B a la plataforma PP-KU-A (KMZ-63); un gasoducto de 24" Ø x 1.9km de longitud, de la plataforma PP-KU-B a la plataforma de enlace KU-A2 (KMZ-64) y un gasoducto de B.M. de 12" Ø x 1.6 km de longitud de PP-KU-A hacia PP-KU-B (KMZ-65); en el campo KU MALOOB ZAAP, Sonda de Campeche, Golfo de México.

"**Pemex**" is defined to include the Mexican state-owned oil company Petróleos Mexicanos, and certain entities within its corporate umbrella, including Pemex-Exploración y Producción (commonly known as "PEP") and its subunits.

"**Ranger**" is defined as Ranger Offshore Mexico S. de R.L. de C.V.

"**Vessel**" is defined to mean the *M/V Lewek Toucan*.

## IV.     FACTS

7.     Tradeco Infraestructura, S.A. de C.V. ("Infraestructura") is a Mexican construction and infrastructure development company founded in 1992.  On or about March 23, 2013, Ranger Offshore Mexico, S. de R.L. de C.V. and Ranger Offshore, Inc., developed a ten page proposal for the provision of diving services for a Pemex public tender.  **Exhibit R-27.** Ranger's proposal scoped work on three pipelines in the Ku Maloob Zaap (Kumaza) oilfields in the Gulf of Mexico. ***Id.***  Ranger's proposal required two critical resources.  First, it needed a Pemex-approved vendor.  Second, Ranger's proposal needed a dive support vessel.  The Pemex-approved vender was to be Infraestructura. For the vessel, Ranger identified a company known as EMAS, which had the ability to provide a vessel with capabilities such as those offered by the *M/V Lewek Toucan.*  Ranger urged that a vessel be secured without delay, citing competing demand in Africa.

8.     On approximately June 17, 2013, Infraestructura contracted with Pemex to perform the work contemplated by Ranger's proposal.  The work involved connecting three pipelines to a platform that PEMEX intended to have built.  The platform was known as the PP-KU-B.  In order for Infraestructura to connect the pipelines to the PP-KU-B, Infraestructura needed a vessel with the capabilities possessed by the *Lewek Toucan*.  Critically, Infraestructura also needed PEMEX to build the PP-KU-B platform.  ***See*** **Exhibit R-20** (showing a map of the Ku Maloob Zaap field and the proposed oil and gas pipelines within the field).

9.     On or about July 6, 2013, Ranger and Tradeco finalized that certain Cooperation Agreement, which Ranger provided, whereby Ranger undertook, in pertinent part, "to assist TRADECO and/or ORCA in the evaluation and preparation of Proposals in accordance with

Tender Documents issued by Customer [PEMEX] that require ROM [Ranger's] services…" ***See Exhibit R-28***.

10.    On October 9, 2013 Pemex notified Infraestructura that the PP-KU-B platform would be built by February or March 2014.  ***See Exhibit R-1.***  Based on this, Infraestructura contracted to charter the *Lewek Toucan* beginning in late January 2014. ***See Exhibit R-2.***

11.    Unfortunately, Pemex failed build the PP-KU-B by February or March 2014, as it had promised.  This failure prevented Infraestructura from being able to use the *Lewek Toucan* as intended.  Accordingly, Ranger and Infraestructura worked together to suspend Infraestructura's charter of the *Lewek Toucan* and to finance charter hire that had become due in the interim.

12.    Ranger and Infraestructura's agreement was retroactively formalized in Amendment No. 1 dated June 13, 2014, which states in pertinent part, "For the convenience of the Charterers [Infraestructura], the Charter will be suspended with the effective date of April 14, 2014 as of 11:59 P.M. U.S. Central Time for a period of not more than 85 days, and an option to Owners [Ranger] to continue the suspension for a period necessary to the complete the project, voyage or well in progress, such time not to exceed 65 days." ***See Exhibit R-3.***  Ultimately, it was agreed that the suspension would last 120 days, concluding August 14, 2014.  ***See Exhibit R-3 and Exhibit R-4***.

13.    Amendment No. 1 also contained the parties' agreement to finance existing charter hire as follows:

- $  600,000.00 payable no later than June 30, 2014.
- $1,189,711.63 payable no later than July 31, 2014.
- $1,189,711.63 payable no later than August 29, 2014.
- $  989,711.63 payable no later than September 30, 2014.
- $  989,711.63 payable no later than October 31, 2014.
- $  989,711.63 payable no later than November 28, 2014.

**Exhibit R-3.**

14.     The agreed payment schedule would have allowed Infraestructura to make the majority of the payments after the PP-KU-B platform had been built and thus after the platform would have been available to make use of the *Lewek Toucan*.  However, as explained below, Infraestructura was never able to use the *Lewek Toucan* as intended.  Despite this fact (and other extenuating circumstances, also detailed below) Infraestructura made at least three separate payments towards the scheduled amounts, totaling at least $1,330,550.00.

15.     In conjunction with the financing of existing charter hire, the parties also agreed that Grupo would become a guarantor of the Charter Party Agreement, by means of a Charter Party Guarantee, which, by its terms, identifies itself with the Charter Party Agreement:  "In consideration of the Owners agreeing to charter the Vessel to the Charterers and accepting this Guarantee as security for the payment by the Charters of sums due under this Charter Party Agreement."  **Exhibit R-5 at 2(a)** (**emphasis added**).

16.     In mid-summer 2014, while the Charter Party Agreement was still suspended, Pemex notified Infraestructura that construction of the PP-KU-B platform was again delayed and that the platform would not be completed until September 2014.  ***See* Exhibit R-6 at p. 52.** Thus, by the time the Charter Party Agreement was set to have come off "suspended" status, Infraestructura would have still been without the platform for which it had chartered the *Lewek Toucan*.

17.     However, on July 23, 2014, before the suspension ended the *Lewek Toucan* suffered a failure of the Vessel's emissions system (the Vessel was being employed by another Pemex contractor at the time).  ***See* Exhibit R-7.**  According to Pemex, the emissions failure caused a large release of smoke, which adversely affected personnel who were working near the E-KU-A2 and E-KU-A1 platforms.  The emissions failure caused or threatened to cause the Ku-

A processing center to shut down for a period of time.  Ultimately this led to Pemex declaring the *Lewek Toucan* unfit for service – effectively barring the Vessel from the field and prohibiting Infraestructura from using the Vessel as intended.  ***Id.***

18.    During August and September 2014, a series of communications passed between Pemex and Infraestructura, on the one hand, and Infraestructura and Ranger on the other.  By way of overview, those communications consisted of:

- Pemex repeatedly telling Infraestructura that the *Lewek Toucan* was unacceptable due to the exhaust system failure;

- Infraestructura's relaying Pemex's objections to Ranger; and

- Ranger's denials.

More specifically, those communications were as follows:

- **August 7:**  Infraestructura asked Pemex to provide detail concerning Pemex's objections to the Vessel (referencing Infraestructura's August 7 correspondence).  ***See* Exhibit R-7.**

- **August 12:**  Pemex responded to Infraestructura's August 7, 2014 request but did not provide the detailed report requested. Instead, Pemex reiterated its complaint about the exhaust system failure.  Pemex also stated that it would require evidence of the repair to the exhaust system before Pemex would provide a full report of its objections to the Vessel.  ***See* Exhibit R-7.**

- **August 13:**  Infraestructura notified Ranger of Pemex's position.  ***See* Exhibit R-4**.

- **August 15:**  Infraestructura reiterated to Ranger the fact that the *Lewek Toucan* had to fulfill all of Pemex's conditions before Pemex would allow Infraestructura the Vessel.  ***See* Exhibit R-8.**

- **August 16:**  Ranger replied to Infraestructura to say that the exhaust problem had been corrected.  ***See* Exhibit R-9.**

- **August 18:**    Infraestructura wrote to Ranger, reiterating that Pemex's communications of July 23, 2014 indicated a prohibition on the return of the Vessel to the project, and that Ranger must again terminate the BIMCO Charter Party Agreement with Infraestructura unless Infraestructura received assurances regarding Pemex's acceptance of the Vessel.  Included with the letter was

Infraestructura's Inspection Request for the *Lewek Toucan* which it made to Pemex. Infraestructura stated that if the inspection was positive, and clearance obtained from Pemex, Infraestructura would be able to reinstate the Charter Party Agreement. ***See* Exhibits R-10 and 10.1.**

- **August 20:** Ranger wrote to Infraestructura, stating Ranger's disagreement with Infraestructura's positions yet promising to assist in coordinating an inspection of the Vessel in order to attempt to satisfy Pemex. ***See* Exhibit R-11.**

- **August 22:** Infraestructura reiterated that Pemex would not allow the *Lewek Toucan* into the Kumaza field until Ranger provided necessary certifications of repair to the exhaust system. ***See* Exhibit R-12.**

- **August 23:** Ranger claimed that "Pemex's position has no bearing on the Charter." ***See* Exhibit R-13.**

- **August 25:** Infraestructura communicated the need for the *Lewek Toucan* for a different opportunity – a "sandbagging project" the purpose of which was to fix damage to the sea floor caused by another contractor taking part in the construction of the PP-KU-B platform. Mindful of Ranger's insistence that Infraestructura should employ the *Lewek Toucan* and consistent with the *force majeure* provision that Infraestructura was to "make all reasonable efforts to avoid, minimize, or prevent the effects of *force majeure*" Infraestructura representatives negotiated with PEMEX to undertake the project. Ultimately, however, the sand-bagging project did not come to fruition.

- **September 30:** Pemex notified Infraestructura that the *Lewek Toucan* was deemed unfit to perform work in the area of the platforms, including the sandbagging project. ***See* Exhibit R-14.**

19.     On October 2, 2014, Infraestructura made a demand to Pemex under an administrative reconciliation process for approximately $22.8 million USD due to losses sustained by virtue of Pemex's delays throughout the entirety of the Kumaza Contract. ***See* Exhibit R-15.** The next day, Pemex notified Infraestructura that it expected the PP-KU-B platform to be installed on January 18, 2015, and to submit a new work plan, taking into account this date. ***See* Exhibit R-16.**

20.     On October 6, 2014, Mr. Eduardo Andrés Benton Zavala of Infraestructura wrote Bill Cunningham, president of Ranger. Mr. Benton informed Ranger that because Pemex had

rejected the *Lewek Toucan*, Infraestructura could not use the Vessel and that Ranger should dispose of it as Ranger saw fit. *See* **Exhibit R-17**.

21.     Pemex eventually responded to Infraestructura's financial demands on December 3, 2014, in a letter to Mr. Gustavo Trujillo Hernández (Gerente de Proyecto) of Infraestructura, to state that in relation to contract no. 420833822, Pemex did not have enough money in its budget to pay an amount demanded by Tradeco but that an authorization would be contemplated when it had the budgetary resources. *See* **Exhibit R-18**.

22.     On January 14, 2015, a meeting was held between Ranger, Infraestructura and Grupo Tradeco parties.

23.     On January 21, 2015, David Espinoza Guzmán, Vice President of Infraestructura, wrote to Bill Cunningham, president of Ranger:

> Dear Bill,
>
> Thank you for meeting with us on January 14, 2015 and for the offer contained in your email of January 19, 2015. Below is our proposal for what we hope will be a mutually acceptable resolution of the outstanding issues surrounding the Charter. You are already well-aware that the difficulties that both Tradeco and Ranger Offshore experienced with regard to mobilization of the MV Lewek Toucan (the "**Vessel**") last August did not result from any fault of Tradeco but were, rather, entirely the result of decisions made by the government of Mexico, acting through Petróleos Mexicanos ("**Pemex**"). In this regard I note at least nine letters passed between Tradeco and Ranger Offshore between August 12, 2014 and August 23, 2014. Further, we wrote to you on October 6, 2014 (copy enclosed) to report that Pemex's final position was that it would not accept the Vessel under any conditions and that due to those "external causes beyond our control… Ranger [was free to] dispose of the [v]essel" as best suited Ranger's interests. By way of additional background, Pemex has not paid Tradeco for the Charter since March, 2014 (which is the reason that only the first two Pagarés mentioned in Amendment No. 1 were able to be paid, leaving a total outstanding to be paid of $5,248,558.00.) Each of these occurrences (no payment by Pemex since March, 2014; the refusal to re-mobilize the Vessel last fall; the cancellation of the order for the Vessel) constitute Force Majeure events according to Section 32 of the Charter, the effects of which Tradeco has made every reasonable effort to avoid, minimize or prevent. Most importantly, Tradeco has submitted a claim to Pemex (see enclosed) pursuant to applicable law that provides a mechanism by which

Tradeco can apply to recover some portion of the loss due to the cancellation of Pemex's order for Vessel. We believe Tradeco will make a recovery between April and June of this current year. At that time we propose to meet with you to resolve the portion of the recovery which corresponds to the Charter.

We are doing our best to meet our current contract conditions.

*See* **Exhibit R-19[6] (alterations in original).**

24.    Both the failure of Pemex to build the platform which was a prerequisite to the pipeline connection work for which Ranger had developed its proposal of March 23, 2013, and the rejection of the *Lewek Toucan* by Pemex constituted *force majeure* events under the express terms of the Charter Party Agreement. Additionally, the facts underlying the latter also constituted a failure by Ranger to provide a seaworthy vessel which in turn caused Infraestructura to incur losses associated with a sandbagging job in the amount of $1,985,815.80, which Respondents assert by way of claim and, alternately, offset.

25.    In 2015 Ranger instituted proceeding in federal court in the Southern District of New York, the Southern District of Florida, and the Southern District of Texas, seeking, *inter alia*, garnishments under Supplemental Rule B, against Grupo, based on the false contention that the Texas Department of Transportation, *inter alia*, was in privity of contract with Grupo. Moreover, although Ranger could have very easily filed the federal court actions under seal, it chose not to, in order to bring illegitimate pressure on Respondents. In so doing, Ranger breached its express duties of confidentiality under the Charter Party Agreement as well as under the Mexican Agreements.[7] As a result, two contracts Infraestructura had with the Texas Department of Transportation were taken over by a bonding group, as a consequence, Infraestructura suffered financial losses which are yet to be fully realized but which are known to

---

[6] **Exhibit R-19** refers to an "enclosed" claim to Pemex made by Infraestructura pursuant to applicable law. The claim to Pemex referred to in Exhibit S is attached hereto as **Exhibit R-15.**
[7] **Exhibit R-28** and **Exhibit R-29.**

exceed $1,106,849 and which Respondents asserts by way of claim and, alternatively, offset.

## V.     CLAIMS AND DEFENSES

26.     Respondents generally deny the allegations made against them and respectfully request strict proof thereof.

### A.     UNCLEAN HANDS AND INEQUITABLE CONDUCT

27.     Claimant's claims are barred by unclean hands.

### B.     PREVENTION OF PERFORMANCE

28.     Claimant's claims are barred by prevention of performance.

### C.     BREACH OF CONTRACT

29.     Paragraphs 1-28 are incorporated herein by reference.

30.     Ranger breached the Charter Party Agreement by failing to re-deliver the Vessel in a seaworthy state at the end of the agreed suspension.  Seaworthiness is a condition, the breach of which entitles the charterers to treat the contract as repudiated.  Additionally or alternatively, the Vessel's unseaworthiness caused Respondents to incur financial losses for which Ranger should be held liable.

### D.     FORCE MAJEURE

31.     Paragraphs 1-30 are incorporated herein by reference.

32.     Under Texas law, a force majeure clause is a creation of the parties' contract, and the courts do not read implicit requirements into force majeure clauses.  *Allegiance Hillview, L.P. v. Range Texas Prod., LLC*, 347 S.W.3d 855, 865 (Tex. App.—Fort Worth 2011, no pet.), stating, "'[W]hen the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure,' and

reviewing courts 'are not at liberty to rewrite the contract or interpret it in a manner which the parties never intended'" (*quoting Sun Operating Limited Partnership v. Holt*, 984 S.W.2d 277, 283 (Tex.App.-Amarillo 1998, pet. denied), and *referencing Moore v. Jet Stream Invs., Ltd.*, 261 S.W.3d 412, 420 (Tex.App.-Texarkana 2008, pet. denied)). **Exhibit R-21.**

33.   The force majeure provision (Clause 32) of the Charter Party Agreement reads:

**Force Majeure.**
**Neither party shall be liable for any loss, damage or delay due to any of the following force majeure events and/or conditions to the extent the party invoking force majeure is prevented or hindered from performing any or all of their obligations under this Charter Party, provided they have made all reasonable efforts to avoid, minimize or prevent the effect of such events and/or conditions:**
(a)      acts of God;
**(b)      any Government requisition, control, intervention, requirement or interference;**
(c)      any circumstances arising out of war, threatened act of war or warlike operations, acts of terrorism, sabotage or piracy, or the consequences thereof;
(d)      riots, civil commotion, blockades or embargoes;
(e)      epidemics;
(f)      earthquakes, landslides, floods or other extraordinary weather conditions;
(g)      strikes, lockouts or other industrial action, unless limited to the Employees of the party seeking to invoke force majeure;
(h)      fire, accident, explosion except where caused by negligence of the party seeking to invoke force majeure;
**(i)      any other similar cause beyond the reasonable control of either party.**

The party seeking to invoke force majeure shall notify the other party in writing within 2 working days of the occurrence of any such event/condition.

**Exhibit R-2 (emphasis added.)**

34.   Infraestructura notified Ranger of the occurrence of what constituted a *force majeure* event on August 13, 2014, when Infraestructura informed Ranger that Pemex was not accepting Infraestructura's requests to put the *Lewek Toucan* in the Kumaza field until evidence of repairs were made. Infraestructura reiterated its notice on October 6, 2014, when it informed Ranger that it should dispose of the Vessel as Ranger saw fit.  *See* **Exhibit R-17.**

15

## E.    IMPOSSIBILITY

35.    Paragraphs 1-34 are incorporated herein by reference.

36.    The doctrine of impossibility is apposite in this maritime context. "To the extent that it is not inconsistent with admiralty principles… state contract law may be applied to maritime contracts." *Ham Marine, Inc. v. Dressler Indus., Inc.,* 72 F.3d 454, 459 (5th Cir. 1995). **Exhibit R-22.**   The defense of impossibility of performance is recognized by both general maritime law and the laws of the state of Texas. *See Louis Dreyfus Corp. v. 27,946 Long Tons of Corn*, 830 F.2d 131 (5th Cir. 1987). **Exhibit R-23.**

37.    Infraestructura attempted to find alternative uses of the Vessel within the stated area of operations.

38.    Ranger's insistence that Infraestructura should have found an alternate use for the Vessel is untenable, clearly ignores the practical aspects of employing the Vessel, and is plainly unreasonable.

## F.    FAILURE TO MITIGATE DAMAGES

39.    Paragraphs 1-38 are incorporated herein by reference.

40.    Ranger has failed to mitigate its damages.  Ranger seeks to recover the entire gross amount of charter hire that would have become due under the Charter Party Agreement – with no offset for costs avoided.  Moreover, to the extent Ranger may have mitigated its damages, any such mitigation is not reflected in the amounts which Ranger seeks to recover.

41.    Upon information and belief, Pemex's barring the *Lewek Toucan* from its waters resulted in Ranger's being able to return the Vessel to its owner in exchange for a discount in amounts Ranger owed to the Vessel's owner.

## G.    UNSEAWORTHINESS OF *LEWEK TOUCAN*

42.     Paragraphs 1-41 are incorporated herein by reference.

43.     Infraestructura does not owe Ranger the amounts alleged from the date of July 23, 2014 onward due to the unseaworthy condition of the *Lewek Toucan*.  Infraestructura was not obligated to, and did not accept an unseaworthy vessel.

44.     Seaworthiness is defined under general maritime law of the United States as reasonable fitness to perform or do the work at hand.  Ranger had an absolute duty to furnish the Vessel for the purpose for which it was intended.

45.     The Charter Party Agreement states:

3.(a)   The Owners undertake that at the date of delivery under this Charter Party the Vessel shall be of the description and Class as specified in ANNEX 'A' … and in a thoroughly efficient state of hull and machinery.
3.(b) The Owners shall exercise due diligence to maintain the Vessel in such Class and in every way fit for the service stated in <u>Clause 6</u> throughout the period of this Charter Party."

46.     Clause 6 states that, "The Vessel shall be employed in offshore activities which are lawful in accordance with the law of… the place of operation."  The place of operation is defined in the Charter Party Agreement as the Gulf of Mexico.

47.     Ranger's position wholly fails to take into account the nature of "the work at hand" which it knew Infraestructura intended to complete for Pemex.  Moreover, Ranger insisted that Infraestructura should immediately have found alternate projects within a limited theater of operation for a vessel which had suffered recent and significant mechanical failures.

### H.     OFFSET

48.     Pleading in the alternative, as may be necessary, Respondents assert the defense of offset.  Should Ranger be determined to be entitled to make any recovery from Respondents, such recovery should be offset by the losses Respondents suffered as a result of lack of seaworthiness of the Lewek Toucan and Ranger's breach of confidentiality of the Charter Party

Agreement, the Cooperation Agreement and the MSA.

## I.     REQUEST FOR ATTORNEYS' FEES

49.     Respondents make request for costs and attorneys' fees pursuant to § 39 of the Charter Party Agreement and as otherwise permitted by law.

## J.     REQUEST FOR AN INTERIM AWARD IS INAPPROPRIATE

50.     Ranger would have the panel "cherry pick" among the competing claims, defenses, counterclaims, and counter-defenses in an attempt to obtain a final award over part of the case, before the rest of the case has been adjudicated.  To this end Ranger originally urged what it termed a "bifurcation" (a procedural device foreign to the rules of the Houston Maritime Arbitrators Association.)  Ranger amended its Statement of Claim to replace its request for bifurcation with a different mechanism, citing Rule 8.2 which provides for the possibility of an interim award in some circumstances.  However, the substance of what Ranger seeks is not an interim award followed by a final award (as contemplated by Rule 8.2) but rather, two separate final awards.  Ranger's desired outcome is precluded by the plain language of Rule 8.2 and by the meaning of the word "interim."

51.     Ranger impermissibly seeks two separate final awards.

52.     The plain language of Rule 8.2 precludes two separate final awards.  Under Rule 8.2 an interim award is not the equivalent of a final award.

53.     Interim relief means relief until the occurrence of an event – that is, "in the meantime and until something is done."  BLACK'S LAW DICTIONARY 814 (6th ed. 1990). **Exhibit R-24.**  In other words, the order is "temporary," or "for now."  Thus, appropriate subjects of interim awards would include relief necessary to remain in place until the granting of a final award.

54.     The rule allowing entry of an interim award correlates to what in a court of law would amount to temporary or preliminary orders.  *See S. Seas Navigation Ltd. of Monrovia v. Petroleos Mexicanos of Mexico City*, 606 F. Supp. 692, 693-94 (S.D.N.Y. 1985) (referring to an interim award properly granted as "not a partial resolution of the parties' claims as an intermediate step in an ongoing arbitral process but, in effect, a grant of a preliminary injunction.").  **Exhibit R-25.**  On the contrary, to be "final" and "definite" an award "must both resolve all issues submitted to arbitration, and determine each issue fully so that no further litigation is necessary to finalize the obligations of the parties under the award."  *Puerto Rico Maritime Shipping Authority v. Star Lines, Ltd.*, 454 F.Supp. 368, 372 (S.D.N.Y. 1978).  **Exhibit R-26.**

55.     Rule 8.2 itself distinguishes between the two concepts, making clear that an interim award is not the same as a final award.  Ranger seeks to misapply the concept of an interim award in order to obtain a final award on matters that remain to be fully heard before the panel and are not, as Ranger characterizes them, "undisputed."

WHEREFORE, Tradeco Infraestructura, S.A. de C.V. and Grupo Tradeco, S.A. de C.V. pray that Ranger Offshore Mexico, S. de R.L. de C.V.'s claims be denied, that Tradeco Infraestructura, S.A. de C.V. and Grupo Tradeco, S.A. de C.V.'s be awarded damages, and/or alternatively, that offset be applied to Ranger's claims and for such other and further relief, including costs and attorney's fees, to which the Respondents may be justly entitled.

Respectfully submitted,

By:      /s/ Michael K. Bell

Michael K. Bell
State Bar No. 02081200
MBell@BlankRome.com
Jay T. Huffman
State Bar No. 24059980

JHuffman@BlankRome.com
717 Texas Avenue, Suite 1400
Houston, Texas 77002
Telephone:  (713) 228-6601
Facsimile: (713) 228-6605

**BLANK ROME LLP**


_____/s/ Brent L. Vannoy_____
Brent L. Vannoy
State Bar No. 00794782
bvannoy@jdkglaw.com
4 Houston Center
1221 Lamar Suite 1000
Houston, Texas 77010
Telephone: (713) 652-2525
Facsimile: (713) 652-5130

**JOHNSON  DELUCA  KURISKY
& GOULD, P.C.**

**ATTORNEYS  FOR  RESPONDENTS  GRUPO
TRADECO,  S.A.  DE  C.V.  AND  TRADECO
INFRAESTRUCTURA, S.A. DE C.V.**

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument was served on the arbitral panel and the following counsel of record on this, the 25th day of March 2016.

***<u>Via Email: ejsilva@swbell.net</u>***
Gene Silva

***<u>Via Email:  Anibal.Sabater@chaffetzlindsey.com</u>***
Anibal Sabater
Chaffetz Lindsey LLP
1700 Broadway, 33rd Floor
New York, New York  10019

***<u>Via Email:  Patrick.Cooney@roystonlaw.com</u>***
Patrick Cooney
Royston Rayzor
1600 Smith Street, Suite 5000
Houston, Texas 77002

***<u>Via Email:  john.sullivan@klgates.com;</u>***
***<u>brett.young@klgates.com;</u>***
***<u>beth.gilman@klgates.com;</u>***
***<u>devin.wagner@klgates.com</u>***
John F. Sullivan, III
Brett J. Young
Beth A. Gilman
Devin Wagner
K & L Gates, LLP
1000 Main Street, Suite 2550
Houston, Texas  77002

***<u>Via Email:  julius.hines@klgates.com</u>***
Julius H. Hines
K & L Gates, LLP
134 Meeting Street, Suite 200
Charleston, South Carolina  29401


                                    /s/ Brent L. Vannoy
                                    Brent L. Vannoy



# Ranger Offshore, Inc.



## Tradeco Infraestructura S.A. de C.V.
## Ing. Jose Cesar Velazquez Muñoz

*Ranger Offshore México, S. de R.L de C.V. Ave. Edzna No. 49ª, Parque Industrial*
*Mundo Maya. Ciudad Del Carmen, Camp, 24153*
*Ranger Offshore, INC. 10370 Richmond Ave. Suite 1000 Houston, Texas 77042*





ARREOLA
055
3-Mar-2016
M. Schneider, CSR, RPR

| Prop # | Rev | Approved Estimating | Approved Operations | Approved Legal | Approved HSE | Approved VP Commercial | Approved CEO | Date |
|---|---|---|---|---|---|---|---|---|
| 13-0038 PEP (50s-13) | | | | | | | | 3/19/2013 |

### CONFIDENTIALITY AGREEMENT

This proposal contains business and technical information proprietary to Ranger Offshore Inc. This document is provided for review and evaluation only and is not to be reproduced or distributed to third parties without the express written permission of Ranger Offshore Inc.

EXHIBIT
R - 27





Ranger Offshore Inc.                    **TRADECO**                    **Proposal #13-0038**

## TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| **1** | **SERVICE LINES** | | **3** |
| | 1.1 | COMPANY STRUCTURE | 3 |
| | 1.2 | HEALTH, SAFETY AND ENVIRONMENTAL (HSE) MANAGEMENT | 3 |
| | 1.3 | SCOPE OF WORK | 4 |
| **2** | **EQUIPMENT** | | **4** |
| **3** | **PERSONNEL** | | **5** |
| | 3.1 | SATURATION DIVING CREW | 5 |
| **4** | **PRICING SCHEDULE CREW AND EQUIPMENT** | | **5** |
| | 4.1 | PERSONNEL AND EQUIPMENT | 5 |
| | 4.2 | U.S. CREW OVER TIME RATES PERSONNEL EACH CHARGED AFTER 12 HOURS | 5 |
| | 4.3 | ADDITIONAL RATES FOR EQUIPMENT OR SERVICES MAY BE PROVIDED UPON REQUEST | 6 |
| **5** | **TERMS AND CONDITIONS** | | **7** |
| | 5.1 | VALIDITY | 7 |
| | 5.2 | COMMERCIAL/CONTRACTURAL | 7 |
| | 5.3 | OPERATIONS | 8 |
| **6** | **ATTACHMENT 1 – ACKNOWLEDGEMENT OF CONTRACT** | | **9** |
| **7** | **ATTACHMENT 2- COST BREAKDOWN** | | **10** |
| | 7.1 | MOBILIZATION | 10 |





Ranger Offshore Inc.                    **TRADECO**                    Proposal #13-0038

# 1    SERVICE LINES

- Saturation diving to water depths of 1000 feet
- Surface supplied air and mixed gas diving to water depths of 300 feet
- Level II, III & IV MMS platform inspections
- Pipeline repairs and abandonments
- Pre- and post-pipeline crossing remediation
- Spool piece metrology and subsea tie-ins
- Underwater burning and welding
- Rig support and rig move site surveys
- Site clearance, debris removal and salvage
- Lay barge, derrick barge and jet barge support
- Pipeline and platform anode retrofits
- Hot taps and subsea valve operations
- Subsea wellhead intervention

## 1.1    COMPANY STRUCTURE

Ranger Offshore Inc. has assembled an experienced management team with extensive knowledge of the marine offshore services market. Ranger has earned an outstanding reputation for our commitment to safety and high quality work.

Total Support

Ranger's headquarters is strategically located in Houston, Texas to provide fast response support to our clients and our operations facility is located in New Iberia, Louisiana.

Ranger Offshore México, S. de R.L. de C.V., a Ranger subsidiary, is strategically headquartered in Ciudad Del Carmen to best support its clients' projects in Mexico.

## 1.2    HEALTH, SAFETY AND ENVIRONMENTAL (HSE) MANAGEMENT

Ranger's Health, Safety, Environment and Quality (HSE&Q) philosophy is to manage all work activities using a system proven HSE&Q process founded on management commitment, supervisor accountability, personnel responsibility and internationally recognized standards. Ranger's HSE&Q Management System is certified by Det Norske Veritas (DNV) to ISO 9001, ISO/TS 29001, ISO 14001 and OHSAS 18001 standards. These certifications demonstrate Ranger's commitment to continuously monitor and measure HSE&Q performance, refine safe operations, correct behaviors, ensure appropriate levels of training, and maximize the quality of services to our clients, while improving the protection of personnel and the environment.

***"The management of Ranger fully believes that all injuries can be prevented and that damage of the environment and to property or equipment can be avoided."***

As such, we are committed to creating a culture that strives for continuous improvement in HSE&Q performance and a working environment where the possibility of harm is reduced to a level which is as low as possible.




Ranger Offshore Inc.                    **TRADECO**                    Proposal #13-0038

### 1.3   SCOPE OF WORK

Ranger Offshore, Inc. / Ranger Offshore Mexico, S. de R.L. de C.V. ("CONTRACTOR") offers this proposal based on the Request for Quote received from Tradeco Infraestructura S.A de C.V., ("COMPANY").  CONTRACTOR will provide diving support services for the following scopes of work:

- Provide diving support during the construction of (3) P/L; 24" x 1.6 km (KMZ-63), 24" x 1.9 km (KMZ-64), and 12" x 1.6 km (KMZ-65). Pemex tender # 18575106-505-13.

## 2   EQUIPMENT

| SURFACE DIVING EQUIPMENT | |
|---|---|
| 1 – Surface Diving Package | |
| 2 - Decompression Chamber | 3 - Diving Umbilical 600' ea. |
| 3- 5120 Compressor | 3 - Bail-Out Bottle |
| 3 - Dive Helmet Superlite 27 | 2 - 60 gal. Volume Tank |
| 2 - Video System | 1 - Dive Control Van |
| 4 - Radio | 2 - Launch and Recovery System |
| 1 - Air Manifold | 1 - 50/50 Regulator |
| 1 - HP Regulator | 2 - $O_2$ Analyzer |
| 1 - Air gear Box | 1 - Gas Fitting Box |
| | |
| SATURATION EQUIPMENT | |
| 1-Dive Control | 1-ECU Van |
| 1- Dive Control Frame | 2-DDC's |
| 1-Reclaim Van | 1-HRC |
| 1-HRC Intervention Van | 1-Bell Winch |
| 1-Umbilical Roller | 1-Clump Winch |
| 1-Lars A-Frame | 2-Band Masks |
| 4-Diving Helmets w/Reclaim | 1- Spares Container  (list to follow) |
| | |
| Rigging Box | |
| 6 - 3/8" x 20' Chain with hooks | 6 - 3/8" Ratchet binder |
| 4 - 2" x 20' Nylon strap | 4 - 2" x 10' Nylon strap |
| 2 - 4" x 20' Nylon strap | 2 - 4" x 10' Nylon strap |
| 4 - 4 Ton snatch block | 2 - 1 1/2 Ton Chain com-a-long |
| 1 - 3 Ton Chain com-a-long | 2 - 1 1/2 Ton Lug-All wire com-a-long |
| 6 - 1/2" Screw pin shackle | 6 - 3/4" Screw Pin shackle |
| 6 - 7/8" Screw Pin shackle | 1 - 1" Safety shackle |
| 1 - Pinch bar | 1 - Crow Bar |




Ranger Offshore Inc.                    **TRADECO**                    Proposal #13-0038

## 3  PERSONNEL

The following personnel and equipment are required for continuous twenty-four (24) hour operations.

| 3.1  SATURATION DIVING CREW | |
|---|---|
| 1 – Saturation Superintendent | 2 - Saturation Supervisor |
| 2 – Sat Tech | 2 – Life Support Tech |
| 6 – Saturation Diver | 2 – Surface Divers |
| 8 – Tender | |

## 4  PRICING SCHEDULE CREW AND EQUIPMENT

| 4.1 | PERSONNEL AND EQUIPMENT | | |
|---|---|---|---|
| 4.1.1 | Saturation Diving Crew and Equipment | Day Rate | $ 37,773.00 |
| 4.1.2 | Project Management and Engineering | Lump Sum | $ 150,000.00 |
| 4.1.3 | Saturation System Std-by (1 superintendent and 2 techs) | Day Rate | $ 17,630.00 |
| 4.1.4 | Mobilization (see attachment 2 for breakdown) | Per Occurrence | See Attachment |
| 4.1.5 | Credit if **CLIENT** supplies vessel for Mob | Per Occurrence | $ 186,000.00 |
| 4.1.6 | Demobilization | Per Occurrence | $ 330,000.00 |
| 4.1.7 | Credit if **CLIENT** supplies vessel for Demob | Per Occurrence | $ 186,000.00 |
| 4.1.8 | Personnel Mob / Demob | Per Occurrence (Cost plus 15%) | (Estimated) $ 1,500.00 |
| 4.1.9 | MXN Personnel Mob / Demob | Per Occurrence (Cost plus 15%) | (Estimated) $ 700.00 |

| 4.2 | U.S. CREW OVER TIME RATES PERSONNEL EACH CHARGED AFTER 12 HOURS | | |
|---|---|---|---|
| 4.2.1 | Superintendent (per person) | Hourly Rate | $ 140.00 |
| 4.2.2 | Supervisor (per person) | Hourly Rate | $ 115.00 |
| 4.2.3 | Diver (per person) | Hourly Rate | $ 105.00 |
| 4.2.4 | Tender (per person) | Hourly Rate | $ 85.00 |





Ranger Offshore Inc.                    **TRADECO**                    Proposal #13-0038

**4.3   ADDITIONAL RATES FOR EQUIPMENT OR SERVICES MAY BE PROVIDED UPON REQUEST**

| Depth Premium Rates (Apply only to US Surface Diving Personnel) US Superintendent receives deepest dive of the day. | | |
|---|---|---|
| 51-100' (per diver) | Per Foot | $ 2.00 |
| 101-150' (per diver) | Per Foot | $ 4.00 |
| 151-200' (per diver) | Per Foot | $ 6.00 |
| 201-250' (per diver) | Per Foot | $ 8.00 |
| 251-300' (per diver) | Per Foot | $ 10.00 |





Ranger Offshore Inc.                    **TRADECO**                    Proposal #13-0038

## 5   TERMS AND CONDITIONS

### 5.1   VALIDITY

5.1.1   This proposal is valid for period of (30) days from the date of submission. It is contingent upon the availability of equipment and personnel, the execution of a mutually agreeable master service agreement ("MSA") and the execution of a mutual agreeable contract ("CONTRACT").

### 5.2   COMMERCIAL/CONTRACTURAL

5.2.1   COMPANY shall pay CONTRACTOR all mobilization cost as follows:

      5.2.1.1   50% upon contract award.

      5.2.1.2   25% upon departure of the US.

      5.2.1.3   25% upon removal of the system from the transit barge.

5.2.2   CONTRACTOR shall submit invoices every 30 days and COMPANY shall pay invoices 30 days in advance.

5.2.3   CONTRACTOR may request COMPANY to obtain and present a bond or other form of acceptable security to secure CONTRACTOR supplied equipment for this project.

5.2.4   CONTRACTOR's proposal has allowed 5 days from the time notice of arrival at mobilization port in Mexico is given to COMPANY, and 5 days from the time CONTRACTOR notifies COMPANY that the system is ready to be demobilized from COMPANY provided vessel, should there be any delays exceeding these five days, the    Stand-By rate will apply.

5.2.5   CONTRACTOR's proposal does not include "all risk" or "builder's risk" insurance and CONTRACTOR is not providing any type of performance bond.

5.2.6   Notwithstanding anything to the contrary, COMPANY shall indemnify and hold CONTRACTOR, its subsidiaries, affiliates, officers, directors, insurers, employees, subcontractors and agents; harmless from and against any and all loss, cost or damage, including any fines, penalties, attorney's fees and court costs, arising from pollution or contamination which originates during the course of this project, other than pollution or contamination which originates from CONTRACTOR's vessel and it's owned equipment, whether or not caused by the negligence of the CONTRACTOR.

5.2.7   CONTRACTOR's proposal has allowed for 2 hours of maintenance or downtime per day. This time will not be subject to penalty.

5.2.8   Personnel day rates are based on twelve (12) hour shifts. A twelve (12) hour shift is the minimum period for billing an offshore workday. Any hours over twelve (12) hours per day requested by the COMPANY will be billing at the listed overtime rates per man-hour.

5.2.9   ABS or DNV integration on COMPANY provided vessel will be on COMPANY's account.

5.2.10   Breakdown of prices are based on COMPANY's scope of work and CONTRACTOR reserves the right to re-evaluate its proposal should the scope of work change or be reduced. CONTRACTOR proposal contains a list of furnished equipment which the CONTRACTOR deems adequate to accomplish the proposed scope of work. Should additional equipment be required at the request of the COMPANY, or as a result of changes to the scope of work, CONTRACTOR will adjust the commercial portion of the proposal accordingly.

5.2.11   All signed daily time tickets indicate approval of work by the COMPANY.

5.2.12   Housing and meals for CONTRACTOR's employees during training while on land will be charged to COMPANY's account.





Ranger Offshore Inc.                    **TRADECO**                    Proposal #13-0038

5.2.13   CONTRACTOR's proposal is not inclusive of VAT.

5.2.14   COMPANY will be responsible for any and all import/export duties imposed or assessed on CONTRACTOR related to its performance of the work, including mobilization and demobilization of CONTRACTOR's personnel and equipment.

5.2.15   Should COMPANY request or require changes or modifications, such changes or modification will be to COMPANY account.

5.2.16   CONTRACTOR's proposal is not inclusive of any installation aids, such as drift-pins, Mesotech, torqueing equipment, slings, etc.

5.2.17   Should COMPANY award CONTRACTOR an additional project, demobilization cost will not apply to this project.

## 5.3   OPERATIONS

5.3.1    All diving operations are conducted in compliance with CONTRACTOR's Operations and Diving Procedure and HSE and Quality Procedures.

5.3.2    CONTRACTOR's supervisor will have the final decision regarding safe working conditions.

5.3.3    COMPANY will be responsible for obtaining consent, permits and/or permission from government agencies or private authorities for the performance of the operations work scope for this project.

5.3.4    Mobilization date will be mutually agreed among CONTRACTOR and COMPANY.

5.3.5    CONTRACTOR's proposal is contingent upon CONTRACTOR's acceptance of COMPANY proposed vessel or barge for the dive operations on COMPANY provided vessel.

5.3.6    CONTRACTOR assumes that the COMPANY will have an offshore medic on the vessel during diving operations while on COMPANY provided vessel.

5.3.7    CONTRACTOR's proposal is based on the COMPANY's vessel having adequate power and fuel to run all CONTRACTOR provided equipment.





Ranger Offshore Inc.                           **TRADECO**                          Proposal #13-0038

## 6    ATTACHMENT 1 – ACKNOWLEDGEMENT OF CONTRACT

Ranger Offshore, Inc. /
Ranger Offshore Mexico, S. de R.L. de C.V.
Estimating Department
10370 Richmond Ave Suite 1000
Houston, TX  77042
Office:  281-465-8331
Fax:  281-465-8335

Return to the Attention of Gerson Arreola
g.arreola@Rangeroffshoreinc.com

Date: 03/19/2013
Subject: Proposal Number   13-0038

We hereby acknowledge receipt and confirm our full acceptance of the documents referred to under
the subject and hereby fully agree on the contents of it without any reservation whatsoever.

Dated:  _____

Company:  _____

Printed Name:  _____

Authorized Signature:  _____





Ranger Offshore Inc.                                    **TRADECO**                                    Proposal #13-0038

# 7   ATTACHMENT 2- COST BREAKDOWN

## 7.1   MOBILIZATION

| DISASSEMBLE THE SAT SYSTEM AND LOAD FOR TRANIST | COST |
|---|---|
| Personnel Charges | $28,997.89 |
| Trucking/Crane Charges | $50,550.08 |
| Barge Charges | $12,999.60 |
| Subtotal | $92,547.57 |

| TRANSIT TO Ciudad Del Carmen, MX | COST |
|---|---|
| Barge Transit to Carmen | $132,000.00 |
| Saturation System (see note 1) | $80,152.93 |
| Barge Charges Unloading System and Customs Hold | $41,000.40 |
| Subtotal | $253,153.33 |

| ASSEMBLE THE SYSTEM ON CLIENT VESSEL | COST |
|---|---|
| Installation Personnel (see note 2 & 3) | $ 11,000.00/per day |
| Saturation System (see note 1, 2 & 3) | $ 8,000.00/per day |
| Installation Material (see note 2 & 3) | $29,951.00/lump sum |
|  |  |
|  |  |
|  |  |

Notes:

1. Sat system charges during transit and assembly on vessel subject to credit based on durations of jobs.
2. Rates to assemble system on vessel "TBD" subject to change based on vessel layout. Assembly duration may vary.
3. Typical assembly duration on "standard DP2 General Arrangement" is 10-14 days.

| COOPERATION AGREEMENT | CONVENIO DE COLABORACION |
|---|---|
| This COOPERATION AGREEMENT ("Agreement") is entered into as of this 6th day of July, 2013, by and between Ranger Offshore Mexico S. de R.L. de C.V., a corporation duly organized under the laws of the United Mexican States, with offices at Av. Edzna #49a, Parque Industrial Mundo Maya, Cd. Del Carmen, Campeche, México C.P. 24153 (herein "ROM"), Tradeco Infraestructura, S.A. de C.V. (herein "TRADECO") y Operaciones y Rentas Costa Afuera, S.A. de C.V. (herein "ORCA") , corporations duly organized under the laws of the Estados Unidos Mexicanos, with offices at Insurgentes Sur 1647, Local D, Col. San José Insurgentes, Del. Benito Juárez, C. P. 03900, Mexico City; jointly known as "The Parties". Unless otherwise defined, capitalized terms used in this Agreement shall have the meaning set forth in Article 1, Definitions. | El presente CONVENIO DE COLABORACION (el "Convenio") se celebra este día 6 de Julio de 2013, entre Ranger Offshore México S. de R. L. de C. V., sociedad debidamente constituida bajo las leyes de los Estados Unidos Mexicanos, con oficinas en Av. Edzna #49a, Parque Industrial Mundo Maya, Cd. Del Carmen, Campeche, México C.P. 24153 (en adelante "ROM"), Tradeco Infraestructura, S.A. de C.V. (en adelante "TRADECO") y Operaciones y Rentas Costa Afuera, S.A. de C.V. (en adelante "ORCA"), sociedades debidamente constituidas bajo las leyes de los Estados Unidos Mexicanos, con oficinas en Insurgentes Sur 1647, Local D, Col. San José Insurgentes, Del. Benito Juárez, C. P. 03900, México, Distrito Federal; denominadas en forma conjunta como "Las Partes". A menos que se indique lo contrario, los términos con iniciales en mayúscula, utilizados en el presente Convenio tendrán el significado establecido en el Artículo con referencia 1, Definiciones. |
| **RECITALS** | **DECLARACIONES** |
| **WHEREAS**, Pemex Exploración y Producción, (herein "Customer"), routinely issues Tender Documents for the provision of construction services involving diving operations ("Tender"); and | **CONSIDERANDO** que, Pemex Exploración y Producción (en adelante "El Cliente"), regularmente publica Bases de Licitación para la prestación de servicios de construcción que involucren operaciones de buceo ("La Licitación"); y |
| **WHEREAS**, ROM, among other things, is in the business of providing subsea construction and diving services, vessels, and equipment for the oil and gas industry; and | **CONSIDERANDO** que, ROM, entre otras cosas, se encuentra en el negocio de la prestación de servicios de construcción submarina y buceo, embarcaciones y equipo para la industria del petróleo y el gas; y |
| **WHEREAS**, TRADECO and ORCA, among other things, are in the business of providing constructions and pipeline laying and related services to the oil and gas industry; and | **CONSIDERANDO** que, TRADECO y ORCA, entre otras cosas, se encuentran en el negocio de la prestación de servicios de construcción, tendido de tuberías y demás servicios relacionados con la industria del petróleo y el gas; y |

**EXHIBIT**

**R - 28**

**WHEREAS**, ROM, TRADECO and ORCA desire to enter into this Agreement for the sole and limited purpose of establishing ROM as the exclusive provider of ROM Services (as hereinafter defined) to TRADECO and ORCA and correspondingly having ROM assist TRADECO and ORCA in preparing Proposals in response to Tender Documents and in the event any Contract is then awarded based on such Proposal, the Parties will jointly decide their respective provision of services with respect thereto. ("Business Purpose").

**NOW   THEREFORE**, in consideration of the premises and mutual covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows.

## AGREEMENT

### 1.- DEFINITIONS
#### 1.1. Definitions

**1.1.1. Agreement** - shall mean this document and all of its appendices, which are incorporated herein by reference.

**1.1.2. Business Purpose** – shall mean those purposes described in the last recital above.

**1.1.3 Contract(s)** - shall mean the document or documents (including all amendments thereto) entered into by TRADECO or ORCA with the Customer defining their rights and obligations with respect to each Project for which the TRADECO or ORCA submitted a Proposal.

**1.1.4.Contract Price** - shall mean the total price paid (or to be paid) by the Customer to TRADECO or ORCA in accordance with the terms of the applicable Contract.

**CONSIDERANDO** que, es voluntad de ROM, TRADECO y ORCA celebrar el presente Convenio con el único y limitado propósito de establecer a ROM como el proveedor exclusivo de Servicios de ROM (como se define más adelante) para TRADECO y ORCA y en consecuencia que ROM asista a TRADECO y ORCA en la elaboración de Propuestas en respuesta a las Bases de Licitación, y en el caso de que cualquier contrato les sea adjudicado como consecuencia de dicha propuesta, las Partes decidirán conjuntamente sobre la respectiva prestación de servicios que llevarán a cabo ("Propósito del Negocio").

**POR LO TANTO,** en consideración a las declaraciones y premisas mutuas establecidas previamente, y tomando en cuenta la buena y valiosa consideración de ambas partes, cuya recepción y suficiencia es aquí reconocida, las Partes convienen lo siguiente:

## CONVENIO

### 1.- DEFINICIONES
#### 1.1. Definiciones

**1.1.1 Acuerdo** – significará este documento y todos sus anexos, los cuales están incorporados al presente por referencia.

**1.1.2 Propósito del Negocio** – significará aquellos propósitos descritos en la última declaración mencionada.

**1.1.3 Contrato(s)** – se referirá él o los documentos (incluidas todas sus modificaciones) celebrados entre TRADECO u ORCA y el Cliente, que definan sus derechos y obligaciones respecto de cada Proyecto por el cual TRADECO u ORCA ha emitido una Propuesta.

**1.1.4. Precio del Contrato** – significará el precio total pagado (o por pagar) por el Cliente a TRADECO u ORCA, de conformidad con los términos del Contrato aplicable.



2

| | |
|---|---|
| **1.1.5.Guarantees or Performance Guarantees** - shall mean those performance guarantees agreed to by TRADECO or ORCA in each applicable Contract. | **1.1.5. Garantías o Garantías de Ejecución** – significará aquellas garantías de ejecución acordadas por TRADECO u ORCA en cada contrato respectivo. |
| **1.1.6. Manager** - shall mean the manager appointed in accordance with Article 4.2. | **1.1.6. Gerente** – se referirá al gerente designado en concordancia con el Artículo 4.2. |
| **1.1.7. Party or Parties** – shall mean ROM, TRADECO, ORCA or all of them, as the context may require, and shall also mean substitute or subsequent Parties that may become signatories to this Agreement. | **1.1.7. Parte o Partes** – significará ROM, TRADECO, ORCA o todas ellas, conforme al contexto requerido, y podrá referirse también a las Partes subsecuentes o sustitutas que puedan convertirse en firmantes del presente Convenio. |
| **1.1.8 Person** - shall mean any natural person, firm, trust, partnership, body corporate, or other business entity, or any governmental authority. | **1.1.8. Persona** – se referirá a cualquier persona física, firma, fideicomiso, asociación, sociedad u otra entidad de negocios o cualquier autoridad gubernamental. |
| **1.1.9 Project** - shall mean the entire scope of work to be performed as specified in the Tender Documents, including but not limited to the services, designs, supply of equipment and materials, installation, erection, pre-commissioning, start-up, testing, training and warranties for the Customer to be provided pursuant to a Contract. | **1.1.9 Proyecto** – significará el alcance total de trabajo a realizarse conforme a lo especificado en las Bases de Licitación, incluyendo más no limitado a: los servicios, diseños, suministro de equipo y materiales, instalación, levantamiento, tiempo de prueba, puesta en marcha, evaluaciones, entrenamientos y garantías de los que el Cliente será proveído conforme al Contrato. |
| **1.1.10. Proposal** – shall mean the formal offer, together with the technical specification and any amendments or modifications thereto, which may be offered by TRADECO or ORCA to the Customer for a Project in response to a specific set of Tender Documents. | **1.1.10 Propuesta** – significará la oferta formal, junto con las especificaciones técnicas y cualesquiera ajustes o modificaciones a la misma, que será ofrecida por TRADECO u ORCA al Cliente para un Proyecto, en respuesta a Bases de la Licitación de que se trate. |
| **1.1.11. Schedule** – shall mean the Project Schedule to be developed as part of a Proposal to address the provision of services associated with such Proposal as may be amended from time to time by the written agreement of the Parties. | **1.1.11 Calendario** – significará el Calendario del Proyecto a desarrollarse como parte de la Propuesta para realizar la prestación de servicios asociados a la misma, y que podrá ser modificado de tiempo en tiempo, por acuerdo escrito entre las Partes. |
| **1.1.12. Scope of Services** – shall mean, for each Party, the sum total of that Party's supply of equipment and services as set forth in Appendix A to each Schedule. | **1.1.12 Alcance de los Servicios** – se referirá, para cada una de las Partes, la suma total de suministro de equipo y servicios de cada Parte, conforme a lo establecido en el Anexo A de cada Calendario. |



3 

tradeco 000275

**1.1.13. Site** – shall mean the Customer location or locations where services for a specific Contract will be performed.

**1.1.14. ROM Services** – shall mean the services that ROM or its affiliates are capable of providing to TRADECO or ORCA in Mexico including, but not limited to, saturation diving in water depths to 1000'. Also surface supplied air and mixed gas diving in water depths to 300', (excluding inspection diving), unless surface supplied air and mixed gas diving in water depths to 300' is provided directly by employees of TRADECO or ORCA or its affiliates.

**1.1.15. Additional ROM Services** – shall mean the optional/ additional services previously agreed that ROM or its affiliates are capable of providing to TRADECO or ORCA in Mexico but that TRADECO or ORCA does not have an obligation to hire unless issued a letter of intent indicating it including, but not limited to; the supply of MSVs, DSVs, and ROV services; inspection, repair, and maintenance of subsea equipment & installations; lay, derrick, & jet barge diving support; and subsea well intervention

**1.1.16. Tender or Tender Documents** – shall mean the request for bids, if any, issued by the Customer for a Project and any amendments thereto.

**1.1.17. Territory** – shall mean the United Mexican States.

**1.1.18. Third Party** - shall mean any Person other than the Parties, their affiliates, their subcontractors, or the Customer.

**1.2 General**
1.2.1 In this Agreement the plural shall as the context or circumstances require, include the singular and vice versa.

---

**1.1.13 Sitio** – significará el domicilio del Cliente o los lugares donde se presten los servicios para un Contrato en específico.

**1.1.14. Servicios ROM** – significarán los servicios que ROM o sus filiales sean capaces de proveer a TRADECO u ORCA en México, incluyendo de forma enunciativa más no limitativa, el buceo de saturación en profundidades de 1000'. Asimismo, buceo de superficie con suministro mixto de aire y gas, en profundidades marinas de 300', (excluyendo buceo de inspección) a menos que el buceo de superficie con suministro mixto de aire y gas, en profundidades marinas de 300' sea proveído directamente por empleados de TRADECO u ORCA o algún filial.

**1.1.15. Servicios Adicionales ROM** – significarán los servicios optativos/adicionales previamente acordados para cotizar que ROM o sus filiales sean capaces de proveer a TRADECO u ORCA en México pero que TRADECO u ORCA no tiene una obligación a contratar salvo que se emita una carta de intención que lo señale, incluyendo de forma enunciativa más no limitativa a la provisión de: MSV, DSV así como la provisión de servicios de ROV, inspección, reparación y mantenimiento de equipos e instalaciones submarinas; soporte de buceo a: barcaza de tendido, barcaza grúa y barcaza de dragado; e intervención de pozos submarinos.

**1.1.16. Licitación o Bases de la Licitación** – significará la solicitud de ofertas, en caso de existir, emitidas por el Cliente para un Proyecto, así como cualquiera de sus modificaciones.

**1.1.17. Territorio** – significará los Estados Unidos Mexicanos.

**1.1.18. Tercero** – significará cualquier Persona, distinta a las Partes, sus filiales, sus subcontratistas, o el Cliente.

**1.2. Generales**
1.2.1 En el presente Convenio, y conforme el contexto o las circunstancias lo requieran, el plural incluye al singular y viceversa.



4

tradeco 000276

1.2.2 The reference to Article or Appendix shall be the Article of this Agreement and the Appendices will be attached hereto at a later date by the parties and will therefore be incorporated as an integral part of this Agreement.

1.2.3 Other capitalized terms used in this Agreement but not defined in Article 1.1 shall have the meanings given them in the preamble or recitals to this Agreement or wherever such terms first appear in this Agreement.

## 2.- RELATIONSHIP AND GENERAL PRINCIPLES OF COOPERATION

2.1. The Parties hereby enter into this Agreement for the sole and limited Business Purpose.

2.2. ROM agrees to assist TRADECO and/or ORCA in the evaluation and preparation of Proposals in accordance with Tender Documents issued by Customer that require ROM Services and or Additional ROM Services with a "Commitment Letter". Nothing in this Agreement requires ROM or any ROM affiliate to jointly bid on any Tender, to enter into any consortium to bid on any Tender, to provide TRADECO or ORCA with any commitment letter for the provision of subcontract services ("Commitment Letter"), to execute any Contract with the Customer, or to enter into any Schedule or Scope of Services with TRADECO or ORCA, depending on the case. TRADECO and ORCA acknowledges that if TRADECO or ORCA are awarded a Contract by the Customer, ROM's sole obligation is to provide the particular ROM Services agreed to by the Parties in the applicable Schedule and Scope of Services for such Contract as a subcontractor or supplier to TRADECO or ORCA, as the case may be.

---

1.2.2 La referencia a algún Artículo o Anexo se referirá a un Artículo del presente Convenio y a los Anexos que serán incluidos al presente en fecha posterior por las Partes, para ser incorporados como parte integral de este Convenio.

1.2.3 Otros términos en mayúscula utilizados en este Convenio pero no definidos en el Artículo 1.1 tendrán el significado que se les haya asignado en el Preámbulo o en las Declaraciones del presente Convenio, o dondequiera que se mencione dicho término por primea vez en el presente Convenio.

## 2.- RELACIÓN Y PRINCIPIOS GENERALES DE COOPERACIÓN

2.1. Las Partes por este medio celebran el presente Convenio única y exclusivamente para los fines del Propósito del Negocio.

2.2. ROM conviene en asistir a TRADECO y/u ORCA en la evaluación y preparación de las Propuestas de conformidad con las Bases de la Licitación emitidas por el Cliente las cuales requieran Servicios ROM y o Servicios Adicionales ROM con una "Carta Compromiso". Nada de lo dispuesto en el presente Convenio obligará a ROM o a cualquier de sus filiales a ofertar conjuntamente en alguna Licitación, a celebrar un consorcio para ofertar en cualquier Licitación, a proporcionar a TRADECO u ORCA alguna carta compromiso para la prestación de los servicios subcontratados ("Carta Compromiso"), a celebrar cualquier Contrato con el Cliente, o a acordar algún Calendario o Alcance de los Servicios con TRADECO u ORCA, según sea el caso. TRADECO y ORCA reconocen que si le es asignado un Contrato por parte del Cliente a cualquiera de ellos, la única obligación de ROM es proveer los Servicios específicamente acordados por las Partes en el Calendario y el Alcance de los Servicios aplicables para dicho Contrato, como subcontratista o proveedor de TRADECO u ORCA, según sea el caso.



tradeco 000277

2.3. Nothing contained in this Agreement is intended nor shall it be construed as creating a partnership, consortium or joint venture, agency, taxable entity, or employment relationship among the Parties or their affiliates, nor as creating or requiring any ongoing or continuing relationship or commitment among the Parties, beyond the Business Purpose, unless otherwise determined by both parties, according to each particular case.

2.4 No Party shall have the right to hold itself out as having the authority or right to assume, create or undertake any obligation of any kind whatsoever, expressed or implied, including but not limited to borrowing money, pledging credit or accepting service of any legal process on behalf of or in the name of the other Party without the prior written consent of the other Party.

2.5 Each Party is responsible for (i) maintaining its own financial accounting records related to its Scopes of Services; (ii) providing its own working capital for its respective Scopes of Services, (iii) payment of any sales expenses, proposal preparation costs, contract negotiation costs, sales commissions, representation expenses or similar expenses incurred by that Party in connection with analyzing Tender Documents, preparing Proposals, and providing services for the Projects and (iv) except as otherwise expressly stated in this Agreement, each party will assume all costs and expenses in connection with performance of its Scopes of Services.

2.6 Any individually owned property that either Party may provide for use in connection with the performance of its respective Scopes of Services shall remain the individual property of that Party.

---

2.3 Nada de lo contenido en este Convenio será entendido ni deberá ser interpretado como la creación de una sociedad, consorcio o joint venture, agencia, entidad fiscal o relación laboral entre las Partes o sus filiales, ni como la creación o requerimiento para la continuación de una relación o compromiso entre las Partes, fuera del Propósito del Negocio a menos que ambas partes determinen algo diferente atendiendo a cada caso en particular.

2.4 Ninguna de las Partes estará facultada para ostentarse como si tuviera la autoridad o el derecho para asumir, crear o adquirir cualquier obligación, de cualesquier tipo, expresa o implícita, incluyendo de forma enunciativa más no limitativa: la solicitud de préstamo de dinero, gravamen de un crédito o la aceptación de notificación o emplazamiento a cualquier procedimiento legal, a nombre de o en representación de la otra Parte, sin que exista el consentimiento previo y por escrito de la otra Parte.

2.5 Cada Parte es responsable de (i) mantener sus propios registros contables relacionados con el Alcance de los Servicios; (ii) proveer su propio capital de trabajo para sus respectivos Alcances de Servicios, (iii) el pago de cualesquiera gastos de venta, costos de preparación de la propuesta, costos de la negociación del contrato, comisiones de venta, gastos de representación o gastos similares incurridos por dicha Parte, en conexión con el análisis de las Bases de la Licitación, la preparación de Propuestas y la provisión de servicios para los Proyectos y (iv) excepto cuando lo contrario sea pactado en el presente Convenio, cada parte asumirá todos los gastos y costos relacionados con la realización de sus Alcances de Servicios.

2.6 Toda aquella propiedad que individualmente posea una Parte y de la cual provea su uso en relación con la ejecución de sus respectivos Alcances de Servicios deberá permanecer como propiedad individual de dicha Parte.



6



tradeco 000278

2.7 Notwithstanding any obligation to deliver information in this Agreement, ROM shall not be required to disclose confidential or proprietary information unless such information is required by TRADECO or ORCA to include ROM in the Proposal exclusively as a subcontractor or service provider, or in general comply with its obligations under this Agreement, and TRADECO and ORCA must give appropriate assurances that they will comply with the terms of Article 14.9.

### 3.- NON-COMPETITION COVENANT

**3.1. TRADECO and ORCA´s Obligation.** In consideration of being granted access to certain ROM Confidential Information, TRADECO and ORCA agree that during the Term they will not, and shall cause each of their affiliates not to, directly or indirectly, acting alone or as a member of a partnership, as a holder or owner of any security, as an employee, agent, advisor, consultant to, representative, or in any other capacity (whether for its own account or for the account of any other person, other than ROM or its affiliates), work (whether for or without compensation) with any other Person (other than ROM or its affiliates) to analyze and prepare Proposals in response to Tender Documents issued by Customer for TENDER Contracts to be performed in the Territory without the prior written consent of ROM, nor shall TRADECO or ORCA solicit or utilize the services of another Person for the same or similar services as the ROM Services without ROM's prior written consent.

**3.2. Clarification.** Notwithstanding the foregoing, TRADECO or ORCA may request for a quote or a proposal to other persons that provides similar services to **Additional ROM Services** for TENDER contracts.

2.7 Sin perjuicio de cualquier obligación contenida en este Convenio de proporcionar información, ROM no será requerido para revelar información confidencial o protegida, a menos que dicha información sea solicitada por TRADECO u ORCA para incluir a ROM en la Propuesta, exclusivamente como subcontratista o como proveedor de servicios, o en general, para cumplir con sus obligaciones bajo el presente Convenio, y TRADECO y ORCA deberán asegurar el cumplimiento de los términos del Artículo 14.9.

### 3.- DECLARACION DE NO COMPETENCIA

**3.1. Obligación de TRADECO y ORCA.** En consideración de haberle otorgado acceso a cierta Información Confidencial de ROM, TRADECO y ORCA se comprometen a que durante la Vigencia de este Convenio, no llevarán a cabo, y se asegurarán de que sus filiales tampoco lleven a cabo, directa o indirectamente, por sí o como miembro de una sociedad, como poseedor o propietario de cualquier garantía, como empleado, agente, asesor, consultor, representante o bajo cualquier otra capacidad (ya sea por cuenta propia o a nombre de otra persona, distinta a ROM o sus filiales), trabajo (ya sea con o sin compensación) con cualquier otra Persona (distinta a ROM o a sus filiales) para analizar y preparar Propuestas en respuesta a las Bases de las Licitaciones emitidas por el Cliente para los Contratos de Licitación a ser realizados dentro del Territorio, sin el consentimiento previo y por escrito de ROM, ni TRADECO u ORCA tampoco solicitarán o utilizarán los servicios de otra Persona para servicios iguales o similares a los Servicios ROM sin el consentimiento previo y por escrito de ROM.

**3.2. Aclaración.** Sin perjuicio de lo anterior, TRADECO u ORCA podrán solicitar cotizaciones y propuestas a otras Personas que provean servicios similares a los **Servicios Adicionales ROM** para los Contratos de Licitación.



7



**3.3 ROM's Obligation**. In consideration of being granted access to certain TRADECO and ORCA's Confidential Information, ROM agrees that during the Term it will not, and shall cause each of its affiliates not to, directly or indirectly, acting alone or as a member of a partnership, as a holder or owner of any security, as an employee, agent, advisor, consultant to, representative, or in any other capacity (whether for its own account or for the account of any other person, other than TRADECO, ORCA or their affiliates), work (whether for or without compensation) with any other Person (other than TRADECO, ORCA or their affiliates) to analyze and prepare Proposals in response to Tender Documents issued by Customer for TENDER Contracts to be performed in the Territory without the prior written consent of TRADECO or ORCA, in the cases in which TRADECO or ORCA have been assisted by ROM to analyze or prepare such proposals.

**3.4.    Clarification**.    Notwithstanding the foregoing, ROM and its affiliates may provide quotes and proposals for ROM to provide particular ROM Services and **Additional ROM Services** as a third party contractor to other Persons providing services for TENDER contracts. They are not intended to prevent ROM from providing services as a third party contractor to other companies that are bidding on or are awarded a TENDER Contract so long as ROM did not violate its obligations pursuant to Section 14.9, or agree to provide its services to a Third Party that is bidding on an TENDER Contract at prices lower than those offered to TRADECO or ORCA.

**4.- GOVERNANCE**

**4.1. Representatives**
Upon the signing of this Agreement, each Party will appoint by a written notice to the other Party a Person to act as its representative for the coordination of such Party's efforts with regard to the preparation of Proposals. Each

**3.3 Obligación de ROM.** En consideración de haberle otorgado acceso a cierta Información Confidencial de TRADECO y ORCA, ROM se compromete a que durante la Vigencia de este Convenio, no llevará a cabo, y se asegurará de que sus filiales tampoco lleven a cabo, directa o indirectamente, por sí o como miembro de una sociedad, como poseedor o propietario de cualquier garantía, como empleado, agente, consejero, consultor, representante o bajo cualquier otra capacidad (ya sea por cuenta propia o de cualquier otra persona, distinta a TRADECO, ORCA o sus filiales), trabajo (ya sea con o sin compensación) con cualquier otra Persona (distinta a TRADECO, ORCA o sus filiales) para analizar y preparar Propuestas en respuesta a las Bases de las Licitaciones emitidas por el Cliente para los Contratos de Licitación a ser realizados dentro del Territorio sin el consentimiento previo y por escrito de TRADECO u ORCA, en los casos en que TRADECO u ORCA hayan sido asistidos por ROM para el análisis y preparación de dichas propuestas.

**3.4. Aclaración.** Sin perjuicio de lo anterior, ROM y sus filiales podrán proporcionar cotizaciones y propuestas para que ROM lleve a cabo ciertos Servicios ROM y Servicios Adicionales ROM como tercero contratista a otras Personas que provean servicios para los Contratos de Licitación. Estas no están diseñadas para impedir a ROM de prestar servicios como tercero contratista a otras compañías que estén ofertando o que les haya sido adjudicado algún Contrato de Licitación, en tanto ROM no incumpla con las obligaciones referidas en la Sección 14.9, o acuerde en prestar sus servicios a un Tercero que esté ofertando en un Contrato de Licitación con precios inferiores a los ofrecidos a TRADECO u ORCA.

**4.- GOBIERNO**

**4.1 Representantes**
A la firma del presente Convenio, cada una de las   Partes nombrará, por medio de aviso escrito a la otra, a una Persona que actúe como su representante para la coordinación de los esfuerzos   de   dicha   Parte   respecto   a   la

8



representative shall be fully authorized by such Party to act on its behalf in connection with all matters arising under this Agreement. Either Party may at any time and from time-to-time change its representative by written notice to the other Party. Each Party shall appoint an alternate representative to act in the absence of its representative. Any representative not an employee of a Party shall be subject to approval by the other Party, which approval shall not be unreasonably withheld, conditioned, or delayed.

### 4.2 Manager

4.2.1. As soon as practical following the signing of this Agreement, TRADECO or ORCA, depending on the case, shall appoint a Manager to oversee the preparation of Proposals. The Manager shall be qualified to undertake his responsibilities in relations with the Parties and between TRADECO or ORCA and the Customer, be experienced in project management, coordination of project teams and have the necessary language skills to enable clear communication.

4.2.2. The Parties by mutual agreement may at any time and from time to time change the Manager by written notice to the other Party.

4.2.3 The Manger's functions shall include:

(i) Coordinate the preparation of Proposals, implementation and execution of the Parties' respective Scopes of Services, manage the Contracts and to raise matters to the attention of the Parties' representatives.

(ii) Arranging meetings between the Parties themselves;

(iii) Transmitting copies of all correspondence and documents, including submitting reports and other information required to be submitted under the Contracts;

---

preparación de las Propuestas. Cada representante deberá estar plenamente autorizado por dicha Parte para actuar en su nombre, en conexión con todos los asuntos que surjan bajo el presente Convenio. Cada Parte podrá, en cualquier momento, y de vez en cuando, cambiar a su representante mediante notificación escrita a la otra Parte. Cada Parte deberá designar a un representante alterno para actuar en ausencia de su representante. Cualquier representante que no sea empleado de una Parte, estará sujeto a la aprobación de la otra Parte, sin que dicha aprobación sea denegada sin razón, condicionada o retrasada injustificadamente.

### 4.2 Gerente

4.2.1 Tan pronto como resulte práctico y posterior a la firma este Convenio, TRADECO u ORCA, según sea el caso, deberá designar a un Gerente que revise la preparación de las Propuestas. El Gerente deberá estar calificado para cumplir con sus responsabilidades en relación a las Partes y entre TRADECO u ORCA y el Cliente, contar con experiencia en el manejo de proyectos, coordinación de equipos de proyecto, así como las habilidades de lenguaje necesarias para entablar comunicaciones claras.

4.2.2. Por mutuo acuerdo, las Partes podrán en cualquier momento y de vez en cuando cambiar al Gerente mediante aviso por escrito a la otra Parte.

4.2.3 Las funciones del Gerente deberán incluir:

(i) Coordinar la preparación de Propuestas, implementación y ejecución de los Alcances de Servicios respectivos de las Partes, dirigir los Contratos y llevar asuntos a la atención de los representantes de las Partes.

(ii) Organizar reuniones entre las mismas Partes;

(iii) Transmitir copias de toda la correspondencia y documentos, incluyendo la presentación de reportes y otra información que requiera ser presentada bajo los Contratos.



9



tradeco 000281

4.2.4 In the event that TRADECO or ORCA requires ROM technical or professional assistance for the handling of any meeting with the Customer, ROM shall be notified with at least two (2) days prior written notice of meetings of TRADECO or ORCA with the Customer.

**4.3 Administrative Costs.** All costs associated with the administrative function related to this Agreement and each Contract shall be the responsibility of the party incurring same.

**5.- BID AND NEGOTIATION PHASE; PERFORMANCE PHASE**

**5.1. Tender Reviews.** The Manager shall be responsible for identifying Tender Documents issued by the Customer that are suitable for the Business Purpose. The Manager will submit the list of all Tenders that could utilize ROM Services to the Parties' representatives.

ROM shall notify TRADECO or ORCA in writing within ten (10) business days of receipt of a list of applicable Tenders, of the Tenders for which ROM will provide its services to assist TRADECO or ORCA, depending on the case, in the preparation of Proposals for such Tenders and which Tenders for which ROM shall submit lump sum pricing for its services. TRADECO or ORCA shall be responsible for providing the applicable Tender Documents and will make such available to ROM within five (5) days of these being published by the Customer.

**5.2 Bid and Negotiation Phase**
5.2.1 The Parties will conduct pre-bid meetings to discuss technical and strategic issues. ROM shall, for any particular Tender, prepare and submit to TRADECO or ORCA, depending on the case, a lump sum based bid for its discrete services to be incorporated into the Proposal.

4.2.4 En el caso que TRADECO u ORCA requiera de la asistencia técnica o profesional de ROM para el manejo de cualquier reunión con el Cliente, ROM deberá ser notificado, con al menos dos (2) días de anticipación y por escrito, acerca de las reuniones entre TRADECO u ORCA con el Cliente.

**4.3 Costos Administrativos.** Todos los costos asociados con la función administrativa relacionada con el presente Convenio y de cada Contrato será la responsabilidad de la parte que incurra en dichos gastos.

**5.- ETAPA DE OFERTA Y NEGOCIACIÓN; ETAPA DE EJECUCIÓN**

**5.1. Revisiones de la Oferta.** El Gerente será el responsable de identificar los Documentos de la Licitación emitidos por el Cliente que sean adecuados para el Propósito del Negocio. El Gerente presentará a los representantes de las Partes, una lista de todas las Licitaciones en las que podrían utilizarse los Servicios de ROM.

ROM deberá notificar a TRADECO u ORCA por escrito en un periodo de diez (10) días hábiles a la recepción de la lista de Licitaciones aplicables, de las cuales ROM proveerá sus servicios para asistir a TRADECO u ORCA, según sea el caso, en la preparación de las Propuestas para dichas Licitaciones, así como de aquellas Licitaciones para las que ROM deberá presentar el costo a precios alzado de sus servicios. TRADECO u ORCA, será responsable de proveer las Bases de la Licitación aplicables y los pondrá a disposición de ROM dentro de los cinco (5) días posteriores a la publicación de estos mismos por parte del Cliente.

**5.2 Etapa de Oferta y Negociación**
5.2.1 Las Partes llevarán a cabo reuniones previas a la licitación para discutir asuntos técnicos y de estrategia. ROM podrá, para cualquier Licitación particular, preparar y presentar a TRADECO u ORCA, dependiendo del caso, una oferta a precio alzado para los



10



tradeco 000282

Additionally, ROM shall have the right to submit day rate pricing for its services with respect to any Tender.

5.2.2. If TRADECO or ORCA is awarded a Contract for which ROM or its affiliate provided a Commitment Letter, TRADECO or ORCA shall provide ROM with the documents that are necessary for the proper provision of services hired to ROM, or according to the scope of the commitments made by ROM on the appropriate letter. The relevant information will be revealed by TRADECO, only if is not considered as confidential or its disclosure is not restricted by the applicable law. TRADECO commits to not seek another subcontractor to provide the particular ROM Services that ROM agreed to provide in such Commitment Letter.

5.2.3. In no event shall any party or their affiliates be forced to execute a Commitment Letter. The subscription of any Commitment Letter, contract or agreement of any kind will be always under the free will of the parties.

**5.3 Contract Performance Phase**

5.3.1. Contemporaneously with this Agreement, the Parties will enter into, or shall cause an affiliate agreeable to the other Party to, a Master Service Agreement substantially in the form of Appendix A. The Master Service Agreement will control all services provided by ROM to TRADECO or ORCA, associated with Contracts won by TRADECO or ORCA, pursuant to Proposals submitted in accordance with this Agreement.

5.3.2. Upon the award of each Contract by the Customer, ROM and TRADECO or ORCA will execute the applicable Schedule and its applicable Scope of Services. Both the Schedule and Scope of Services will incorporate the terms of the Master Service Agreement (MSA) by reference. The Parties

servicios que se deban incorporar a la Propuesta. Adicionalmente, ROM tendrá el derecho de presentar tarifas diarias por sus servicios con respecto a cualquier Licitación.

5.2.2. Si a TRADECO o a ORCA le es adjudicado un Contrato respecto del cual ROM o su filial emitieron una Carta Compromiso, TRADECO u ORCA deberá entregar a ROM los documentos que le resulten necesarios para la correcta prestación de los servicios que en su caso le sean contratados, o de acuerdo a los alcances de los compromisos adquiridos por ROM en la carta que corresponda. La información relevante será revelada por TRADECO, únicamente si no es considerada como confidencial o su divulgación no se encuentra restringida por la legislación aplicable. TRADECO se compromete a no buscar a otro subcontratista para prestar los Servicios específicos que ROM acordó en proveer en dicha Carta Compromiso.

5.2.3. Bajo ninguna circunstancia alguna de las partes o cualquiera de sus filiales serán obligadas a firmar una Carta Compromiso. La suscripción de cualquier carta compromiso, contrato o acuerdo de cualquier índole será siempre bajo la libre voluntad de las partes.

**5.3 Etapa de Ejecución del Contrato**

5.3.1. A la par de este Convenio, las Partes celebrarán, o harán que una filial aprobada por la otra Parte celebre un Acuerdo General de Servicios, sustancialmente en la forma indicada en el Anexo A. El Acuerdo General de Servicios controlará todos los servicios suministrados por ROM a TRADECO u ORCA asociados con los Contratos ganados por TRADECO u ORCA, conforme a las Propuestas presentadas de conformidad con el presente Convenio.

5.3.2 Ante la adjudicación de cada Contrato por parte del Cliente, ROM y TRADECO u ORCA celebrarán el Calendario y el Alcance de Servicios aplicable. Ambos, Calendario y Alcance de Servicios incorporarán los términos del Acuerdo General de Servicios en referencia. Las Partes acuerdan que cada



11 

agree that each Schedule together with its applicable Scope of Services will be a separate contract between TRADECO and ROM or between ORCA and ROM, as the case may be, identifying the specific ROM Services to be provided by ROM for the specific Contract, and the price that TRADECO or ORCA will cover for such services, in the understanding that the price will be previously agreed by the Parties, based on the budget submitted by ROM for each particular contract. In no event will ROM charge a price or percentage different than that previously agreed with TRADECO or ORCA but in the event the Scope of Services or Schedule changes for any reason outside the control of ROM and after the ROM budget was submitted to Tradeco or ORCA, the Parties agree to utilize a change order process to address that change.

Calendario junto con su Alcance de Servicios respectivo será un contrato independiente entre TRADECO y ROM o entre ORCA y ROM según sea el caso, en el que se identificarán específicamente los Servicios ROM que serán prestados por ROM para el Contrato en específico, así como el precio que TRADECO u ORCA habrán de cubrir por dichos Servicios, en el entendido de que dicho precio será previamente pactado por las Partes, teniendo como base el presupuesto presentado por ROM para cada contrato en particular. En ningún caso ROM llevará a cabo el cobro de un precio o porcentaje distinto al acordado con TRADECO u ORCA, pero en el caso que el Alcance de los Servicios o Calendario cambie por causes fuera del control de ROM, una vez que ROM presentó el presupuesto a Tradeco o a Orca, las Partes acuerdan utilizar el proceso de órdenes de cambio para atender este cambio.

5.3.3 Each Party agrees that its respective portion of the Scope of Services is to be performed strictly in accordance with the MSA and the applicable Schedule.

5.3.3. Cada Parte acuerda que su respectiva porción del Alcance de Servicios será realizada estrictamente en concordancia con el Acuerdo General de Servicios y el Calendario aplicable.

**5.4 Posting of Bonds and Guarantees.** TRADECO or ORCA will be responsible for obtaining at its own cost and expense any performance bond or Guarantee that may be required under each Contract awarded by the Customer. TRADECO or ORCA will bear the cost and risk of a Customer draw upon the bond or Guarantee regardless of cause.

**5.4 Otorgamiento de Fianzas y Garantías.** TRADECO u ORCA serán responsables de obtener, bajo su propio costo y gasto cualquier fianza de cumplimiento o Garantía que se requiera para cada Contrato que les sea adjudicado por el Cliente. TRADECO u ORCA correrán con el costo y riesgo de que el Cliente ejecute la fianza o Garantía respectiva, independientemente de la causa.

## 6.- PAYMENT

## 6.- PAGO

6.1. TRADECO or ORCA will be responsible for submitting invoices to and receiving payments from the Customer. All payments from the Customer shall be received in a trust opened and/or organized by the Parties for each Contract; with irrevocable instructions to the trustee of the trust, to effect payment of ROM invoices within two (2) business days from receipt of the funds from the Customer .

6.1 TRADECO u ORCA serán responsables de presentar las facturas al Cliente, y de recibir los pagos por parte de éste. Los pagos del Cliente serán recibidos en un fideicomiso abierto y/o organizado por las Partes para cada Contrato; con instrucciones irrevocables al fiduciario de dicho fideicomiso, a efecto de pagar las facturas de ROM en un plazo de dos (2) días hábiles a partir de la recepción de los fondos de parte del Cliente.



12

6.2 TRADECO or ORCA, shall assume all risks of non-payment by the Customer of the Contract Price.

6.3 All payments due to ROM derived from services provided to TRADECO or ORCA, as a subcontractor or supplier, shall be paid by TRADECO or ORCA from a trust established for that effect by wire transfer to ROM as directed by ROM on its invoice or otherwise agreed by the Parties as specified in a written notice. ROM shall issue invoices upon delivery of the equipment, completion of the Services, monthly, or otherwise as mutually agreed in the applicable Schedule or Scope of Services for each Contract.

6.4 In the event of insufficient funds in the trust for the payment of ROM invoices, TRADECO or ORCA shall pay from its own resources such invoices forty-five (45) days from the date of the ROM invoice.

### 7.- TAXES

7.1. Each Party shall bear and pay and be responsible for, and shall release, protect, indemnify defend and hold each other harmless from and against, their own taxes, licenses, fees, charges or claims of any nature, imposed, assessed or levied by any governmental authority, including property (real or personal), stamp, document, value added, sales and excise taxes, surtaxes, surcharges, duties and tariffs ("Taxes"), relating to this Agreement or the Services provided by each of the Parties or its affiliates.

7.2 Each Party shall bear and pay and be responsible for, and shall release, protect, indemnify defend and hold each other harmless from and against, any and all taxes on account of salaries or other benefits paid to their respective or its affiliates' employees and all employment benefits or other similar taxes or

6.2 TRADECO u ORCA, en su caso, asumirá todos los riesgos por la falta de pago de parte del Cliente del Precio del Contrato.

6.3 Todos los pagos adeudados a ROM, que deriven de servicios que preste a TRADECO u ORCA, como subcontratista o proveedor, deberán ser pagados por TRADECO u ORCA, desde un fideicomiso que se constituya para tal efecto, por transferencia bancaria a ROM, como lo indique ROM en su factura, o como haya sido pactado por las Partes mediante aviso por escrito. ROM emitirá facturas tras la entrega del equipo, finalización de los Servicios, mensualmente, o en la forma que mutuamente convengan en el Calendario o Alcance de Servicios respectivo a cada Contrato.

6.4 En caso de insuficiencia de fondos en el fideicomiso para el pago de las facturas de ROM, TRADECO u ORCA deberán pagar de sus propios recursos dichas facturas en un plazo de cuarenta y cinco (45) días contados a partir de la fecha de la factura de ROM.

### 7.- IMPUESTOS

7.1. Cada Parte deberá asumir, pagar y ser responsable de, y deberá liberar, proteger, indemnizar, defender y mantener a salvo y en paz a la otra, y a cada uno de sus respectivos impuestos, licencias, honorarios, cargos o reclamaciones de cualquier naturaleza, impuestos, calculados o exigidos por cualquier autoridad gubernamental, incluidos impuestos sobre la propiedad (real o personal), timbre, documental, de valor agregado, impuestos de venta y bienes específicos, sobretasas, recargos, derechos y tarifas ("Impuestos"), relacionados con el presente Convenio o con los Servicios prestados por cada una de las Partes o por sus filiales.

7.2 Cada Parte deberá asumir y pagar, y deberá liberar, proteger, indemnizar, defender y mantener en paz y a salvo a la otra, de todos y cada uno de los impuestos a cuenta de salarios u otros beneficios pagados a sus respectivos empleados o los de sus filiales, y de todos los



13

contributions relating to amounts paid by each Party to their respective or its affiliates' employees, agents or authorized representatives.

beneficios laborales u otros impuestos o contribuciones similares relativos a las cantidades pagadas por cada Parte a sus respectivos empleados o los de sus filiales, agentes o representantes autorizados.

**8.- CLAIMS**

**8.1 NEITHER TRADECO/ORCA NOR ROM SHALL BE LIABLE TO THE OTHER FOR ANY SPECIAL, INCIDENTAL, OR CONSEQUENTIAL LOSSES OR DAMAGES, INCLUDING LOST PROFITS AND GOODWILL WHETHER IN AN ACTION IN CONTRACT, OR TORT, OR OTHERWISE AND EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

**8.- CLAIMS**

**8.1 NI TRADECO/ORCA NI ROM SERÁN RESPONSABLES ANTE EL OTRO POR CUALESQUIER PÉRDIDAS O DAÑOS ESPECIALES, INCIDENTALES O CONSECUENCIALES, INCLUYENDO LA PÉRDIDA DE GANANCIAS Y LUCRO ALGUNO, YA SEA BAJO UNA ACCION CONTRACTUAL O EXTRA CONTRACTUAL, O DE CUALQUIER OTRA FORMA, E INCLUSO BAJO LA ADVERTENCIA DE LA POSIBILIDAD DE DICHOS DAÑOS.**

**9.- FINANCIAL CAPABILITY;**

9.1 Each Party agrees that it will, if requested to do so, demonstrate, to the reasonable satisfaction of the other Party, its financial capability to assume or continue to carry out the services associated with its respective Scope of Services and to continue to carry out such Scope of Services. To this end, the Parties agree that the Party requested to make such demonstration shall provide a certification to comply with applicable local requirements signed by a financial officer of the Party's organization in addition to its supporting financial data.

**9.- CAPACIDAD FINANCIERA;**

9.1 Cada una de las Partes se compromete a que, de ser requerida, demostrará a satisfacción razonable de la otra Parte, su capacidad financiera para asumir o continuar realizando los servicios asociados a su respectivo Alcance de Servicios, así como para continuar con la ejecución de dichos Alcances de Servicios. Para ello, las Partes convienen que aquella que sea solicitada para realizar dicha demostración deberá proporcionar una certificación para cumplir con los requisitos locales aplicables, firmada por el director financiero de dicha Parte, en adición a su información financiera de respaldo.

**10.- PERMITS**

10.1 TRADECO or ORCA, as the case may be, shall assume all liability and responsibility in obtaining all of the required permits for the Contract.

**10.- PERMISOS**

10.1 TRADECO u ORCA, en su caso, deberá asumir toda la obligación y responsabilidad para la obtención de todos los permisos requeridos para la ejecución del Contrato

**11.- BUSINESS PRACTICES**

11.1 In performance of this Agreement and the Project, neither Party shall pay, offer, promise to pay, or authorize the payment directly or indirectly through any other person or firm, of

**11.- PRÁCTICAS COMERCIALES**

11.1 Durante la ejecución del presente Convenio y del Proyecto, ninguna de las Partes deberá pagar, ofrecer, prometer pagar, o autorizar el pago, directa o indirectamente a

14

any monies or anything of value to (i) any person or firm employed by or acting for or in behalf of the Customer, whether private or governmental, or (ii) any government official or employee or any political party or candidate for political office, for the purpose of inducing or rewarding any action or decision by the Customer or official favorable to either Party thereof in connection with the gaining or retaining business (any such act being a "Prohibited Payment"). A Prohibited Payment does not include the payment of reasonable and bona fide expenditures, such as travel and lodging expenses, which are directly related to the promotion, demonstration or explanation of products or services, or the execution or performance of a contract with a customer or foreign government or agency thereof; provided such payments are permissible under local law and Customer guidelines.

11.2 No agent or representative shall be engaged by the Parties, or by either Party for the Project without the prior written consent of both Parties. Each Party agrees that it will take all reasonable steps to assure that any agent or representative hired to represent such Party abides by the obligations dealing with Prohibited Payments set forth in Article 11.1 above.

11.3 If either Party breaches its obligations in this Article 11, the other Party may (without limiting any other right it may have), notwithstanding any other provision of this Agreement or a Contract to the contrary, immediately terminate this Agreement, in whole or in part, and may terminate each Schedule, each Scope of Services, and/or the Master Services Agreement. The breaching Party shall be responsible to and shall indemnify the other Party for any and all damages, costs, fines, penalties, judgments, expenses and losses (including lost profits) of any nature incurred by the terminating Party as a result of such Prohibited Payment, termination and withdrawal, notwithstanding

a través de cualquier otra persona o empresa, de ningún dinero u objeto de valor a (i) cualquier persona perteneciente a una firma contratada por, o que actúe por o a nombre del Cliente, ya sea privada o gubernamental, o (ii) cualquier funcionario o empleado gubernamental, partido político o candidato a cargos políticos, con el fin de provocar o compensar cualquier acción o decisión del Cliente o del funcionario, favorable para cualquiera de las Partes con relación a la obtención o adjudicación del negocio (cualquier acto considerado como "Pago Prohibido"). El Pago Prohibido no incluye el desembolso de pagos razonables y de buena fe, como los gastos de transporte y hospedaje, que se encuentren directamente relacionados con la promoción, demostración o explicación de productos o servicios, o con la ejecución o realización de un contrato con un cliente, gobierno extranjero o agencia del mismo; siempre y cuando dichos pagos sean permitidos bajo las leyes locales y las directrices indicadas por el Cliente.

11.2 Ningún agente o representante deberá ser contratado por las Partes o por una de ellas para algún Proyecto sin el consentimiento previo y por escrito de ambas Partes. Cada Parte acuerda que tomará todas las medidas razonables para asegurar que cualquier agente o representante contratado para actuar en nombre de la misma, respete las obligaciones referentes a los Pagos Prohibidos establecidos en el párrafo anterior, Artículo 11.1.

11.3 Si cualquiera de las Partes incumple con las obligaciones del Artículo 11, la otra Parte podrá (sin limitar cualquier otro derecho que pueda tener), no obstante cualquier otra provisión contenida en el presente Convenio o de algún Contrato que indique lo contrario, terminar inmediatamente con este Convenio, parcial o totalmente; y podrá terminar con cada Calendario, Alcance de los Servicios, y/o Acuerdo General de los Servicios. La Parte que hubiere incumplido será responsable y deberá indemnizar a la otra Parte por todos y cada uno de los daños, costos, multas, penalizaciones, sentencias, gastos y pérdidas (incluyendo las ganancias perdidas) de cualquier naturaleza en las que incurra la Parte que termine con el



15

tradeco 000287

any other provision of this Agreement or any applicable Contract to the contrary.

11.4 Each Party agrees that upon the prior written request of the other party, it will, and will cause each of its directors, officers, employees, agents or other representatives who have any direct involvement with any of the management or operations of its business under this Agreement, to provide a certification of compliance with this Article 11 in a form reasonably requested by such other party.

## 12.- TERM AND TERMINATION

**12.1 Term**. Unless terminated earlier, this Agreement shall commence on the date of its signature and shall remain in effect for any Projects of which the Tender was issued by the Customer up through December 31, 2014. Upon the mutual written agreement of the Parties, this Agreement may be renewed for additional one-year periods (each a "Renewal Term"). The Initial Term and all Renewal Terms are collectively referred to herein as the "Term."

**12.2 Termination**. If a party fails to perform any material obligation under this Agreement, the non-defaulting party within ten (10) days will notify in writing to the other party specifying such failure, to the effect that the corresponding party remedy its failure within a period not exceeding fifteen (15) days from the date of the notification; provided that upon the occurrence of the same or a similar failure twice during any six-month period, the performing party may immediately terminate this Agreement by written notice without providing any notice and opportunity to cure. The Parties may agree in writing to terminate this Agreement at any time.

---

Contrato, como resultado de dicho Pago Prohibido, terminación o retiro, sin perjuicio de cualquier otra cláusula del presente Convenio o de cualquier Contrato aplicable en contrario.

11.4 Cada una de las Partes se compromete a que, previo a la solicitud por escrito de la otra Parte, proveerá o se asegurará de que sus directores, funcionarios, empleados, agentes o cualesquier otros representantes involucrados con cualquiera de las operaciones o manejo de su empresa en relación a este Convenio, proporcionen un certificado de cumplimiento respecto del artículo en referencia Artículo 11, en una forma razonablemente solicitada por la otra Parte.

## 12.- VIGENCIA Y TERMINACIÓN

**12.1 Vigencia.** A menos que sea terminado anticipadamente, el presente Convenio comenzará a partir de su Fecha de firma y permanecerá vigente para cualquier Proyecto del cual la Licitacion haya sido emitida por el Cliente hasta el 31 de diciembre de 2014. Por mutuo acuerdo entre las Partes y por escrito, el presente Convenio podrá ser renovado por periodos adicionales de un año (en adelante, cada uno "Vigencia Renovada"). Tanto la Vigencia Inicial como todas las Vigencias Renovadas serán referidas colectivamente en el presente como "La Vigencia".

**12.2 Terminación.** Si una de las Partes incumple materialmente con cualquier obligación consignada en el presente Convenio, la otra parte notificará por escrito a la parte que incumplió, dentro de los diez (10) días posteriores al incumplimiento de que se trate, especificando dicho incumplimiento, a efecto de que la parte correspondiente subsane su incumplimiento en un plazo que no exceda de 15 (quince) días contados a partir de la notificación; en caso de que ocurra el mismo incumplimiento o una similar en dos ocasiones en un periodo de seis meses, la Parte que si ha cumplido podrá terminar inmediatamente el presente Convenio mediante notificación por escrito a la otra, sin necesidad de previo aviso u oportunidad para subsanar el



16

**12.3    Continuing    Obligations**.    Any termination of this Agreement for whatever cause shall not affect or be deemed to affect any right or obligation outstanding of either Party, which arose prior to such termination.

**13.-    DISPUTE    RESOLUTION; GOVERNING LAW**

**13.1 Disputes Arising under this Agreement**

13.1.1. Any and all disputes, controversies, claims or demands arising out of or relating to Agreement shall be settled, if possible, by amicable negotiation of the Parties and in accordance with the procedures herein contained. If the matter is not resolved by negotiations, either Party may by the giving of written notice requesting the matter to be referred to a meeting of appropriate higher management of the Parties. Such meeting shall be held within ten (10) business days following the giving of the written notice.

13.1.2. If the matter is not resolved within twenty (20) business days after the date of the notice referring the matter to appropriate higher management, or such later date as may be agreed upon in writing, then the dispute shall be finally settled by arbitration without recourse to common or commercial courts. Any and all disputes, controversies, claims or demands arising out of or relating to this Agreement, whether in contract, tort or otherwise, at law or in equity, for damages or any other relief will be resolved by final and binding arbitration to be held in Mexico City, United Mexican States pursuant to the Rules of the Mexican Center of Arbitration (El Centro de Arbitraje de México) (CAM); provided, however, a party, notwithstanding the foregoing, may seek injunctive relief or other similar equitable remedy from a court of

incumplimiento. Las Partes podrán acordar por escrito la terminación de este Convenio en cualquier momento.

**12.3 Continuación de las Obligaciones.** Cualquier terminación del presente Convenio, por cualquier causa, no afectará ni deberá afectar cualquier derecho u obligación que se encuentre pendiente de cumplimiento por cualquiera de las Partes y que hubiere surgido previo a la terminación.

**13.- SOLUCIÓN DE CONTROVERSIAS; LEGISLACIÓN APLICABLE.**

**13.1 Controversias surgidas bajo el presente Convenio**

13.1.1. Todas y cada una de las controversias, reclamos o demandas que surjan de o se relacionen con el presente Convenio serán resueltas, de ser posible, mediante negociación amigable entre las Partes y de conformidad con los procedimientos aquí contenidos. Si la controversia no es resuelta mediante negociaciones, cualquiera de las Partes podrá solicitar mediante escrito a la otra que el asunto sea tratado en una junta de los altos mandos gerenciales de las Partes. Dicha reunión deberá celebrarse dentro de los diez (10) días hábiles siguientes a la entrega del aviso escrito.

13.1.2. Si la controversia no es resuelta dentro de los siguientes veinte (20) días hábiles a partir de la fecha del aviso escrito que refiere la controversia a los altos mandos gerenciales, o en fecha posterior que sea acordada por escrito entre las Partes, entonces la controversia se decidirá finalmente por arbitraje sin recurso alguno ante tribunales comerciales o del fuero común. Todos y cada uno de los litigios, controversias, reclamos o demandas que surgieren o estuvieren relacionadas al presente Convenio, ya sea contractual o extracontractual o de cualquier otro tipo, por ley o equidad, por daños o cualquier otro remedio, serán resueltos por Arbitraje definitivo y vinculante a realizarse en el Distrito Federal, Estados Unidos Mexicanos, aplicando las Reglas de El Centro de Arbitraje de México) (CAM); lo anterior sin perjuicio de que, cualquiera de las



17



competent jurisdiction at any time or from time to time prior to the initiation of the arbitration. All arbitration filings and proceedings shall be in English and Spanish. Each Party shall have the right, giving notice to the other Party to refer a dispute or controversy to arbitration if it's appropriate. The notice shall identify the name and address of the arbitrator appointed by the Party giving notice and the points of dispute.

13.1.3 Within fifteen (15) days after receipt of such notice, the other Party shall give notice to the first Party of the appointment and name and address of the second arbitrator. Within thirty (30) days after appointment of the second arbitrator, the two arbitrators so appointed shall appoint a third arbitrator as chairman of the arbitration tribunal, provided that the chairman shall be independent and shall have a different nationality than any of the Parties' countries of incorporation. If the second Party fails to appoint the second arbitrator within fifteen (15) days after receipt of notice of the appointment of the first arbitrator, or, if the two arbitrators appointed by the Parties fail to appoint a third arbitrator within thirty (30) days after the appointment of the second arbitrator, then the President of the CAM shall have the power, on the request of a party, to make appointments which have not been made.

13.1.4 The seat of arbitration shall be in Mexico City, United Mexican States and the arbitration shall be conducted in English and Spanish, in accordance with the Rules of CAM. The Parties shall have the right to present documentary evidence and witnesses and to cross-examine witnesses.

13.1.5 In arriving at their decision, the arbitrators shall consider the pertinent facts and circumstances and be guided by terms of this Agreement; and, if a solution is not found in

Partes, no obstante lo anterior, podrá solicitar medidas cautelares o cualquier otro recurso similar en equidad de un tribunal que sea competente, en cualquier momento y de vez en vez, previo al inicio del arbitraje. Todos los documentos y procedimientos del arbitraje deberán estar en idioma Inglés y Español. Cada una de las Partes tendrá derecho, mediante aviso a la otra, de someter un conflicto o controversia al arbitraje cuando así resulte procedente. La notificación deberá contener el nombre y domicilio del árbitro designado por la Parte notificadora, así como los puntos en controversia.

13.1.3. Dentro de los quince (15) días posteriores a la recepción de la notificación, la otra Parte deberá informar a la primera del nombre y domicilio del segundo árbitro. Dentro de los treinta (30) días siguientes a la designación del segundo árbitro, ambos árbitros designados deberán designar a un tercer árbitro que fungirá como presidente del tribunal arbitral, considerando que dicho presidente deberá ser independiente y de nacionalidad distinta a cualquiera de los países de constitución de las Partes. Si la segunda Parte no cumple con la designación del segundo árbitro dentro de los quince (15) días posteriores a la recepción del aviso de designación del primer árbitro, o, si los dos árbitros designados por las partes no cumplen con la designación del tercer árbitro dentro de los treinta (30) días posteriores a la designación del segundo árbitro, entonces el Presidente de la CAM tendrá el poder, por solicitud de una de las Partes, para realizar las designaciones que no se hubieren cumplimentado.



13.1.4 La sede del arbitraje será en el Distrito Federal, Estados Unidos Mexicanos y será llevado a cabo en idioma Inglés y Español, de conformidad con las Reglas de CAM. Las Partes tendrán el derecho de presentar pruebas documentales y testimoniales, así como a contra examinar a los testigos de la contraria.



13.1.5 Para llegar a una decisión, los árbitros deberán considerar los hechos y circunstancias pertinentes y guiarse por los términos de este Convenio; y, de no encontrar solución alguna

18

tradeco 000290

the terms of this Agreement, the arbitrators shall apply the provisions of the law governing this Agreement. Notwithstanding any other provision of this Agreement to the contrary, the arbitrators are hereby instructed to determine each matter based upon a de novo review of the evidence and claims presented by the Parties. The arbitrators shall    award reasonable attorney's fees and costs to the prevailing Party.

en los términos del presente, los árbitros aplicarán las disposiciones legales que rigen el presente Convenio. No obstante cualquier otra disposición contenida en el presente Convenio que indique lo contrario, los árbitros están instruidos para determinar cada controversia conforme a una nueva revisión de la evidencia y de los reclamos presentados por las Partes. Los árbitros deberán adjudicar honorarios y costos razonables de abogados a la Parte vencedora.

13.1.6 The decision of the arbitrators shall be final, reasoned, in writing, and binding upon the Parties, and neither Party shall have the right to seek recourse to a law court or other authorities to appeal for revisions of such decision.

13.1.6 La decisión de los árbitros será final, razonada, por escrito y vinculante para las Partes, ninguna Parte tendrá derecho a recurrir a tribunal alguno u otras autoridades para solicitar la revisión de dicha decisión.

13.1.7 The arbitration award to the prevailing Party shall include the cost of the CAM for administering the arbitration and the cost of the arbitrators. On request of either Party, a transcription of the hearings shall be prepared and made available to the Parties.

13.1.7. En el laudo arbitral para la Parte vencedora deberá de incluir el costo de la CAM por la administración del arbitraje, así como el costo de los árbitros. A solicitud de cualquiera de las Partes, una transcripción de las audiencias podrá ser preparada y puesta a disposición de ambas.

13.1.8. Confidential information disclosed during the proceedings by the Parties or by witnesses shall not be divulged by the arbitrators, the administrator, or the Parties. Unless otherwise agreed by the Parties or required by applicable law, the arbitrators, the administrator, and the Parties shall keep confidential all matters relating to the arbitration and the award.

13.1.8 La información confidencial revelada durante los procedimientos por las Partes o por los testigos no deberá ser divulgada por los árbitros, el administrador o las Partes. A menos que se pacte lo contrario por las Partes o así lo establezca la ley aplicable, los árbitros, el administrador y las Partes deberán mantener como confidenciales todos los asuntos relativos al arbitraje y al laudo.

13.1.9 The fact that arbitration is or may be allowed will not impair the exercise of any termination rights under this Agreement or rights to seek injunctive or other equitable relief.

13.1.9 El hecho de que el arbitraje sea o pueda ser llevado a cabo, no impedirá el ejercicio de los derechos a terminar este Convenio, o de los derechos a solicitar medidas cautelares u otras soluciones bajo equidad.

**13.2 Governing Law**. This Agreement, and all the rights and duties of the parties arising out of, in connection with, or relating in any way to the subject matter of this Agreement or the transactions contemplated by it, shall be governed by, construed, and enforced in accordance with the laws of Mexico (excluding its conflict of laws rules which would refer to

**13.2 Legislación Aplicable.** Este Convenio y todos los derechos y obligaciones de las Partes, derivados de, en conexión o relacionados en cualquier forma al objeto materia del presente Convenio o a las transacciones contempladas en él, deberán ser reguladas, interpretadas y ejecutadas conforme a las leyes Mexicanas (excluyendo sus reglas relativas al conflicto de



19

and apply the substantive laws of another jurisdiction). The rights and obligations of the Parties under this Agreement shall not be governed by the provisions of the 1980 U.N. Convention on Contracts for the International Sale of Goods.

## 14.- GENERAL PROVISIONS

**14.1. Notices.** Any notices or other communications required or permitted hereunder shall be signed by a duly authorized representative of the party initiating such notice and shall be deemed to have been duly given (a) if delivered in person or by facsimile; or (b) if sent by courier, in any case postage prepaid and addressed as follows:

If to ROM:
At'n: Thomas F. Cunningham
Telephone: (281) 465-8331 (USA)
Fax: (281) 465-8335 (USA)

If to TRADECO:
At'n:  David Ignacio Espinosa Guzmán
Telephone: 54827600
Ext. 15003

If to ORCA:
At'n: José César Velázquez Muñoz
Telephone: 01993131371
Ext. 118

Any notice made by facsimile shall be deemed received simultaneously with confirmation of receipt of transmission thereof if sent during business hours or at the start of the next business day if sent after business hours. Or if sent to such substituted address as any of the Parties has given to the others in writing in accordance with this Article.

**14.2 Waivers.** No waiver or failure to insist upon strict compliance with any obligations, covenant, agreement or condition of this Agreement shall operate as a waiver of any

leyes que pudieran referir a o aplicar leyes sustantivas de otra jurisdicción). Los derechos y obligaciones de las Partes bajo este Convenio no serán regulados por las disposiciones de la Convención de las Naciones Unidas sobre Contratos de Compraventa Internacional de Mercaderías de 1980.

## 14.- DISPOSICIONES GENERALES

**14.1 Notificaciones.** Todas las notificaciones y demás comunicaciones requeridas o permitidas bajo el presente deberán estar firmadas por el representante autorizado de la Parte que inicie dicha notificación, y se considerará debidamente entregada: (a) si es entregada en persona o por fax; o (b) si es enviada por mensajería, en cualquier caso el envío deberá ser pre-pagado y dirigido a la siguiente dirección:

Si es para ROM:
At'n: Thomas F. Cunningham
 Teléfono: (281) 465-8331 (USA)
Fax: (281) 465-8335 (USA)

Si es para TRADECO:
Atención: David Ignacio Espinosa Guzmán
Teléfono: 54827600
Ext. 15003

Si es para ORCA:
Atención: José César Velázquez Muñoz
Teléfono: 01993131371
Ext. 118

Cualquier notificación hecha por fax será considerada como recibida simultáneamente con la confirmación del recibo de transmisión de la misma, si es enviada durante horas laborables; o al comienzo del siguiente día hábil en caso que hubiere sido enviada fuera de horas laborables. O si fuere enviada al domicilio sustituido siempre que cualquiera de las Partes haya entregado a la otra un aviso por escrito, de conformidad con este Artículo.

**14.2 Renuncias.** Ninguna renuncia o falta de solicitud del estricto cumplimiento a cualquier obligación, pacto, acuerdo o condición de este Convenio, deberá entenderse como una

20

subsequent or other failure.

**14.3 Additional Parties.** No Person shall become an additional party to this Agreement without the prior written consent of both Parties.

**14.4 Headings.** The headings in this Agreement have been included solely for ease of reference and shall not be considered in the interpretation or construction of this Agreement.

**14.5 Counterparts.** This Agreement may be executed in two (2) counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.

**14.6 Assignment and Subcontracting.** No Party may assign, subcontract or delegate this Agreement or any of its rights or obligations under this Agreement or the Contract without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned, or delayed. No such consent shall be required for either party to assign this Agreement or its rights and duties hereunder to an affiliate, subsidiary, or purchaser of substantially all of the assets of such party. Nothing herein shall prevent either Party from working with its affiliated entities, placing or permitting the placing of orders on others for the supply of goods or services within such Party's Scope of Services, provided that the placing of such orders shall not in any way relieve such Party from any of its obligations under this Agreement or the Contract.

**14.7 Severability.** If any provision of this Agreement or its application will be invalid, illegal, or unenforceable in any respect, the validity, legality and enforceability of all other applications of that provision, and of all other provisions and applications hereof will not be affected or impaired. If any arbitration panel or court shall determine that any provision of this Agreement is in any way unenforceable, that

renuncia a cualquier otro o subsecuente incumplimiento.

**14.3 Partes Adicionales.** Ninguna persona podrá convertirse en parte adicional a este Convenio sin el consentimiento previo y por escrito de ambas Partes.

**14.4 Encabezados.** Los encabezados en el presente Convenio han sido incluidos solamente como elementos de fácil referencia y no deberán ser considerados en la interpretación del presente Convenio.

**14.5 Duplicados.** Este Convenio será firmado en dos (2) ejemplares, cada uno de los cuales deberá ser un original, pero ambos ejemplares juntos constituirán un solo y mismo instrumento.

**14.6 Cesión y Subcontratación.** Ninguna de las Partes podrá ceder, subcontratar o delegar el presente Convenio o cualquiera de los derechos u obligaciones consignados en él o en el Contrato sin el consentimiento previo y por escrito de la otra Parte, dicho consentimiento no deberá ser retenido, condicionado o retrasado sin razón alguna. El consentimiento no será requerido para ninguna de las Partes cuando cedan el presente Convenio o los derechos y obligaciones consignadas en él a una filial, subsidiaria o comprador de sustancialmente todos los activos de dicha Parte. Nada de lo establecido en el presente documento impedirá a ninguna de las Partes de trabajar con sus entidades filiales, colocar o permitir colocar pedidos con otros para el suministro de bienes o servicios dentro del Alcance de Servicios de dicha Parte, toda vez que la colocación de dichos pedidos no releven a dicha Parte de cualquiera de sus obligaciones bajo este Convenio o del Contrato.

**14.7 Divisibilidad.** Si cualquier cláusula o disposición del presente Convenio o su aplicación resultara inválida, ilegal o inaplicable en cualquier aspecto, la validez, legalidad y aplicabilidad de todas las demás disposiciones de dicha cláusula o cláusulas, así como de todas aquellas disposiciones y aplicaciones de este documento no serán afectadas o perjudicadas. Si cualquier panel



21

provision shall be reduced to the extent necessary to make the provision enforceable and the Parties shall seek an arrangement having a valid legal and economic effect which will be as similar as possible to the ineffective provision and will cover the scope of any missing provision in a manner reasonably direct to the purpose of this Agreement.

**14.8 Successors and Assigns.** This Agreement shall be binding upon the Parties' legal successors and assigns.

**14.9 Confidentiality.**

14.9.1 Except as otherwise provided herein, TRADECO, ORCA and ROM agree that any and all information that is not otherwise publicly available ("Confidential Information") communicated by one party ("Disclosing Party") to the other ("Receiving Party"), (i) shall be treated as confidential, proprietary, and trade secret information of Disclosing Party (with Disclosing Party reserving all rights to its Confidential Information); (ii) shall be held in strict confidence by Receiving Party, (iii) shall be used only for purposes of this Agreement by Receiving Party, and (iv) that no Confidential Information, including without limitation the provisions of this Agreement, shall be disclosed by the Receiving Party, its affiliates, subsidiaries or contractors and each of their respective directors, officers, employees, consultants, agents, or representatives ("Representatives"), without the prior written consent of the Disclosing Party, except as may be necessary by reason of legal, accounting or regulatory requirements beyond the reasonable control of the Receiving Party.

14.9.2 The Receiving Party shall safeguard Confidential Information with at least the same degree of care (which shall always be at least a reasonable amount of care) that it uses to safeguard its own confidential, proprietary, and

---

arbitral o tribunal determina que cualquier disposición de este Convenio es de algún modo inaplicable, dicha disposición será reducida al extremo necesario para hacerla aplicable y las Partes deberán buscar un acuerdo con efectos legales y económicos tan similares como sea posible a la disposición sin efectos y cubrirán el alcance de cualquier disposición faltante de manera razonable y directa al objeto de este Convenio.

**14.8 Sucesores y Cesionarios.** Este Convenio será vinculante a los sucesores y cesionarios legales de las Partes.

**14.9 Confidencialidad.**

14.9.1 Con excepción a lo declarado en contrario en este documento, TRADECO, ORCA y ROM convienen que toda y cualquier información que no esté disponible públicamente ("Información Confidencial") y que sea comunicada por una Parte ("Parte Reveladora") a la otra ("Parte Receptora"), (i) será tratada como confidencial, protegida y como secreto comercial de la Parte Reveladora (donde la Parte Reveladora se reserva su derecho respecto a la Información Confidencial); (ii) deberá ser manejada en estricta confidencialidad por la Parte Receptora, (iii) deberá ser utilizada por la Parte Receptora únicamente para los fines del presente Convenio, y (iv) ninguna Información Confidencial, incluyendo sin límite, las cláusulas de este Convenio, deberá ser revelada por la Parte Receptora, sus filiales, subsidiarias o contratistas y por cada uno de sus respectivos directivos, funcionarios, empleados, consultores, agentes o representantes (los "Representantes") sin el consentimiento previo y por escrito de la Parte Reveladora, excepto cuando así sea necesario por razones legales, contables o requerimientos regulatorios más allá del control razonable de la Parte Receptora.

14.9.2 La Parte Receptora deberá salvaguardar la Información Confidencial con al menos el mismo nivel de cuidado (que deberá ser siempre por lo menos un nivel razonable de cuidado) que utiliza para salvaguardar su



22

trade secret information.

14.9.3 This Section shall not apply to information (i) which is in the public domain (other than through its unauthorized disclosure by Receiving Party or its Representatives), (ii) which the Receiving Party had in its possession prior to receiving it from the Disclosing Party, (iii) which the Receiving Party obtained from a third party who rightfully acquired such information, or (iv) which the Receiving Party independently developed without reference to the information received from the Disclosing Party. If the Receiving Party must disclose any such confidential information pursuant to applicable law or regulation or by operation of law, the Receiving Party may disclose only such information as, in the opinion of counsel, is legally required, and provided, further, that the Receiving Party shall provide reasonable notice to the Disclosing Party of such requirement and a reasonable opportunity to object to such disclosure.

14.9.4 Notwithstanding anything elsewhere in this Agreement to the contrary, the terms of this Section shall apply to Confidential Information amounting to a trade secret for as long as such information remains a trade secret under applicable law. The terms of this provision shall survive the termination of this Agreement for a period of three (3) years.

**14.10 Further Assurances.** Each Party agrees that it will, at any time, and from time to time, do execute, acknowledge and deliver all such further acts, documents, and instruments as may be reasonably required by the other Party in order to carry out fully and effectuate the transactions herein contemplate in accordance with the provisions of this Agreement, including making appropriate revisions to this Agreement.

**14.11 Survival.** The following Articles shall survive termination of this Agreement: Article 2 (Relationship of the Parties and General

---

propia información confidencial, protegida o secreto comercial.

14.9.3 Esta Sección no le será aplicable a la información que (i) sea del dominio público (que no sea por su revelación sin autorización por la Parte Receptora o sus Representantes), (ii) aquella que la Parte Receptora ya poseía previo a su recepción por parte de la Parte Reveladora, (iii) aquella que la Parte Receptora obtenga por medio de terceros que legalmente adquirieran dicha información, o (iv) aquella que la Parte Receptora desarrollara independientemente y sin referencia a la información recibida por la Parte Reveladora. Si la Parte Reveladora debe publicar cierta información confidencial por disposición u operación de las leyes, la Parte Receptora podrá revelar solamente aquella información que, a juicio del abogado, sea la legalmente requerida, y siempre y cuando la Parte Receptora envíe notificación razonable a la Parte Reveladora sobre dicho requerimiento, así como oportunidad razonable para objetar dicha revelación.

14.9.4 No obstante cualquier disposición establecida en sentido contrario en el presente Convenio, los términos de esta Sección deberán aplicar para la Información Confidencial relativa al secreto comercial en la medida en que dicha información permanezca como secreto comercial bajo la ley aplicable. Los términos de esta cláusula deberán subsistir a la terminación del presente Convenio por un periodo de tres (3) años.

**14.10 Garantías Adicionales.** Cada una de las Partes acuerda que en cualquier momento y de vez en cuando firmará, reconocerá y entregará todos los actos, documentos e instrumentos que sean razonablemente requeridos por la otra Parte, de modo que ésta pueda efectuar las transacciones contempladas en el presente documento, de conformidad con las disposiciones del presente Convenio, incluyendo la adecuada revisión de este Convenio.

**14.11 Sobrevivencia.** Los siguientes artículos sobrevivirán a la terminación de este Convenio: Artículo 2 (Relación entre las Partes

23

Principles of Cooperation), Article 5.1 (Obligation to Provide Information), Article 5.4 (Obligation to Provide Information), Article 6 (Payment), Article 8 (Claims), Article 11 (Proper Business Practices), Article 12 (Term of the Agreement), Article 13 (Dispute Resolutions; Governing Law), Article 14 (General Provisions) and all the Appendices.

**14.12 Non-solicitation**. During the term hereof and for a period of two (2) years thereafter, each Party agrees not to, either directly or indirectly, for itself or on behalf of any other person, firm, partnership, corporation or other entity hire, solicit, contract for, attempt to solicit, or cause to be solicited, the employment or services of any current or previous employee of the other Party (unless a period of twelve months has elapsed from the last date that such employee was employed by such Party) without the prior written consent of such other Party. This prohibition does not apply to personnel of either Party who respond to a public advertisement or who otherwise participate in a public job solicitation.

**14.13 Entire Agreement; Amendment.** This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof. All prior negotiations and agreements by and among the Parties hereto with respect to the subject matter hereof are superseded by this Agreement and there are no representations, warranties, undertakings or agreements with respect to the subject matter hereof other than those expressly set forth herein or in an Appendix delivered in connection herewith. If there is any conflict between the text of this Agreement and any Appendix, the terms of this Agreement shall control and the rights and obligations of the Parties shall be governed thereby. The rights and remedies of the Parties as stated in this Agreement are to the exclusion of any other rights or remedies that may be available at law or in equity. No amendment or modification of this Agreement shall be binding unless the same shall be in writing and signed by both

y Principios Generales de Cooperación), Artículo 5.1 (Obligación de Proporcionar Información), Artículo 5.4 (Obligación de Proporcionar Información), Artículo 6 (Pago), Artículo 8 (Reclamos), Artículo 11 (Prácticas de Negocios Adecuadas), Artículo 12 (Vigencia del Convenio), Artículo 13 (Solución de Controversias; Jurisdicción Aplicable), Artículo 14 (Disposiciones Generales) y todos sus Anexos.

**14.12 Cláusula de No-Captación.** Durante la vigencia del presente y por un periodo de dos (2) años posteriores, cada una de las Partes se compromete, ya sea directa o indirectamente, por sí o en nombre de cualquier otra persona, firma, sociedad, corporación u otra entidad, a no contratar, solicitar, pactar, intentar solicitar o hacer que le soliciten, el trabajo o servicios de cualquier antiguo o actual empleado de la otra Parte (a menos que un periodo de doce meses haya pasado a partir de la última fecha en que el empleado estuvo contratado por dicha Parte) sin el consentimiento previo y por escrito de la otra. La prohibición no es aplicable al personal de cualquiera de las Partes que responda a los avisos públicos o que esté participando en una oferta de trabajo pública.

**14.13 Convenio Completo; Modificación.** Este Convenio contiene el acuerdo completo entre las Partes respecto del objeto en cuestión. Todas las negociaciones y acuerdos previos entre las Partes respecto del objeto en cuestión, serán reemplazados por este Convenio y no habrá representaciones, garantías, compromisos o acuerdos respecto de esta materia más que los que se establecieron previamente en este documento, o en algún Anexo entregado en relación con el presente. De existir algún conflicto entre el texto de este Convenio y cualquier Anexo, los términos del Convenio prevalecerán, y los derechos y obligaciones de las Partes serán regulados conforme a los mismos. Los derechos y recursos de las Partes, conforme a lo establecido en este Convenio, existen en exclusión de cualesquier otros derechos y recursos que pudieren estar disponibles por ley o en equidad. Ninguna enmienda o modificación al presente Convenio será vinculatoria a menos



24

Parties.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their respective authorized representatives as of the date first written above.

A. _____

**By:** RANGER OFFSHORE MEXICO S. DE R.L. DE C.V.
**Name:** THOMAS F. CUNNINGHAM
**Title:** SR. VICE PRESIDENT

B. _____

**By:** TRADECO INFRAESTRUCTURA, S.A DE C.V.
**Name:** DAVID IGNACIO ESPINOSA GUZMÁN
**Title:** VICE PRESIDENT

C. _____

**By:** OPERACIONES Y RENTAS COSTA AFUERA, S.A DE C.V.
**Name:** JOSÉ CÉSAR VELÁZQUEZ MUÑOZ
**Title:** MARINE WORKS DIRECTOR

---

que la misma sea plasmada por escrito y firmada por ambas Partes.

EN TESTIMONIO DE LO ANTERIOR, las Partes al presente han firmado este Convenio por medio de sus representantes autorizados respectivos, en la fecha escrita al inicio de este escrito.

A. _____

**Por:** RANGER OFFSHORE MEXICO S. DE R.L. DE C.V.
**Nombre:** THOMAS F. CUNNINGHAM
**Cargo:** VICEPRESIDENTE

B. _____

**Por:** TRADECO INFRAESTRUCTURA, S.A DE C.V.
**Nombre:** DAVID IGNACIO ESPINOSA GUZMÁN
**Cargo:** VICEPRESIDENTE

C. _____

**Por:** OPERACIONES Y RENTAS COSTA AFUERA, S.A DE C.V.
**Nombre:** JOSÉ CÉSAR VELÁZQUEZ MUÑOZ
**Cargo:** DIRECTOR DE OBRAS MARINAS

25

| CONVENIO DE SERVICIO MAESTRO | MASTER SERVICE AGREEMENT |
|---|---|
| ENTRE: | BETWEEN: |
| TRADECO INFRAESTRUCTURA S.A DE C.V., | TRADECO INFRAESTRUCTURA S.A DE C.V., |
| OPERACIONES Y RENTAS COSTA AFUERA S.A DE C.V. | OPERACIONES Y RENTAS COSTA AFUERA S.A DE C.V. |
| Y | AND |
| RANGER OFFSHORE MEXICO, S. DE R.L. DE C.V. | RANGER OFFSHORE MEXICO, S. DE R.L. DE C.V.. |



HOUSTON 1152650v.2



Página | i

EXHIBIT
R - 29

Ranger_004303

| CONTENIDO | | TABLE OF CONTENTS | |
|---|---|---|---|
| ARTÍCULO 1 | DEFINICIONES E INTERPRETACIÓN | ARTICLE 1 | DEFINITIONS AND INTERPRETATION |
| ARTÍCULO 2 | APLICACIÓN DEL CONVENIO DE SERVICIO MAESTRO | ARTICLE 2 | APPLICATION OF MASTER SERVICE AGREEMENT |
| ARTÍCULO 3 | RESCISIÓN DE CONVENIOS PREVIOS | ARTICLE 3 | TERMINATION OF PRIOR AGREEMENTS |
| ARTÍCULO 4 | EQUIPO | ARTICLE 4 | EQUIPMENT |
| ARTÍCULO 5 | TIEMPO Y RENDIMIENTO | ARTICLE 5 | TIME AND PERFORMANCE |
| ARTÍCULO 6 | DECLARACIONES Y GARANTÍAS | ARTICLE 6 | REPRESENTATIONS AND WARRANTIES |
| ARTÍCULO 7 | SERVICIOS DE CONSULTORIA | ARTICLE 7 | CONSULTING SERVICES |
| ARTÍCULO 8 | RETIRO DE EQUIPO | ARTICLE 8 | REMOVAL OF EQUIPMENT |
| ARTÍCULO 9 | PAGOS | ARTICLE 9 | PAYMENT |
| ARTÍCULO 10 | LIBROS Y REGISTROS | ARTICLE 10 | BOOKS AND RECORDS |
| ARTÍCULO 11 | CONTRATISTA INDEPENDIENTE | ARTICLE 11 | INDEPENDENT CONTRACTOR |
| ARTÍCULO 12 | CUMPLIMIENTO CON LA LEY 16 | ARTICLE 12 | COMPLIANCE WITH THE LAW |
| ARTÍCULO 13 | RESPONSABILIDADES DE SEGURIDAD DEL CONTRATISTA | ARTICLE 13 | CONTRACTOR'S SAFETY RESPONSIBILITIES |
| ARTÍCULO 14 | DROGAS, ALCOHOL Y ARMAS DE FUEGO | ARTICLE 14 | DRUGS, ALCOHOL AND FIREARMS |
| ARTÍCULO 15 | SEGUROS | ARTICLE 15 | INSURANCE |
| ARTÍCULO 16 | ASIGNACION DE RIESGO E INDEMNIZACION | ARTICLE 16 | ALLOCATION OF RISK AND INDEMNITY |
| ARTÍCULO 17 | CESIÓN | ARTICLE 17 | ASSIGNMENT |
| ARTÍCULO 18 | CONFIDENCIALIDAD | ARTICLE 18 | CONFIDENTIALITY |
| ARTÍCULO 19 | FUERZA MAYOR | ARTICLE 19 | FORCE MAJEURE |
| ARTÍCULO 20 | LEY VIGENTE Y | ARTICLE 20 | GOVERNING LAW AND |

Ranger_004304

| | CONTROVERSIAS ................ | | DISPUTES ......................... |
|---|---|---|---|
| ARTÍCULO 21 | FCPA........................................ | ARTICLE 21 | FCPA...................................... |
| ARTÍCULO 22 | ANULACIÓN PARCIAL.......... | ARTICLE 22 | SEVERABILITY ..................... |
| ARTÍCULO 23 | CONVENIO TOTAL................ | ARTICLE 23 | ENTIRE AGREEMENT.......... |
| ARTÍCULO 24 | TERMINACIÓN...................... | ARTICLE 24 | TERMINATION ...................... |
| ARTÍCULO 25 | NOTIFICACIONES ................ | ARTICLE 25 | NOTICES................................ |

## CONVENIO DE SERVICIO MAESTRO

**ESTE CONVENIO DE SERVICIO MAESTRO** (este "**Convenio**") que entra en vigor con fecha del día 14 de Febrero, 2014 ("**Fecha de Vigencia**") se celebra por y entre Tradeco Infraestructura, S.A. de C.V., Operaciones y Rentas Costa Afuera, S.A. de C.V., en nombre propio y de sus Subsidiarias, en lo sucesivo denominadas conjuntamente como la "**Empresa**," y **RANGER OFFSHORE MEXICO S. DE R.L. DE C.V.**, en nombre propio y de sus Subsidiarias, en lo sucesivo denominados conjuntamente como "**Contratista**". La Empresa y el Contratista pueden ser denominados individualmente como "**Parte**" o conjuntamente como "**Partes**."

### INFORMACIÓN DE CONTACTO DE LAS PARTES

EMPRESA: Tradeco Infraestructura S.A de C.V.
Avenida Insurgentes Sur número 1647, Local "D", Colonia San José Insurgentes, Delegación Benito Juárez, C.P. 03900, en México, Distrito Federal.

Representante: David I. Espinosa Guzmán
Tel: (555)482-7600
Correo electrónico: despinosa@tradeco.com

EMPRESA: Operaciones y Rentas Costa Afuera, S.A. de C.V.

Avenida Insurgentes Sur número 1647, Local "D", Colonia San José Insurgentes, Delegación Benito Juárez, C.P. 03900, en México, Distrito Federal.

Representante: José César Velazquez Muñoz
Tel: (555)482-7600
Correo electrónico:
jose.velazquez@orcanav.com

## MASTER SERVICE AGREEMENT

**THIS MASTER SERVICE AGREEMENT** (this "Agreement") with an effective date of February 14, 2014 ("Effective Date") is made by and between Tradeco Infraestructura, S.A. de C.V., Operaciones y Rentas Costa Afuera, S.A. de C.V. , on behalf of itself and its Affiliates, hereinafter collectively referred to as "**Company**," **and RANGER OFFSHORE MEXICO, S. DE R.L. DE C.V..**, on behalf of itself and its Affiliates, hereinafter collectively referred to as "Contractor". Company and Contractor may be referred to herein individually as "Party" or collectively as "Parties."

### PARTY CONTACT INFORMATION

COMPANY: Tradeco Infraestructura S.A de C.V.

Avenida Insurgentes Sur número 1647, Local "D", Colonia San José Insurgentes, Delegación Benito Juárez, C.P. 03900, en México, Distrito Federal.

Atn: David I. Espinosa Guzmán.
Phone: (555)482-7600
Email: despinosa@tradeco.com

COMPANY: Operaciones y Rentas Costa Afuera, S.A. de C.V.

Avenida Insurgentes Sur número 1647, Local "D", Colonia San José Insurgentes, Delegación Benito Juárez, C.P. 03900, en México, Distrito Federal.

Atn: José César Velazquez Muñoz

Phone: (555)482-7600
Email: jose.velazquez@orcanav.com

Ranger_004306

| | |
|---|---|
| CONTRATISTA: Ranger Offshore México, S. de R.L. de C.V.<br><br>Ave. Edzna # 49-A, Parque Industrial Mundo Maya, Ciudad del Carmen, Campeche. C.P. 24153<br><br>Atn: Thomas F. Cunningham<br>Tel:    (938)131-4707Fax:<br>Correo electrónico:<br>t.cunningham@rangeroffshoreinc.com | CONTRACTOR: Ranger Offshore Mexico, S. de R.L. de C.V.<br>Ave. Edzna # 49-A, Parque Industrial Mundo Maya, Ciudad del Carmen, Campeche. C.P. 24153<br>Atn: Thomas F. Cunningham<br>Phone: (938)131-4707<br>Fax:<br>Email:<br>t.cunningham@rangeroffshoreinc.com |

**CONSIDERANDO QUE,** la Empresa y sus Subsidiarias de tiempo en tiempo podrán contratar al Contratista o a sus Subsidiarias para prestar Servicios (como se define más adelante), todos los cuales pueden ser independientes uno del otro; y

**CONSIDERANDO QUE,** las Partes del presente contemplan que dicha contratación será manejada ya sea informalmente mediante autorización verbal u orden de trabajo escrita de un representante de la Empresa o formalmente por medio de un contrato escrito especificando la ubicación de los Servicios, alcance, materiales que se suministrarán y toda otra cuestión que se considere pertinente; y

**CONSIDERANDO QUE,** las Partes del presente desean acordar y celebrar este Convenio para establecer los términos y condiciones en que los Servicios serán realizados por el Contratista para la Empresa independientemente de la formalidad o informalidad por la cual se contrate al Contratista.

**AHORA, POR LO TANTO,** para y en consideración de las premisas y promesas mutuas, pactos y acuerdos que en lo sucesivo se establezcan, la Empresa y el Contratista acuerdan como sigue:

## ARTÍCULO 1    DEFINICIONES E INTERPRETACIÓN

Además de otros términos definidos en el presente, los siguientes términos tendrán los respectivos significados:

**WHEREAS,** Company and its Affiliates may from time to time retain Contractor or its Affiliates to perform Services (as hereinafter defined), all of which may be independent of one another; and

**WHEREAS,** the Parties hereto contemplate that such retention will be handled either informally by oral authorization or written job order from a representative of Company or formally by execution of a written contract specifying the Services location, scope, materials to be furnished and such other matters as may be deemed pertinent; and

**WHEREAS,** the Parties hereto desire to agree upon and enter into this Agreement to set forth the terms and conditions under which the Services shall be performed by Contractor for Company irrespective of the formality or informality by which Contractor is retained.

**NOW, THEREFORE,** for and in consideration of the premises and the mutual promises, covenants and agreements hereinafter set forth, Company and Contractor agree as follows:

## ARTICLE 1    DEFINITIONS AND INTERPRETATION

In addition to other terms defined herein, the following terms shall have the following respective meanings:

Ranger_004307

1.1.  **"Subsidiaria"** significa cualquier Persona que controle, esté controlado por o esté en control común con otra Persona. Una Persona se considera que controla a otra si (a) es propietario directa o indirectamente de por lo menos el cincuenta por ciento (50%) de: (i) las acciones con derecho a voto en las elecciones generales de directivos de otra entidad o (ii) el interés de voto en dicha entidad si dicha entidad no tiene ni acciones ni directivos; o (b) por el contrario controla o dirige a la otra Persona.

1.1  **"Affiliate"** means any Person which controls, is controlled by, or is under common control with another Person. A Person is deemed to control another if it (a) owns directly or indirectly at least fifty percent (50%) of: (i) the shares entitled to vote at a general election of directors of such other entity or (ii) the voting interest in such other entity if such entity does not have either shares or directors; or (b) otherwise controls or directs the other Person.

1.2.  **"Reclamación"** significa cualquiera y todas las reclamaciones, demandas, acciones de cualquier clase o carácter, responsabilidades, pérdidas, derecho de retención, gravámenes, daños, fallos, conciliaciones, multas, penalizaciones, laudos, intereses, gastos (incluyendo honorarios de abogados) y costos (incluyendo, cuando sea apropiado, costos de control, contención, limpieza, remoción, y disposición), que surjan de o en relación con este Convenio y cualesquiera Servicios, sin limitación alguna por razón de cualquier seguro proporcionado por cualquiera de las Partes, en la máxima medida permitida por la legislación aplicable en cada caso y específicamente incluyendo cualquiera de las mencionadas anteriormente que surja en su totalidad o parcialmente debido a la defensa, indemnización, y /o acuerdo de exoneración entre las Partes en este Convenio y cualquier miembro del "Grupo" de las Partes.

1.2  **"Claim"** means any and all claims, demands, causes of action of any kind or character, liabilities, losses, liens, encumbrances, damages, judgments, settlements, fines, penalties, awards, interests, expenses (including attorney fees) and costs (including, where appropriate, costs of control, containment, clean-up, removal, and disposal), arising out of or in connection with this Agreement and any Services, without limitation by reason of any insurance provided by either Party, to the maximum extent permitted by applicable law in each and every case and specifically including any of the above that arise in whole or in part due to a defense, indemnity, and/or release agreement between a Party to this Agreement and any member of that Party's Group.

1.3.  **"Empresa"** significa la Parte definida anteriormente como la "Empresa" o un Afiliado de dicha Parte para la cual el

1.3  **"Company"** means the Party defined above as the "Company" or an Affiliate of such Party for which

Ranger_004308

Contratista acuerda proporcionar los Servicios. Si un Subsidiaria de la Parte nombrada anteriormente como la "Empresa" utiliza este Convenio para obtener Servicios del Contratista, dicha Subsidiaria será considerado como la "Empresa" y la empresa nombrada será parte del Grupo de la Empresa

1.4.    "**Grupo de la Empresa**" significa la Empresa y sus Subsidiarias y sus respectivos consorcios (joint venture), socios, co-propietarios, co-arrendadores o co-arrendatarios que en su totalidad o parcialmente sufragan los costos de las operaciones en cualquiera de las instalaciones de la Empresa, los respectivos contratistas y subcontratistas de cualquier nivel de las anteriores (otro que no sea el Grupo Contratista), y sus respectivos funcionarios, directivos, gerentes, agentes, servidores y empleados de cada una de las anteriores (otro que no sea el Grupo Contratista) así como sus herederos, representantes, causahabientes o cesionarios de cualquier miembro del Grupo de la Empresa

1.5.    "**Contratista**" significa la Parte definida anteriormente como el "Contratista" o un Afiliado de dicha Parte, que acuerda proporcionar los Servicios de conformidad con los términos de este Convenio. Si una Subsidiaria de la Parte denominada como el "Contratista" utiliza este Convenio para proporcionar Servicios a la Empresa, entonces dicho Subsidiaria será considerado como el "Contratista" y el nombrado Contratista será parte del Grupo Contratista

1.6.    "**Grupo Contratista**" significa que el Contratista y sus Afiliados y cualquiera

Contractor agrees to provide Services. If an Affiliate of the Party named above as the "Company" utilizes this Agreement to obtain Services from Contractor, then such Affiliate shall be considered the "Company" and the named Company shall be part of the Company Group

1.4 -   Company Group" means Company and its Affiliates and their respective joint venturers, partners, co-owners, co-lessors, or co-lessees that wholly or partially bear the costs of operations at any of Company's premises, the respective contractors and sub-contractors of any tier of the foregoing (other than Contractor Group), and the respective officers, directors, managers, agents, servants and employees of each of the foregoing (other than Contractor Group) as well as the heirs, representatives, successors or assigns of any member of Company Group

1.5"**Contractor**" means the Party defined above as the "Contractor" or an Affiliate of such Party, which agrees to provide Services pursuant to the terms of this Agreement. If an Affiliate of the Party named as the "Contractor" utilizes this Agreement to provide Services to Company, then such Affiliate shall be considered the "Contractor" and the named Contractor shall be part of the Contractor Group -

Ranger_004309

de sus empresas conjuntas y socios, sus respectivos contratistas y subcontratistas de cualquier nivel de las anteriores, y sus respectivos funcionarios, directivos, agentes, personal de servicios y empleados de cualquiera de las anteriores así como sus herederos, representantes, sucesores o cesionarios de cualquier de los miembros del Grupo Contratista

1.6 - **Contractor Group**" means Contractor and its Affiliates, and any of its joint venturers and partners, the respective contractors and sub-contractors of any tier of the foregoing, and the respective officers, directors, agents, servants and employees of each of the foregoing as well as the heirs, representatives, successors or assigns of any member of Contractor Group.-

1.7. **Defensa**" o "**Defensor**" incluye la obligación de pagar los honorarios razonables de abogados, costos judiciales, costos de peritos, y otros costos razonables incurridos por el indemnizador y/o indemnizado como resultado de la defensa en contra de una Reclamación como es requerido por este Convenio o, a elección y cuenta del indemnizador, la obligación de seleccionar y contratar abogados competentes y peritos para la Defensa en contra de una Reclamación como es requerido por este Contrato.

1.7 "**Defense**" or "**Defend**" includes the obligation to pay reasonable attorneys' fees, court costs, experts' fees, and other reasonable costs incurred by the indemnitor and/or indemnitee as a result of defending against a Claim as required by this Agreement or, at the election and cost of the indemnitor, the obligation to select and engage competent attorneys and experts to Defend against a Claim required by this Agreement.

1.8. "**Leyes Ambientales**" significa todas las leyes y Normas Oficiales Mexicanas relacionadas con la contaminación o el medio ambiente aplicables a las Partes en relación con las estipulaciones de los Servicios y todas las actividades relacionadas de las Partes,

1.8. "**Environmental Laws**" means all laws and Mexican Official Norms relating to pollution, contamination or the environment applicable to the Parties in relation to the terms of the Services and all related activities of the Parties.,

1.9. "**Equipo**" significa todas las herramientas, vehículos, equipo, bienes y servicios, materiales y suministros.

1.9 "**Equipment**" means all tools, vehicles, equipment, products, goods, materials and supplies.

1.10. "**Autoridad Gubernamental**" significa cualquier gobierno federal, estatal, local, municipal u otro, cualquier autoridad, organismo, comisión, agencia administrativa o regulatoria que ejerza o esté autorizada para ejercer autoridad o poder administrativo, ejecutivo, judicial,

1.10 "**Governmental Authority**" means any federal, state, local, municipal or other governments, any governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any

Ranger_004310

legislativo, policial, regulatorio o autoridad o poder fiscal y cualquier tribunal gubernamental o legal, incluyendo cualquier autoridad tribal que tenga jurisdicción.

administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, and any court or governmental tribunal, including any tribal authority having jurisdiction.

1.11. **"Materiales Peligrosos"** significa cualquier sustancia o material químico en cualquier forma. Ya sea sólido, líquido, gaseoso, semisólido o cualquier combinación de los mismos, ya sea material de desecho, materia prima, químico, producto terminado, subproducto y otro material o artículo, que está descrito o regulado bajo las Leyes Ambientales aplicables como sustancia o desecho "peligroso" o "tóxico", o como "contaminante," o de otra manera descrito o regulado bajo las Leyes Ambientales aplicables porque significa un peligro para la salud humana o el ambiente; incluyendo productos de petróleo, sílice, asbestos, aislante de espuma de urea formaldehído, y pinturas y recubrimientos que contengan plomo.

1.11 **"Hazardous Materials"** means any chemical, material or substance in any form, whether solid, liquid, gaseous, semisolid, or any combination thereof, whether waste material, raw material, chemical, finished product, byproduct, or any other material or article, that is listed or regulated under applicable Environmental Laws as a "hazardous" or "toxic" substance or waste, or as a "contaminant," or is otherwise listed or regulated under applicable Environmental Laws because it poses a hazard to human health or the environment; including petroleum products, silica, asbestos, urea formaldehyde foam insulation, and lead-containing paints or coatings.

1.12. **"Negligencia u otra Culpa Legal"** significa condiciones pre-existentes, ya sea que dichas condiciones sean patentes o latentes, incumplimiento de garantía (expresa o implícita), incumplimiento de contrato, responsabilidad objetiva o la negligencia o culpa de cualquier persona, Partes, o entidades, e independientemente de si puede alegarse o probarse que cualquier indemnizado bajo el presente pudo haber sido negligente (ya sea que dicha negligencia sea activa, pasiva, única, en conjunto, concurrente, comparativa, contribuyente, simple, grave, etc.) o legalmente responsable de cualquier otra forma (con o sin culpa o ya sea por

1.12 **"Negligence or other Legal Fault"** means pre-existing conditions, whether such conditions be patent or latent, breach of warranty (express or implied), breach of contract, strict liability, or the negligence or fault of any persons, Parties, or entities, and irrespective of whether any indemnitee hereunder may be alleged or proven to have been negligent (whether such negligence be active, passive, sole, joint, concurrent, comparative, contributing, simple, gross, etc.) or otherwise legally liable (with or without fault or whether strictly liable or in breach of any contract or warranty).

Ranger_004311

responsabilidad objetiva o en incumplimiento de cualquier contrato o garantía).

1.13.    "Permisos" significa permisos, licencias, certificados, consentimientos y otras autorizaciones de la Autoridad Gubernamental o de cualquier Tercero.

1.14.    "Persona" o "persona" significa cualquier individuo o corporación, sociedad, consorcio (joint venture), sociedad de responsabilidad limitada, fideicomiso, entidad legal, asociación no incorporada, o cualquier otra entidad legal o dependencia gubernamental o estatal o subdivisión política relacionada.

1.15.    "Orden de Compra" significa cualquier orden de trabajo, orden de servicio, orden de obra, recibo de entrega, propuesta de precios o documento similar que establezca los parámetros de los Servicios.

1.16.    "Servicios" significa, con respecto a cada Orden de Compra, el trabajo o servicios acordados para ser ejecutados por el Contratista, incluyendo la inspección aplicable, mantenimiento, y reparación de varias estructuras marinas tales como muelles, puertos, embarcaderos, mamparas, plataformas, tuberías, tomas, desagües y navíos, a cambio del pago por parte de la Empresa al Contratista especificado en dicha Orden de Compra.

1.17.    "Terceros" significa cualquier persona que no es un miembro del Grupo de la Empresa o del Grupo del Contratista.

1.18.    Interpretación. En este Convenio, a menos que el contexto requiera lo

1.13    "Permits" means permits, licenses, certificates, consents and other authorizations of Governmental Authority or any other Third Party.

1.14    "Person" or "person" means any individual, corporation, partnership, joint venture, limited liability company, trust, legal entity, unincorporated association, or any other legal entity or a government, state or agency or political subdivision thereof.

1.15    "Purchase Order" means any job order, service order, work order, delivery ticket, pricing proposal or similar document setting forth the parameters of the Services.

1.16    "Services" means, with respect to each Purchase Order, the work or services agreed to be performed by Contractor, including as applicable inspection, maintenance, and repair to various marine structures such as docks, piers, wharves, bulkheads, platforms, pipelines, intakes, outfalls and vessels, in exchange for the payment by Company to Contractor specified in such Purchase Order.

1.17    "Third Party" means any Person that is not a member of Company Group or ContractorGroup.

Ranger_004312

contrario:

(a) El número singular incluye al plural y viceversa;

(b) Referencia a cualquier Artículo o Apéndice significa dicho Artículo o Apéndice de o a este Convenio, y referencias en cualquier Artículo, Apéndice o definición a cualquier cláusula significa dicha cláusula de dicho Artículo, Apéndice o definición;

(c) Las palabras "este Convenio," "en el presente," "por este medio," "bajo el mismo," "del mismo," y palabras de importancia similar son referencias a este Convenio como un todo y no a algún Artículo en particular u otras estipulaciones del mismo, a menos que se limite así expresamente;

(d) La palabra "incluyendo" y sus derivados significa "incluyendo, pero no limitando a," y expresiones derivativas correspondientes;

(e) No se dará importancia a los títulos de los artículos, secciones, subsecciones, o cláusulas, que se inserten por conveniencia para localizar las estipulaciones del presente Convenio y no como una ayuda en su construcción;

(f) Cada Apéndice del presente Convenio forma parte de este Convenio, pero si hay algún conflicto o inconsistencia entre la parte principal del presente Convenio y algún Apéndice, lo dispuesto en el cuerpo principal de este Convenio prevalecerá y;

(g) La palabra "o" no puede ser mutuamente excluyente, y puede interpretarse en el sentido "y" cuando el contexto requiera que haya un múltiplo

1.18 Interpretation. In this Agreement, unless the context otherwise requires:

(a) the singular number includes the plural number and vice versa;

(b) reference to any Article or Exhibit means such Article or Exhibit of or to this Agreement, and references in any Article, Exhibit or definition to any clause means such clause of such Article, Exhibit or definition;

(c) the words "this Agreement," "herein," "hereby," "hereunder," "hereof," "hereto" and words of similar import are references to this Agreement as a whole and not to any particular Article or other provision hereof or thereof, unless expressly so limited;

(d) the word "including" and its derivatives means "including, but not limited to," and corresponding derivative expressions;

(e) no consideration shall be given to the captions of the articles, sections, subsections, or clauses, which are inserted for convenience in locating the provisions of this Agreement and not as an aid in its construction;

(f) each Exhibit to this Agreement is a part of this Agreement, but if there is any conflict or inconsistency between the main body of this Agreement and any Exhibit, the provisions of the main body of this Agreement shall prevail; and

(g) the word "or" may not be mutually exclusive, and can be construed to mean "and" where the context

Ranger_004313

más que una obligación alternativa.

requires there to be a multiple rather than an alternative obligation.

## ARTÍCULO 2 APLICACION DEL CONVENIO DE SERVICIO MAESTRO

Este Convenio aplicará para todos los Servicios, y se incorporará automáticamente en toda y cada una de las Órdenes de Compra, ya sea verbal o por escrito, entre la Empresa y el Contratista. Cada Orden de Compra se interpretará como un contrato por separado. Cualquier término y condición contenido en cualquier Orden de Compra que trate del tema que sea el mismo o similar a aquél encontrado en este Convenio no será efectivo ni tendrá vigor entre las Partes y dichos términos serán inválidos e inaplicables.

## ARTICLE 2 APPLICATION OF MASTER SERVICE AGREEMENT

This Agreement shall apply to all Services, and shall be automatically incorporated into each and every Purchase Order, whether written or verbal, between Company and Contractor. Each such Purchase Order shall be construed as a separate contract. Any terms and conditions contained in any Purchase Order that address subject matter that is the same or similar to that found in this Agreement shall have no force and effect between the Parties and such terms shall be void and unenforceable.

## ARTÍCULO 3 RESCISIÓN DE CONVENIOS PREVIOS

A excepción del Convenio de Colaboración suscrito entre Las Partes con fecha 6 de Junio de 2013; todos los convenios previos relativos a los Servicios descritos en el presente, entre el Contratista y la Empresa, serán rescindidos en la Fecha que entre en Vigor este Convenio; no obstante, todo convenio sobre fijación de precios se mantendrá vigente.

## ARTICLE 3 TERMINATION OF PRIOR AGREEMENTS

Except for the collaboration agreement entered by the Parties on June 6, 2013, all prior agreements relating to the Services described herein, between Contractor and Company, are terminated as of the Effective Date of this Agreement; provided however, that any current pricing agreements in effect shall remain in effect.

## ARTÍCULO 4 EQUIPO

A menos que la Empresa acuerde lo contrario por escrito, todo el Equipo necesario o conveniente para el trabajo descrito en la Orden de Compra verbal o escrita será provisto por el Contratista.

## ARTICLE 4 EQUIPMENT

Unless otherwise agreed by Company in writing, all Equipment necessary or desirable for the work described in the verbal or written Purchase Order shall be furnished by Contractor.

## ARTÍCULO 5 TIEMPO Y RENDIMIENTO

Este Convenio no requiere que la Empresa ordene Servicios al Contratista, ni requiere que el Contratista acepte dichas órdenes para Servicios. Tras la aceptación de cualquier Orden de Compra, sin embargo, sea verbal o por escrito, el Contratista deberá comenzar los trabajos y prestará los Servicios durante el tiempo convenido por las Partes.

## ARTICLE 5 TIME AND PERFORMANCE

This Agreement does not require Company to order Services from Contractor, nor does it require Contractor to accept any such orders for Services. Upon acceptance of any Purchase Order, however, either oral or written, Contractor shall commence work and perform the Services during the time frame agreed by the Parties.

HOUSTON 1152650v.2

Página | 10

Ranger_004314

**ARTÍCULO 6    DECLARACIONES Y GARANTÍAS**

6.1    Declaraciones y Garantías de la Empresa. La Empresa declara y garantiza al Contratista que la Empresa posee, mantiene y cumple en su totalidad con los Permisos necesarios y convenientes para permitir al Contratista tener acceso sin restricciones al lugar de trabajo y para que el Contratista realice sus Servicios sin restricción alguna. La Empresa reconoce que el Contratista no será responsable de obtener dichos Permisos.

6.2    Declaraciones y Garantías del Contratista. El Contratista declara y garantiza a la Empresa lo siguiente:

(a) Garantía de Rendimiento. Los Servicios se realizarán diligentemente por el Contratista de una manera correcta y profesional. El Contratista garantiza que lo Servicios cumplirán o superarán las especificaciones proporcionadas o acordadas por el Contratista en la Orden de Compra correspondiente.

(b) Recurso Exclusivo. Como recurso exclusivo de la Empresa en caso de incumplimiento de la garantía establecida en el ARTÍCULO 6 .2 (a), El Contratista, como única opción deberá ya sea, (i) volver a realizar dicho Servicio que no cumple con lo estipulado sin costo adicional para la Empresa, o (ii) reembolsar a la Empresa la cantidad pagada al Contratista por la Empresa por los Servicios defectuosos. Cualquier repetición de los Servicios defectuosos se

**ARTICLE 6    REPRESENTATIONS AND WARRANTIES**

6.1.    Company Representations and Warranties. Company represents and warrants to Contractor that Company possesses, maintains and is in full compliance with all necessary or advisable Permits to allow Contractor to gain unrestricted access to the work location and for Contractor to perform the Services in an unrestricted manner. Company acknowledges that Contractor will not be responsible for obtaining such Permits.

6.2.    Contractor Representations and Warranties. Contractor represents and warrants to Company the following:

(a) Performance Warranty. The Services shall be diligently performed by Contractor in a good and workmanlike manner. Contractor warrants that the Services will meet or exceed the specifications provided or agreed to by Contractor in the applicable Purchase Order.

(b) Exclusive Remedy. As Company's exclusive remedy for any breach of the warranty set forth in Article 6.2(a), Contractor shall, at Contractor's sole option, either (i) reperform such non-conforming Services without additional cost to Company, or (ii) refund to Company the applicable amount paid to Contractor by Company for the defective Services. Any reperformance of defective Services shall begin as

Ranger_004315

iniciarán tan pronto como sea práctico después de que la Empresa notifique al Contratista del defecto, dicha notificación se debera dar al contratista antes de la salida del buque donde el contratista está realizando los Servicios y también antes de la aceptación de conformidad de los Servicios por parte de la empresa por medio de una prueba hidrostática del sistema que era el objeto de los Servicios, después de lo cual existirá ninguna obligación de garantía del contratista.. El trabajo de reemplazo o el trabajo repetido bajo este párrafo estará sujeto a las mismas garantías que el trabajo original. La solución expuesta en este ARTÍCULO 6.2 (b) se extenderá únicamente a las Partes en este Convenio y no creará ninguna responsabilidad para cualquier otro miembro del Grupo de la Empresa o un Tercero **SALVO LO DISPUESTO EN EL ARTÍCULO 6.2(a), EL CONTRATISTA EXPRESAMENTE RECHAZA TODAS LAS DEMÁS GARANTIAS EXPRESAS O IMPLICITAS INCLUYENDO CUALQUIER GARANTIA DE COMERCIABILIDAD O ADECUACION POR UN PROPOSITO PARTICULAR.**

(c) <u>Limitación de la Responsabilidad.</u> A excepción de las responsabilidades, de conformidad con el ARTÍCULO 16, en ningún caso la responsabilidad del Contratista hacia la Empresa, conforme a este Convenio, excederá la cantidad pagada por la Empresa en virtud de la Orden de Compra correspondiente a los Servicios no

soon as practicable after Company's timely notice to Contractor of the defect and such notice must be given to Contractor prior to the departure of the vessel from which Contractor is performing the Services departs the area of operation and also prior to the acceptance of the Services by Company by means of a successful hydro test of the System which was the object of the Services, after which no warranty obligation of Contractor shall exist. Replacement work or work re-performed under this paragraph shall be subject to the same warranties as the original work. The remedy set forth in this <u>Article 6.2(b)</u> shall extend only to the Parties to this Agreement and shall not create any liability to any other member of Company Group or any Third Party **EXCEPT AS PROVIDED IN <u>ARTICLE 6.2(a)</u>, CONTRACTOR EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE..**

(c) <u>Limitation of Liability.</u> Except for any **LIABILITIES** pursuant to <u>Article 16</u>, in no event shall the liability of Contractor to Company pursuant to this Agreement exceed the amount paid by Company to Contractor under the applicable Purchase Order associated with the non-confirming Services or other

Ranger_004316

confirmados    u    otro incumplimiento de este Convenio.

breach of this Agreement.

## ARTÍCULO 7    SERVICIOS    DE CONSULTORIA

El Grupo Contratista puede proporcionar predicciones o recomendaciones en cuanto a las condiciones, estrategias para concluir los Servicios, o cualquier otro tema que surja de o relacionado a los Servicios. Sin embargo, debido a la existencia de condiciones variables e inciertas y la necesidad de información confiable y servicios de apoyo proporcionados por otros, el Contratista no puede asegurar o garantizar su efectividad y exactitud de dichas recomendaciones o predicciones. **Las recomendaciones y predicciones son proporcionadas a la Empresa sólo como opiniones y el Contratista no garantiza, expresa o implícitamente en cuanto a la exactitud de o los resultados obtenidos, excepto que dichas recomendaciones u opiniones se hagan de buena fe.**

## ARTICLE 7    CONSULTING SERVICES

Contractor Group may provide predictions or recommendations as to conditions, strategies for completing the Services, or any other topic arising from or related to the Services. However, because of the existence of uncertain and variable conditions and the necessity of relying on information and supporting services furnished by others, Contractor is unable to ensure or guarantee the effectiveness, accuracy or results of any such recommendations or predictions. **Recommendations and predictions are provided to Company solely as opinions and Contractor makes no warranty, express or implied, as to the accuracy thereof or the results to be obtained, except that such recommendations or opinions shall be made in good faith.**

## ARTÍCULO 8    RETIRO DE EQUIPO

Al término de los Servicios, sin perjuicio de los retrasos ocasionados por el Grupo de la Empresa o de Terceros, el Contratista retirará su equipo y colocará el material excedente o sin usar en los lugares designados o bajo la dirección de la Empresa.

## ARTICLE 8    REMOVAL    OF EQUIPMENT

Upon completion of the Services, subject to any delays caused by the Company Group or Third Parties, Contractor will remove its Equipment and place any excess or unused material at points or places as designated or under the direction of Company.

## ARTÍCULO 9    PAGOS    Y GARANTÍAS

9.1    <u>Pagos</u>. Almenos que se establezca en la orden de compra / orden de servicio aplicable, lo siguiente aplicara; La compensación por los servicios se acordarán entre el Contratista y la Empresa en la Orden de Compra correspondiente. La empresa pagará todas las cantidades pagaderas conforme a este Convenio y todas las Órdenes de Compra al Contratista dentro de un término de treinta (30)

## ARTICLE 9    PAYMENT    AND SECURITY

9.1.    <u>Payment</u>. Unless otherwise agreed to in the applicable work order/ purchase order, the following will apply; Compensation for Services shall be as agreed upon between Contractor and Company in the applicable Purchase Order. Company shall pay all amounts payable pursuant to this Agreement and all Purchase Orders to Contractor within



Ranger_004317

días subsiguientes a que la Empresa haya recibido la factura del Contratista.

9.2 La Empresa será responsable de presentar las facturas al Cliente, y de recibir los pagos por parte de éste, los pagos del Cliente serán recibidos en un fideicomiso creado y/o constituido por las Partes para cada Contrato; con instrucciones irrevocables al fiduciario de dicho fideicomiso, a efecto de pagar las facturas del Grupo del Contratista en un plazo de dos (2) días hábiles a partir de la recepción de los fondos de parte del Cliente.

9.3 La Empresa asumirá todos los riesgos por la falta de pago de parte del Cliente del Precio del Contrato.

9.4 Todos los pagos adeudados al Grupo del Contratista, que deriven de servicios que preste a cualquier miembro del Grupo del Contratista, como subcontratista o proveedor, deberán ser pagados por la Empresa o el Grupo de la Empresa, desde un fideicomiso que se constituya para tal efecto, por transferencia bancaria al Contratista , como lo indique el Contratista en su factura, o como lo haya indicado mediante aviso por escrito. El Contratista emitirá facturas tras la entrega del equipo, finalización de los Servicios, mensualmente, o en la forma que mutuamente convengan en el Calendario o Alcance de Servicios respectivo a cada Contrato.

9.5 En caso de insuficiencia de fondos en el fideicomiso para el pago de las facturas del Contratista o del Grupo del Contratista, La Empresa deberá pagar de sus propios recursos dichas facturas en un plazo de cuarenta y cinco (45) días contados a partir de la fecha de la factura del Contratista o del Grupo del Contratista.

9.6 Garantía. Para garantizar al Contratista el cumplimiento en su totalidad de todas las obligaciones de la Empresa por el presente, incluyendo los pagos por parte de la Empresa de conformidad a los Artículos 9.1 y 16,

---

thirty (30) days of Company receiving Contractor's invoice

9.2. Company will be responsible for submitting invoices to and receiving payments from the Customer. All payments from the Customer shall be received in a trust opened and/or organized by the Parties for each Contract; with irrevocable instructions to the trustee of the trust, to effect payment of Contractor's Group invoices within two (2) business days from receipt of the funds from the Customer .

9.3. Company, shall assume all risks of non-payment by the Customer of the Contract Price, .

9.4. All payments due to Contractor Group derived from services provided to the Company, as a subcontractor or supplier, shall be paid by the Company from a trust established for that effect by wire transfer to Contractor  as directed by Contractor on its invoice or otherwise as specified in a written notice. Contractor shall issue invoices upon delivery of the equipment, completion of the Services, monthly, or otherwise as mutually agreed in the applicable Schedule or Scope of Services for each Contract.

9.5. In the event of insufficient funds in the trust for the payment of Contractor's or Contractor's Group invoices, Company shall pay from its own resources such invoices forty-five (45) days from the date of the Contractor's or Contractor's Group invoice.

9.6. Security. To provide security to Contractor for the complete performance of all obligations of Company hereunder, including payments by Company pursuant to Articles 9.1 and 16, contemporaneously with the execution of each Purchase Order under this Agreement, Company shall



Ranger_004318

simultáneamente con la ejecución de cada Orden de Compra bajo este Convenio, la Empresa entregará al Contratista una Carta de Crédito a favor del Contratista por la cantidad especificada en dicha Orden de Compra, emitida por un banco comercial de importancia en los Estados Unidos de América que sea aceptable para el Contratista con fecha de vencimiento de no menos de noventa días (90) después de la terminación programada de los Servicios bajo la correspondiente Orden de Compra y en forma y sustancia aceptable para el Contratista. La Empresa extenderá el vencimiento de dicha Carta de Crédito a solicitud del Contratista de tiempo de tiempo de forma que venza en no menos de noventa (90) días después de la terminación programada de los Servicios bajo la Orden de Compra correspondiente. El Contratista tendrá derecho de (a) suspender los Servicios, (b) dar por terminada la Orden de Compra correspondiente, y/o (c) unilateralmente utilizar de tiempo en tiempo, dicha Carta de Crédito, si la cantidad a pagar al Contratista sigue sin cubrirse después de quince (15) días después de la notificación por escrito por el Contratista a la Empresa o si la Empresa no logra extender el vencimiento de dicha Carta de Crédito a solicitud del Contratista de conformidad con lo anterior.

deliver to Contractor a Letter of Credit in favor of Contractor specified in such Purchase Order, issued by a major U.S. commercial bank acceptable to Contractor that expires no less than ninety (90) days after the scheduled completion of Services under the applicable Purchase Order and in form and substance acceptable to Contractor. Company shall extend the expiration of such Letter of Credit as requested by Contractor from time to time so that it expires no less than ninety (90) days after the scheduled completion of Services under the applicable Purchase Order. Contractor shall be entitled to (a) suspend Services, (b) terminate the applicable Purchase Order, and/or (c) unilaterally draw on such Letter of Credit from time to time, if any amount payable to Contractor hereunder remains unpaid fifteen (15) days after written notice by Contractor to Company or if Company fails to extend the expiration of such Letter of Credit upon request of Contractor pursuant to the preceding sentence.

## ARTÍCULO 10    LIBROS    Y REGISTROS

El Contratista deberá mantener libros y registros detallados relativos a todos los Servicios realizados por el Contratista suficientes para verificar y apoyar en su totalidad los cargos hechos a la Empresa. Dichos libros y registros, a petición y en tiempos razonables, estarán

## ARTICLE 10    BOOKS    AND RECORDS

Contractor shall keep detailed books and records relating to all Services performed by Contractor sufficient to fully verify and support the charges made to Company. Such books and records shall, upon request at reasonable times, be made available for a period of two (2) years from completion of the applicable Services for inspection or audit by a representative of Company, at Company's expense,

Ranger_004319

disponibles por un periodo de dos (2) años desde la terminación de los Servicios aplicables para inspección y/o auditoría por parte de un representante de la Empresa, a expensas de la Empresa, mediante notificación razonable y en tiempos razonables. Si una auditoría revela que el Contratista ha cobrado en exceso o por el contrario la Empresa le ha pagado en exceso por gastos reembolsables, el Contratista reembolsará a la Empresa el exceso en un plazo de treinta (30) días después de haber recibido la notificación.

upon reasonable notice and at reasonable times. Should an audit reveal that Contractor has overbilled or been otherwise overpaid by Company for reimbursable items, Contractor shall reimburse Company for the overpayment within thirty (30) days of receiving notice.

## ARTÍCULO 11    CONTRATISTA INDEPENDIENTE

Nada de lo contenido en este Convenio será interpretado como que constituye al Contratista como socio, empleado o agente de la Empresa o de cualquier otra parte para la que la Empresa esté trabajando, ni cualquiera de las Partes tendrá autoridad para obligar a la otra en ningún aspecto. Se pretende que cada una de las Partes permanezca siendo un contratante independiente responsable de sus propias acciones. A este respecto, el Contratista, por este medio, reconoce que la Empresa dirigirá los resultados a llevar cabo, pero no tiene derecho a controlar la manera en que los detalles del trabajo son realizados. La Empresa no dará instrucciones al Grupo Contratista salvo aquellos que sean necesarios para especificar los resultados a obtener.

## ARTICLE 11    INDEPENDENT CONTRACTOR

Nothing contained in this Agreement shall be construed to constitute Contractor as a partner, employee or agent of Company or any other party for whom Company is working, nor shall either Party have any authority to bind the other in any respect. It is intended that each Party shall remain an independent contractor responsible for its own actions.    In this respect, Contractor hereby acknowledges that Company will direct the results to be accomplished, but does not have the right to control the manner in which the details of the work are performed.  Company shall not give instructions to Contractor Group other than those necessary to specify the results to be accomplished.

## ARTÍCULO 12    CUMPLIMIENTO DE LA LEY

Cada una de las Partes acuerda que mientras dicha Parte desempeñe sus obligaciones y actividades relativas a este Convenio, cumplirá totalmente con todas las leyes aplicables, normas y reglamentos.

## ARTICLE 12    COMPLIANCE WITH THE LAW

Each Party agrees that in course of such Party performing its obligations and activities related to this Agreement, it will comply fully with all applicable laws, rules and regulations.

## ARTÍCULO 13  RESPONSABILIDADES DE SEGURIDAD DEL CONTRATISTA

13.1    El Contratista será responsable por la seguridad de sus empleados y agentes, así como su capacitación en procedimientos adecuados para garantizar el funcionamiento seguro de cualquier maquinaria o equipo proporcionado por el Contratista.

## ARTICLE 13    CONTRACTOR'S SAFETY RESPONSIBILITIES

13.1.    Contractor shall be responsible for the safety of its employees and agents, and their training in procedures adequate to ensure safe operation of any machinery or equipment provided by Contractor.

13.2.    Contractor agrees to familiarize itself with all applicable safety regulations

Ranger_004320

13.2 El Contratista acuerda familiarizarse con los reglamentos de seguridad aplicables de la Empresa, proporcionados por la Empresa al Contratista. La Empresa acuerda proporcionar al Contratista toda la documentación relativa a las normas de seguridad de la Empresa. Para los fines de este ARTÍCULO 13.2, las "normas de seguridad" deberán incluir todas las normas, procedimientos, instrucciones, directrices o recomendaciones relacionadas con la protección de personas, propiedades, el medio ambiente, o los Servicios.

13.3　El Contratista acuerda proporcionar a su personal todo el equipo de protección apropiado de seguridad y la capacitación para el uso adecuado de dicho equipo.

13.4　El Contratista también deberá mantener todo el Equipo del Contratista en operación de manera segura y lo inspeccionará regularmente para asegurar su buen funcionamiento.

13.5　El Contratista se compromete a proporcionar a la Empresa copias de todos los reportes de accidentes no confidenciales preparados por el mismo como resultado de incidentes relativos a u ocurridos durante los Servicios.

13.6　El Contratista se compromete a proporcionar a la Empresa la documentación, cuando sea solicitada, la cual refleja las tasas de frecuencias de accidentes automotores y lesiones y el entrenamiento aplicable a los empleados.

13.7　El personal del Contratista no estará obligado a prestar servicios o a permanecer en cualquier lugar si, en la opinión del Contratista, las condiciones

of Company provided by Company to Contractor. Company agrees to provide Contractor all documentation pertaining to Company's safety regulations. For the purposes of this Article 13.2, "safety regulations" shall include any rules, procedures, instructions, directives, or recommendations associated with the protection of persons, property, the environment, or the Services.

13.3.　Contractor agrees to provide its personnel with all reasonable and appropriate protective and safety equipment and training for the proper use of such equipment.

13.4.　Contractor also shall maintain all Equipment Contractor furnishes in safe running order and shall inspect it regularly to ensure continued safe operation.

13.5.　Contractor agrees to provide Company with copies of all non-privileged accident reports prepared by it as a result of any incidents related to or occurring during any Services.

13.6.　Contractor agrees to provide Company with documentation, when requested, which reflects injury and automotive accident frequency rates and applicable employee training.

13.7.　Contractor personnel shall not be required to render Services or remain in any location if, in the sole opinion of Contractor, the conditions at such location render it unsafe. Furthermore, Contractor's refusal to

Ranger_004321

en ese lugar son inseguras. Más aun, la negativa del Contratista a prestar sus servicios o permanecer en ese lugar en virtud de una condición insegura, no será considerada como incumplimiento del Contrato.

## ARTÍCULO 14   DROGAS, ALCOHOL Y ARMAS DE FUEGO

El Contratista acuerda notificar a todos sus empleados que todas las personas y propiedad en las instalaciones de la Empresa están sujetas a registro en cualquier momento sin notificación. Cualquier persona a quien se le encuentre en posesión de alcohol, armas de fuego, y/o drogas ilegales o prohibidas es sujeto a ser retirado inmediatamente de las instalaciones.

## ARTÍCULO 15     SEGUROS

15.1   Tanto el Contratista como la Empresa mantendrán vigentes y efectivos, y en todo momento durante el término de este Convenio, pólizas que proporcionen los tipos y montos de seguros como se especifica en el Apéndice A. Dichos seguros se contratarán con compañías de seguros financieramente responsables a satisfacción de la otra Parte. Cada Parte proporcionará o hará que se le proporcione, a petición de la otra Parte, los certificados del seguro a dicha Parte y cumplirá con todos los otros requisitos establecidos en el Apéndice A.

15.2     Las obligaciones del seguro y de indemnización en este Convenio estarán separadas y las obligaciones del seguro no se interpretarán de manera que limiten la obligación de indemnización ni la obligación de indemnización se interpretará de manera que limite la obligación del

render services or remain on location pursuant to an unsafe condition shall not be deemed a breach of this Agreement.

## ARTICLE 14     DRUGS,     ALCOHOL AND FIREARMS

Contractor agrees to notify all of its employees that all persons and property on Company's premises are subject to search at any time without notice. Any person found in possession of alcohol, firearms, and/or illegal or banned drugs is subject to immediate removal from the premises.

## ARTICLE 15   , INSURANCE

15.1.   Contractor and Company each shall maintain, in full force and affect at all times during the term of this Agreement, policies providing the types and amounts of insurance as specified in Exhibit A. Such insurance shall be carried with financially responsible insurance companies satisfactory to the other Party. Each Party shall, upon request of the other Party, furnish or cause to be furnished certificates of insurance to such other Party and fulfill all other requirements set forth in Exhibit A.

15.2.   The insurance and indemnity obligations in this Agreement shall be separate and the insurance obligation shall not be construed to limit the indemnity obligation nor shall the indemnity obligation be construed to limit the insurance obligation.

Ranger_004322

seguro.

## ARTÍCULO 16    ASIGNACIÓN DE RIESGO E INDEMNIZACIÓN

LA INTENCIÓN Y EL ACUERDO EXPRESO DE LAS PARTES DEL PRESENTE ES QUE TODAS LAS OBLIGACIONES Y RESPONSABILIDADES DE INDEMNIZACIÓN ASUMIDAS POR LA PARTE QUE PROMETE LA INDEMNIZACIÓN (EL "INDEMNIZADOR") EN FAVOR DE LA PARTE A QUIEN SE PROMETE INDEMNIZAR (EL "INDEMNIZADO") BAJO LOS TÉRMINOS DE ESTE CONVENIO, INCLUYENDO ESTA SECCIÓN 16, SEAN SIN LÍMITE MONETARIO Y SIN IMPORTAR LA CAUSA O CAUSAS DE LA MISMA, INCLUYENDO (A) CONDICIONES O DEFECTOS PRE-EXISTENTES, (B) LA NEGLIGENCIA U OTRA MALA CONDUCTA DEL INDEMNIZADO (YA SEA QUE LA NEGLIGENCIA DEL INDEMNIZADO SEA POR SÍ SOLO, CONJUNTAMENTE, O CONCURRENTE, ACTIVA O PASIVA, ORDINARIA O GRAVE), (C) LA CULPA O RESPONSABILIDAD DE CUALQUIER PARTE O PARTE BAJO CUALQUIER CONTRATO O CUALQUIER ORDENAMIENTO, REGLAMENTO, O LEYES, INCLUYENDO, SIN LIMITARSE A, INCUMPLIMIENTO DE GARANTÍA EXPRESA Y RESPONSABILIDAD OBJETIVA DEL INDEMNIZADO, (D) MALA REPRESENTACIÓN, (E) RESPONSABILIDAD DEBIDA AL INCUMPLIMIENTO DE CUALQUIER DEBER LEGAL, Y (F) FALTA DE CONDICIONES DE NAVEGABILIDAD DE ALGUNA EMBARCACIÓN. ESTE CONVENIO NO CREARÁ DERECHOS DE PROCESO PARA NINGUNA PERSONA NI PARTE DEL PRESENTE O NO ESPECIFICAMENTE IDENTIFICADA COMO INDEMNIZADO EN EL PRESENTE. LA PARTE INDEMNIZADORA QUE ASUME LA RESPONSABILIDAD CON EL INDEMNIZADO BAJO ESTE CONVENIO ACUERDA INVESTIGAR, DEFENDER Y/O RESOLVER CUALQUIER RECLAMACIÓN O ACCIÓN LEGAL POR LA CUAL ESTÉ OBLIGADA A DAR INDEMNIZACIÓN CONFORME AL PRESENTE, SOLVENTAR TODOS LOS COSTOS Y GASTOS RELACIONADOS AL MISMO AL PRESENTARSE (INCLUYENDO, SIN LIMITAR, COSTOS DE TRIBUNALES Y HONORARIOS DE ABOGADOS), Y SATISFACER CUALQUIER FALLO O DECRETO QUE PUDIERA RESULTAR DEL PRESENTE.

## ARTICLE 16    ALLOCATION OF RISK AND INDEMNITY

THE INTENT AND EXPRESS AGREEMENT OF THE PARTIES HERETO IS THAT ALL INDEMNITY OBLIGATIONS AND LIABILITIES ASSUMED BY THE PARTY PROMISING INDEMNITY (THE "INDEMNITOR") IN FAVOR OF THE PARTY TO WHOM THE INDEMNITY IS PROMISED (THE "INDEMNITEE") UNDER THE TERMS OF THIS AGREEMENT, INCLUDING THIS SECTION 16, BE WITHOUT MONETARY LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF, INCLUDING (A) PRE-EXISTING CONDITIONS OR DEFECTS, (B) THE NEGLIGENCE OR OTHER MISCONDUCT OF THE INDEMNITEE (WHETHER THE INDEMNITEE'S NEGLIGENCE BE SOLE, JOINT, OR CONCURRENT, ACTIVE OR PASSIVE, ORDINARY OR GROSS), (C) THE FAULT OR RESPONSIBILITY OF ANY PARTY OR PARTIES UNDER ANY CONTRACT OR ANY STATUTE, RULE, OR THEORY OF LAW, INCLUDING, BUT NOT LIMITED TO, BREACH OF EXPRESS WARRANTY AND STRICT LIABILITY OF THE INDEMNITEE, (D) MISREPRESENTATION, (E) LIABILITY DUE TO BREACH OF ANY LEGAL DUTY, AND (F) THE UNSEAWORTHINESS OF ANY VESSEL. THIS AGREEMENT SHALL CREATE NO RIGHT OF ACTION IN ANY PERSON NOT A PARTY HEREUNDER OR NOT SPECIFICALLY IDENTIFIED AS AN INDEMNITEE HERETO. THE INDEMNIFYING PARTY ASSUMING LIABILITY TO THE INDEMNITEE UNDER THIS AGREEMENT AGREES TO INVESTIGATE, DEFEND AND/OR SETTLE ANY CLAIM OR SUIT FOR WHICH IT IS OBLIGATED TO PROVIDE INDEMNIFICATION HEREUNDER, TO BEAR ALL COSTS AND EXPENSES RELATED THERETO AS THEY ARE INCURRED (INCLUDING, BUT NOT LIMITED TO, COURT COSTS AND ATTORNEY'S FEES), AND TO SATISFY ANY JUDGMENTS OR DECREES WHICH MAY BE ENTERED THEREIN.



Ranger_004323

**16.1 Personal y Propiedad del Grupo Contratista**

El Contratista acuerda proteger, defender, indemnizar y mantener a salvo al Grupo de la Empresa de cualquier Reclamación que surgiera en relación al presente en favor de cualquier miembro del Grupo Contratista debido a lesiones corporales, enfermedad o muerte de personas, o (conforme a la Sección 16.3) cualquier daño a o pérdida de propiedad de cualquier miembro del Grupo Contratista.

**16.2    Personal y Propiedad del Grupo de la Empresa**

La Empresa acuerda proteger, defender, indemnizar y mantener a salvo al Grupo Contratista de cualquier Reclamación que surgiera en relación al presente en favor de cualquier miembro del Grupo    de la Empresa debido a lesiones corporales, enfermedad o muerte de personas, o cualquier daño a o pérdida de propiedad de cualquier miembro del Grupola Empresa.

**16.3    Riesgos Especiales al Equipo del Contratista**

(a) **Indemnización por Gravámenes**. La Empresa (i) no permitirá que se determine ningún gravamen, carga o afectación sobre el Equipo del Grupo del Contratista e    incluirá en cada contrato, fletamento, arrendamiento u otro convenio con algún miembro del Grupo de la Empresa o un Tercero involucrado    en    la transportación,    manejo, almacenamiento u otro uso o control sobre el Equipo del Grupo Contratista que dicho miembro del Grupo de la a Empresa o Tercero renuncie a cualquier gravamen, carga o

**16.1.    Contractor Group's Personnel and Property**

Contractor agrees to protect, Defend, indemnify and hold harmless Company Group from and against all Claims arising in connection herewith in favor of any member of Contractor Group on account of bodily injury, illness or death to persons, or (subject to Section 16.3) any damage to or loss of property of any member of Contractor Group.

**16.2.    Company Group's Personnel and Property**

Company agrees to protect, Defend, indemnify and hold harmless Contractor Group from and against all Claims arising in connection herewith in favor of any member of Company Group on account of bodily injury, illness or death to persons, or any damage to or loss of property of any member of Company Group.

**16.3.    Special    Risks    to    Contractor's Equipment**

(a) **Indemnification    for    Liens**. Company shall (i) allow no lien, charge or encumbrance to be fixed upon any Equipment of any of Contractor Group (ii) include in each contract, charter, lease or other agreement with any member of Company Group or any Third Party    involved    in    the transportation, handling, storage or other use of or control over Contractor Group's Equipment that such member of Company Group or Third Party waives any lien, charge or encumbrance on, and shall allow no lien, charge or encumbrance to attach to, any

Ranger_004324

afectación sobre el mismo y no permitirá que se ejecute ningún gravamen, carga o afectación sobre dicho Equipo del Grupo Contratista. La Empresa acuerda proteger, defender, indemnizar y mantener a salvo al Grupo Contratista de cualquier Reclamación que surgiera en relación a cualquier incumplimiento de este __Artículo 16.3(a)__ por parte de la Empresa.

(b) __Detención de Equipo__. No obstante cualquier estipulación de este Convenio que establezca lo contrario, la Empresa acuerda pagar al Contratista por el costo de reemplazo de cualquier Equipo del _Grupode la Empresa que se vaya a utilizar en relación a los Servicios, que sea detenido o retenido al Contratista por el Grupo de la Empresa o algún Tercero en el país donde se van a realizar los Servicios por un periodo mayor a treinta (30) días. El Contratista proporcionará un programa de costos de remplazo actualizado para dicho Equipo a solicitud de la Empresa, en el entendido que dicho programa está sujeto a cambios únicamente a criterio del Contratista sin notificación.

16.4    __Polución y Contaminación__

(a) __RESPONSABILIDAD DEL CONTRATISTA__. El Contratista será responsable, y por el presente libera al Grupo de la Empresa de cualquier responsabilidad, y protegerá, defenderá, indemnizará y

such Equipment of Contractor Grupo . Company agrees to protect, Defend, indemnify and hold harmless Contractor Group from and against any Claims arising in connection with any breach of this __Article 16.3(a)__ by Company.

(b) __Detention of Equipment__. Notwithstanding any other provision of this Agreement to the contrary, Company agrees to pay Contractor for the replacement cost of any Equipment of Company Group to be used in connection with the Services that is detained or withheld from Contractor by Company Group or any Third Party in the country where the Services are to be performed for a period of more than thirty (30) days. Contractor shall provide a schedule of current replacement costs for such Equipment upon Company's request, provided that such schedule is subject to change at Contractor's sole discretion without notice.

16.4.    __Pollution and Contamination__

(a) __CONTRACTOR'S LIABILITY__. Contractor shall be liable for, and hereby releases Company Group from all liability for, and shall protect, Defend, indemnify and hold Company Grop harmless from and against any and all Claims caused by



Ranger_004325

mantendrá a salvo al Grupo de la Empresa de cualquier y toda Reclamación causada por fugas, derrames, u otras descargas o escape de contaminantes del Equipo propiedad de, arrendado o controlado en su totalidad por el GrupoContratista, incluyendo combustibles, lubricantes, aceites de motor, aguas residuales y basura, (pero específicamente que excluya Materiales Peligrosos y cualquier fluido de pozos, tuberías o represas).

(b) <u>RESPONSABILIDAD DE LA EMPRESA</u>. La Empresa será responsable, y por el presente libera al GrupoContratista de cualquier responsabilidad, y protegerá, defenderá, indemnizará y mantendrá a salvo al Grupo Contratista de cualquier y toda Reclamación causada por fugas, derrames, u otras descargas o escape de contaminantes aparte de aquéllos por los cuales el Contratista es responsable conforme al <u>Artículo 16.4(a)</u>, incluyendo aquéllos causados por fugas, derrames, u otras descargas o escape de Materiales Peligrosos o cualquier fluido de pozos, tuberías o represas.

16.5 <u>Responsabilidad de Patentes y Licencias</u>

El Contratista asumirá la responsabilidad e indemnizará a la Empresa por todas las Reclamaciones que surjan de cualquier infracción real o presunta sobre cualquier patente, derechos de autor, marcas, u otros derechos de propiedad que resulten de, o surjan en relación a, los Servicios prestados

leaks, spills, or other discharges or escape of pollutants or contaminants from Equipment owned, leased or wholly-controlled by Contractor Group, including fuels, lubricants, motor oils, waste water, and garbage, (but specifically excluding Hazardous Materials and any well, pipeline or reservoir fluids).

(b) <u>COMPANY'S LIABILITY</u>. Company shall be liable for, and hereby releases Contractor Group from all liability for, and shall protect, Defend, indemnify and hold Contractor Group harmless from and against any and all Claims caused by leaks, spills or other discharges or escape of pollutants or contaminants other than those for which Contractor is liable pursuant to <u>Article 16.4(a)</u>, including those caused by leaks, spills, or other discharges or escapes of Hazardous Materials or any well, pipeline or reservoir fluids.

16.5. <u>Patent and License Liability</u>

Contractor shall assume liability for and indemnify Company for all Claims arising from any actual or alleged infringement of any patents, copyrights, trademarks, or other proprietary rights resulting from or arising in connection with the Services furnished by Contractor hereunder; provided however, this indemnity shall not

Ranger_004326

por el Contratista aquí mencionado; sin embargo, esta indemnización no aplicará a los Servicios especiales realizados o al Equipo provisto conforme a las instrucciones específicas de cualquier miembro del Grupo la Empresa que esté fuera del procedimiento normal de operaciones del Contratista bajo condiciones y circunstancias similares.

apply to special Services performed or Equipment provided according to specific instructions from any member of Company Group that are outside Contractor's normal operating procedure under similar conditions and circumstances.

16.6    <u>Incumplimiento de Leyes Aplicables, Declaraciones o Garantías</u>. El Contratista protegerá, defenderá, indemnizará y mantendrá a salvo al Grupo de la Empresa de cualquier Reclamación por incumplimiento del <u>Artículo 12</u> de parte de algún miembro del GrupoContratista. La Empresa protegerá, defenderá, indemnizará y mantendrá a salvo al Grupo del Contratista de cualquier Reclamación por incumplimiento del <u>Artículo 12</u> de parte de algún miembro del Grupo de la Empresa.

16.6.    <u>Breach of Applicable Laws, Representations or Warranties</u>. Contractor shall protect, defend, indemnify and hold Company Group harmless from and against any and all Claims for any breach of <u>Article 12</u> by any member of Contractor Group. Company shall protect, defend, indemnify, and hold harmless Contractor Group from and against any breach of <u>Article12</u> by any member of Company Group.

16.7    <u>Pérdidas Consecuenciales ("Perjuicios")</u>. Ni el Contratista ni la Empresa serán responsables con respecto al otro, y cada una de las Partes aquí mencionadas libera a la otra de cualesquiera daños o pérdidas especiales, incidentales, indirectas, punitivas, ejemplares y consecuenciales en los que haya incurrido la otra Parte o su "Grupo" como se define más adelante, que surja del Convenio, cualquier Orden de Compra o debido a alguna interrupción de los Servicios, incluyendo pérdida de ganancias, pérdida de ingresos, interrupción del negocio o pérdida de producción de cualquier naturaleza. **ESTA ESTIPULACIÓN APLICARÁ NO OBSTANTE SI DICHA PÉRDIDA CONSECUENCIAL ES CAUSADA U ORIGINADA POR ALGUNA NEGLIGENCIA (INCLUYENDO**

16.7.    <u>Consequential Loss</u>. Neither Contractor nor Company shall be liable to the other in respect of, and each Party hereby releases the other Party from, any special, incidental, indirect, punitive, exemplary and consequential damages or losses incurred by the other Party or its "Group" as defined hereunder, arising out of the Agreement, any Purchase Order or due to any interruption of the Services, including loss of profit, loss of revenue, business interruption or loss of production of any nature. **THIS PROVISION SHALL APPLY REGARDLESS OF WHETHER SUCH CONSEQUENTIAL LOSS IS CAUSED OR BROUGHT ABOUT BY ANY NEGLIGENCE (INCLUDING SOLE, JOINT, CONCURRENT OR ORDINARY NEGLIGENCE) OR ANY OTHER**



Ranger_004327

NEGLIGENCIA        ÚNICA, CONJUNTA, CONCURRENTE U ORDINARIA)    O    CUALQUIER OTRA      TEORÍA      DE RESPONSABILIDAD        LEGAL, INCLUYENDO              LA RESPONSABILIDAD    OBJETIVA, CON RESPECTO A LA PARTE LIBERADA.    Las Partes también acuerdan que la presente liberación de responsabilidad también se extiende a cada Afiliado de las Partes y sus respectivos    funcionarios,    directivos, empleados, agentes e invitados.

16.8    Aplicación de Indemnizaciones. Un indemnizado bajo este Convenio puede contratar   asesoría   para   seguir   o participar en la defensa haciéndose cargo de los costos y gastos. Si alguna de las Partes disputara el deber de liberar, defender, o indemnizar a un indemnizado bajo este Convenio, el costo de ejecutar las estipulaciones de este    Artículo    será    incluido    al computarizar la deuda que se debe a dicho indemnizado.

16.9    Reducción        Automática        de Indemnizaciones.    Si    se    determina judicialmente que las indemnizaciones asumidas voluntariamente y de común acuerdo en el presente (las cuales se respaldarán ya sea por un seguro de responsabilidad disponible, bajo el cual la aseguradora no tiene derecho de subrogación contra los indemnizados, o por un auto-seguro total o parcial, como se estipula en el Artículo 15.3) exceden los límites máximos permitidos bajo la legislación        aplicable,        las indemnizaciones    automáticamente    se modificarán para ir conforme a los límites monetarios máximos permitidos bajo la legislación aplicable.

16.10    Recurso Exclusivo. LAS PARTES EN

THEORY      OF      LEGAL LIABILITY,        INCLUDING STRICT LIABILITY, ON THE PART    OF    THE    RELEASED PARTY.    The Parties further agree that the foregoing release of liability shall also extend to each Party's Affiliates      and      their      respective officers, directors, employees, agents and invitees

16.8    Application of Indemnities.    An indemnitee under this Agreement may hire counsel to monitor or participate in the defense at its sole cost and expense. Should either Party dispute the duty to release, defend, or indemnify an indemnitee under this Agreement, the cost of enforcing the provisions of this Article shall be included in computing    the    liability    owed    to    such indemnitee.

16.9 Automatic Reduction of Indemnities.    If it is judicially determined that the indemnities voluntarily and mutually assumed hereunder (which shall be supported by either available liability insurance, under which the insurer has no right of subrogation against the indemnitees, or voluntarily self-insured in part or whole, as provided in Article 15.3) exceed the maximum limits permitted under applicable law, the indemnities shall automatically be amended to conform to the maximum monetary limits permitted under applicable law.

16.10 Exclusive Remedy. THE PARTIES HEREBY    ACKNOWLEDGE    AND

Ranger_004328

EL PRESENTE ADMITEN Y ACUERDAN QUE LA INDEMNIZACIÓN CONFORME A ESTE <u>ARTÍCULO 16</u> SERÁ EL RECURSO ÚNICO Y EXCLUSIVOY ÚNICA Y EXCLUSIVA FORMA DE DETERMINAR LOS DAÑOS, EN RELACIÓN A LOS RIESGOS Y RESPONSABILIDADES DESCRITAS EN ESTE <u>ARTÍCULO 16</u>, YA SEA EN BASE A CONTRATO, PERJUICIO U OTRO (INCLUYENDO EL CUMPLIMIENTO O NO-CUMPLIMIENTO DE CUALQUIER ACUERDO U OBLIGACIÓN DEL PRESENTE O CUALQUIER VIOLACIÓN O INEXACTITUD DE CUALQUIER DECLARACIÓN O GARANTÍA AQUÍ INCLUIDOS.

AGREE THAT INDEMNIFICATION PURSUANT TO THIS <u>ARTICLE 16</u> SHALL BETHE SOLE AND EXCLUSIVE REMEDY, AND THE SOLE AND EXCLUSIVE MEASURE OF DAMAGES, IN CONNECTION WITH THE RISKS AND LIABILITIES DESCRIBED IN THIS <u>ARTICLE 16</u>, WHETHER BASED IN CONTRACT, TORT OR OTHERWISE (INCLUDING THE PERFORMANCE OR NON-PERFORMANCE OF ANY COVENANT OR OBLIGATION HEREUNDER OR ANY BREACH OR INACCURACY OF ANY REPRESENTATION OR WARRANTY CONTAINED HEREIN).

## ARTÍCULO 17   CESIÓN

Este Convenio o cualesquiera otras obligaciones del mismo no serán cedidas por una de las Partes sin el previo consentimiento por escrito de la otra Parte.

## ARTÍCULO 18   CONFIDENCIALIDAD

18.1      Las Partes acuerdan guardar confidencialidad, y requerir que otros miembros de su Grupo guarden confidencialidad y no revelar, o utilizar para cualquier fin que no sea el desempeño de sus Servicios, el total o cualquier parte de los Servicios o información del Convenio (incluyendo la ubicación y tipo de servicio realizado) mapas, datos, planos, informes, manuscritos, procedimientos, programas, dibujos, especificaciones,

## ARTICLE 17   ASSIGNMENT

This Agreement or any obligations hereunder shall not be assigned by a Party without the prior written consent of the other Party.

## ARTICLE 18   CONFIDENTIALITY

18.1.   The Parties agree to hold in confidence, and require other members of their Group to hold confidence , and not to disclose, or use for any purpose other than the performance of the Services, all or any part of the Services or contract information (including the location and type of services performed) maps, data, plans, reports, manuscripts, procedures, schedules, drawings, specifications, results, models, price books, computer programs, or any work product which



HOUSTON 1152650v.2

Ranger_004329

resultados, modelos, catálogos de precios, programas de computación, o cualquier producto de trabajo que sea: (i) recibido o conocido por una de las Partes, directa o indirectamente, de la otra Parte; o (ii) haya sido originado o adquirido por una de las Partes o el Grupo de esa Parte, en relación con, como resultado de, o un incidente por el desempeño de los Servicios. Nada de lo aquí dispuesto impedirá que alguna de las Partes proporcione dicha información a un tribunal de jurisdicción competente, o a cualquier dependencia federal, estatal, o local. Este Artículo no aplicará para cualquier información adquirida legalmente por un Tercero que no tenga obligación de confidencialidad y que tenga el derecho legal de revelar dicha información.

18.2    Al término de este Convenio o al terminarse los Servicios, la Empresa puede requerir al Contratista devolver o destruir la información confidencial de la Empresa, y el Contratista puede requerir que la Empresa devuelva o destruya la información confidencial del Contratista. No obstante lo anterior, las Partes pueden conservar una copia de todos dichos documentos e información según sea necesario para cumplir con los requerimientos de este Convenio, o cualquier ley, regla, o reglamentación, por un plazo máximo de 12 (doce) meses posteriores a la solicitud de destrucción por la Parte que corresponda o 12 (doce) meses posteriores a la terminación de la vigencia del presente Convenio.

## ARTÍCULO 19  FUERZA MAYOR

En el caso de que el cumplimiento de este Convenio se vea impedido, completa o parcialmente, por disturbios, huelgas, guerras (declaradas o no declaradas), insurrección, rebeliones, actos terroristas, disturbios civiles, disposiciones u órdenes de cualquier Autoridad

is: (i) received or ascertained by one Party, directly or indirectly, from the other Party; or (ii) was originated or otherwise acquired by a Party or that Party's Group, in connection with, as a result of, or incident to the performance of the Services. Nothing herein shall preclude a Party from providing such information to any court of competent jurisdiction, or any federal, state, or local agency. This Article shall not apply to any information lawfully acquired by a Third Party not under an obligation of confidentiality and who possesses the legal right to disclose such information.

18.2.   Upon termination of this Agreement or the completion of any Services, Company may request that Contractor return or destroy Company's confidential information, and Contractor may request that Company return or destroy Contractor's confidential information. Notwithstanding the foregoing, the Parties may retain one copy of all such documents and information as necessary to comply with the requirements of this Agreement, or any law, rule, or regulation, for a maximum term of 12 (twelve) moths after the destruction request is made by any party or 12 ( twelve) months after the termination of this agreement.

## ARTICLE 19      FORCE MAJEURE

In the event that compliance with this Agreement is prevented, wholly or in part, by riots, strikes, wars (declared or undeclared), insurrection, rebellions, terrorist acts, civil disturbances, dispositions or orders of any Governmental Authority, acts of God, or by



Ranger_004330

Gubernamental, casos fortuitos, o por cualquier otra causa o razón (aparte de embargo financiero o incapacidad de pagar deudas a su vencimiento) lo que está más allá del control de las Partes aquí mencionadas, tales causas se considerarán "**Fuerza Mayor**," en el presente, dicha Parte notificará en detalle sobre la Fuerza Mayor por escrito a la otra Parte lo más pronto posible después de que haya ocurrido. En dicho caso, las obligaciones de las Partes (aparte de la obligación de pagar el monto vencido) serán suspendidas mientras continúen las condiciones de Fuerza Mayor.

any other act or cause (other than financial distress or inability to pay debts when due) which is beyond the control of the Parties hereto, such cause being herein called "**Force Majeure**," such Party shall give notice in detail of Force Majeure in writing to the other Party as promptly as possible after its occurrence. In such case, the obligations of the Parties (other than the obligation to pay amounts due) shall be suspended during the continuance of the Force Majeure condition.

## ARTÍCULO 20    LEY VIGENTE Y CONTROVERSIAS

## ARTICLE 20    GOVERNING LAW AND DISPUTES

20.1  La Empresa y el Contratista acuerdan que todas las reclamaciones, disputas, controversias y cualquier otro asunto que surja por o en relación a la validez, el alcance, la realización, interpretación, ejecución, desempeño, incumplimiento, o relación de alguna manera a este Convenio, o a la relación entre la Empresa y el Contratista creada por este Convenio o el objeto de este Convenio, incluyendo, sin limitarse a, la arbitrabilidad o a la autoridad o capacidad de cualquiera de los signatarios de este Convenio (en conjunto, una "Disputa"), se resolverá por conciliación entre la Empresa y el Contratista. Cualquier Disputa no resuelta dentro de treinta (30) días siguientes a la notificación por parte de la Empresa o el Contratista que haya solicitado la conciliación, será determinada y resuelta por arbitraje vinculante en México, Distrito Federal, aplicando las Reglas de la Centro de Arbitraje de México. El arbitraje se llevará a cabo en español e inglés. Todo laudo, final o provisorio, se hará por escrito con las razones de la decisión estipuladas. La realización, validez, alcance, interpretación y ejecución de este acuerdo de arbitraje, incluyendo, sin limitarse a, quienes serán las partes en el arbitraje y qué asuntos se

20.1.  Company and Contractor agree that, any and all claims, disputes, controversies and any other matter arising out of or related to the validity, scope, making, interpretation, enforceability, performance, breach of, or relating in any way to this Agreement, or the relationship between Company and Contractor created by this Agreement or the subject matter of this Agreement, including, but not limited to, arbitrability or the authority or capacity of any signatory to this Agreement (collectively, a "Dispute"), will be resolved by consultation between Company and Contractor. Any Dispute not resolved within thirty (30) days after the notice from Company or Contractor requesting the consultation, will be determined and resolved by binding arbitration in Mexico City according to the rules of the Centro de Arbitraje de México . The arbitration will be conducted in English. All awards, final or interim, will be in writing with the reasons for the decision stated. The making, validity, scope, interpretation and enforceability of this agreement to arbitrate, including, but not limited to, who will be parties to the

Ranger_004331

someterán a arbitraje, serán determinados por el árbitro elegido conforme a este Convenio. Si hubiera algún conflicto entre las reglas y estipulaciones de este Convenio y las reglas de arbitraje, prevalecerán las estipulaciones de este Convenio.

20.2    Cada una de las Partes tendrá derecho, mediante aviso a la otra, de someter un conflicto o controversia al arbitraje cuando así resulte procedente. La notificación deberá contener el nombre y domicilio del árbitro designado por la Parte notificadora, así como los puntos en controversia. Dentro de los quince (15) días posteriores a la recepción de la notificación, la otra Parte deberá informar a la primera del nombre y domicilio del segundo árbitro. Dentro de los treinta (30) días siguientes a la designación del segundo árbitro, ambos árbitros designados deberán designar a un tercer árbitro que fungirá como presidente del tribunal arbitral, considerando que dicho presidente deberá ser independiente y de nacionalidad distinta a cualquiera de los países de constitución de las Partes. Si la segunda Parte no cumple con la designación del segundo árbitro dentro de los quince (15) días posteriores a la recepción del aviso de designación del primer árbitro, o, si los dos árbitros designados por las partes no cumplen con la designación del tercer árbitro dentro de los treinta (30) días posteriores a la designación del segundo árbitro, entonces el Presidente de la Centro de Arbitraje de México tendrá el poder, por solicitud de una de las Partes, para realizar las designaciones que no se hubieren

arbitration and what issues will be submitted to arbitration, will be determined by the arbitrator chosen in accordance with this Agreement. Should there be a conflict between the rules and provisions of this Agreement and the arbitration rules, the provisions of this Agreement will govern.

20.2.    Either party will have the right, through notice to the other party, to submit any dispute or controversy to arbitration. The notice must contain the name and domicile of the arbitrator named by the party rendering notice, as well as the points under dispute. Within the following fifteen (15) days from the service of the notice of arbitration, the other party must informed the first party of the name and domicile of the second arbitrator, both appointed arbitrators must name the third arbitrator, who must act as president of the arbitration tribunal, in the understanding that said president must be independent and from a different nationality than from the country where the parties were organized. If the second party does not name the second arbitrator in a term of fifteen (15) days following the receipt of the demand for arbitration and designation of the first arbitrator, or if the two arbitrators named by the parties do not name the third arbitrator within thirty (30) days following the appointment of the second arbitrator, then the president of the Centro de Arbitraje de México could make the appointment not made.



Ranger_004332

cumplimentado.

20.3   Las Partes harán su mayor esfuerzo para concluir con el proceso arbitral y tener el fallo del arbitraje dentro de los ciento veinte (120) días posteriores al inicio del proceso. A los treinta (30) días de la designación de los árbitros, éstos convocarán a una audiencia preliminar en México, Distrito Federal, para establecer un programa para el proceso. A menos que las Partes estipulen lo contrario, la audiencia final de arbitraje se llevará a cabo en México, Distrito Federal, en la sede de la Centro de Arbitraje de México, a más tardar noventa (90) días después de la asignación de los árbitros, en el entendido de que se pronunciará la decisión arbitral final por escrito con las razones estipuladas para la decisión, a más tardar treinta (30) días después de que concluya la audiencia final. Los árbitros decidirán todos los asuntos relacionados a la Disputa, incluyendo la validez e interpretación de las estipulaciones de esta disposición arbitral y de este Convenio, y todos los aspectos procesales del arbitraje llevados a cabo conforme a esta disposición. Las Partes acuerdan que los árbitros no tendrán autoridad de adjudicar daños triplicados, ejemplarios, consecuenciales o punitivos de cualquier tipo bajo cualquier circunstancia, sin importar si dichos daños sean procedentes bajo la legislación aplicable, la ley de otro estado, o la ley federal, .

20.3   The Parties shall use their best efforts to have the arbitral proceeding concluded and a judgment rendered by the arbitrator within one hundred twenty (120) days of the initiation of the arbitration proceeding. Within thirty (30) days after the appointment of the arbitrator, the arbitrator will convene a preliminary hearing in Mexico City to set a schedule for the proceedings. Unless the Parties stipulate to the contrary, the final arbitration hearing will be held in Mexico City before the CAM no later than ninety (90) days after the appointment of the arbitrator and the arbitrator will render the arbitrator's final decision in writing with reasons for the decision stated, no later than thirty (30) days after the final hearing is concluded. The arbitrator shall decide all issues regarding the Dispute, including the validity, construction and interpretation of this arbitration provision and this Agreement, and all procedural aspects of the arbitration conducted pursuant to this provision. The Parties agree that the arbitrator shall have no authority to award treble, exemplary, consequential or punitive damages of any type under any circumstances, regardless of whether such damages may be available under applicable law, the law of any other state, or federal law, or under the rules of the American Arbitration Association.

20.4   Los costos (que incluyen, sin limitación, los honorarios razonables y los gastos de asesoría y peritos para las Partes) de

20.4   The costs (including, without limitation, reasonable fees and



Ranger_004333

dicho arbitraje (que incluyen, sin limitación, el costo de hacer cumplir o preservar los derechos adjudicados en el arbitraje) correrán por parte de la Parte en contra de la cual la decisión de arbitraje se pronuncie. Si la decisión del árbitro no está claramente en contra de una de las Partes o si la decisión del árbitro es en contra de más una de las Partes sobre uno o más temas, cada Parte pagará sus propios gastos y el costo del arbitraje correrá por partes iguales entre las Partes. Las Partes aceptan que es su intención que toda y cada una de las Disputas entre las Partes se resuelva por arbitraje vinculante en lugar de litigio entre las Partes. Las Partes acuerdan que, si una de las Partes inicia algún proceso judicial en relación a alguna Disputa antes del arbitraje, la Parte que no inició dicho litigio tendrá derecho a recuperar todos los costos y gastos asociados con dichos procesos judiciales, que incluyen, sin limitación, los honorarios y gastos razonables de asesoría, no obstante el resultado final de la Disputa. Los árbitros adjudicarán los costos y gastos a dicha Parte independientemente de cualquier adjudicación de costos en base a las decisiones finales del árbitro en relación a la Disputa.

expenses of counsel and experts for the Parties) of such arbitration (including, without limitation, the cost to enforce or preserve the rights awarded in the arbitration) shall be borne by the Party against whom the arbitrator's decision is rendered. If the decision of the arbitrator is not clearly against one of the Parties or if the decision of the arbitrator is against more than one Party on any one or more issues, each Party shall pay its own costs and the cost of the arbitrator shall be borne equally by the Parties. The Parties acknowledge that it is their intent that any and all Disputes between the Parties shall be resolved by binding arbitration in lieu of litigation between the Parties. The Parties agree that, if a Party initiates any court proceeding regarding any Dispute prior to arbitration, the Party that did not initiate such litigation shall be entitled to recover all costs and expenses associated with such court proceeding, including, without limitation, reasonable fees and expenses of counsel, regardless of the ultimate outcome of the Dispute. The arbitrator shall award such costs and expenses to such Party separately from any award of costs based on the final decisions of the arbitrator regarding the Dispute.

20.6 A no ser que los árbitros, al mostrar una buena causa, dispongan lo contrario, se respetará una petición de confidencialidad de toda respuesta o documento y dicha información no se revelará a terceros o se usará con ningún fin fuera del arbitraje sin el consentimiento de la Parte que solicita el privilegio. El periodo de exhibición iniciará al designar a los árbitros y concluirá sesenta (60) días naturales

20.6 Unless the arbitrator, upon a showing of good cause, rules otherwise, a claim of confidentiality of any answer or document will be honored and such information will not be disclosed to third parties or used for any purpose outside the arbitration without the consent of the Party claiming the privilege. The discovery period will begin upon appointment

después. Cada Parte presentará todos los documentos de apoyo para respaldar una reclamación o defensa, y una lista de todas las personas con conocimiento correspondiente a cualquier reclamación o defensa dentro de treinta (30) días después del periodo de exhibición. A cada Parte se le permitirá solicitar treinta (30) interrogatorios por escrito, incluyendo sub-partes, y presentar treinta (30) solicitudes de presentación de documentos u otros objetos tangibles. Las Partes podrán entrevistar y discutir asuntos con los testigos. La recepción y consideración de toda la evidencia será únicamente conforme al criterio de los árbitros.

20.7     Este Convenio se regirá y se interpretará conforme al derecho sustantivo de los Estados Unidos Mexicanos, cuyas leyes también aplicarán a todos los asuntos presentados a los árbitros, incluyendo la validez, alcance, interpretación y ejecución de este acuerdo de arbitraje. Los conflictos de leyes o elección de principios de ley que pudieran requerirse para la aplicación de otra ley no serán aplicables.

20.8  Los árbitros tienen la facultad de dictar laudos provisionales a su criterio, incluyendo prohibiciones judiciales para conservar el status quo, y requerir que se presenten garantías por laudos potenciales, gastos de arbitraje y honorarios de los árbitros. Los árbitros tienen la facultad de emitir citatorios para testigos y documentos. Los árbitros tienen la facultad de adjudicar daños compensatorios, pero no de adjudicar utilidades perdidas, daños morales, ejemplarios o punitivos. Los árbitros tienen la facultad de otorgar

of the arbitrator and will conclude sixty (60) days later. Each Party will produce all documents relied upon to support a claim or defense, and a list of all individuals with knowledge relevant to any claim or defense within thirty (30) days after the beginning of the discovery period. Each Party will be allowed to ask thirty (30) written interrogatories, including subparts, and to propound thirty (30) requests for production of documents or other tangible things. The Parties may interview and discuss matters with the witnesses. The receipt and consideration of all evidence will be within the sole discretion of the arbitrator.

20.7 This Agreement shall be governed by, and construed in accordance with, the substantive law of the United Mexican States, which law also will apply to all issues presented to the arbitrator, including the validity, scope, interpretation and enforceability of this agreement to arbitrate. Conflict of laws or choice of law principles that might call for the application of another law will not be applied.

20.8   The arbitrator is empowered in the arbitrator's sole discretion to make interim awards, including injunctions to preserve the status quo, and to require the posting of security for potential awards, arbitration expenses and fees of the arbitrator. The arbitrator is empowered to issue subpoenas for witnesses and documents. The arbitrator is empowered to award compensatory damages, but may not award lost profits, moral, exemplary or punitive

Ranger_004335

compensación equitativa. Todas y cada una de las decisiones y órdenes de los árbitros serán inapelables y de ser necesario serán ejecutables por cualquier tribunal. El laudo de los árbitros y cualquier laudo provisorio puede ser confirmado y el fallo de cualquier laudo puede registrarse en cualquier tribunal que tenga jurisdicción sobre las Partes o en cualquier jurisdicción donde cualquiera de las Partes posea bienes, cada Parte accediendo a la jurisdicción de dichos distritos.

damages. The arbitrator is empowered to grant equitable relief. Any and all of the decisions or orders of the arbitrator shall be non-appealable and may be enforced if necessary by any court. The arbitrator's award and all interim awards may be confirmed and judgment entered upon the award in any court having jurisdiction over the Parties or in any jurisdiction where any of the Parties have real or personal property, each Party consenting to jurisdiction in such venues.

## ARTÍCULO 21

## ARTICLE 21

21.1   Las Partes Empresa en el presente documento admiten entender que las estipulaciones de la Ley contra Prácticas de Corrupción de los Estados Unidos ( United States Foreing Corrupt Practices Act" en ingliés, "FCPA" por sus siglas en inglés), la Ley Federal Anticorrupción en Contratos Públicos y otras leyes aplicables que prohíben a la Empresa o al Contratista o a los afiliados de ambos incluyendo cualquier funcionario, director, empleado o agente del Contratista que actúe de parte del Contratista, ofrecer, pagar, prometer pagar, o autorizar el pago de dinero u ofrecer, dar, prometer dar o autorizar el dar cualquier cosa de valor (en lo sucesivo referido en conjunto como "Pago Prohibido") a (i) cualquier funcionario extranjero; (ii) cualquier partido político extranjero o funcionario o algún candidato para un puesto político en el extranjero; o (iii) alguna otra persona, en conocimiento de que todo o parte de dicho dinero o cosa de valor será ofrecida, dada o prometida, directa o indirectamente, a algún funcionario

21.1.   Company hereby acknowledges that it understands that the provisions of the United States Foreign Corrupt Practices Act (the "FCPA") and Federal Anticorruption Law for Public Contracts and other applicable laws prohibit Company or Contractor or any affiliate of either including any officer, director, employee or agent of Contractor acting on behalf of Contractor to offer, pay, promise to pay, or authorize the payment of money or offer, give, promise to give or authorize the giving of anything of value (hereinafter referred to collectively as the "Prohibited Payment") to (i) any foreign official; (ii) any foreign political party or official thereof or any candidate for foreign political office; or (iii) any other person, while knowing that all or a portion of such money or thing of value will be offered, given or promised, directly or indirectly, to any foreign official, to any foreign political party or official thereof, or to any candidate for political office



Ranger_004336

extranjero, a algún partido político extranjero o funcionario del mismo, o algún candidato para un puesto político (en lo sucesivo referido en conjunto como "Grupo Prohibido") con el fin de (A) influenciar cualquier acto o decisión de dicho funcionario extranjero, partido político, funcionario de partido o candidato en su capacidad oficial o induciendo a dicho funcionario extranjero, partido político, funcionario de partido o candidato a hacer u omitir hacer algún acto en violación de sus obligaciones legales de dicho funcionario extranjero, partido político, funcionario de partido o candidato; o (B) inducir a dicho funcionario extranjero, partido político, funcionario de partido o candidato a utilizar su influencia con un gobierno extranjero o la mediación del mismo para afectar o influenciar algún acto o decisión de dicho gobierno o mediación con el fin de ayudar al Contratista o a sus afiliados a obtener o conservar negocios para, o con, o dirigir negocios hacia alguna persona (en lo sucesivo referidos en conjunto como "Fines Prohibidos"). En relación a los Servicios, este Convenio y el Contratista, la Empresa del presente declaran y garantizan lo siguiente:

(a)　　Las Partes se abstendrán de, y no permitirán que ninguno de sus directores, funcionarios y/o empleados realice un Pago Prohibido a algún miembro del Grupo Prohibido por Fines Prohibidos en relación a los Servicios, este Convenio, el Contratista o la Empresa;

(b)　　Ninguna de Las Partes es un miembro del Grupo Prohibido o

(hereinafter referred to collectively as the "Prohibited Group") for the purposes of (A) influencing any act or decision of such foreign official, political party, party official or candidate in his or its official capacity or inducing such foreign official, political party, party official or candidate to do or omit to do any act in violation of the lawful duty of such foreign official, political party, party official or candidate; or (B) inducing such foreign official, political party, party official, or candidate to use his or its influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality in order to assist Contractor or its affiliates in obtaining or retaining business for or with or directing business to any person (hereinafter referred to as "Prohibited Purposes"). In connection with the Services and this Agreement the Parties hereby represent and warrant the following:

(a)　　The Parties will not, permit any of its directors, officers or employees to, make a Prohibited Payment to any member of the Prohibited Group for the Prohibited Purposes in connection with the Services, this Agreement, Contractor or Company;

(b)　　Neither Party is a member of the Prohibited Group or an

Ranger_004337

un Afiliado del Grupo Prohibido;

(c) Las Partes están familiarizadas con las estipulaciones del FCPA y otras leyes aplicables y su aplicación a los Servicios y a este Convenio y al Contratista;

(d) Si en algún momento cualquiera de Las Partes se entera de que la otra parte, o alguno de sus directores, funcionarios y/o empleados ha realizado un Pago Prohibido al Grupo Prohibido en relación con los Servicios, este Convenio, la Parte correspondiente inmediatamente notificará a la otra parte por escrito al domicilio señalado para tal efecto, incluyendo todos los detalles de dicho Pago Prohibido;

(e) Si en algún momento alguna de Las Partes se diera cuenta de la otra Parte o alguno de sus funcionarios, directivos, empleados, accionistas, agentes o afiliados ha solicitado, directa o indirectamente, que se realice un Pago Prohibido al Grupo Prohibido en relación a los Servicios o este Convenio, inmediatamente notificará a la Parte que corresponda por escrito, incluyendo todos los detalles de dicho Pago Prohibido;

(f) La Empresa no cometerá ningún acto u omisión que viole alguna ley de alguna jurisdicción en la cual el Contratista realice Servicios para la Empresa; y

(g) La Empresa acuerda que hará

Affiliate of the Prohibited Group;

(c) The Parties are familiar with the provisions of the FCPA and other applicable laws and their application to the Services, this Agreement and Contractor;

(d) If at any time any of the Parties becomes aware that other party its directors, officers or employees have made a Prohibited Payment to the Prohibited Group in connection with the Services, this Agreement or Contractor, the corresponding Party shall immediately notify the other Party , in writing at the address stated herein , including all details of such Prohibited Payment;

(e) If at any time any of the Parties becomes aware that the other party or any officer, director, employee, shareholder, agent or affiliate of Contractor has requested, directly or indirectly, that a Prohibited Payment is made to the Prohibited Group in connection with the Services or this Agreement, said Party shall immediately notify the other party , in writing, including all details of such Prohibited Payment;

(f) Company will not commit any act or omission that would violate any laws of any jurisdiction in which Contractor performs Services

Ranger_004338

que cada miembro del Grupo de la Empresa coopere cabalmente con el Contratista y el Abogado del Contratista en relación a cualquier duda o investigación con el fin de asegurar el cumplimiento del Contratista, y el Grupo de la Empresa, con la FCPA y otras leyes aplicables.

21.2 La Empresa acuerda mantener libros y registros exactos que reflejen y justifiquen adecuadamente todos los ingresos y gastos de la Empresa relacionados a los Servicios, este Convenio o el Contratista. Dichos libros y registros se mantendrán en todo momento en la principal sede de negocios de la Empresa como se menciona en el Segundo párrafo de este Convenio y estarán disponible para su revisión, copiado y auditoría por parte del Contratista o sus representantes (por cuenta del Contratista) en dicha ubicación en cualquier momento durante horas laborales normales.

21.3 No obstante si se estipula lo contrario en el presente, el Contratista puede terminar inmediatamente este Convenio con una notificación por escrito a la Empresa por cualquier violación a este Artículo 21de parte de cualquiera del Grupo de la Empresa.

## ARTÍCULO 22 ANULACIÓN PARCIAL

En caso de que cualquier estipulación o parte de este Convenio se determine como inejecutable o inválida, entonces las Partes aquí presente acuerdan que la parte restante del Convenio se inferirá, interpretará, y ejecutará a la máxima extensión permitida por la ley.

---

for Company; and

(g) Company agrees to cause each member of the Company Group to fully cooperate with Contractor and Contractor's legal counsel in connection with any inquiry or investigation intended to insure compliance by Contractor, and the Company Group, with the FCPA and other applicable laws.

21.2. Company agrees to maintain accurate books and records which properly reflect and account for all of Company's income and expenses related to the Services, this Agreement or Contractor. Such books and records shall be maintained at all times at Company's principal place of business listed in the second paragraph of this Agreement and shall be available for review, copy and audit by Contractor or its representatives (at Contractor's expense) at such location at any time during normal business hours.

21.3. Notwithstanding anything herein to the contrary, Contractor may immediately terminate this Agreement by written notice to Company upon any breach of this Article 21 by any of the Company Group.

## ARTICLE 22 SEVERABILITY

In the event that any provision or portion of this Agreement is determined to be unenforceable or void, then the Parties hereto agree that the remainder of the

Ranger_004339

## ARTÍCULO 23   CONVENIO TOTAL

23.1    Este Convenio constituye el Convenio total de las Partes y ninguna discusión, negociación o escrito anterior o subsiguiente se usará para interpretar sus términos. Este Convenio puede ser modificado sólo en un escrito firmado por un signatario autorizado de ambas Partes y dicho escrito debe identificar a este Convenio y el Artículo específico a modificar. Cualquier Orden de Compra será válida sólo para especificar los Servicios a realizar y/o el precio que la Empresa pagará al Contratista por los Servicios. Cualquier otro término en dichos documentos será inválido e inejecutable.

23.2    Las Partes reconocen que este Convenio, incluyendo lo estipulado en Fuerza Mayor en el Artículo 19, fue sujeto de una negociación justa entre las Partes, y que ninguna de las Partes será considerada como "quien elabora" este Convenio con el fin de dar interpretación a alguno de sus términos.

## ARTÍCULO 24  TERMINACIÓN

Este Convenio puede ser terminado por cualquiera de las Partes por medio de notificación por escrito al respecto con treinta (30) días de anticipación a la otra Parte. Todas las Órdenes de Compra ingresadas antes de dicha terminación permanecerán vigentes no obstante dicha notificación de terminación, y todos los Servicios en progreso al momento de terminación serán terminados por el Contratista y pagados por la Empresa. Dicha terminación no tendrá efecto sobre los derechos de las Partes del presente ya que pertenecen a Órdenes de Compra anteriores o existentes y los Servicios aplicables y cualesquiera responsabilidades u obligaciones que surjan de los mismos, incluyendo las responsabilidades y obligaciones que surjan bajo el Artículo 16.

## ARTÍCULO 25  NOTIFICACIONES

La notificación requerida o permitida bajo este Convenio se enviará a los domicilios indicados como Información

Agreement shall be construed, interpreted, and enforceable to the maximum extent permitted by law.

## ARTICLE 23      ENTIRE AGREEMENT

23.1.    This Agreement constitutes the entire agreement of the Parties and no prior or subsequent discussions, negotiations or writings shall be used to construe its terms. This Agreement may be modified only in a writing signed by an authorized signatory of both Parties and such writing must identify this Agreement and the specific Article to be modified. Any Purchase Order shall be valid only to specify the Services to be performed and/or the price Company shall pay Contractor for the Services. All other terms in such documents shall be void and unenforceable.

23.2.    The Parties acknowledge that this Agreement, including the Force Majeure provision in Article 19, was the subject of a fair negotiation between the Parties, and that neither Party shall be considered the "drafter" of this Agreement for the purpose of construing any of its terms.

## ARTICLE 24       TERMINATION

This Agreement may be terminated by either Party by the giving of thirty (30) days written notice thereof to the other Party. All Purchase Orders entered into prior to such termination shall remain in effect notwithstanding such notice of termination, and all Services in progress at the time of termination shall be completed by Contractor and paid for by Company. Such termination shall have no effect upon the rights of the Parties hereto as they pertain to prior or existing Purchase Orders and the applicable Services and any liabilities or obligations arising thereunder, including liabilities and obligations arising under Article 16.

## ARTICLE 25       NOTICES

Ranger_004340

de Contacto de la Parte en el preámbulo de este Convenio. Cualquiera de las Partes puede cambiar su domicilio para notificaciones, notificando a la otra Parte por escrito de dicho cambio. Las notificaciones serán consideradas efectivas: (i) tres días después de enviarse por correo, si han sido enviados por medio del servicio postal de los E.U.A; (ii) a su recepción, si fueron enviados por mensajería; (iii) a la recepción de confirmación de entrega, si se envió por fax o correo electrónico; o (iv) a su recepción, si fue enviado de cualquier otra manera.

Notice required or permitted under this Agreement shall be sent to the addresses indicated as the Party Contact Information in the preamble of this Agreement. Either Party may change its address for notices by notifying the other Party in writing of such change. Notices will be deemed effective: (i) three days after mailing, if mailed by U.S. postal service; (ii) upon receipt, if sent by courier; (iii) receipt of delivery confirmation, if faxed or emailed; or (iv) upon receipt, if sent in any other manner.

EN TESTIMONIO DE LO CUAL, estas partes han permitido que este Convenio se realice por duplicado por sus respetados representantes autorizados.

IN WITNESS WHEREOF, these parties have caused this agreement to be executed in duplicate by their respected authorized representatives.

RANGER OFFSHORE MEXICO, S. DE R.L. DE C.V.

Por: _~B Dom F. Cunnigto_____

Nombre: _Thomas F Cunningham_

Título: _Legal Representation_

RANGER OFFSHORE MEXICO, S. DE R.L. DE C.V.

By: _~B Dom F. Cunnigto_____

Name: _Thomas F Cunningham_

Title: _Legal Representative_

TRADECO INFRAESTRUCTURA S.A DE C.V.

Por: _____

Nombre: _____

Título: _____

TRADECO INFRAESTRUCTURA S.A DE C.V.

By: _____

Name: _____

Title: _____

OPERACIONES Y RENTAS COSTA AFUERA S.A DE C.V.

Por: _____

OPERACIONES Y RENTAS COSTA AFUERA S.A DE C.V.

By: _____

Ranger_004341

| | |
|---|---|
| Nombre: _____ | Name: _____ |
| Título: _____ | Title: _____ |

## APÉDICE A

### COBERTURAS DE SEGUROS QUE MANTENDRÁN LAS PARTES

Con el fin de proteger a la otra Parte contra responsabilidades por daños, pérdidas o gastos que surjan de daños a la propiedad o lesiones a alguna persona que surgiera de, en relación con o como resultado de los Servicios proporcionados de lo siguiente, cada Parte, a su propia cuenta, mantendrá las siguientes coberturas de seguros, con una empresa de seguros confiable aceptable para la otra Parte y autorizada a realizar negocios en el estado donde los Servicios se lleven a cabo:

### PARTE I

1. Seguro de Compensación a Trabajadores conforme a todas las leyes y reglamentaciones aplicables estatales, federales y locales, incluyendo cobertura ocupacional por enfermedad. Tal cobertura estipulará que una reclamación "in rem" será tratada como una reclamación "in personam." Si en el seguro está escrito en base a "reclamaciones hechas", dicho seguro se conservará por un mínimo de tres años.

2. El Seguro de Responsabilidad del Patrón con límites mínimos de $1,000,000 por evento, $1,000,000 por enfermedad de cada empleado,

## EXHIBIT A

### INSURANCE COVERAGES TO BE MAINTAINED BY THE PARTIES

To protect the other Party against liability for damage, loss or expense arising from damage to property or injury to any person arising out of, in connection with or resulting from the Services provided for hereunder, each Party, at its own expense, shall carry the following insurance coverages, with a reliable insurance company acceptable to the other Party and authorized to do business in the state in which the Services are to be performed:

### PART I

1. Worker's Compensation Insurance in accordance with all applicable state, federal and local laws and regulations, including occupational disease coverage. Such coverage shall further provide that a claim "in rem" shall be treated as a claim "in personam." If insurance is written "claims made" basis, such insurance shall be maintained for a minimum of three years.

2. Employer's Liability Insurance with minimum limits of $1,000,000 per occurrence, $1,000,000 disease each employee, $1,000,000 disease policy

Ranger_004342

$1,000,000 de límite de póliza por enfermedad, con cobertura por lesión o muerte de algún empleado que pudiera estar fuera del alcance del estatuto de Compensación del Trabajador de cada estado en donde la obra o trabajo se lleve a cabo o fuera del alcance de estatutos federales similares si el trabajo se realiza fuera de la jurisdicción del estado.

limit, covering injury or death to any employee which may be outside the scope of the Worker's Compensation statute of each state in which the work or job is performed or outside the scope of similar federal statutes if the work is performed outside state jurisdiction.

3.    Seguro de Responsabilidad Comercial General, que incluye responsabilidad contractual asegurando el Convenio de indemnización como se establece en este Convenio y Seguro de Responsabilidad de Protección al Contratista que cubre subcontratación de la obra, con límites mínimos de $1,000,000 aplicables a lesiones corporales, enfermedad o muerte cualquiera en un acontecimiento, $1,000,000 por pérdida o daño a propiedad cualquiera en un acontecimiento, y $2,000,000 cobertura total, incluyendo las siguientes coberturas:

3.    Commercial General Liability Insurance, including contractual liability insuring the indemnity agreement as set out in this Agreement and Contractor's Protective Liability Insurance covering work sublet, with minimum limits of $1,000,000 applicable to bodily injury, sickness or death in any one occurrence, $1,000,000 for loss or damage to property in any one occurrence, and $2,000,000 aggregate coverage, including the following coverage:

A.    Cobertura de Instalaciones y Operaciones.

B.    Cobertura de Contingencia para Contratistas Independientes.

C.    Responsabilidad Contractual con cobertura de responsabilidades asumidas bajo este Convenio.

D.    Con respecto al Contratista únicamente, Cobertura de Productos y Operaciones Terminados.

A.    Premises and Operations Coverage.

B.    Independent Contractor's Contingent Coverage.

C.    Contractual Liability covering liabilities assumed under this Agreement.

D.    With respect to Contractor only, Products and Completed

Ranger_004343

| | | | | |
|---|---|---|---|---|
| E. | Endoso de Forma Amplia de Responsabilidad de Daños a la Propiedad. | | | Operations Coverage. |
| | | | E. | Broad Form Property Damage Liability Endorsement. |
| F. | Responsabilidad de Lesiones Personales. | | | |
| | | | F. | Personal Injury Liability. |
| G. | Extensión territorial con cobertura en todas las áreas de trabajo. | | | |
| | | | G. | Territorial extension to cover all work areas. |
| H. | Cuando sea aplicable, se borre Exclusión de Embarcación o se estipule Protección e Indemnización. | | | |
| | | | H. | Where applicable, Watercraft Exclusion deleted or Protection and Indemnity provided. |
| I. | Cobertura provista para "Acción sobre Litigios". | | | |
| | | | I. | Coverage provided for "Action Over Suits". |
| J. | Cobertura para Contaminación Repentina y Accidental. | | | |
| | | | J. | Sudden and Accidental Pollution Coverage. |
| K. | La Cobertura no mencione Daños Punitivos. | | | |
| | | | K. | Coverage is silent as regards Punitive Damages. |
| 4. | Seguro de Responsabilidad Automovilística con cobertura de vehículos propios, alquilados y no propios con límites de $1,000,000 por lesiones corporales por evento, enfermedad, muerte y daños a la propiedad combinados con límites únicos. | | 4. | Automobile Liability Insurance covering owned, hired and non-owned vehicles with limits of $1,000,000 per occurrence bodily injury, sickness, death and property damage combined single limits. |
| 5. | Seguro de Responsabilidad Civil Complementaria con un límite único combinado de $10,000,000 por cada evento/total cuando sea aplicable que excedan las coberturas y límites requeridos en 1 al 4 antes mencionados. | | 5. | Umbrella Liability Insurance with a combined single limit of $10,000,000 each occurrence/aggregate where applicable to be in excess of the coverages and limits required in 1 through 4 above. |

### PARTE II

### PART II

| | | |
|---|---|---|
| 1. | Todas las pólizas arriba mencionadas contendrán estipulaciones que las compañías de seguros renuncien al derecho de subrogación y no tendrán derecho de recuperación o subrogación | 1. | All of the above described insurance policies shall contain provisions that the insurance companies waive subrogation and will have no right of |



Ranger_004344

en contra de la otra Parte, o sus divisiones, afiliadas, empresas subsidiarias, co-arrendatarios, o asociados, agentes, directores, funcionarios, empleados, servidores y aseguradores, siendo la intención de las Partes que el seguro para tal efecto proteja a todas las Partes, y la empresa aseguradora de la Parte asegurada sea directamente responsable por cualquier y toda pérdida cubierta por el seguro descrito.

2. La otra Parte será designada como el asegurado adicional en las pólizas de seguro requerida de la Parte asegurada arriba mencionada, con excepción de la Compensación del Trabajador estatutaria, pero sólo en la medida de las responsabilidades asumidas por la Parte asegurada en este Convenio.

3. Todos y cada uno de los deducibles en las pólizas antes descritas serán asumidos por, a cuenta de y al riesgo único de la Parte que contrata el seguro.

### PARTE III

Todas las pólizas que proporcionen la cobertura aquí descrita contendrán estipulaciones referentes a que ninguna cancelación o cambio material en las pólizas será efectivo excepto con treinta (30) días de notificación por escrito al respecto, a la otra Parte en el domicilio para notificaciones de este Convenio. La Parte asegurada no cancelará o hará ningún cambio material en dichas pólizas sin el previo consentimiento por escrito de la otra Parte.

recovery or subrogation against the other Party, or its divisions, affiliates, subsidiary companies, co-lessees, or co-venturers, agents, directors, officers, employees, servants, and insurers, it being the intention of the Parties that the insurance so effected shall protect all Parties, and the insured Party's carrier shall be primarily liable for any and all losses covered by the described insurance.

2. The other Party shall be named as an additional insured in the insured Party's insurance policies required above, except statutory Worker's Compensation, but only to the extent of the liabilities assumed by the insured Party in this Agreement.

3. Any and all deductibles in the above described insurance policies shall be assumed by, for the account of and at the sole risk of the Party providing the insurance.

### PART III

1. All policies providing coverage hereunder shall contain provisions that no cancellation or material changes in the policies shall become effective except on thirty (30) days written notice thereof to the other Party at the notice address in this Agreement. The insured Party shall not cancel or make any material change in any such policies without the prior written consent of the other Party.

Ranger_004345