# EXHIBIT A-15

HOUSTON MARITIME ARBITRATORS ASSOCIATION

| | |
|---|---|
| RANGER OFFSHORE MEXICO, S. DE R.L. DE C.V., | § § § |
| *Claimant,* | § § |
| vs. | § § |
| TRADECO INFRAESTRUCTURA, S.A. DE C.V.; GRUPO TRADECO, S.A. DE C.V. | § § § § |
| *Respondents.* | |

## DECLARATION OF JAMES P. LAM

I, James P. Lam, declare as follows:

1. My name is James P. Lam. The facts stated herein are based on my personal knowledge because they relate to events or occurrences in which I personally participated or which I have personally observed, and are true and correct.

2. I am an attorney licensed in Texas and have been the General Counsel of Ranger Offshore, Inc. since 2011.

3. In my role as General Counsel, I also oversee legal matters related to Ranger Offshore, Inc.'s fully-owned subsidiary Ranger Offshore Mexico, S. de R.L. de C.V. ("Ranger").

4. I have personal knowledge of Ranger's regularly conducted business activity and also have personal knowledge concerning records and other materials that reflect Ranger's regularly conducted business activity.

5. As general counsel, I was involved in the above-styled proceeding against Tradeco Infraestructura, S.A. de C.V. ("Tradeco") and Grupo Tradeco, S.A. de C.V. ("Grupo") (collectively "Respondents").

6. One of my earliest actions was to retain the firm of **Gardere Wynne Sewell LLP** in March of 2014. I had worked previously at Gardere and knew it had offices both in Houston and Mexico City. Gardere represented Ranger in negotiations with Tradeco and counseled Ranger with regard to the initial suspension of the charter, including drafting and revision of "Amendment No. 1" to the time charter, and the pagares described in that amendment. In addition, Gardere prepared an early draft of an arbitration demand. This was not filed as Ranger was hopeful it could reach a commercial resolution.

7. In addition, in April of 2014 Ranger hired **Eddie Moses,** whose background and credentials were described in detail during the hearing, to provide further assistance in negotiations with Tradeco. Ranger agreed to pay Eddie a monthly retainer of $12,500.00 and reimburse him for his expenses. This rate is usual and customary in the industry for a consultant. Mr. Moses was instrumental in securing execution of the charter amendment on June 13, 2014, as well as the Charter Party Guarantee on May 27, 2014. He continued to meet extensively with Tradeco personnel in an ongoing effort to collect the debt, including during the pendency of the arbitration. Given his capabilities and his relationships, Mr. Moses served as a valuable tool by working toward collection of the debt through commercial channels and the arbitration proceeding.

8. In October of 2014, Ranger consulted Mexican law firm, **Garza Tello y Asociados SC** ("Garza Tello") to advise Ranger with respect to its claims against Respondents. Ranger has a long history with Garza Tello. It uses the firm for the majority of its legal needs in Mexico. Therefore, it was a natural fit to seek the firm's assistance with this matter. They have provided legal advice throughout the arbitration. In addition, Garza Tello provided considerable other legal services to Ranger during the pendency of the arbitration. However, Ranger only seeks to recover those fees directly related to this proceeding.

9. By this point in time my main contact and former mentor at Gardere, Jim Sentner, had unfortunately passed away. Therefore, in December of 2014, I contacted Randel R. Young, at **K&L Gates LLP**, and engaged his law firm to commence arbitration proceedings against Tradeco, as well as invoke maritime process to obtain security for Ranger's claim. Garza Tello continued to assist with service of Ranger's arbitration demand on Tradeco.

10. Ranger also retained **Morales Banuet & Asociados SC ("Morales Banuet")**, a Mexican firm specializing in litigation matters. Morales Banuet provided legal advice and assisted Ranger to try to ensure the successful enforcement of any resulting award. All of the services provided by Morales Banuet relate to Ranger's efforts to collect the debt from Respondents.

11. In February of 2015, I engaged **Control Risk Group, LLC** to perform a search for assets in the name of Tradeco and Grupo Tradeco. Around the same time, **Phenix Investigations** was also engaged to try to local bank accounts for Tradeco. K&L Gates successfully brought attachment proceedings in three jurisdictions (Houston, New York and Miami) in an effort to obtain security. Ranger was concerned that it may have trouble collecting from Respondents. Ultimately, no attachable assets were discovered.

12. The parties engaged in further negotiations after the arbitration proceedings were underway. To that end, on June 5, 2015, Ranger engaged the **Albright Stonebridge Group** ("ASG") to assist with those negotiations. Ranger was hopeful that ASG's high-level connections in Mexico would be of value in pursuing a resolution of Ranger's claim. Former U.S. Secretary of Commerce

Carlos M. Gutierrez participated in these negotiations on Ranger's behalf. ASG facilitated and participated in many face-to-face meetings with management for Respondents. ASG and Ranger believed that a settlement was consummated as of December 2015. Settlement papers were drafted. Nonetheless, Respondents refused to finalize the documents and this prospective settlement unraveled in January 2016. Nonetheless, ASG continued to have discussions with Respondents to try to resolve the dispute. ASG also corresponded with Petróleos Mexicanos regarding the dispute. ASG provided valuable information that was relevant to assessing collectability of and prosecuting the claim against Respondents. ASG has also provided other services to Ranger. Those services were provided pursuant to other agreements and, therefore, the amount for which Ranger seeks recovery all relates to its efforts to collect the debt from Respondents.

13. The Respondents asserted a "force majeure" defense in response to Ranger's claim. As the matter proceeded, it became evident to me that there was little, if any, American law on the BIMCO Supplytime 2005 force majeure clause. The majority of the case law interpreting this charter form appeared to be from England. Although the time charter to Tradeco was governed by U.S. general maritime law, it appeared likely that English law was likely to be persuasive. Ranger already had a relationship with the London firm of **Holman Fenwick Willan LLP** ("HFW"). Ranger therefore requested HFW's advice with respect to interpretation of the relevant force majeure clause. HFW in turn recommended a consultation with Simon Rainey, Q.C., author of a leading English text on offshore contracts including the BIMCO Supplytime 2005 form.

14. Ranger used Mr. Rainey as a consulting expert witness. His advice on the usual interpretation and application of the force majeure clause was useful in responding to Tradeco's force majeure arguments.

15. To date, Ranger has incurred almost $3 million in fees and costs pursuing Respondents' debt that was incurred in 2014. These amounts are on top of what Ranger incurred in ordinary costs to charter the Vessel. These extra fees and costs were all made necessary by Respondents' conduct in connection with the debt and this proceeding. All of the requested fees and costs Ranger seeks to recover were incurred to enforce the Charter Party Agreement and the Guarantee.

16. Ranger provides true and accurate copies of the invoices received from the vendors identified therein.

I declare under penalty of perjury that the foregoing is true and correct.

James P. Lam