# EXHIBIT
# A-20

**HOUSTON MARITIME ARBITRATORS ASSOCIATION**

| | |
|---|---|
| RANGER OFFSHORE MEXICO, S. DE R.L. DE C.V., | § § § |
| *Claimant*, | § § |
| vs. | § § |
| TRADECO INFRAESTRUCTURA, S.A. DE C.V.; GRUPO TRADECO, S.A. DE C.V. | § § § § |
| *Respondents.* | § |

**Claimant's Response to Respondents' Motion for Summary
Disposition to Dismiss, or Alternatively, Abate**

Claimant Ranger Offshore Mexico, S. de R.L. de C.V. ("Ranger") submits this Response to Respondents' Motion for Summary Disposition to Dismiss, or, Alternatively, Abate (the "Motion"). Ranger respectfully requests that the Panel deny the Motion in all respects because—

- **Respondents are judicially estopped from challenging the Panel's jurisdiction;**

- **The parties expressly agreed to resolve this matter in this specific forum;**

- **The draft Master Services Agreement is not a binding contract;**

- **The relevant transactions are governed exclusively by the Time Charter.**

**I.**
**The Response**

Incredibly, more than a year after Ranger commenced this arbitration, following extensive case development by the parties and involvement by the Panel, and only a few weeks before the final hearing, Respondents now contend—for the very first time—that this Panel lacks authority to even issue an award. Respondents' eleventh-hour plea is nothing more than a specious attempt to derail this proceeding before an award is eventually issued. Moreover, because Respondents' newfound position is in complete contradiction of their original request to compel this proceeding, Respondents are judicially estopped from attacking this Panel's jurisdiction now.

Furthermore, Respondents' Motion has no basis in fact or law. Respondents tell this Panel that the parties' dispute is not subject to the provisions of the Time Charter, but by two other "contracts" which pre-date this matter by more than one year. The first document, the Master Service Agreement ("MSA"), is nothing more than a draft arrangement that was never executed and put into force. Even if the terms of the MSA were somehow binding, they do not apply to any matter that this Panel must resolve. The same is true for the Cooperation Agreement which, although executed does not apply to any transaction at issue here. Accordingly, Ranger respectfully requests that the Panel deny the motion.

**A.      Respondents are judicially estopped from challenging this Panel's jurisdiction**

Respondents' last-ditch effort to disrupt this proceeding is judicially estopped.  Under the doctrine of judicial estoppel, if a party takes a position in litigation and succeeds in maintaining it, he may not later assume a contrary position just because his interests have changed.  *See In re Superior Crewboats, Inc*., 374 F.3d 330, 334–35 (5th Cir. 2004). *In re Coastal Plains, Inc*., 179 F.3d 197, 206 (5th Cir. 1999); *see also Gutierrez v. F. Miller Const*., LLC, CIV.A. H-11-1996,

2012 WL 5361037, at *3 (S.D. Tex. Oct. 30, 2012). The "purpose of judicial estoppel is to protect the integrity of the judicial process by preventing the parties from playing fast and loose with the courts to suit the exigencies of self interest." *Superior Crewboats*, 374 F.3d at 334. Judicial estoppel "does not require a formal judgment; rather, it only requires that the first court has adopted the position urged by the party, either as a preliminary matter or as part of a final disposition." *Id*. at 335.

The party seeking to invoke judicial estoppel must demonstrate that: (1) the opposing party's position is clearly inconsistent with a previous one; (2) the court accepted the previous position; and (3) the opposing party did not act inadvertently. *Id*. Importantly, judicial estoppel applies equally in arbitration, where "[a]rbitrators are bound by estoppel doctrines." *Hill v. Wackenhut Services Intern.,* 971 F. Supp. 2d 5, 14 (D.D.C. 2013).

    1.      Respondents' inconsistent positions warrant the imposition of judicial estoppel

The elements of judicial estoppel are satisfied here. This arbitration derives from a federal garnishment action formerly pending in the U.S. District Court for the Southern District of Texas. Ranger commenced that action against both Respondents on March 10, 2015.[1] It filed this proceeding two days later, naming Tradeco as the only Respondent in its demand for arbitration. On April 8, 2015, Tradeco filed a motion to compel arbitration in the garnishment action, contending "[t]here is no question that the [Time Charter] includes a valid agreement to arbitrate" and that the claims against Grupo Tradeco "derive" from those against

---

[1] *See* **Exhibit A**, pleadings filed in federal garnishment action pending before the United States District Court for the Southern District of Texas.

Tradeco.[2] Thus, Tradeco asked the court to "stay the pending litigation and "compel [Ranger's]

claims against Grupo Tradeco . . . to the *arbitration currently pending against Tradeco*."[3]

Tradeco's motion to compel demonstrates that its request for dismissal is "clearly

inconsistent" with the position it previously asserted in federal court—namely that *all* of

Ranger's claims are properly arbitrable before this tribunal.  While Tradeco's motion to compel

expressly addressed Ranger's claims against Grupo Tradeco, the supporting rationale specifically

relied on (1) the Time Charter's arbitration provisions (which call for arbitration in Houston,

Texas before the HMAA), and (2) the conclusion that Ranger's claims against Grupo Tradeco

"are derivative of those against Traceco."[4]

Now, with the final hearing less than two months away, Tradeco has reversed its position,

contending "the instant arbitration should be dismissed" because an unenforceable agreement

terminated the Panel's authority before it began.  But "[a] party should not be permitted to claim

that an enforceable contract exists in one instance and, then, when trying to avoid the contract's

arbitration clause, claim that the contract never existed." *NCR Corp. v. Hoppe Specialty Co.,*

*Inc*., CIV 93-0791 LH/DJS, 1994 WL 510999, at *3 (D.N.M. Jan. 28, 1994).  That is essentially

what Respondents do here.  After first arguing [t]here is no question that the [Time Charter]

includes a valid agreement to arbitrate," Tradeco now claims that exact same agreement does not

exist.[5]  Likewise, after first requesting an order compelling the case to the "current arbitration,"

Tradeco now asks this Panel "to *dismiss*, or alternately abate this matter pending the outcome of

arbitration in Mexico."  The inconsistencies are manifestly clear.  Respondents' current position

---

[2] *See id*.

[3] *See id*. (emphasis added).

[4] *Id.*

[5] *See* **Exhibit A**; *see also* Motion to Dismiss, or Alternatively, Abate, at ¶ 5 ("the express language of the MSA would seem to terminate the Charter Party Agreement").

and previous one are completely incompatible and should be estopped. *See Pegram v. Herdrich*, 530 U.S. 211, 227 n. 8 (2000) ("Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.").

The second element of judicial estoppel is indisputably established as well. After Tradeco persuaded the court to accept its position, Judge Melinda Harmon ordered the claims against Grupo Tradeco to arbitration before this *specific* forum.[6] Respondents would have the Panel ignore that order and dismiss this action in favor of a foreign tribunal. The invitation, if accepted, would invariably compromise judicial integrity and should be estopped. *See New Hampshire v. Maine*, 532 U.S. 742, 754 (2001) (noting the overarching goal of judicial estoppel is "to protect the integrity of the judicial process").

Finally, judicial estoppel is warranted here because Tradeco's previous position was not the result of mistake or inadvertence. Tradeco only invoked the Panel's jurisdiction after it concluded that the claims against Grupo Tradeco "derived" from the claims that were already here. Those claims contain the same allegations today as they did back then.[7] Indeed, Respondents' jurisdictional attack does not arise from any new information; instead it relies solely on documents Respondents had in their possession more than one year before this action began. *See Maine*, 532 U.S. at 754 (applying judicial estoppel where party offered inconsistent position from prior litigation based on documentation that existed well before the first matter was filed). Accordingly, because Respondents' request for dismissal satisfies each of the elements set forth above, the Panel should deny the Motion as judicially estopped.

---

[6] *See id*.

[7] *See id*.

2.   The application of judicial estoppel prevents the imposition of unfair prejudice on Ranger

"Application of the doctrine of judicial estoppel should be guided by a sense of fairness, with the facts of the particular dispute in mind." *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011). Accordingly, the Supreme Court instructs that judicial estoppel is particularly applicable if the party affected by the former position would suffer unfair prejudice. *See Maine*, 532 U.S. at 754; *see also Gutierrez v. F. Miller Const.*, LLC, CIV.A. H-11-1996, 2012 WL 5361037, at *3 (S.D. Tex. Oct. 30, 2012). The unfair prejudice threatened by Respondents' dismissal request is self-evident here.

Since the commencement of formal proceedings over one year ago, the parties have: (1) exchanged hundreds of communications; (2) prepared and submitted dozens of pleadings in various venues; (2) identified, analyzed and produced more than 10,000 pages of documents; (3) spent more than forty hours deposing nearly every material fact witness: (4) retained numerous experts and generated and served expert reports; and (5) prepared and submitted dispositive motions on the actual *merits* of the case.

After hundreds of hours and substantial cost, the parties stand just weeks away from the final hearing date. Yet Respondents now contend—for the very first time—that the Panel lacks jurisdiction over this dispute. The position not only lacks legal merit, it directly contravenes the position Respondents previously took in federal court. Respondents brazenly suggest that their request for dismissal was brought "to the Panel as soon as practicable," when the very documents on which they rely pre-date this action by more than one year.[8] If granted, Respondents' Motion will destroy the progress made in this case and force Ranger to start from square one in a foreign

---

[8] Respondents' Motion for Summary Disposition to Dismiss, or, Alternatively, Abate, at 2 n. 1.

tribunal. The inescapable result is a colossal waste of the parties' money, effort and time. The detriment to Ranger is manifestly clear.

At bottom, Respondents' self-contradicting, untimely arguments are nothing more than a desperate attempt to delay and disrupt in the name of self-interest. "This is the precise conduct that judicial estoppel is meant to prohibit." *New Hampshire Ins. Co. v. Magellan Reinsurance Co., Ltd.*, 02-12-00196-CV, 2013 WL 1830349, at \*7 (Tex. App.—Fort Worth May 2, 2013) (applying judicial estoppel to enjoin party from compelling arbitration after successfully arguing against it). Accordingly, the Panel should deny the Motion as judicially estopped.[9]

**B.      The draft MSA is not a binding contract**

The draft MSA is not a binding agreement because the parties never expressed their mutual assent to be bound by its terms. Mutual assent of material, essential terms is a prerequisite to formation of a binding, enforceable contract. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). Evidence of mutual assent in written contracts generally consists of signatures of the parties and delivery with the intent to bind. *See Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Although signatures are not always required, "the parties may insist upon signing as a condition precedent to contract formation." *Simmons & Simmons Constr. Co. v. Rea*, 286 S.W.2d 415, 418 (Tex. 1956); *see also Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc.*, 323 S.W.3d 151, 157 (Tex. 2010). Here, the parties expressly conditioned their mutual assent on the delivery of a jointly executed MSA. Because that condition was never fulfilled, the MSA cannot operate to bind the parties in any respect.

---

[9] Respondents additionally note that the parties separately agreed to arbitrate this matter before this Panel on June 5, 2015. The parties memorialized their intent in a letter agreement mutually signed by the parties' officers and counsel. Respondents cannot escape the binding effect of that agreement, which the parties expressly entered to facilitate the resolution of this matter.   A true and correct copy of the letter is attached hereto as **Exhibit B.**

1.    The parties' mutual assent was expressly conditioned on delivery of a jointly signed agreement

The parties specifically conditioned their mutual assent to the MSA on signatures from both parties. "[T]he question of whether a written contract must be signed to be binding is a question of the parties' intent." *In re Bunzl*, 155 S.W.3d at 209.  The parties' intent is determined under an objective standard of what they said and did and not on their subjective state of mind. *Copeland*, 3 S.W.3d at 604.   The parties' intent "is normally a fact question for the jury to decide." *Scaife v. Associated Air Ctr. Inc.*, 100 F.3d 406, 410 (5th Cir. 1996) (applying Texas law); *n re Bunzl*, 155 S.W.3d at 209.

Here, "what the parties said and did" reveals that they expressly conditioned contract formation on the delivery of mutually executed MSA. Tom Cunningham was principally responsible for negotiating the MSA on Ranger's behalf. After the parties exchanged and reviewed a number of drafts, Cunningham wrote Tradeco's Guillermo Iturbide Garcia on March 11, 2014, notifying him that Ranger had not received the "executed Master Service Agreement and Purchase Order necessary to begin diving services."[10]  To avoid any confusion, Cunningham emphasized that "[t]he executed MSA and Purchase Order must be received prior to any commencement of diving services."[11]

On March 26, 2014, Tradeco's Jose Alberto Montoya Escalante circulated another draft MSA to Ranger's Gerson Arreola. Escalante noted the document was "already OK'd by our legal department" but asked Arreola to "check it and give it your OK so arrangements can be

---

[10] *See* **Exhibit C**, true and correct copies of communications exchanged between the parties regarding contract formation and the MSA.

[11] *Id.*

made for signing it."[12]  By this time, however, Ranger was preoccupied with Tradeco's ongoing

failure to pay the outstanding hire due for the Vessel.  As a result, Ranger decided to suspend

negotiations on the MSA and direct its attention towards collecting the debt.

Escalante sent another note several days later requesting an update from Arreola on

"progress on this matter."[13]  In conveying the message, Arreola informed Ranger personnel that

"Tradeco is asking for an update on the MSA they sent us back on 3/26/2014."[14]  Ranger, still

trying to retrieve the amounts in arrears, did not respond to Escalante's status request.

The matter went ignored for the next five more months. Finally, on August 27,

2014, Tradeco informed Ranger that it was ready to use the Vessel for diving operations on at

least one of the contracts it had pending with Pemex.[15]  Hoping to salvage some return on its

original investment, Ranger decided to resume negotiations on the MSA. Arreola wrote

Escalante to confirm whether the MSA circulated in March "is ready for signing" and whether it

"is the same one you wish to use to carry out the diving services."[16]  On August 28, 2014,

Escalante confirmed that the March draft was authorized by Tradeco's "legal department" and

"[a]ll that is left to do is for it be signed."[17]  Ranger ultimately tendered a signed copy of the

MSA to Tradeco in late August 2014.  Tradeco, however, never delivered a draft MSA that was

signed on its behalf.

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

Throughout this period of protracted negotiations, "what the parties said and did" consistently demonstrated their intention to condition contract formation on the delivery of a mutually executed MSA. This condition is standard practice in commercial settings and comports with the rule that "[m]anifestation of assent commonly consists of signing and delivery." *Scaife v. Associated Air Ctr. Inc.*, 100 F.3d 406, 411 (5th Cir. 1996) (internal citation and quotation omitted).

2. The MSA was never signed and delivered by both parties

Ranger eventually signed the MSA but Tradeco never did. "If parties negotiating a contract intend to require signatures, then a contract is not formed unless both parties sign the contract." *Scaife v. Associated Air Ctr. Inc.*, 100 F.3d 406, 410 (5th Cir. 1996) (citing *Simmons & Simmons Const. Co. v. Rea*, 286 S.W.2d 415, 419 (1955)). Thus, Tradeco destroyed the prospect of contract formation when it failed to sign and deliver a final MSA,

The decision in *Scaife* helps demonstrate the point. That case involved a proposed agreement to repair and renovate an aircraft. *Scaife*, 100 F.3d at 406. The agreement "was revised at least three times and expressly contained signature blocks for the parties." *Id.* at 411. The agreement was never signed, but Scaife nonetheless argued it was enforceable against the repair company. *Id.* The district court disagreed and rendered judgment against Scaife as a matter of law. *See id.* at 409.

The Fifth Circuit affirmed, holding "that the parties contemplated the formation of a binding agreement to include the signatures of both parties." *Id.* at 411. "No evidence" showed that the defendant "began work on the aircraft or acted in any affirmative manner to assent to the agreement notwithstanding the lack of delivery and formal execution of the contract." *Id.* Thus,

10

"no contract was ever formed" and, as a result, summary judgment was appropriately granted. *Id.*

Scaife* is instructive here. Although Ranger signed the contract Tradeco did not. Respondents would ostensibly argue the stamp bearing Tradeco's commercial logo conveys a valid expression of an intent to be bound. But as in *Scaife*, the MSA "expressly contained signature blocks for both parties," and the spot reserved for Tradeco's signature remains blank to this day. *See Andypolo LP v. Caravan Rug Corp.*, CIV.A. H-12-3556, 2014 WL 4273886, at *11 (S.D. Tex. Aug. 28, 2014) (holding a purchase agreement was not a valid contract where it contained "signature blocks for all the parties" but one did not sign).

Moreover, the MSA was stamped on March 14, 2014, but on several occasions after that date *both* parties acknowledged the writing had yet to be signed.[18] It is well-understood that "[i]n determining whether mutual assent is present, the court looks to the communications between the parties and to the acts and circumstances surrounding these communications." *Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex. App.— Houston [14th Dist.] 2000). Thus, the fact that neither party treated the stamp as Tradeco's expression of assent is direct evidence that a binding agreement was never formed.

In short, the parties never expressed their mutual assent to be bound by the terms in the draft MSA. Accordingly, the document is not case-determinative in any respect, and the Panel should deny Respondents' dismissal request.

---

[18] *See* **Exhibit C**.

11

**D.    Even if the draft MSA had some binding effect, its terms do not apply to any matter this Panel must decide**

Even if the draft MSA was somehow binding (which it is not), its terms have no bearing on the instant dispute. Article 2 of the MSA expressly provides that "[t]his Agreement shall apply to all *Services*."[19] The MSA defines "Services" in Section 1.16. Under that provision, "Services … means, with respect to each *Purchase Order*, the work to be performed by [Ranger] . . . in exchange for the payment by [Tradeco] to [Ranger] specified in the *Purchase Order*." Section 1.15 defines "Purchase Order" as "any job order, service order, work order . . . or similar document setting forth the parameters of the *Services*."[20]

Read together, these provisions demonstrate that the parties intended to restrict the application of the MSA to work performed under a specific schedule—one that required the submission of a "Purchase Order" describing the parameters and price of the "Services" sought. Consequently, any work performed outside of this schedule would not qualify as "Services" under the MSA. Such work, therefore, is beyond the scope of the MSA—which expressly restricts itself to the "Services" defined in Section 1.16.

1.    Ranger never performed "Services" under the MSA

At no point during the life of the charter did Tradeco present Ranger with a Purchase Order for any type of work, whether diving or otherwise. Tradeco does not attach one to its Motion, nor has it produced any in discovery. Although Ranger mobilized diving personnel at Tradeco's request, it did so while (1) noting the absence of a binding MSA or mandatory Purchase Order, and (2) specifically reserving its rights under the Time Charter. This was clearly conveyed on February 24, 2014, when Arreola advised Rendon that:

---

[19] *See* **Exhibit D**, a true and correct copy of the unexecuted MSA.

[20] *Id.*

12

> On Feb. 15, 2014 your company requested in writing that Ranger mobilize its diving personnel for the Lewek Toucan. To comply with the request we began to mobilize the very next day. As of today, February 28, 2014, we have no executed services contract and continue to incur costs related to the mobilized personnel. This cost must be reimbursed by Tradeco.[21]

Cunningham delivered a similar message to Iturbide Garcia on March 11, 2016.[22]  In that communication, Cunningham informed Iturbide that Ranger had "not received the Tradeco[sic] executed Master Service Agreement and Purchase Order necessary to begin diving services." Leaving no doubt on writings' conditional nature, Cunningham emphasized that "[t]he executed MSA and Purchase Order must be received prior to any commencement of diving services. . . . Ranger reserves all rights, including the right to terminate the charter. Any termination of the charter due to a continuing payment default will not relieve Tradeco from its obligation to pay charterhire for the full firm period of the charter."[23] No further communications were exchanged on the matter.

2.    The charges Respondents cite in their Motion are governed by the Time Charter— not the MSA

As explained *supra*, the MSA was never signed and no Purchase Order was ever submitted. But as Respondents' note in their Motion, Ranger *did* charge Tradeco $122,983.44 for the "Dive Personnel" it mobilized in March. Respondents contend these charges—which account for less than 1% of Ranger's requested relief—somehow implicate the MSA. But Ranger did not invoice these sums pursuant to an unsigned MSA or phantom Purchase Order.  The charges instead comprised a portion of Respondents' pre-suspension debt, which the

---

[21] *See* **Exhibit C**.

[22] By March 2014 Tradeco was already delinquent on more than $3 million in charter hire and related expenses owed for its use and access to the Vessel. *See* Claimant's Motion for Partial Summary Disposition on the Stipulated Amount of Respondents' Pre-Suspension Debt, at Exhibit C.

[23] *See* **Exhibit C.**

parties' stipulated totaled $5,948,588.15 in past due charter hire and "related ancillary charges" as of April 14, 2014.[24]

As the Panel is now keenly aware, that stipulation is found in Amendment No. 1 to the Time Charter, which (unlike the MSA) the parties mutually executed June 13, 2014.[25] The Charter Amendment included, among other things, a merger clause providing that "[o]ther than the [Time] Charter, this Amendment, and the Parent Company Charter Guarantee, *there are no other agreements*, oral or written, related" to the charter of the Vessel.[26] This clause, together with the stipulation in the Charter Amendment and the absence of a MSA or Purchase Order, leave no doubt that costs incurred for the "Dive Personnel" fall exclusively within the purview of the Time Charter.

The same is true for the "Personnel Service Charges" noted by Respondents. These charges, which total $220,870.89, reflect routine maintenance performed on the multi-million dollar saturation diving system Ranger installed on the Vessel. The maintenance had nothing to do with any diving services provided to Tradeco (as such services were never performed); nor was it charged in connection with any Purchase Order submitted by Tradeco (as such Purchase Order was never submitted). Instead, Ranger invoiced these charges pursuant to Clause 12(e) of the Time Charter, which allows Ranger to issue invoices covering "Hire and any other payments."[27] These "other" payments may include, for instance, various charges related to the maintenance and operation of the Vessel.[28]

---

[24] *See* Claimant's Motion for Partial Summary Disposition on the Stipulated Amount of Respondents' Pre-Suspension Debt, at Exhibit I.

[25] *Id*.

[26] *Id*. (emphasis added).

[27] Claimant's Motion for Partial Summary Disposition on the Stipulated Amount of Respondents' Pre-Suspension Debt, at Exhibit A, at Section 1(a)-(b).

In short, the application of the MSA is expressly limited to the "Services" described in Section 1.16. Those "Services" are not at issue here. Thus, even if the draft MSA was contractually binding (which it is not), its terms would have no affect on the outcome of this matter.

**A.     The Cooperation Agreement is completely irrelevant to the claims and defenses at issue in this case**

The terms of the Cooperation Agreement do not apply to any transactions that relate to Ranger's claims for past due charter hire and related expenses.  The Cooperation Agreement was simply designed to help the parties jointly obtain saturation diving work from Pemex under an enumerated schedule.[29]  This limited purpose is supplied by agreement's opening provisions:

> [The parties] desire to enter into this Agreement for the *sole* and *limited* purpose of establishing [Ranger] as the exclusive provider of [Ranger] Services (as hereinafter defined) to TRADECO . . . and correspondingly having [Ranger] *assist* TRADECO . . . in preparing *Proposals* in response to *Tender Documents* and *in the event* any contract is then awarded *based on* such *Proposal*, the Parties will jointly decide their respective provision of services with respect thereto.[30]

In other words, the parties entered the Cooperation Agreement for two reasons: (1) establish Ranger as Tradeco's provider of saturation diving services, and (2) help Tradeco prepare and submit competitive bids for saturation diving work.[31]

Under this arrangement, Ranger "agree[d] to assist TRADECO . . . in the evaluation and preparation of Proposals" in response to "Tender Documents issued by [Pemex]" for saturation

---

[28] *Id.*

[29] Respondents won their contracts with Pemex concerning the Kumaza and Akal projects without any involvement from Ranger.

[30] *See* **Exhibit D,** a true and correct copy of the parties' Cooperation Agreement.

[31] *See Id.*

diving work. [32]  Section 1.1.10 defines "Proposal" as "the formal offer . . . which may be offered by TRADECO . . . to [Pemex] for a Project in response to a specific set of Tender Documents."[33] The Cooperation Agreement defines "Tender Documents" as "the request for bids, if any, issued by [Pemex]."[34]

Importantly, the Cooperation Agreement did not obligate Ranger to jointly bid on any project with Tradeco, or otherwise enter any contract with Pemex.[35] Ranger's obligations under the Cooperation Agreement would only trigger if Pemex awarded a contract to Tradeco.[36] In that event, Section 2.2 provided that Ranger's "sole obligation is to provide [diving services] agreed to by the Parties in the applicable Schedule and Scope of Services for such Contract as a subcontractor or supplier to TRADECO."[37]

At not time during the Time Charter did Ranger ever assist Tradeco in preparing a Proposal in response to Tender Documents issued by Pemex. Consequently, Ranger and Tradeco never agreed to a "Schedule and Scope of Services" contained in a contract awarded by Pemex. No such contract ever existed. Thus, Ranger never had the occasion, much less the obligation, to provide any services under the Cooperation Agreement.  Simply stated, the terms of that contract were never at play, and Respondents offer no evidence which suggests the converse is true.  Because the Cooperation Agreement does not control any transaction presented at issue in this case, its terms cannot support Respondents' dismissal request.

---

[32] *Id*. at Section 2.2.

[33] *Id*. at Section 1.1.10.

[34] *Id*. at Section 1.1.16.

[35] *See id*. at Section 2.2.

[36] *See id.*

[37] *Id.*

### III.
### Conclusion & Prayer

For these reasons, Claimant Ranger Offshore Mexico, S. de R.L. de C.V. respectfully requests the Panel deny Respondents' Motion for Summary Disposition to Dismiss, or, Alternatively, Abate.

Respectfully submitted,

**K&L Gates, LLP**

/s/ John F. Sullivan III
**John F. Sullivan III**
Texas State Bar No. 1948510
S.D. Texas I.D. No. 9761
john.sullivan@klgates.com
**John D. Wagner**
Texas State Bar No. 24090451
S.D. Texas I.D. No. 2433520
devin.wagner@klgates.com
1000 Main Street, Suite 2550
Houston, Texas  77002
Phone: (713) 815-7300
Fax: (713) 815-7301

**Julius S. Hines**
South Carolina Bar. No. 065472
S.D. Texas I.D. No. 2583013
Julius.hines@klgates.com
134 Meeting Street, Suite 500
Charleston, SC 29401
Phone: (843) 579-5660
Fax: (843) 579-5601

**ATTORNEYS FOR CLAIMANT
RANGER OFFSHORE MEXICO,
S. DE R.L. DE C.V.**

18

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing was served on the following

on April 8, 2016:

*Via Email to ejsilva@swbell.net*
Eugene J. Silva, Sr.
8 Smithdale Estates Drive
Houston, TX 77024-6600

*Via Email to Anibal.Sabater@chaffetzlindsey.com*
Aníbal Sabater
Chaffetz Lindsey LLP
505 Fifth Avenue, 4th Floor
New York, NY 10017

*Via Email to Patrick.Cooney@roystonlaw.com*
James Patrick Cooney
Royston, Rayzor, Vickery & Williams, LLP
1600 Smith Street, Suite 5000
Houston, TX 77002

*Via Email to MBell@BlankRome.com; JHuffman@BlankRome.com*
Michael Bell
Jay T. Huffman
Blank Rome LLP
700 Louisiana Street, Suite 4000
Houston, Texas  77002-2727

*Via Email to bvannoy@jdkglaw.com*
Brent Vannoy
Johnson DeLuca Kurisky & Gould, P.C.
4 Houston Center
1221 Lamar Street, Suite 1000
Houston, Texas 77010

/s/ John F. Sullivan III
John F. Sullivan III

19